JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director
Federal Programs Branch

ANDREA GACKI
andrea.gacki@usdoj.gov
JONATHAN E. ZIMMERMAN
jonathan.zimmerman@usdoj.gov
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 514-4336/(202) 353-0441
Fax:    (202) 318-2461/(202) 318-7610

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*,

       Plaintiffs,

  v.

UNITED STATES DEPARTMENT
OF THE TREASURY, *et al.*,

       Defendants.

CV. 07-1155-KI

**MEMORANDUM OF
POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANTS'
MOTION TO DISMISS AND
FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY FRAMEWORK (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.      Historical Overview (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.      IEEPA (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.      Executive Order No. 13,224 (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.      Regulations (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FACTUAL BACKGROUND (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      I.      THE OFAC DESIGNATION OF AHIF-OREGON WAS
           RATIONAL AND SUPPORTED BY THE ADMINISTRATIVE
           RECORD. (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           A.      Standard of Review (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           B.      The Administrative Record Amply Supports the
                 Designation of AHIF-Oregon as an SDGT. (U) . . . . . . . . . . . . . . . . . 16

               1.      AHIF Has Provided Support to al Qaeda and
                      Has Been Infiltrated by al Qaeda (U) . . . . . . . . . . . . . . . . . . . . . 18

               2.      AHIF Has Provided Support to Other SDGTs
                      and Terrorist Activity (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

               3.      AHIF Branches Were Subject to Control by the
                      Headquarters in Saudi Arabia and, Specifically, to
                      Control by the director of AHIF, SDGT Aqeel
                      Abdulaziz al-Aqil (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

               4.      AHIF Oregon Was Part and Parcel of AHIF
                      and Owned or Controlled by Two SDGTs,
                      Al-Aqil and Al-Buthe (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                5.      AHIF-Oregon Funded SDGTs by Providing Funds
                      to Its Parent Organization in Saudi Arabia (U) . . . . . . . . . . . . . 21

II.    ALL OF PLAINTIFF AHIF-OREGON'S CONSTITUTIONAL
       CLAIMS AGAINST THE IEEPA BLOCKING ACTION
       LACK MERIT.  (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       A.    Fifth Amendment Due Process (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

             1.    OFAC Did Not Violate AHIF-Oregon's Due
                   Process Rights by Relying on Classified Evidence
                   to Designate AHIF-Oregon (U) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

             2.    OFAC Did Not Violate AHIF-Oregon's Due Process
                   Rights by Allegedly Failing to Provide AHIF-Oregon
                   with Notice, an Adequate Explanation, or Sufficient
                   Time to Respond to the Administrative Record (U) . . . . . . . . . 27

             3.    OFAC Did Not Violate AHIF-Oregon's Due Process
                   Rights by Denying Plaintiff's Counsel Access to
                   Blocked Funds (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                   a.    AHIF-Oregon Has No Constitutional Right
                         to Blocked Funds for Its Legal Defense (U) . . . . . . . . . 30

                   b.    OFAC's Decision to Deny AHIF-Oregon
                         Access to Blocked Funds for Attorney Fees Did
                         Not Violate the APA (U) . . . . . . . . . . . . . . . . . . . . . . . . . 33

             4.    OFAC Did Not Violate AHIF-Oregon's Due Process
                   Rights Because the Redesignation of AHIF-Oregon Is
                   Not Based on the Inadvertently Disclosed "Sealed
                   Document" (U)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       B.    First Amendment (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

             1.    Freedom of Speech (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

             2.    Freedom of Association (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

       C.    Overbreadth and Vagueness (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

             1.    Executive Order No. 13,224 Is Not Unconstitutionally
                   Overbroad (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

             2.    Executive Order No. 13,224 Is Not Unconstitutionally
                   Vague (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

       D.    Fourth Amendment (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1.    OFAC's Blocking and Freezing of Assets Is Not
a Seizure (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2.    To the Extent Any Blocked Assets, Records, or Property
Were Taken into OFAC Custody, Such Action Did Not
Violate the Fourth Amendment (U) . . . . . . . . . . . . . . . . . . . . . 54

III.    PLAINTIFF MCASO LACKS STANDING TO BRING
ITS CLAIMS.  (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION (U) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Al-Haramain Islamic Foundation,  Inc. v. Bush*, 451 F.
    Supp. 2d 1215 (D. Or. 2006), *rev'd on other grounds,*
    507 F.3d 1190 (9th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24, 31, 35

*Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . 7

*Beobanka D.D. Belgrade v. United States*, No. 95-5138,
    1997 WL 23182 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 44

*Buckley v. American Constitutional Law Foundation, Inc.,*
    525 U.S. 182 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886 (1961) . . . . . . . . . . . . . . . 24

*Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003)  . . . . . . . . . . . . . . . . . . 58

*Camera v. Municipal Court of San Francisco*, 387 U.S. 523 (1967) . . . . . . . . . . . . . . . . . . . . 54

*Camp v. Pitts*, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) . . . . . . . . . . . . . . . 31, 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.,*
    651 F.2d 800 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) . . . . . . . . . . . . . . 12, 15

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Columbia Natural Reources, Inc. v. Tatum*, 58 F.3d 1101
    (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.,*

700 F.2d 1279 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Commodity Futures Trading Comm'n v. Noble Metals International, Inc.*,
67 F.3d 766 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Consarc Corp. v. U.S. Treasury Dep't*, 71 F.3d 909 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . 22

*DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254 (11th Cir. 2007) . . . . . . . . . . . . 42

*D.C. Precision, Inc. v. United States*, 73 F. Supp. 2d 338 (S.D.N.Y. 1999) . . . . . . . . . . . . . . 52

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15, 52

*De Cuellar v. Brady*, 881 F.2d 1561 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Donovan v. Dewey*, 452 U.S. 594 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Farrakhan v. Reagan*, 669 F. Supp. 506 (D.D.C. 1987), *aff'd*, 851 F.2d 1500
(D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Federal Savings and Loan Ins. Corp. v. Ferm*, 90 F.2d 372 (9th Cir. 1990) . . . . . . . . . . . . . . 31

*Federal Trade Comm'n v. World Wide Factors, LTD*, 882 F.2d 344
(9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Florida Power & Light v. Lorion*, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Freedom to Travel Campaign v. Newcomb*, , 82 F.3d 1431 (9th Cir. 1996) . . . . . . . . 16, 38, 58

*Freeman v. City of Dallas*, 242 F.3d 642 (5th Cir.), *cert. denied*,
534 U.S. 817 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Gilbert v. Homar*, 520 U.S. 924 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Global Relief Found. v. Newcomb*, No. 02-cv-0674 (slip op.) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Global Relief Found. v. O'Neill*, 207 F. Supp. 2d 779 (N.D. Ill. 2002),
*aff'd*, 315 F.3d 748 (7th Cir.), *cert. denied*, 540 U.S. 1003 (2003) . . . . . . . . . . . . passim

*Haig v. Agee*, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116 (2d Cir. 2000) . . . . . . . . . . . . 15, 22

*Healy v. James*, 408 U.S. 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57
    (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), *cert. denied*,
    540 U.S. 1218 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134
    (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000),
    *cert. denied*, 532 U.S. 904 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Islamic American Relief Agency v. Gonzales*, 477 F.3d 728
    (D.C. Cir.), *cert. denied*, 128 S. Ct. 92 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174 (D.C. Cir. 2004),
    *cert. denied*, 543 U.S.1146 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 33

*Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mathews v. Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 8, 9

*Miranda v. Secretary of Treasury*, 766 F.2d 1 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . 16, 32, 33

*Morrissey v. Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 34

*National Council of Resistance of Iran v. Department of State*,
    251 F.3d 192 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 29

*New Jersey v. T.L.O.*, 569 U.S. 325 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Orvis v. Brownell*, 345 U.S. 183 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 52

*Palestine Info. Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . 28, 38, 40

*Paradissiotis v. Rubin*, 171 F.3d 983 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*Parker v. Levy*, 417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595
    (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pennsylvania v. Mimms*, 434 U.S. 106 (1977)*S* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*People's Mojahedin Org. of Iran v. Dep't of State*,
　182 F.3d 17 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People's Mojahedin Organization of Iran v. Dep't of State*, 327 F.3d 1238
　(D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Propper v. Clark*, 337 U.S. 472 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 52

*Regan v. Wald*, 468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Richardson v. Simon*, 560 F.2d 500 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Riggs v. Miller*, 480 F. Supp. 799 (E.D. Va. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Sacks v. OFAC*, 466 F.3d 764 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Sage Realty Corp. v. United States Dep't of Treasury*, No. 99-3718,
　2000 WL 272192 (S.D.N.Y. Mar. 10, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Samuels v. Meriwether*, 94 F.3d 1163 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . 33

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 12

*Singh-Kaur v. Ashcroft*, 385 F.3d 293 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Smith v. Office of Civilian Health & Med. Program*, 97 F.3d 950
　(7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Snepp v. United States*, 444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Soldal v. Cook County*, 506 U.S. 56 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Teague v. Regional Comm'r of Customs*, 404 F.2d 441 (2d Cir. 1968) . . . . . . . . . . . . . . . . . 38

*Terry v. Ohio*, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134
    (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

*Torbet v. United Airlines*, 298 F.3d 1087 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Tran Qui Than v. Regan*, 658 F.2d 1296 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . .  32, 33, 52

*United States v. Assi*, 414 F. Supp. 2d 707 (E.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . .  47, 50

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*United States v. Hays*, 515 U.S. 737 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

*United States v. Holy Land Found. for Relief & Dev.*, No. 04-cr-240
    (N.D. Tex. May 2, 2007) (slip op.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

*United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . .  46

*United States. v. Miller*, 771 F.2d 1219 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

*United States v. Monsanto*, 491 U.S. 600 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 32

*United States v. O'Brien*, 391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 38

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

*Veterans and Reservists for Peace in Vietnam v. Regional Comm'r
    of Customs*, 459 F.2d 676 (3d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Village of Hoffman Estates v. Flipside, Hoffman Estates*, 456 U.S. 489 (1982) . . . . . .  44, 47, 49

*Virginia v. Hicks*, 539 U.S. 113 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41, 43, 44

*Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Wayte v. United States*, 470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Zemel v. Rusk*, 381 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

## <u>STATUTES AND REGULATIONS</u>

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . . . 4, 12, 15

Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") . . . . . . . . . . . . . . . . . 47

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706 . . . passim

8 U.S.C. § 1182(a)(3)(B)(iv)(IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C. § 853 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

22 U.S.C. § 287c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C. app. § 5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 U.S.C. § 1701(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

50 U.S.C. § 1702(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

31 C.F.R. §§ 501.801-802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 C.F.R. § 594.316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 45, 48

31 C.F.R. § 594.406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## **FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## **MISCELLANEOUS**

Exec. Order No. 13,224  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Exec. Order No. 13,372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

S. Rep. No. 95-466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540  . . . . . . . . . . . . . . . . . . . . .  6

U.N. SCOR, 4051st Mtg., S/Res/1267 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

**INTRODUCTION** (U)

(U) The President's paramount authority to preserve the national security of the United States in times of national emergency depends, in large part, on his ability to use all the tools — military, law enforcement, diplomatic, and economic — that are placed at his disposal by the Constitution or Act of Congress. This case involves the President's response to the threat of terrorism, where that response involved sensitive diplomatic negotiations as well as direct regulatory action to eliminate the threat posed by the Al Haramain Islamic Foundation ("AHIF"), a Saudi charity with offices worldwide, which is widely considered to have been infiltrated by and to have provided support and services to al Qaeda.

(U) On September 8, 2004, the President, through his delegate the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), designated as a "Specially Designated Global Terrorist" ("SDGT") the Oregon branch of AHIF ("AHIF-Oregon") under the Global Terrorism Exec. Order No. 13,224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001), and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, after first blocking AHIF-Oregon's assets on February 19, 2004, pending an investigation into whether AHIF-Oregon met the standards for designation set forth in the Executive Order. The designation of AHIF-Oregon was based on evidence, both classified and unclassified, that the purported charity is owned or controlled by, or acts for and on behalf of, persons determined to be subject to E.O. 13224, and that the purported charity "assist[s] in, sponsor[s], or provide[s] financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to [E.O. 13224] or determined to be subject to [E.O. 13224]." *See* E.O. 13224, § 1(d)(I). AHIF-Oregon was also listed in the United Nations as an "entity belonging to or associated with the Al-Qaida organisation."

(U) The backdrop against which the Court must consider OFAC's direct administrative action against AHIF-Oregon can be found in the ongoing and joint efforts between the United States and Saudi Arabia to address the threat posed by AHIF, and other financiers of terrorism, worldwide. AHIF was a prominent Saudi charity established in the early 1990s, described as the "United Way" of Saudi Arabia; at its peak, it had a presence in at least 50 countries. But the U.S. intelligence community appreciated another characteristic of AHIF, specifically, its connection to the financing of terrorists, most compellingly evidenced in AHIF's participation in al Qaeda's bombings of the U.S. embassies in Kenya and Tanzania in 1998. The United States sought the cooperation of Saudi Arabia in addressing the threat posed by AHIF.

(U) Even as Saudi Arabia grew to recognize the harm posed by AHIF in the aftermath of the 9/11 attacks, the United States was faced with the question of whether to press for the goal of unilateral designation of the entire organization pursuant to E.O. 13224, or to pursue a multilateral diplomatic approach to address AHIF, because to act against AHIF without Saudi support would likely be counterproductive. The United States engaged in both strategies, and when all was said and done, thirteen branches of AHIF worldwide — including the United States branch — were designated pursuant to E.O. 13224 and listed in the United Nations as "belonging to or associated with" al Qaeda. The Saudi head of AHIF, Shaykh Aqeel Adbulaziz al-Aqil (also the president and founder of AHIF-Oregon), and a Saudi AHIF official on the board of AHIF-Oregon, Soliman al-Buthe, would be designated pursuant to E.O. 13224 as well. Due to the joint efforts of the United States and Saudi Arabia, it was announced that all branches of AHIF would cease operations in 2004.

(U) AHIF-Oregon requested administrative reconsideration of its designation by OFAC. On February 6, 2008, OFAC denied AHIF-Oregon's request for reconsideration of this designation and further redesignated AHIF-Oregon pursuant to IEEPA and E.O. 13224, based on new classified and

unclassified evidence as well as the consideration of evidence in view of AHIF-Oregon's counterarguments contained in its request for administrative reconsideration and in this lawsuit. OFAC determined that because plaintiff is a component of the worldwide organization which has provided financial, material, and technological support and services to al Qaeda and other SDGTs, AHIF-Oregon has been properly designated and its assets lawfully blocked pursuant to IEEPA and the Executive order. Moreover, AHIF-Oregon was also properly designated pursuant to Exec. Order No. 13,224, § 1(c), because AHIF-Oregon is owned or controlled by, or acts for or on behalf of, two SDGTs — specifically, al-Aqil and al-Buthe, who is also currently under indictment in the District of Oregon and a fugitive from justice.

(U) AHIF-Oregon has now challenged its designation in this Court and attempts to distance itself from the international organization in order to avoid the repercussions of the government's actions. By virtue of both his Article II authority and powers delegated to him by Congress in IEEPA, the President has the power to impose economic sanctions on terrorist organizations and groups that support those organizations. This includes the power to block or freeze assets and property subject to U.S. jurisdiction, including the assets and property of branch offices or components of worldwide organizations that support terrorism. Courts have repeatedly upheld IEEPA actions against a variety of statutory and constitutional challenges such as plaintiff asserts in its Complaint. Indeed, plaintiff AHIF-Oregon raises constitutional challenges virtually identical to those already considered and rejected by appellate and district courts in three asset-blocking cases in two circuits. As the D.C. and Seventh Circuits have held in cases also involving three purported charities' challenges to their designations pursuant to E.O. 13224, charities have no constitutional right of access to classified information submitted to the Court *ex parte* and *in camera* pursuant to IEEPA; no constitutional right to notice and an opportunity to challenge an initial blocking action, such as OFAC's blocking of AHIF-Oregon pending investigation on February 19, 2004; and no First

Amendment right to contribute money to terrorists. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84-85 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1218 (2004); *Global Relief Found. v. O'Neill*, 207 F. Supp. 2d 779, 809 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir.), *cert. denied*, 540 U.S. 1003 (2003). Most recently, the D.C. Circuit again upheld a district court's decision dismissing the constitutional and statutory claims of the United States branch of a worldwide Muslim charitable organization, the Islamic African Relief Agency ("IARA"), finding that as a branch of a larger organization that funds terrorism, the U.S. branch of IARA itself supported terrorism. *See Islamic American Relief Agency* ("*IARA*") *v. Gonzales*, 477 F.3d 728, 734-35 (D.C. Cir.), *cert. denied*, 128 S. Ct. 92 (2007). The court therefore rejected a similar argument to that raised by AHIF-Oregon here — that is, as a branch office of a worldwide organization, it cannot be held responsible for the actions of its parent organization, thus allowing a foreign organization to utilize the United States and its citizens to carry out the goals of the larger organization free from sanctions. Plaintiff's broad-scale attack on the President's (and his delegate's) use of economic sanctions powers has already failed in these almost identical contexts, and must fail here.

(U) With no hope of prevailing on its constitutional claims against the blocking action, plaintiff AHIF-Oregon is left with its claim under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, that OFAC's action in designating and blocking the assets of IARA-USA was arbitrary and capricious. *See* Compl., ¶¶ 66-67. As described above, and discussed more fully below, plaintiff cannot prevail as to its APA claim because OFAC had a rational basis for its designation actions, based on both unclassified and classified evidence gathered prior to designation and as developed in response to plaintiff's request for reconsideration and on redesignation. In order to limit the activities of AHIF worldwide, the United States engaged in coordinated diplomatic efforts and OFAC reasonably acted against all of AHIF's assets, including those within its

jurisdiction. To facilitate pursuit of the President's goal of disrupting sources of financial and other support to terrorists, the Executive had the discretion to act against any of the branches of the purported charity, including the branch located in the United States, in order to shut down all sources of funding that could potentially be used to support the larger organization's ties to terrorism.

(U) Finally, plaintiff Multicultural Association of Southern Oregon ("MCASO") alleges that the provisions of IEEPA, E.O. 13224, and implementing regulations are unconstitutional as they prevent MCASO from, *inter alia*, promoting "diversity and multiculturalism in their southern Oregon community." MCASO's claims are nothing more than generalized grievances and, accordingly, MCASO lacks standing to bring these claims.

(U) For the following reasons, defendants' Motion to Dismiss and for Summary Judgment should be granted, and this case should be dismissed.

## STATUTORY AND REGULATORY FRAMEWORK (U)

### A.    Historical Overview (U)

(U) For virtually its entire history, the United States has utilized economic sanctions as a tool of its foreign policy and national security arsenals. In much of the 20th century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. *See* 50 U.S.C. app. § 5(b); *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). Although TWEA does not use the term "block," the authority it conveyed to the Executive to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

**B.    IEEPA** (U)

(U) In 1977, Congress amended TWEA and enacted IEEPA to delineate "the President's authority to regulate international economic transactions during wars or national emergencies." *See* S. Rep. No. 95-466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars and to certain existing TWEA programs, with IEEPA available during other times of declared national emergency. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although the broad authorities granted to the President under TWEA and IEEPA remained essentially the same as those under TWEA, with certain limited exceptions, *see id.*, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a). As under TWEA, IEEPA authorized the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).[1]

(U) Pursuant to this expansive authority, Presidents have designated entities whose assets were to be blocked based on IEEPA in response to a variety of declared national emergencies,

---

[1] (U) In October 2001, the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("PATRIOT Act") amended IEEPA. These amendments added, among other things, authority to block assets pending an investigation, and provided that, in case of judicial review of an IEEPA blocking, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera." *See* 50 U.S.C. § 1702(c), *added by* Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

including those relating to Iran, Sudan, Burma, Cuba, North Korea, Syria, Lebanon, and Zimbabwe, as well as relating to narcotics traffickers and kingpins; terrorism-related governments, entities, and individuals; and proliferators of weapons of mass destruction and their supporters. *See* Declaration of Adam J. Szubin, Director of OFAC ("Szubin Decl."), ¶ 4.[2/]

### C.    Executive Order No. 13,224 (U)

(U) President Bush issued E.O. 13224, effective on September 24, 2001, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." *See* E.O. 13224, Preamble. In determining that actual and threatened terrorist acts constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," the President invoked the authority of, *inter alia*, IEEPA. *See id.*

(U) The annex to E.O. 13224 listed 27 foreign terrorists, terrorist organizations, and their supporters — that is, it ordered the blocking of their property and interests in property that are in the United States, subsequently come within the United States, or come within the "possession or control" of U.S. persons. *Id.* § 1 & Annex. The Order further authorized the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate "persons" (defined as individuals or entities) whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or because they "assist in, sponsor, or provide financial, material or technological support for, or

---

[2] (U) The Declaration of Adam J. Szubin, Director of OFAC, is Attachment 1 to the Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment. The Szubin Declaration is provided as background information for the IEEPA blocking action and is thus properly before the Court, notwithstanding the fact that it is not part of the Administrative Record. *See Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115, 1124 (9th Cir. 1998) ("A district court may go outside the administrative record for the purposes of background information . . . ."); *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (permitting introduction of agency declaration, in addition to the administrative record, as "background information").

financial or other services to or in support of," or are "otherwise associated" with them. *Id.* § 1(c)-
(d) (emphasis added).[3]

(U) The Executive Order authorized the Secretary of the Treasury to "employ all powers
granted to the President by IEEPA and UNPA,"[4] and to promulgate rules and regulations to carry
out the purposes of the Order and to re-delegate such functions if he so chose. *See* E.O. 13224, §
7. Due to the exigencies of the national emergency, the President declared that:

> because of the ability to transfer funds or assets instantaneously, prior
> notice to such [designated] persons of measures to be taken pursuant
> to this order would render these measures ineffectual. I therefore
> determine that for these measures to be effective in addressing the
> national emergency declared in this order, there need be no prior
> notice of a listing or determination made pursuant to this order.

*Id.* at § 10. The President further prohibited humanitarian aid donations under certain circumstances,
determining "that the making of donations of the type specified in section 203(b)(2) of IEEPA . . .
by United States persons to persons determined to be subject to this order would seriously impair
my ability to deal with the national emergency declared in this order, and would endanger Armed
Forces of the United States that are in a situation where imminent involvement in hostilities is
clearly indicated by the circumstances." *See id.* § 4; *see also* Exec. Order No. 13,372 (clarifying that
the IEEPA humanitarian aid exception does not authorize entities blocked pursuant to E.O. 13224
to donate humanitarian aid articles to anyone, even unblocked persons, without prior authorization
from OFAC).

---

[3] (U) In its Complaint, plaintiffs avoid any reference to the full language of the financial and
other support and services prong, characterizing it as only "material support" or "services." Compl. ¶¶
16, 67, 77.

[4] (U) The United Nations Participation Act ("UNPA") authorizes the President to implement
measures adopted by the United Nations Security Council pursuant to Article 41 of the U.N. charter. *See*
22 U.S.C. § 287c; *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 622 (5th Cir. 1993).

### D.    Regulations (U)

(U) Pursuant to a delegation of authority by the Secretary of the Treasury, OFAC has promulgated recordkeeping and procedural regulations applicable to their various sanctions programs. *See* 31 C.F.R. pt. 500; *see also Regan*, 468 U.S. at 226 n.2. These regulations permit a designated or blocked individual or entity to seek a license from OFAC to engage in transactions involving blocked property. *See* 31 C.F.R. §§ 501.801-802. In addition, the regulations establish a procedure to allow a person to "seek administrative reconsideration" of a designation or blocking if a party believes an error has been made. *Id.* § 501.806-807. An applicant seeking administrative reconsideration is allowed to submit materials to contest the designation, and OFAC may request additional materials from the applicant in assessing the request for reconsideration. *See id.*

### FACTUAL BACKGROUND (U)[5]

(U) The United States acted in concert with Saudi Arabia to address the threat posed by AHIF. *See* Szubin Decl. ¶¶ 42-52. In March 2002, the United States and Saudi Arabia jointly designated AHIF branches in Somalia and Bosnia and proposed those entities for sanctions in the United Nations. *See id.* ¶ 43.[6] In January 2004, the United States and Saudi Arabia acted in similar

---

[5] (U) For a more complete presentation of all of the facts underlying this motion, please see defendants' separate Statement of Material Facts Supporting Defendants' Motion to Dismiss and for Summary Judgment, submitted herewith.

[6] (U) *See* "Consolidated List of Individuals and Entities Belonging to or Associated with the Taliban and Al-Qaida Organisation as Established and Maintained by the 1267 Committee," *available at* http://www.un.org/Docs/sc/committees/1267/1267ListEng.htm. The 1267 Committee was established pursuant to U.N. Security Council Resolution 1267 to oversee sanctions imposed upon al Qaeda, Usama bin Laden, and the Taliban. *See* S.C. Res. 1267, U.N. SCOR, 4051st Mtg., S/Res/1267 (1999). The Committee maintains a list of individuals and entities associated with Usama bin Laden, members of the Taliban, and the al Qaeda organization. U.N. member States are obliged "[t]o freeze without delay funds and other financial assets of Usama bin Laden and individuals and entities associated with him as designated by the Committee, including those in the Al-Qaida organization, and including funds derived or generated from property owned or controlled directly or indirectly by Usama bin Laden and individuals and entities associated with him." *See* S.C. Res. 1333, U.N. SCOR, 4251st Mtg., at ¶ 8(c), S/Res/1333 (2000).

fashion against four more AHIF branches in Indonesia, Kenya, Tanzania, and Pakistan. *See id.* ¶ 47. On February 19, 2004, acting pursuant to IEEPA, 50 U.S.C. § 1702(a)(1)(B), and E.O. 13224, OFAC issued an order blocking AHIF-Oregon, including its funds, accounts, and business records, pending further investigation into AHIF-Oregon's ties to terrorists. *See id.* ¶ 50 & Ex. A.

(U) In June 2004, the United States and Saudi Arabia continued their efforts targeting AHIF, designating five additional branches of AHIF (in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands), and designating the founder and head of AHIF and founder of AHIF-Oregon, Shaykh Aqeel Abdulaziz al-Aqil. *See id.* ¶ 51. On September 9, 2004, after completing its investigation, which included consideration of AHIF-Oregon's submissions, and after consulting with the Secretaries of State and Homeland Security and the Attorney General, the Department of the Treasury designated AHIF-Oregon as an SDGT. *See id.* ¶ 59. In the same action, OFAC designated AHIF-Oregon director Soliman al-Buthe and the AHIF branch in the Comoros Islands. *See id.* Additionally, on September 28, 2004, the United Nations, acting under United Nations Security Council Resolution 1267, listed AHIF-Oregon, al-Buthe, and AHIF-Comoros because of their links to, among others, al Qaeda. *See id.* ¶ 52 Finally, in 2004, Saudi authorities announced that they would be dissolving AHIF's office in Saudi Arabia. *See id.* ¶ 51.

(U) On February 14, 2005, AHIF-Oregon requested administrative reconsideration of its designation. *See id.* ¶ 61. In the months thereafter, OFAC continued to work on a range of matters related to the designation and the blocking of AHIF-Oregon. *See id.* ¶¶ 62-65. On February 6, 2008, OFAC denied AHIF-Oregon's request for reconsideration and redesignated AHIF-Oregon as being owned or controlled by, and acting for or on behalf of, SDGTs al-Aqil and al-Buthe, *see* E.O. 13224, § 1(c), as well as assisting in, sponsoring, or providing financial,

material, or technological support for, or financial or other services to or in support of, SDGTs

through its role as a branch office of AHIF, *see id.* § 1(d)(i); *see also* Szubin Decl. ¶ 71.

## **ARGUMENT** (U)

(U) Contrary to plaintiff's assertions, OFAC's actions in initially designating and

blocking the assets of AHIF-Oregon, and the subsequent actions of denying AHIF-Oregon's

request for reconsideration and redesignating AHIF-Oregon, were authorized under IEEPA and

the Constitution.[7] Plaintiff's claims are without merit and should be dismissed.  In addition, the

Administrative Record [8] supporting redesignation of AHIF-Oregon amply supports OFAC's

actions.  Accordingly, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706,

summary judgment should be entered on defendants' behalf.[9]

---

[7] (U)  Plaintiff names as defendants the Secretary of the Treasury; the U.S. Department of the Treasury; the Director of OFAC; OFAC; the Attorney General; and the U.S. Department of Justice. *See* Compl., ¶¶ 6-11.  Treasury, of which OFAC is a component, issued the blocking order at issue in this case.  Plaintiff does not allege any final agency action, much less any unlawful action, on the part of the Department of Justice, the Secretary of the Treasury, or the Attorney General.  The Secretary of the Treasury, the Attorney General, and the U.S. Department of Justice should be dismissed for this reason alone.

[8] (U)  Defendants have herewith provided the Court and plaintiff with all of the unclassified, non-privileged material that is in the current Administrative Record supporting the redesignation of AHIF-Oregon.  Moreover, the classified and privileged Administrative Record has been lodged with the Court for its *ex parte* and *in camera* review.  As noted, the classified section of the record upon designation was submitted pursuant to 50 U.S.C. § 1702(c), which permits the government to submit to the Court the classified information on which it relied "*ex parte* and *in camera*."  *See id.*
(U)  References throughout the unclassified Memorandum to the "AR" are to the unclassified Administrative Record.

[9] (U)  Defendants' Motion to Dismiss is brought pursuant to Fed. R. Civ. P. 12(b)(6).  Although all allegations of material fact in the Complaint are accepted as true for purposes of the 12(b)(6) motion, the court need not accept conclusory allegations.  *See Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006) (finding that conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss).  Further, summary judgment is required under Rule 56 when the pleadings and other record evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Under the APA, summary judgment is appropriate when the agency's decision, based on the administrative record before it, was not arbitrary and capricious.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

I.    **THE OFAC DESIGNATION OF AHIF-OREGON WAS RATIONAL AND SUPPORTED BY THE ADMINISTRATIVE RECORD.** (U)

(U) The fundamental issue in this case is whether OFAC's designation of AHIF-Oregon as an SDGT violated the APA. Plaintiff's APA claim that the designation of AHIF-Oregon was "unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law," Compl. ¶ 67, must be evaluated on the basis of evidence before the agency. *See Camp v. Pitts*, 411 U.S. 138, 141-42 (1973); *Holy Land Found.*, 333 F.3d at 162.

(U) In this case, the Administrative Record on redesignation and reconsideration, including unclassified, privileged, and classified evidence, supports the agency's determination that it had a reasonable basis to believe that the worldwide AHIF, with headquarters in Saudi Arabia and branch offices carrying out its goals and functions in over 50 countries throughout the world, had provided financial and other support and services to al Qaeda and other SDGTs. As an integral part of AHIF — indeed having been established by the Saudi head of the entire worldwide organization, his deputy, Mansour al-Kadi, as well as other AHIF officials — the Oregon branch could not reasonably insulate itself from the goals and activities of the worldwide organization. It therefore was designated under section 1(d)(i) of E.O. 13224 for "sponsor[ing], or provid[ing] financial, material, or technological support for, or financial or other services to or in support of" al Qaeda and other SDGTs. *See also IARA*, 477 F.3d at 734-35. In addition, having been established and run by two SDGTs — specifically, Aqeel Abdulaziz Al-Aqil, the Saudi head of AHIF and AHIF-Oregon's initial president, and Soliman Al-Buthe, Saudi AHIF official and AHIF-Oregon's treasurer — AHIF-Oregon was also reasonably designated for being "owned or controlled by" and "acting for and on behalf of" those two SDGTs. *See* Szubin Decl. ¶ 71; *see also* E.O. 13224, § 1(c).

(U) Although plaintiff has argued that the fact that AHIF in Saudi Arabia has not been designated pursuant to E.O. 13224 undermines the basis for the designation, the United States has

a range of tools by which it may stop such organizations from supporting terrorism. As described in the Staff Report to the National Commission on Terrorist Attacks Upon the United States (hereafter, "Monograph on Terrorist Financing"),[10] the United States, after providing Saudi Arabia with substantial information, "including details on the role of the [AHIF] headquarters in supporting terrorist organizations," acted in concert with Saudi Arabia to eliminate the harm posed by AHIF through the organization's support to SDGTs. This led to the eventual dissolution of AHIF worldwide by the Saudi government. *See* Szubin Decl. ¶ 51. The Court must defer to the Executive in its choice of which tools to implement to accomplish the national security and foreign policy objectives. As the Ninth Circuit has recently stated in another lawsuit brought by AHIF-Oregon, "we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena." *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007).

(U) Finally, the basis for the Court's review here is the Administrative Record on reconsideration and redesignation of AHIF-Oregon. Upon AHIF-Oregon's redesignation pursuant to E.O. 13224 — in which OFAC considered and denied AHIF-Oregon's request for reconsideration of the designation — the original designation of AHIF-Oregon no longer represents final agency action. Redesignation is bound by the same standards set forth in IEEPA and E.O. 13224; it is, in essence, a "superseding" action replacing the original designation. *See* Szubin Decl. ¶ 66 & n.5. In the *Holy Land* case, for example, the D.C. Circuit based its review of the administrative record on the record that OFAC had developed upon redesignation of Holy Land,

---

[10] (U) Plaintiff AHIF-Oregon submitted the Monograph on Terrorist Financing to OFAC in support of its request for reconsideration, *see* AR0810-0973, which was incorporated into the administrative record on reconsideration and redesignation. *See* Szubin Decl. ¶ 71.

which, as here, was completed after Holy Land had challenged its initial designation in district court.

*See Holy Land Found.*, 333 F.3d at 164; *see also Holy Land Found.*, 219 F. Supp. 2d at 76 n.29.[11]

A.    **Standard of Review** (U)

(U) Pursuant to the APA's limited waiver of sovereign immunity, a reviewing court must uphold an agency decision unless it is (1) arbitrary and capricious; (2) an abuse of discretion; or (3) otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Holy Land Found.*, 333 F.3d at 162. The scope of judicial review under this standard is a narrow and highly deferential one, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Holy Land Found.*, 333 F.3d at 162. Under arbitrary and capricious review, the court does not undertake its own fact-finding; rather, the court must review the administrative record as assembled by the agency. *See Camp*, 411 U.S. at 142; *Holy Land Found.*, 333 F.3d at 162. As long as the agency's decision was supported by a rational basis, it must be affirmed.

(U) The deference due the Secretary's decision is at its zenith here because it relates to the President's exercise, through the Secretary, of his vast authority in the field of foreign affairs. As

---

[11] (U) All of plaintiffs' arguments are therefore properly directed to the Administrative Record created upon reconsideration and redesignation of AHIF-Oregon. Much like the situation in which OFAC first blocks an entity pending investigation, and thereafter designates the entity pursuant to E.O. 13224 on an expanded administrative record as in the *Global Relief* case, any challenges appropriate only to the initial agency action are unavailable once the agency takes superseding, final agency action:

> Designation does not change the status of GRF's assets and records, which remain in Treasury's control. But it does affect the scope of arguments available on appeal. . . . To the extent that GRF was attacking the factual support for the interim order, time has passed that issue by; the right question now is whether the designation of October 18 is supported by adequate information. . . .

*See also Global Relief Found.*, 315 F.3d at 750-51.

the Supreme Court has explained, IEEPA and its predecessor statute, TWEA, grant the President

"broad authority" during times of war or declared national emergencies to "investigate, regulate, . . .

prevent or prohibit . . . transactions involving . . . any property in which any foreign country or a

national thereof has any interest." *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 663 (1981);

*see also* 50 U.S.C. § 1702(a)(1)(B); *id.* app. § 5(b). For decades, courts consistently have accorded

uniquely broad deference to sanctions programs and actions under both IEEPA and TWEA.[12]  Thus,

in addition to the deference ordinarily due an agency, actions taken "'[i]n this vast external realm'"

of foreign affairs are entitled to even greater deference, *see Regan*, 468 U.S. at 243 (citation

omitted), and the judiciary's role is correspondingly limited. *See Miranda v. Secretary of Treasury*,

766 F.2d 1, 3-4 (1st Cir. 1985). As the district court noted in considering a similar challenge brought

by Global Relief Foundation, another charitable organization that has been designated as an SDGT:

> Global Relief is in essence challenging the power of the Executive
> Branch of the United States government to conduct foreign policy.
> In so doing, Global Relief is asking this Court to approach the outer
> limit of its constitutional authority. Chief Justice Rehnquist, writing
> for the Court in *Regan v. Wald* . . . stated that "[m]atters related 'to
> the conduct of foreign relations . . . are so exclusively entrusted to the
> political branches of government as to be largely immune from
> judicial inquiry or interference.'" As a general principle, therefore,

---

[12] (U)  *See, e.g., Dames & Moore*, 453 U.S. at 672 (noting the "broad authority of the Executive when acting under this congressional grant of power"); *Regan v. Wald*, 468 U.S. 222, 243-44 (1984) (confirming the deference due the Executive Branch's implementation of TWEA-based sanctions programs); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996) (declining to examine the policy reasons underlying the Cuban travel ban and citing the "history of judicial deference" to executive decision-making in the foreign policy area); *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 125 (2d Cir. 2000) (OFAC interpretation of its regulation given "controlling weight"); *Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999) ("The IEEPA grants the President sweeping powers . . . ."); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 807 (1st Cir. 1981) ("The language of IEEPA is sweeping and unqualified," cited in *Dames & Moore*, 453 U.S. at 671); *De Cuellar v. Brady*, 881 F.2d 1561, 1570 (11th Cir. 1989) (affirming OFAC's application of Cuban asset control regulations to plaintiff (a U.S. person), as well as the agency's denial of a specific license, and stating that the agency's decision is "entitled to great deference from this court"); *Richardson v. Simon*, 560 F.2d 500, 504 (2d Cir. 1977) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

> this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security.

*Global Relief Found.*, 207 F. Supp. 2d at 787-88 (citations omitted), *aff'd*, 315 F.3d 748 (7th Cir.);

*see also Holy Land Found.*, 219 F. Supp. 2d at 84 (denying motion for preliminary injunction

because, *inter alia*, "[b]locking orders are an important component of U.S. foreign policy, and the

President's choice of this tool to combat terrorism is entitled to particular deference"), *aff'd*, 333

F.3d 156 (D.C. Cir. 2003); *IARA*, 394 F. Supp. 2d at 45.

### B.    The Administrative Record Amply Supports the Designation of AHIF-Oregon as an SDGT. (U)

(U) AHIF-Oregon argues that the administrative record contains no evidence that it "engaged

in terrorist activity or knowingly provided material support to terrorism or to any designated entity

or individual." *See* Compl. ¶ 67.  Plaintiff thus wholly misunderstands — or refuses to recognize —

precedent in this area establishing that an intent to support terrorism is not a element of the criteria

that OFAC must apply before deciding to block the assets of an entity and designate it pursuant to

IEEPA and E.O. 13224.  *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1134 (holding that the

First Amendment does not require "the government to demonstrate a specific intent to aid an

organization's illegal activities before attaching liability to the donation of funds"), *aff'd en banc*, 393

F.3d 902 (9th Cir. 2004)[13]; *IARA*, 477 F.3d 728, 737 (D.C. Cir. 2007) ("we do not require a showing that IARA-USA intended its funding to support terrorist activities").

(U) Both the classified and unclassified portions of the Administrative Record support OFAC's reasonable belief that AHIF-Oregon is a component of a larger organization that funds terrorism; moreover, AHIF-Oregon itself supported the goals and activities of the larger organization, whose goals and activities included financial and other support and services for SDGTs.[14] The Court should apply the appropriate deference to OFAC's decision to act on this evidence, given that this decision is in the realm of national security and foreign policy. *See IARA*, 477 F.3d at 734 (even where evidence in the unclassified record may not be overwhelming, "we reiterate that our review — in an area at the intersection of national security, foreign policy, and administrative law — is extremely deferential").

**REDACTED TEXT**

(U) Notwithstanding the fact that the United States did not designate the entire AHIF organization, as demonstrated below, OFAC had a reasonable basis (1) to believe that the Saudi organization has provided financial, material, technological, and other support and services to SDGTs, and (2) to block the assets of those offices that it deemed most a threat to United States

---

[13] (U) This case is part of a series of cases brought by the Humanitarian Law Project challenging the criminal sanctions for providing "material support or resources" to foreign terrorist organizations under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 18 U.S.C. § 2339B. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130 (C.D. Cal. 2000), *aff'd en banc*, 393 F.3d 902 (9th Cir. 2004), and on remand, *Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134 (C.D. Cal. 2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007). These cases will be referred to in this brief as "*Humanitarian Law Project/AEDPA*" in order to distinguish them from another case brought by the Humanitarian Law Project challenging IEEPA and E.O. 13224, in which there are two opinions. Those opinions — *Humanitarian Law Project v. Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006), and on reconsideration, *Humanitarian Law Project v. Treasury*, 484 F. Supp. 2d 1099 (C.D. Cal. 2006) — will be cited in short form as *Humanitarian Law Project/IEEPA*.

[14] (U) OFAC has sought declassification of the classified portions of the Administrative Record, *see* Szubin Decl. ¶ 68, but as of the date of this filing, no part of the classified record may be released.

interests while achieving other sanctions against AHIF through diplomatic means.  Indeed, as established by the Monograph on Terrorist Financing, as submitted by AHIF-Oregon to OFAC, the Saudis recognized the threat posed by AHIF — including its involvement in al Qaeda's bombing of the U.S. embassies in Kenya and Tanzania in 1998 — and its activities both within and outside Saudi Arabia, and thus joined with the United States in designating not only the Saudi head of the worldwide organization but also AHIF-Oregon and other branches, while also ordering the closing of the AHIF headquarters.  *See* AR0936; AR0948-0949.  The United Nations similarly took action against AHIF-Oregon, al-Aqil, and other branches, thus effecting a worldwide effort to stem AHIF's efforts on behalf of terrorists.  *See* AR0948-0949.

    1.    **AHIF Has Provided Support to al Qaeda and Has Been Infiltrated by al Qaeda** (U)

**REDACTED TEXT**

    2.    **AHIF Has Provided Support to Other SDGTs and Terrorist Activity** (U)

**REDACTED TEXT**

- (U) In 1998, the head of Egyptian Islamic Jihad[15] in Albania was reportedly also the "accountant" for AHIF in Albania, according to a French news report.  *See* AR0193. This individual, named Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998.  At his trial in Egypt, al-Nager reportedly voiced his support for bin Laden and al-Qaeda's terrorist attacks against the U.S. embassies in Tanzania and Kenya, according to Agence France Presse.  *See* AR0198-0199.

**REDACTED TEXT**

    3.    **AHIF Branches Were Subject to Control by the Headquarters in Saudi Arabia and, Specifically, to Control by the Director of AHIF, SDGT Aqeel Abdulaziz al-Aqil (U)**

**REDACTED TEXT**

---

[15] (U) Egyptian Islamic Jihad has been designated pursuant to E.O. 13224.

(U) It was reported in the press that "among the reasons for al-Aqil's removal is his 'absolute centralization'" of AHIF.  *See* AR0254.  Shaykh al-Aqil himself has not denied that AHIF headquarters maintained "tight control over the affiliated offices":

> The offices' directors are employees who follow the directions of the main office with regards to hiring workers at the offices and making any decisions on cooperation with any party.

*See* AR0595.  Mansour al-Kadi, Shaykh al-Aqil's deputy and one of AHIF's main leaders, cited Shaykh al-Aqil's "autocratic and centralist governance" of AHIF as the main reason for his, al-Kadi's, resignation, according to a purported letter of resignation of al-Kadi posted to an Arabic language internet forum and translated by Treasury analysts.  *See* AR0258.  Al-Kadi's posting on the internet identifies al-Aqil as the "only individual with the final decision making on spending . . . and the one with the authority to hire employees, even if just a janitor."  *See* AR0260.

REDACTED TEXT

### 4.    AHIF Oregon Was Part and Parcel of AHIF and Owned or Controlled by Two SDGTs, Al-Aqil and Al-Buthe (U)

(U) The AHIF Headquarters, under Shaykh al-Aqil's leadership and control, provided funding and instructions that governed the activities of AHIF throughout the world, including in the United States.  At the time it was designated as an SDGT for support to al Qaeda, AHIF-Oregon had four directors: Shaykh al-Aqil, who, as noted, was also the founder and director of AHIF worldwide; Mansour al-Kadi, his deputy; Soliman al-Buthe; and Pirouz Sedaghaty (a/k/a Pete Seda).  *See* AR0126.

(U) Al-Aqil is identified as AHIF-Oregon's President and Chairman in federal tax forms and in newspaper articles, at least through 2004.  *See* AR0126; AR0248-0249; AR0257.  As evidence of al-Aqil's control of AHIF-Oregon, when AHIF-Oregon official Pete Seda applied to OFAC for a license in late 2001, purportedly to assist Afghan refugees in border camps in Iran, *see* AR0118-0120,

Seda specifically reported that Shaykh al-Aqil, the president of AHIF-Oregon, agreed to Seda's proposal to fund $500,000 for assistance to the Afghan refugees. *See id.*

**REDACTED TEXT**

(U) Investigations by the FBI also reveal that al-Buthe, on behalf of AHIF, entered into agreements to work closely with alleged terrorist supporter Sami Omar al-Hussayen, who was charged by federal prosecutors in Idaho with material support for terrorism. *See* AR0304-0314. The government charged that al-Hussayen provided internet and computer expertise to support and recruit for violent jihad, with support allegedly provided to AHIF, Hamas, and a list of extremist websites, one or more of which contained explicit calls for violence against non-Muslims and urged visitors to participate in, or make financial contributions in support of, violent jihad. *See* AR0270. On June 11, 2004, after seven days of deliberation, jurors in Idaho found al-Hussayen not guilty of the three terrorism-related criminal charges. *See* AR0297.[16]

**REDACTED TEXT**

(U) The remaining official of AHIF-Oregon, Pirouz Sedaghaty, a/k/a Pete Seda, is the registered agent for AHIF-Oregon and is considered to be head of that office. *See* AR0204. Like al-Buthe, he has been indicted on charges of conspiracy to defraud the United States, filing a false tax return by a tax-exempt organization, and failure to file a currency transportation report, with the counts related to his alleged concealment of $150,000 sent to Chechen mujahideen. *See* AR0233. The prosecution of Seda in the District of Oregon is currently underway. *See* AR0615.

**REDACTED TEXT**

---

[16] (U) Despite the jury's finding, some of the information from the criminal proceeding available to OFAC may reasonably be relied upon in the present administrative action. That this evidence did not contribute to a jury finding of proof beyond a reasonable doubt in a criminal proceeding does not negate the merits and integrity of the evidence, nor does it preclude OFAC from reviewing and evaluating some or all of this evidence for use in this or other separate administrative actions.

**5.    AHIF-Oregon Funded SDGTs by Providing Funds to Its Parent Organization in Saudi Arabia (U)**

(U) As AHIF-Oregon admits, funds flowed between the branch and its headquarters in Saudi Arabia.  AHIF-Oregon admits that it "transferred approximately $180,000 to [AHIF in Saudi Arabia] for Chechen humanitarian relief activities." Compl. ¶¶ 35, 63.  Likewise, AHIF "donated some funds to support [AHIF-Oregon's] charitable operations."  Compl. ¶ 25.  Regardless of the alleged purpose of this funding, Exec. Order 13,224 prohibits the provision of *any* financial and other support to terrorists.  Because money is fungible and quickly transferable, and because the proscribed terrorist organizations typically operate clandestinely, there is a danger that monies sent even for charitable purposes will be used directly or indirectly to support terrorist activities.  Even if monies are not used for illicit purposes, such contributions may free up funds from other sources for use in violent activities.  Moreover, the government is unable to ensure that plaintiff's funds are used for legitimate purposes.  *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1135-36.

**REDACTED TEXT**

(U) Despite AHIF-Oregon's claims that it only sent funds to AHIF headquarters for humanitarian reasons, there is a reasonable basis to believe that on at least one occasion, AHIF-Oregon sent funds to AHIF headquarters in order to support terrorist activity, specifically, the Chechen mujahideen.  In March 2000, al-Buthe and Seda withdrew funds from the AHIF-Oregon bank account in the amount of $150,000.  *See* AR0624; AR1059.  This $150,000 had been donated by an Egyptian individual, Dr. Mahmoud Talaat El-Fiki, who in a February 20, 2000 email to "haramain" had indicated that these funds were for the benefit of "your nobel [*sic*] support to our muslim brothers in Chychnia," *see* AR1059, thereby implying that AHIF-Oregon had been engaging in ongoing support of Muslim "brothers" in Chechnya.  In a request for reconsideration, AHIF-Oregon has asserted that al-Buthe never met Dr. el-Fiki; that al-Buthe was uncertain why Dr. el-Fiki

sent the $150,000 to the United States; and that al-Buthe suspects that Dr. el-Fiki was responding to "website instructions or advertisements that had been published in Islamic magazines directing contributions to the United States." The details of Dr. el-Fiki's email to AHIF-Oregon, however, undercut al-Buthe's defense and indicate that this was not the first time el-Fiki had provided money to AHIF-Oregon. For example, el-Fiki referenced his "previous correspondence" to AHIF-Oregon and also noted that the details of AHIF-Oregon's "USA account" had been "provided in an earlier e-mail." *See* AR1059.

(U) AHIF-Oregon asserts that its participation in "the Chechnya project" did "not involve any designated entities; was officially approved by the Saudi Arabian and Russian governments; was undertaken exclusively for humanitarian purposes; and had nothing to do with terrorist or violent activities." *See* Compl. ¶ 35. AHIF-Oregon has submitted documentation pertaining to a $180,000 contribution to AHIF by AHIF-Oregon, also made in 2000, purportedly for "Chechen humanitarian relief activities." *See id.*; *see also* AR0365-0367.

**REDACTED TEXT**

(U) In further support of its request for reconsideration, AHIF-Oregon has argued that al-Buthe never traveled to Chechnya, "has no first hand knowledge of [AHIF] activities there," has had "no control over activities there," and that "any funding of activities in Chechnya was by officials in Saudi Arabia." *See* AR0601. This defense rings false, however, given that documents and other materials relating to Chechnya and Chechen mujahideen were obtained by law enforcement officials from AHIF-Oregon. Among the photographs seized during the execution of a search warrant at the AHIF-Oregon property in Ashland, Oregon, was a photograph of Islamic Army of the Caucasus ("IAC") Commander-in-Chief Shamil Basayev,[17] together with Ibn Ul Khattab of the IAC loyal

---

[17] (U) Shamil Basayev was designated as an SDGT on August 8, 2003.

foreign mujahideen brigade, and Khattab's successor after Khattab's death in March 2002, Abu Al-Walid Al-Ghamidi.  *See* AR1060-1061.  Other AHIF-Oregon items seized by law enforcement include passports belonging to deceased Russian soldiers; a map indicating the location of mujahideen military engagements; videos depicting violent acts committed against Russian soldiers by mujahideen in Chechnya; and photographs of deceased mujahideen and Russian soldiers.  *See* AR0705-0712; *see also* AR0622-0623.  In addition, al-Buthe, who was according to his counsel "responsible for internet activities and then for charitable works in the United States," *see* AR0599, would presumably have been familiar with the AHIF website (www.alharamain.org) which, as of 1999 and 2000, contained numerous articles supportive of Chechen mujahideen, including reports such as "The Latest News About Jihaad in Chechnya." *See* AR0764.  The website also contained a prayer for Chechen mujahideen, referring to them as the "Mujahideen brothers in Chechnya." *See id.*  The indictment also states that a link was provided via the AHIF website to www.qoqaz.com, through which details could be obtained on how to fund Chechen mujahideen.  *See id.*

**REDACTED TEXT**

(U) OFAC's determination that AHIF-Oregon has been properly designated as an SDGT, being "an agency's application of its own regulations, receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." *Paradissiotis,* 171 F.3d at 987; *accord Consarc Corp. v. U.S. Treasury Dep't,* 71 F.3d 909, 915 (D.C. Cir. 1995) (same); *Global Relief Found.*, 207 F. Supp. 2d at 792-93.[18/]  Plaintiff has not shown that OFAC's determination is unreasonable.  Based on the totality of the evidence, both in the unclassified

---

[18] (U) *See also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations."); *Havana Club Holding*, 203 F.3d at 125 (deferring to OFAC interpretation of its regulations); *Smith v. Office of Civilian Health & Med. Program*, 97 F.3d 950, 955 (7th Cir. 1996) ("[An] agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (internal quotation omitted).

Administrative Record and in classified and privileged portions lodged *ex parte* and *in camera* with the Court, plaintiff cannot sustain its heavy burden of showing that there is no rational basis to OFAC's determination that AHIF should be designated pursuant to E.O. 13224.[19/]

## II.    ALL OF PLAINTIFF AHIF-OREGON'S CONSTITUTIONAL CLAIMS AGAINST THE IEEPA BLOCKING ACTION LACK MERIT.  (U)

### A.    Fifth Amendment Due Process (U)

#### 1.    OFAC Did Not Violate AHIF-Oregon's Due Process Rights by Relying on Classified Evidence to Designate AHIF-Oregon (U)

(U) Plaintiffs allege that defendants have violated AHIF-Oregon's Fifth Amendment due process rights "by relying on classified evidence that afforded AHIF[-Oregon] no meaningful opportunity to respond." *See* Compl., ¶ 69.  This is not the first time that plaintiffs have asserted to this Court that they have a due process right to classified evidence, and the Court previously rejected plaintiffs' claim of a right of access to classified information.  *See Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp. 2d 1215, 1229 (D. Or. 2006) (ordering plaintiffs to return the inadvertently disclosed classified document, finding that "[t]he Executive has not granted authority to plaintiffs to

---

[19] (U)  If the Court were to find this evidence inadequate to support the determination that AHIF-Oregon warranted designation pursuant to E.O. 13224, the remedy would not be to order OFAC to lift its blocking, but instead to remand the case to the agency.  *See, e.g.*, *Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."); *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 209 (D.C. Cir. 2001) (although finding that certain pre-deprivation remedies should have been provided under the unique circumstances of this case, involving AEDPA, the court also refused to order the lifting of the designations and instead remanded the issue to the agency because of "the realities of the foreign policy and national security concerns asserted by the Secretary in support of those designations").  For this reason, the Court also could not order OFAC "to release impounded [AHIF-Oregon] funds and property to non-designated entities in order that the charitable purposes of the donors be accomplished." *See* Compl., "Request for Relief," ¶ 9.

review classified materials, and the document remains classified"), *rev'd on other grounds*, 507 F.3d 1190 (9th Cir. 2007).

(U)  In this case, moreover, Congress has clearly and specifically authorized the government to submit classified evidence *ex parte* and *in camera* in defending a challenge to a designation under IEEPA. *See* 50 U.S.C. § 1702(c), *as amended by* USA PATRIOT Act, Pub. L. No. 107-56, § 106, 115 Stat. 272, 278.  As explained below, this provision has consistently withstood challenges to its constitutionality.  The Court should reject AHIF-Oregon's challenge to the constitutionality of that provision as well.

(U)  "[I]t is by now well established that '"due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'"  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961) (internal quotations omitted)).  Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  In determining what process is constitutionally required, courts must consider not only the private interests that will be affected and the risk of an erroneous deprivation of those interests, but also the particular "Government[al] interest, including the function involved" and the "burdens that the additional or substitute procedural requirements would entail." *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

(U)  "[N]o governmental interest is more compelling than the security of the nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning.").  As the Supreme Court has recognized, "[t]he Government has a compelling interest in protecting both the secrecy of information important

to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam). Moreover, "that strong interest of the government [in protecting against the disclosure of classified information] clearly affects the nature . . . of the due process which must be afforded petitioners." *National Council of Resistance of Iran* ("*NCRI*") *v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001). As the D.C. Circuit explained in *NCRI*, disclosure of classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect." *See id.* at 208-09. Consequently, while the Due Process Clause requires that the government provide notice of the action sought and an opportunity to be heard, the government "need not disclose the classified information to be presented *in camera* and *ex parte* to the court under the statute." *Id.* at 208.[20]

(U) Congress authorized that classified information in support of a designation made pursuant to IEEPA be produced to the Court *in camera* and *ex parte*. See 50 U.S.C. § 1702(c). And courts reviewing challenges to E.O. 13224 based designations consistently uphold that provision as constitutional and permit the production of classified information *in camera* and *ex parte*. *See Holy Land Found.*, 333 F.3d at 162; *see also IARA*, 394 F. Supp. 2d at 45 (recognizing that plaintiff's review of the administrative record is "limited only to those portions of the administrative record that are not classified" while the Court "has before it both the classified and unclassified administrative record"). As the Seventh Circuit has stated:

---

[20] (U) Indeed, numerous courts have considered *ex parte* and *in camera* submissions containing information that is classified or that relates to ongoing counterterrorism activities of the federal government. *See, e.g., Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (finding the court has "inherent authority to review classified material *ex parte*, *in camera* as part of its judicial review function"), *cert. denied*, 543 U.S. 1146 (2005); *People's Mojahedin Organization of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003); *Torbet v. United Airlines*, 298 F.3d 1087, 1089 (9th Cir. 2002); *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 600 n.9, 604-05 (3d Cir. 1990).

> Administration of the IEEPA is not rendered unconstitutional because that statute authorizes the use of classified evidence that may be considered *ex parte* by the district court. . . .  The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives.

*Global Relief Found.*, 315 F.3d at 754 (internal citation omitted).

(U) Accordingly, this Court should reject AHIF-Oregon's claims that its rights to due process prevent defendants from relying on, and submitting, classified evidence *ex parte* and *in camera* pursuant to 50 U.S.C. § 1702(c).

### 2.    OFAC Did Not Violate AHIF-Oregon's Due Process Rights by Allegedly Failing to Provide AHIF-Oregon with Notice, an Adequate Explanation, or Sufficient Time to Respond to the Administrative Record (U)

(U) Among its allegations of violations of its due process rights, plaintiff AHIF-Oregon cannot legitimately claim that it was unaware of the grounds for the agency's action against it.  As plaintiff concedes, prior to its September 2004 designation, plaintiff was provided with numerous documents and information noting that its parent organization AHIF was one of the principal Islamic charities providing support for the al Qaeda network worldwide.  *See* Szubin Decl. ¶ 29; *see also* AR0344-0348.  Plaintiff was aware that it was part of that organization, as well as aware of the fact that its founder — who was designated an SDGT between the time of the February blocking of AHIF-Oregon's assets and its designation in September — was the head of the whole organization.  *Id.*

(U) Plaintiff AHIF-Oregon was also aware of the Treasury press release issued on September 9, 2004, which stated unequivocally that "Al Haramain has been used around the world to underwrite terror," which also referred to activities of the U.S. branch.  *See* AR1872.  The press release also stated that "[t]he entities were designated today pursuant to Executive Order 13,224 pursuant to paragraphs (d)(i) and (d)(ii) based on a determination that they assist in, sponsor, or provide financial,

material, or technological support for, or financing or other services to or in support of, or are otherwise associated with, persons listed as subject to E.O. 13,224." *See id.* Further, AHIF-Oregon was aware that its founders al-Aqil and al-Buthe had been designated.[21] AHIF-Oregon cannot use its myopic view of itself as a basis for saying that these documents failed to give it notice.

(U) Nor can plaintiff AHIF-Oregon reasonably contend that OFAC failed to provide it with notice and sufficient time to respond to the administrative record, thereby violating plaintiff's right to due process under the Fifth Amendment. *See* Compl., ¶ 69. As explained in Defs.' Statement of Material Facts, and as set forth in plaintiffs' Complaint, *see* Compl., ¶¶ 26-50, 58-64, OFAC provided AHIF-Oregon with extensive notice and opportunity to comment prior to both the initial designation and redesignation.[22] AHIF-Oregon had advance notice and extensive opportunity to comment prior to both designation and redesignation.

(U) To the extent plaintiff's challenge focuses on process provided prior to its blocking pending investigation, those claims are moot, as any lack of opportunity to comment prior to blocking was surely cured by the extensive opportunity to comment following blocking and prior to designation, and then redesignation. *See Global Relief Found.*, 315 F.3d at 750 ("To the extent that

---

[21] (U) Although OFAC has not provided and cannot provide AHIF-Oregon with classified evidence in support of its designation, OFAC has met its Fifth Amendment obligations by providing AHIF-Oregon with as much evidence as possible.

[22] (U) This process began in February 2004 with notice provided to AHIF-Oregon that it was being blocked pending investigation pursuant to E.O. 13224, which spells out the criteria by which Treasury could act. Between April and September 2004, AHIF-Oregon and OFAC engaged in extensive communications concerning the organization's proposed designation, with AHIF-Oregon providing documents and responses for OFAC's consideration and OFAC providing questions as well as unclassified materials upon which it was relying. *See* Szubin Decl. ¶¶ 53-59. During this period, OFAC granted plaintiff's numerous requests for additional time in which to provide further documents and responses. Following designation, AHIF-Oregon and OFAC remained in contact; AHIF-Oregon submitted a petition for reconsideration, as did al-Buthe. Finally, prior to redesignation, OFAC provided notice of its proposed redesignation and offered plaintiff the opportunity to respond. At AHIF-Oregon's request, OFAC postponed final decision on redesignation so that AHIF-Oregon would have further opportunity to respond. Szubin Decl. ¶ 66.

GRF was attacking the factual support for the interim [blocking] order, time has passed that issue by; the right question now is whether the designation of October 18 is supported by adequate information. . . .").  Moreover, even if not moot, any claims of due process violation for failure to receive notice prior to its blocking pending investigation on February 19, 2004, would be without merit, particularly given the Executive's authority to act in the national security and foreign policy arenas; the broad congressional delegation of power under IEEPA; the obvious need to prevent dissipation of the fungible assets at issue; and economic sanctions case law fully supporting the Executive's traditional practice followed here.

(U)  Numerous courts have noted, in rejecting almost identical due process claims brought by designated parties, that pre-deprivation notice is not required prior to the blocking of assets.  *See Holy Land Found.*, 333 F.3d at 163-64; *Global Relief Found.*, 315 F.3d at 754; *IARA*, 394 F. Supp. 2d at 49-50.  Because of the Executive's need for speed in matters of national security and foreign affairs, *see, e.g.*, *Palestine Info. Office v. Shultz*, 853 F.2d 932, 942-43 (D.C. Cir. 1988), and the need to prevent the flight of assets and destruction of records, the President and his designees cannot practicably provide pre-deprivation notice under these circumstances.  *See Global Relief Found.*, 207 F. Supp. 2d at 803.

(U)  The immediate blocking of fungible assets such as money — which an organization could easily dissipate with prior notice — and the corresponding disruption of all transactions and future services to the designated entity remain the fundamental goal of the actions undertaken under IEEPA and the blocking of AHIF-Oregon's assets.  To address this problem, the President stated in E.O. 13224:

> For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be

> taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

E.O. 13224, § 10. Thus, as has been repeatedly held by the courts, post-designation remedies are permissible where, as here, "earlier notification would impinge upon the security and other foreign policy goals of the United States." *NCRI*, 251 F.3d at 208.

### 3.   OFAC Did Not Violate AHIF-Oregon's Due Process Rights by Denying Plaintiff's Counsel Access to Blocked Funds (U)

(U)  Plaintiff AHIF-Oregon claims that OFAC's "refusal to allow [AHIF-Oregon] and its officers to use their frozen assets for their defense in connection with OFAC's designation violates [AHIF-Oregon's] Fifth Amendment due process rights and is arbitrary, capricious, and otherwise not in accordance with the law." *See* Compl., ¶ 71.  The Fifth Amendment, however, does not require that blocked funds be made available to pay attorneys' fees for either a blocked entity or its officers. OFAC's decision prohibiting the payment of such fees from AHIF-Oregon's blocked assets is therefore reasonable, and not in violation of any law.[23]

### a.    AHIF-Oregon Has No Constitutional Right to Blocked Funds for Its Legal Defense (U)

(U)  Plaintiff AHIF-Oregon's assets were blocked pending investigation pursuant to E.O. 13224 on February 19, 2004. *See* Szubin Decl. ¶ 50.  At the time the blocking took place, OFAC sent a blocking notice to plaintiff indicating that OFAC would "consider requests for licenses to help ameliorate the effects of the blocking of [AHIF-Oregon] funds and that such licenses may allow for, among other activities, the payment from blocked funds or accounts of outstanding financial

---

[23] (U) Even if denial of access to blocked funds violated AHIF-Oregon's rights, which it did not, the same rationale would still not require access to blocked funds by third parties, including a designated entity's officers.

obligations owed by the organization, such as salary, rent, and utility payments, as well as for attorneys' fees and expenses related to legal representation of AHIF in this matter." Szubin Decl. ¶ 50 (internal quotation marks omitted) & Ex. A. In July 2004, OFAC responded to a license request by attorney Lynne Bernabei, authorizing her to represent AHIF-Oregon in matters related to the blocking but noting that any payment received for this work had to come from unblocked assets, so-called "fresh funds," that may be overseas. *See* Compl. ¶ 28; Szubin Decl. ¶ 81. A similar license was granted to attorney Thomas Nelson to represent AHIF-Oregon in other litigation matters. That license was amended in April 2007 to include the representation of AHIF-Oregon in its designation challenge as well. *See* Szubin Decl. ¶ 83.

(U)    OFAC, however, has never permitted AHIF-Oregon to use blocked funds to pay attorneys' fees related to the blocking action.[24/] *See* Szubin Decl. ¶¶ 81, 84. But the limitation to pay attorney's fees only from  fresh funds does not appear to have injured plaintiff AHIF-Oregon in any way. Plaintiff's attorneys have zealously represented plaintiff, both prior to and after designation, *see, e.g.*, Szubin Decl. ¶¶ 53-66, as well as in this case, in which no fewer that five attorneys are listed on plaintiffs' pleadings. Further, AHIF-Oregon has been represented in three other lawsuits since its designation. *See, e.g.*, *In re Terrorist Attacks of September 11, 2001*, 464 F. Supp. 2d 335 (S.D.N.Y. 2006); *Al Haramain Islamic Found. v. Bush*, 451 F. Supp. 2d 1215 (D. Or. 2006), *rev'd*

---

    24  (U) Plaintiff AHIF-Oregon claims it received a letter dated May 18, 2004 in which "Director Newcomb . . . stated that AHIF-Oregon's blocked assets could be used to reimburse AHIF-Oregon's legal counsel for 'legal representation involving the blocking action taken by OFAC.'" *See* Compl. ¶ 28. This incorrectly summarizes the letter sent to AHIF-Oregon. Contrary to plaintiff's assertion, OFAC stated only that it would consider licensing the use of blocked funds to pay attorneys' fees; it did not agree to do so. *See* Szubin Decl. Ex. D ("It is a basic tenant of OFAC sanctions policy that blocked funds are not licensed for release except under limited and compelling circumstances consistent with national security, foreign policy, and economic interests of the United States. Accordingly, OFAC has determined that it will consider a request on behalf of your firm for payment of attorney fees from blocked property solely with regard to legal representation involving the blocking action taken by OFAC on February 19, 2004.").

PAGE 31 –    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
             MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

*on other grounds*, 507 F.3d 1190 (9th Cir. 2007); *Al-Haramain Islamic Found. v. United States*, No. 06-553-AA (D. Or.).

(U) Notwithstanding the fact that AHIF-Oregon has secured representation in several lawsuits even without access to blocked funds, the courts of this circuit have routinely held that the Fifth Amendment does not require that frozen funds be made available to satisfy attorneys' fees in situations analogous to that currently before the Court.  As the Ninth Circuit held in *Federal Savings and Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 375 (9th Cir. 1990), "pretrial restraining orders which freeze assets, including funds which a defendant seeks to use to pay an attorney, do not arbitrarily interfere with a defendant's fair opportunity to retain counsel and violate neither the fifth nor the sixth amendments."  *Id.* (citing *United States v. Monsanto*, 491 U.S. 600 (1989) (internal citations omitted)); *Federal Trade Comm'n v. World Wide Factors, LTD*, 882 F.2d 344 (9th Cir. 1989); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.*, 700 F.2d 1279, 1284 (9th Cir. 1983); *Commodity Futures Trading Comm'n v. Noble Metals International, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995); *see also Beobanka D.D. Belgrade v. United States*, Nos. 95-5138 & 95-5771, 1997 WL 23182, at *1 (S.D.N.Y. 1997) (finding OFAC's denial of plaintiff's application for a license to pay attorney fees out of blocked funds did not deprive plaintiffs of due process).

(U) Indeed, in both *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617 (1989), and *United States v. Monsanto*, 491 U.S. 600 (1989), the Supreme Court held that "neither the Fifth nor the Sixth Amendment to the Constitution requires Congress to permit a defendant to use assets adjudged to be forfeitable to pay that defendant's legal fees" in the context of criminal forfeiture statutes.  *See Monsanto*, 491 U.S. at 614 (citing to *Caplin & Drysdale*).[25/]  If the Fifth Amendment

---

[25] (U) Both *Caplin & Drysdale* and *Monsanto* concerned challenges to a federal criminal forfeiture statute that permitted the forfeiture of any property consisting of, or derived from, a drug crime, *see* 21 U.S.C. § 853 (2000), without making provision for the payment of attorneys' fees out of otherwise

(continued...)

does not require that criminal defendants be given access to frozen or forfeitable assets to retain counsel, despite their having a Sixth Amendment right to counsel in their cases, *see Monsanto*, 491 U.S. at 614, then surely there is no Fifth Amendment violation in denying the use of blocked funds to civil plaintiffs, who have no right to counsel under the Sixth Amendment.

> **b.**    **OFAC's Decision to Deny AHIF-Oregon Access to Blocked Funds for Attorney Fees Did Not Violate the APA** (U)

(U) Blocking actions under IEEPA serve a number of objectives.  A blocking action can deprive a sanctioned entity of the benefit of its property, prevent that property from being used to further ends that conflict with United States interests, or prevent the sanctioned entity from receiving the economic benefits of transactions with United States persons or in United States markets. *See* Szubin Decl. ¶ 11.  Blocking actions also preserve blocked funds as a negotiating tool for use by the President in addressing the relevant national emergency, *see Tran Qui Than v. Regan*, 658 F.2d 1296, 1305 (9th Cir. 1981); *Miranda v. Secretary of the Treasury*, 766 F.2d 1, 4 (1st Cir. 1985); *Beobanka D.D. Belgrade v. United States*, Nos. 95-5138 & 95-5771, 1997 WL 23182, at *1 (S.D.N.Y. 1997), and preserve the availability of blocked assets for legal judgments.  *See Tran Qui Than*, 658 F.2d at 1305; *Miranda*, 766 F.2d at 4.  Blocking actions are designed to swiftly immobilize funds and other types of assets that the Executive has a reason to believe could be used to finance activity that poses a threat to U.S. interests, *see* Szubin Decl. ¶ 11, and are of particular importance in cases where the U.S. Government targets assets associated with terrorist organizations, or those who assist or support

----

[25](...continued)

forfeitable assets.  In both cases the petitioners argued, *inter alia*, that because the forfeiture statute barred defendants from using potentially forfeitable funds to pay defense counsel, the "operation of the [forfeiture statute] interferes with . . . the guarantee afforded by the Fifth Amendment's Due Process Clause of a 'balance of forces' between the accused and the Government."  *Monsanto*, 491 U.S. at 614. The Court rejected this argument finding that the Fifth Amendment does not require Congress to permit a defendant to use frozen assets to pay his or her legal fees.  *See id.*; *Caplin & Drysdale*, 491 U.S. at 623-24.

them.  *See id.*  In such cases, the blocking action prevents the use of these assets in the orchestration, assistance, or support of unlawful and dangerous terrorist acts around the world, and other plans and activities by entities hostile to the United States.  *See id.*

(U) In light of these substantial government interests, at the time AHIF-Oregon requested a license to pay attorneys' fees out of blocked funds, OFAC's policy had been to license payment of attorneys' fees only from "fresh funds" — that is, funds originating from outside the United States. Szubin Decl. ¶ 84.  *See also Beobanka DD. Belgrade*, 1997 WL 23182, at *1 (noting that OFAC regulations "require as a general rule that the attorney be paid with funds that originate outside the United States, so called fresh funds").  In keeping with this policy, OFAC denied plaintiff AHIF-Oregon's request to use blocked funds to pay its attorneys.[26] *See* Compl. ¶71.  The decision to refuse a license to allow plaintiff to deplete blocked assets to pay counsel is rationally related to achieving legitimate government goals, which is all that the APA requires.  *See Jifry*, 370 F.3d at 1180; *Beokbanka*, 1997 WL 23182, at *2.

(U)  The only case to directly address a challenge to an OFAC licensing decision on attorney fees upheld the right OFAC asserts here to restrict access to blocked funds for the payment of counsel.  *See Beobanka*, 1997 WL 23182, at *2-*3.[27]  The APA does not allow the Court, at AHIF-

[26] (U) OFAC has recently revised this policy to allow the release of a limited amount of blocked funds for the payment of legal fees under certain circumstances.  *See* Szubin Decl. ¶¶ 84-85.  In order to qualify for the release of funds, however, an applicant must provide certain billing information, an itemized statement and description of costs incurred in seeking administrative reconsideration or judicial review, a certification that the applicant has no assets or access to assets outside the United States, and a certification that the blocked funds do not represent the property interest of another or serve as security for other obligations.  *Id.*  Plaintiff AHIF-Oregon has been informed of this policy, *see* Szubin Decl. ¶ 85, and is free to submit the necessary documentation for OFAC's review.

[27] (U) Other cases addressing OFAC licensing decisions uniformly uphold OFAC's broad discretion to grant or deny licenses as it deems necessary to advance the President's foreign policy goals. *See, e.g., Tran Qui Than*, 658 F.2d at 1302-03 (upholding denial of license to unblock funds); *Miranda*, 766 F.2d at 6-7 (same); *Veterans and Reservists for Peace in Vietnam v. Regional Comm'r of Customs*, 459 F.2d 676, 683-84 (3d Cir. 1972) (upholding licensing requirement for receipt of literature); *Sardino v.*

(continued...)

Oregon's request, to substitute its own judgment as to what is the most reasonable policy choice for the agency to make. The Court's review is limited to determining whether the choice actually made is a rational one. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43; *Holy Land Found.*, 333 F.3d at 162. That is especially true where the decision is premised on an assessment by the Executive that a given activity poses a threat to national security and foreign policy. *See People's Mojaheddin Org. of Iran v. Department of State*, 182 F.3d 17, 23 (D.C. Cir. 1999). OFAC's decision to grant AHIF-Oregon only a "fresh funds" license, and refusal to allow the depletion of blocked assets to pay attorney fees, was a rational and reasonably related to the policy goals of the IEEPA. As such, plaintiff's claim that OFAC's action was "arbitrary" or "capricious" fails.

### 4. OFAC Did Not Violate AHIF-Oregon's Due Process Rights Because the Redesignation of AHIF-Oregon Is Not Based on the Inadvertently Disclosed "Sealed Document" (U)

(U) Concluding its allegations regarding due process, plaintiff AHIF-Oregon claims that "[t]he classified document disclosed to AHIF's counsel reflected illegal interference in a privileged attorney-client communication, and to the extent that the designation was based on that interference, it violates the Fifth Amendment guarantee of due process." *See* Compl. ¶ 73.

(U) Defendants can neither confirm nor deny AHIF-Oregon's characterization of this document as containing privileged attorney-client communications,[28] but much about this document is already known to this Court. This inadvertently disclosed classified document — referred to as

---

[27](...continued)
*Federal Reserve Bank*, 361 F.2d 106, 112 (2d Cir. 1966) (upholding denial of license to transfer blocked funds); *Sage Realty Corp. v. United States Dep't of Treasury*, No. 99-3718, 2000 WL 272192, at *5 (S.D.N.Y. Mar. 10, 2000) (upholding denial of license for payment of judgment from blocked funds).

[28] (U) Although defendants cannot confirm or deny plaintiffs' characterization of the Sealed Document, defendants recognize and respect that the attorney-client privilege "is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States*, 524 U.S. 399 (1998) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

the "Sealed Document" in litigation commenced in this Court by AHIF-Oregon in a challenge to the

President's Terrorist Surveillance Program, *see* Szubin Decl. ¶70 — is, according to the Ninth

Circuit's recent decision, protected by the state secrets privilege:

> Having reviewed it *in camera*, we conclude that the Sealed Document
> is protected by the state secrets privilege, along with the information
> as to whether the government surveilled Al-Haramain. We take very
> seriously our obligation to review the documents with a very careful,
> indeed a skeptical, eye, and not to accept at face value the
> government's claim or justification of privilege. Simply saying
> "military secret," "national security" or "terrorist threat" or invoking
> an ethereal fear that disclosure will threaten our nation is insufficient
> to support the privilege. Sufficient detail must be — and has been —
> provided for us to make a meaningful examination.

*Al-Haramain Islamic Found.*, 507 F.3d at 1203.  On the basis of *in camera* review of this document,

this Court granted the government's Motion to Prevent Plaintiffs' Access to the Sealed Document

in that case, ordering AHIF-Oregon "to deliver to my chambers all copies of the Sealed Document

in their possession or under their control."  *See Al-Haramain Islamic Found.*, 451 F. Supp. 2d at

1229, *rev'd on other grounds*, 507 F.3d 1190 (9th Cir. 2007). The Ninth Circuit concluded that "[t]he

Sealed Document, its contents, and any individuals' memories of its contents, even well-reasoned

speculation as to its contents, are completely barred from further disclosure in this litigation by the

common law state secrets privilege."  *See Al-Haramain Islamic Found.*, 507 F.3d at 1204-05.

(U) Given the Ninth Circuit's ruling that this document is protected by the state secrets

privilege, it has been "completely removed from [that] case."  *See Kasza v. Browner*, 133 F.3d

1159,1166 (9th Cir. 1998) ("[B]y invoking the privilege over particular evidence, the evidence is

completely removed from the case.").  Neither is the Sealed Document part of the Administrative

Record upon redesignation, and OFAC has not relied upon it.  As the Director of OFAC has stated:

> Consistent with the Ninth Circuit's decision to protect the document
> from disclosure in litigation, and without confirming or denying any
> allegations with respect to the information in the document, OFAC has

> *not* considered the document as a basis for the re-designation of AHIF-Oregon, and the document is not a part of the Administrative Record in this case.

Szubin Decl. ¶ 45 (emphasis in original).

(U) Regardless of the classified contents of the Sealed Document, plaintiff AHIF-Oregon's argument that the Sealed Document amounts to a violation of its due process rights hinges on "the extent that the designation was based on" the alleged "interference" with attorney-client communications. *See* Compl. ¶ 73. Because the designation of AHIF-Oregon is *not* based on the Sealed Document, plaintiff AHIF-Oregon is "no longer faced with adverse consequences resulting from" OFAC's alleged reliance on the Sealed Document as a basis for determining that AHIF-Oregon should be designated pursuant to E.O. 13224. *Cf. Riggs v. Miller*, 480 F. Supp. 799, 802 (E.D. Va. 1979) (noting that, as a challenged "misconduct report has been removed from [plaintiff prisoner's] files and the United States Parole Commission has been specifically instructed not to consider the report as part of plaintiff's record," plaintiff's due process claim was moot).

(U) Thus, plaintiff AHIF-Oregon's due process claim regarding the Sealed Document, which is without foundation, must be dismissed.[29]

**B.    First Amendment** (U)

(U)  Plaintiff AHIF-Oregon also makes the same claims raised, earlier and unsuccessfully, by the Holy Land Foundation, the Global Relief Foundation, and IARA — to wit, that its designation by OFAC "was based on AHIF-Oregon's protected First Amendment activities" and therefore violated its First Amendment right to free speech.  As explained *supra* Section I, AHIF-Oregon's

---

[29] (U) To the extent that plaintiff AHIF-Oregon is challenging other documents that are actually in the classified administrative record, which AHIF-Oregon suspects might contain attorney-client privileged information, the Court is able to assess the classified portions of the Administrative Record, *ex parte* and *in camera*, in light of plaintiff's allegations.

**REDACTED TEXT**

designation was based on AHIF-Oregon being part of an international organization that provided financial and other support for terrorist activities of SDGTs, as well as its own support of that organization, and the fact that it was owned or controlled by, and acted for and on behalf of, SDGTs. The designation was not based on any particular First Amendment protected conduct in which AHIF-Oregon engaged.  Accordingly, the Court should dismiss AHIF-Oregon's First Amendment claims.

### 1.    Freedom of Speech (U)

(U)  While regulations of pure political speech are entitled to strict scrutiny, *see Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 208 (1999), the regulation of actions that happen to be combined with speech warrants lesser protection.  As the Supreme Court held in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." In such situations, a "government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

(U)  Recognizing the difference between the regulation of pure speech and that of actions combined with speech, courts have consistently rejected the strict scrutiny approach of pure speech cases in situations concerning the regulation of actions combined with speech, and instead have applied the standard set forth in *O'Brien* in such cases.  Plaintiff AHIF-Oregon was designated on the basis of its being owned or controlled by and acting for or on behalf of SDGTs al-Aqil and al-Buthe, and its designation is further based on its role as a branch of the larger AHIF which supported

SDGTs, including al Qaeda. *See* Szubin Decl. ¶ 71. The designation of AHIF-Oregon is not based on pure speech. Assessing similar situations, courts have routinely applied the *O'Brien* test rather than strict scrutiny, holding that charitable contributions, such as those at issue in this case, "plainly do not involve political expression, and therefore do not warrant strict scrutiny." *See Holy Land Found.*, 219 F. Supp. 2d at 81 n.37, *aff'd*, 333 F.3d 156; *see also Humanitarian Law Project/AEDPA*, 205 F.3d 1130, 1135-36 (9th Cir. 2000) (rejecting First Amendment challenge by U.S. citizens and others to prohibition on providing cash and goods to foreign terrorist organizations under AEDPA), *cert. denied*, 532 U.S. 904 (2001); *Global Relief Found.*, 207 F. Supp. 2d at 806 (applying *O'Brien* standard to deny preliminary injunction for free speech challenge to IEEPA asset freeze); *IARA*, 394 F. Supp. 2d at 52-53, *aff'd* 477 F.3d 728; *Walsh v. Brady*, 927 F.2d 1229, 1234-35 (D.C. Cir. 1991); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996); *Palestine Info. Office*, 853 F.2d at 939-40; *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445-46 (2d Cir. 1968); *Farrakhan v. Reagan*, 669 F. Supp. 506, 512 (D.D.C. 1987), *aff'd*, 851 F.2d 1500 (D.C. Cir. 1988).

(U)   As the Courts have held in essentially identical challenges by designated charities, OFAC's blocking of plaintiff AHIF-Oregon easily satisfies the relevant four-part test detailed in *O'Brien*, 391 U.S. at 376-77, thereby passing constitutional muster under the First Amendment. *See Holy Land Found.*, 219 F. Supp. 2d at 82 ("OFAC's designation of [Holy Land] and attendant blocking order satisfy scrutiny under the *O'Brien* test, and therefore do not violate [Holy Land's] First Amendment right to freedom of speech."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *Global Relief Found.*, 207 F. Supp. 2d at 806, *aff'd*, 315 F.3d 748 (7th Cir. 2002) ("[W]e find that Global Relief is unlikely to prevail in proving that defendants' actions violate the First Amendment . . . ."); *IARA*, 394

F. Supp. 2d at 53 ( "Moreover, nothing in the IEEPA or the Executive Order prohibits the IARA-USA from expressing its views.").[30/]

### 2.    Freedom of Association (U)

(U) Plaintiff AHIF-Oregon also challenges its designation by OFAC as an unconstitutional violation of its First Amendment right to freedom of association.  AHIF-Oregon claims that its designation was unconstitutionally "based on AHIF[-Oregon']s advocacy and associations," and further alleges that its designation violates the First Amendment by "punishing AHIF[-Oregon] for its associations and conduct without proof that AHIF[-Oregon] sought to further the unlawful ends of any designated entity."  *See* Compl. ¶¶ 75, 77.  While the First Amendment precludes the government from barring mere membership in any group, the government remains free to prohibit the financial support of particular groups.  As the Ninth Circuit has succinctly stated, "there is no constitutional right to facilitate terrorism by [giving material support]. "  *Humanitarian Law Project/AEDPA*, 205 F.3d at 1133; *see also Holy Land,* 219 F. Supp. 2d at 81 ("there is no constitutional right to facilitate terrorism") (citing *Humanitarian Law Project/AEDPA*, 205 F. 3d at 1133); *IARA*, 477 F.3d at 736-37.  Accordingly, AHIF-Oregon's claims lack merit and must be dismissed.

(U) AHIF-Oregon was not designated or redesignated based on association alone.  "The [Executive Order] does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group."  *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1133 (internal citation omitted); *IARA*, 477 F.3d at 736 ("[T]he blocking was not based on, nor does it prohibit, associational activity other than financial support.").  As the Supreme Court

---

[30] (U)  And, of course, nothing in the Executive Order, or IEEPA, prohibits plaintiff MCASO from expressing its views or advocating in favor of AHIF-Oregon.  *See* Compl. ¶¶ 82-85.

explained in *Healy v. James*, 408 U.S. 169, 192 (1972), "[T]he critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." While the Constitution precludes the government from prohibiting mere membership in any particular group, the government may prohibit the provision of financial support to certain groups.[31] E.O. 13224 and OFAC's designation and blocking of AHIF-Oregon do not meaningfully impinge upon AHIF-Oregon's associational rights because they bar only action while still permitting advocacy. Although AHIF-Oregon is prevented from making financial contributions to any group or individual, and although U.S. persons are prevented from engaging in transactions with AHIF-Oregon, AHIF-Oregon may associate with any person or group of its choice, so long as that association does not include providing or receiving financial and other support.[32] For example, although AHIF-Oregon may not make financial contributions to a particular cause, it may still engage in non-financial advocacy of that cause. *See Holy Land Found.*, 333 F.3d at 166; *IARA*, 477 F.3d at 736-37. Because the government's actions in this case serve important national interests, they clearly withstand First Amendment scrutiny.[33]

---

[31] (U) Even if the government's actions in designating and blocking AHIF-Oregon did implicate some First Amendment right of association, which they do not, the government's compelling interest in preventing foreign terrorists from acquiring financial and other support — an interest unrelated to the restriction of association — obviously outweighs any incidental burden on associational rights that the government action might entail. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on [the] right [to associate] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.")

[32] (U) *See also Palestine Info. Office*, 853 F.2d at 941 ("The associational interest of appellants is minimal to nonexistent. The order does not prevent them from associating with any individual or group of individuals. It does not even prevent them from 'associating' with the PLO in the normal sense of that word. It does not, for example, bar them from speaking with members of the PLO. It simply prevents them from acting as the organization's foreign mission.").

[33] (U) Beyond mere association, AHIF-Oregon also implies that it has a First Amendment right to provide support to a foreign terrorist organization so long as it does not "intend to further any unlawful ends," and also suggests that defendants violated the Fifth Amendment by failing to account for AHIF-Oregon's intent. Compl., ¶ 79. First, plaintiff AHIF-Oregon is not clear as to how it believes the Fifth

(continued...)

C.    **Overbreadth and Vagueness** (U)

(U) Plaintiff AHIF-Oregon claims E.O. 13224 is overbroad and vague, and therefore an unconstitutional violation of the First and Fifth Amendments both as applied to AHIF-Oregon and facially.  *See* Compl. ¶ 77.  Recognizing that E.O. 13224 is a content-neutral restriction on unprotected conduct, and one that is set forth in clear terms, courts have repeatedly rejected overbreadth and vagueness challenges to the Executive Order.  This Court should do the same.

1.    **Executive Order No. 13,224 Is Not Unconstitutionally Overbroad** (U)

(U) Under the First Amendment doctrine of overbreadth, "a showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep' suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal citations to *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973), omitted).  Plaintiff AHIF-Oregon brings both an as-applied and a facial overbreadth challenge to E.O. 13224.  Plaintiff AHIF-Oregon's as-applied challenge lacks merit because E.O. 13224 has not been applied to block plaintiff AHIF-Oregon on the basis of any First-Amendment protected activity in which AHIF-Oregon may have engaged.  As previously discussed, plaintiff AHIF-Oregon has instead been designated on the basis of being owned

---

[33](...continued)

Amendment to have been violated, but to the extent plaintiff's claim is that the lack of an intent requirement amounts to a due process violation, that argument is addressed in Section II.A. of this memorandum in which defendants address the inadequacy of all of plaintiff's due process claims. Second, plaintiff's claim fails to recognize that neither the government nor the plaintiff can effectively regulate how terrorist organizations will use material resources provided to them, and it runs counter to the case law on this issue.  *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1134 (holding that the First Amendment does not require "the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds"); *IARA*, 477 F.3d at 737.  As another district court of this Circuit has recognized in rejecting a similar claim, "the E.O. [13,224] makes clear that President Bush did not intend to include a 'specific intent' requirement for designating individuals and groups under the E.O.  Indeed, the E.O. prohibits even the provision of humanitarian aid." *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1073.

or controlled by, or acting for or on behalf of, SDGTs, and for providing financial and other support for terrorism. *See supra* Section I; Section II.B.  Because no protected activity provides a basis for the application of E.O. 13224 to plaintiff AHIF-Oregon, the application of E.O. 13224 does not infringe on any of plaintiff AHIF-Oregon's First Amendment rights and the application of E.O. 13224 to plaintiff AHIF-Oregon is therefore constitutional as applied. *See IARA*, 477 F.3d at 735 ("[T]here is no constitutional right to fund terrorism.") (citing *Holy Land Found.*, 333 F.3d at 165).

(U) Plaintiff AHIF-Oregon's facial overbreadth challenge to E.O. 13224 similarly lacks merit. A plaintiff may be allowed to challenge on overbreadth grounds the reach of a statute on "facts that apply to others," *DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1269 (11th Cir. 2007), but "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine." *Broadrick*, 413 U.S. at 613.  Accordingly, "[i]t has been employed by the Court sparingly and only as a last resort." *Id.*  Further, when the statute or regulation at issue purports to regulate conduct but risks deterrence of constitutionally-protected speech, the overbreadth of the statute must be "substantial" before coming into contact with the constitutional boundaries of the First Amendment. *Id.*; *see also DA Mortgage*, 486 F.3d at 1270; *Horton*, 272 F.3d at 1332.

(U) Plaintiff AHIF-Oregon claims that because E.O. 13224 permits the designation of parties who are "otherwise associated with" designated parties, or who provide "material support" or "services" to designated parties, E.O. 13224 impermissibly sweeps in and prohibits constitutionally protected activities. *See* Compl. ¶ 77.  These terms are all, however, content-neutral restrictions on conduct that is not protected by the First Amendment — namely, the provision of support to terrorists. *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1133, *aff'd*, 333 F.3d at 166.  And the terms of E.O. 13224 that plaintiff AHIF-Oregon challenges focus explicitly on prohibiting the provision of support to terrorists, not on any constitutionally protected conduct.

(U) The prohibition on the provision of "material support" or "services" is content-neutral and limited to the provision of support or services to an SDGT, which is unprotected conduct. *See Holy Land Found.*, 219 F. Supp. 2d at 81 (quoting *Humanitarian Law Project/AEDPA*, 205 F.3d at 1133), *aff'd*, 333 F.3d at 166; *IARA*, 477 F.3d at 736-37. Similarly, the term "otherwise associated with" has recently been defined by regulation as "(a) to own or control; or (b) to attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to," an SDGT. *See* 31 C.F.R. § 594.316. This provision, while focusing on association, is limited to specific types of conduct that extend beyond mere association, and requires that the designated party engage in unprotected conduct before it can be applied.[34] While it is conceivable that some type of protected activity could be covered by these terms, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law — particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Hicks*, 539 U.S. at 119 (quoting *Broadrick*, 413 U.S. at 615).

(U) A similar overbreadth challenge was recently rejected by a district court of this Circuit. In *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1064, the district court rejected the plaintiff's overbreadth challenge to E.O. 13224 finding that its ban on "services" is "content neutral and serves the legitimate purpose of deterring groups and individuals from providing services to foreign terrorist organizations." *See id.* The court held that "the E.O.'s application to protected speech is not substantial either in an absolute sense or relative to the scope of its plainly legitimate applications," and therefore declined to "apply the strong medicine of the overbreadth doctrine." *Id.*

---

[34] (U) This interpretative regulation was issued after plaintiff AHIF-Oregon's initial designation, but before plaintiff AHIF-Oregon's redesignation.

at 1065 (internal quotation marks and citation to *Humanitarian Law Project/AEDPA*, 380 F. Supp. 2d 1134, 1153 (C.D. Cal. 2005), omitted). Additionally, upon reconsideration, the Court ruled that the term "otherwise associated with" as used in E.O. 13224 and defined by 31 C.F.R. § 594.316 is "sufficiently precise to satisfy the Constitution." *Humanitarian Law Project/IEEPA*, 484 F. Supp. 2d 1099, 1106-07 (C.D. Cal. 2007), *appeal docketed* No. 07-55893 (9th Cir. June 22, 2007).[35/]

(U) While E.O. 13224 may, at its margins, conceivably touch on some imagined protected activity, that overlap is not substantial in absolute terms, and it is even less so when "judged in relation to the [E.O. 13224's] plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. Given E.O. 13224's plainly legitimate applications, the Court should not here apply the "strong medicine" of overbreadth invalidation. *Hicks*, 539 U.S. at 119.

## 2.    Executive Order No. 13,224 Is Not Unconstitutionally Vague (U)

(U) The standard for evaluating vagueness under the Fifth Amendment is not mechanically applied. *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 456 U.S. 489, 498 (1982). "The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment." *Id.* Courts judge civil penalties with more tolerance for vagueness than criminal penalties "because the consequences of imprecision are qualitatively less severe." *Flipside*, 455 U.S. at 499. And a less strict vagueness test applies where a regulated entity "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.* at 498.

---

35  (U)  The district court originally rejected Humanitarian Law Project's facial challenges to "services," and the term "Specially Designated Global Terrorist," but held that the "otherwise associated with" prong was unconstitutionally overbroad. *See Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1071. Shortly after this decision, OFAC issued 31 C.F.R. § 594.316 which further clarified the "otherwise associated with" prong. Upon the government's motion for reconsideration, the district court amended its earlier ruling, holding that the 31 C.F.R. § 594.316 definition remedied any constitutional deficiencies in the "otherwise associated with" prong. *See* 484 F. Supp. 2d at 1106-07.

(U) Statutes are voided on vagueness grounds for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1057 (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)).

(U) Plaintiff AHIF-Oregon claims that E.O. 13224 is unconstitutionally vague, both as applied and facially, because the terms "otherwise associated with," "material support," and "services" permit the designation of individuals and groups "without regard to the character or intent of the association or support." *See* Compl. ¶ 77. This appears to be a challenge to E.O. 13224 on either the ground that the terms are so vague as to preclude a person of normal intelligence from determining what is prohibited, or on the ground that the supposed vagueness of these terms permits the arbitrary and discriminatory enforcement of the Executive Order.[36/] E.O. 13224, however, provides sufficient clarity as to what conduct is barred to allow persons of normal intelligence to determine what conduct is prohibited, and to prevent arbitrary and discriminatory enforcement.

(U) As an initial matter, plaintiff AHIF-Oregon cannot maintain an as-applied challenge to the term "otherwise associated with," because that term has not been applied to AHIF-Oregon as a basis for its redesignation. *See* Szubin Decl. ¶ 71. Even if that term had been applied to plaintiff, however, it is sufficiently clear to pass vagueness scrutiny. As noted above, recent regulations have explicitly defined what is meant by the term "otherwise associated with," precluding any possible

---

[36] (U) To the extent plaintiff AHIF-Oregon's claim is instead that the vagueness of these terms chills First Amendment freedoms, this argument has been addressed in Section II.B. of this memorandum dealing with plaintiff's First Amendment claims. As explained in Section II.B., E.O. 13224 does not prohibit either protected speech or association; it merely limits the provision of support to terrorists, which is not a First Amendment-protected activity. *See Humanitarian Law Project/AEDPA*, 205 F.3d at 1133.

confusion as to what the term means. *See* 31 C.F.R. § 594.316. This definition was sufficient to persuade another district court to reverse an earlier finding that "otherwise associated with" was unconstitutionally vague. *See Humanitarian Law Project/IEEPA*, 484 F. Supp. 2d at 1107.

(U) While plaintiff AHIF-Oregon was not redesignated for being "otherwise associated with" an SDGT, it was redesignated for, *inter alia*, providing services and financial, material, and other support for SDGTs and terrorism.[37] *See* Szubin Decl. ¶ 71. These terms are, however, sufficiently clear to allow a person of reasonable intelligence to determine what behaviors are proscribed, and to assure that the Executive Order will not be applied arbitrarily. OFAC regulations provide guidance as to what is intended by the term "services," offering examples of what behavior would fall under that provision. *See* 31 C.F.R. § 594.406 ("U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked. . . ."). Moreover, the *Humanitarian Law Project/IEEPA* court recently rejected a challenge by persons seeking to provide services to SDGTs. The Court found that "[h]ere, by contrast, the EO's ban on 'services' is not vague on its face," *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1062, and held that the Executive Order's ban on "services" is not only "clear in the vast majority of its intended applications" but also does not give "unfettered authority to designate a person or group as an SDGT." *See id.* at 1063 (internal quotation marks omitted); *see also United States v. Lindh*, 212 F. Supp. 2d 541, 574 (E.D. Va. 2002) (dismissing a vagueness challenge to a prohibition against "services" under Exec. Order No. 12,947 and implementing regulations on the ground that

---

[37] (U) Plaintiff cannot challenge its initial designation as it has been rendered moot by its redesignation, which is the final agency action at issue in this case. *See, e.g., Global Relief Found.*, 315 F.3d at 751.

"the prohibition is set forth 'with sufficient definiteness that an ordinary person could understand what conduct was prohibited'") (citation omitted).

(U) The term "material support" is similarly clear. "Material" is defined as "having real importance or great consequences." *Merriam-Webster's Collegiate Dictionary* 715 (10th ed. 2002). The term "support" is defined as "to promote the interests or cause of." *Id.* at 1180. Moreover, although plaintiff fails to acknowledge it, the term "material support" is part of a longer clause reading, "to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order." *See* E.O. 13224, § 1(d)(ii). "We do not . . . construe the meaning of statutory terms in a vacuum. Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme." *Tyler v. Cain*, 533 U.S. 656, 662 (2001). In this context, "material support" refers to support to an SDGT that is of a type that is on par with, or would aid an SDGT in a way similar to, the provision of financial or technological support or services. When the context is combined with the normal definitions of the words used, a person of ordinary intelligence would understand what types of behavior would be covered by the term "material support." And accordingly, other courts have upheld the designation of groups under E.O. 13224 for providing "material support" to SDGTs. *See IARA*, 394 F. Supp. 2d at 40; *Global Relief Found. v. Newcomb*, No. 02-cv-0674, Memorandum, Opinion and Order (N.D. Ill. May 31, 2007) at 14 (Attach. 2).

(U) Additionally, the term "material support" as used in other statutes has survived vagueness challenges. The term "material support" as used in § 212(a)(3)(B)(iv)(IV) of the Immigration and Nationality Act, *codified at* 8 U.S.C. § 1182(a)(3)(B)(iv)(IV), has been upheld against vagueness challenge. *See Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298-99 (3d Cir. 2004). Similarly, the term

"material support" as used in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 18 U.S.C. § 2339B, has been upheld against vagueness challenge, although some of the terms the AEDPA uses to define "material support" have been struck down for their own vagueness. *See United States v. Assi*, 414 F. Supp. 2d 707, 717-18 (E.D. Mich. 2006) (rejecting vagueness challenge to the terms "other physical assets" and "weapons" as used to define "material support" under 18 U.S.C. § 2339B because they clearly encompassed defendant's conduct); *United States v. Hammoud*, 381 F.3d 316, 330 (4th Cir. 2004) (rejecting vagueness challenge to "material support" as used in 18 U.S.C. § 2339B to the extent it was defined as the provision of currency), *vacated on other grounds*, 543 U.S. 1097 (2005); *but see Humanitarian Law Project/AEDPA*, 509 F.3d 1122 (9th Cir. 2007) (holding that the terms "training," and "service" as used to define "material support" in 18 U.S.C. § 2339B are unconstitutionally vague).

(U) Further, a less strict vagueness test applies where an individual or regulated entity "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Flipside*, 455 U.S. at 498. As explained in the declaration of the Director of OFAC, an individual can call OFAC's compliance hotline and speak to an operations officer; send an email to OFAC's e-hotline mailbox; call OFAC's licensing division to inquire whether a proposed transaction requires OFAC authorization; speak with an attorney in OFAC's Chief Counsel's Office; or submit a written request to OFAC for a written interpretation addressing whether the activity in which they wish to engage would constitute a violation. *See* Szubin Decl. ¶ 87. Even if any of the challenged terms were so vague that a person of reasonable intelligence could not understand what they prohibited, plaintiff AHIF-Oregon had numerous administrative channels available to it through which it could determine exactly which behaviors fell within the purview of E.O. 13224.

(U)  Finally, E.O. 13224 is not so vague as to permit arbitrary or discriminatory enforcement. In the *Humanitarian Law Project* challenge to IEEPA, the district court rejected a very similar vagueness challenge to the term "services" finding it does not grant "unfettered authority to designate a person or group as an SDGT."  463 F. Supp. 2d at 1063.  And while initially finding the term "otherwise associated with" to be unconstitutionally vague because, *inter alia*, it gave "the Government unfettered discretion in enforcing it," *see id.*, 463 F. Supp. 2d at 1070, the court held on reconsideration that the 31 C.F.R. § 594.316 definition of "otherwise associated with" sufficiently clarified the term to satisfy the Constitution.  *See id.*, 484 F. Supp. 2d at 1107.  *See also Humanitarian Law Project/AEDPA*, 205 F.3d 1130, 1136-37 (9th Cir. 2000) (holding AEDPA "authorizes the Secretary to designate only those groups that engage in terrorist activities.  This standard is not so vague or indeterminate as to give the Secretary unfettered discretion.").

(U)  E.O. 13224 provides sufficient criteria to prevent arbitrary enforcement of the Order on any of the Order's prongs.  *See Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1066 (citing to the Executive order provisions, including the support prong, and holding that "these provisions of the E.O., like the analogous provisions of the AEDPA, set forth adequate criteria for the Secretary of the Treasury to exercise his discretion in designating individuals and groups as SDGTs").  First, a party may not be designated under E.O. 13224 unless it engages in specific behaviors.[38/]  *See* E.O.

---

[38] (U) The criteria set forth for designation in E.O. 13224 are more than substantial to satisfy constitutional standards.  Many Congressional grants of authority to the Executive with far fewer restrictions on that authority have been upheld against arbitrary enforcement claims.  *See e.g. Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (holding Congress's grant of authority to the Executive to impose area restrictions in the issuance of passports without any constraints did not grant unfettered discretion because in delegating powers to the Executive in the area of foreign affairs Congress must "of necessity paint with a brush broader than that which it customarily wields in domestic areas"); *Curtiss-Wright*, 299 U.S. 304 (1936) (upholding against claim that it granted Executive "unfettered discretion," a Joint Resolution of Congress that provided that if the President finds and proclaims that the prohibition of the sale of arms and munitions of war in the United States to those countries engaged in armed conflict in the Chaco would contribute to peace in the region, it would become unlawful to sell arms and munitions to those countries except under limitations and exceptions proscribed by the President).

13224, §§ 1-3.  Second, there are internal checks on the Executive order's enforcement.  The Department of the Treasury engages in an extensive investigation, and multiple layers of review, before proposing a designation, *see* Szubin Decl. ¶¶ 20-22, and before a proposed designation may become final, the Secretary must confer with the Secretary of State and the Attorney General.  *See* E.O. 13224, § 7; Szubin Decl. ¶ 22.  Third, designated parties may challenge their designations administratively and judicially.  *See* Szubin Decl. ¶ 23.  Finally, as discussed, the terms plaintiff specifically challenges are all sufficiently defined through regulation and litigation to provide suitable guidance to the Secretary as to how to apply them.  *See Flipside*, 455 U.S. at 504 ("In economic regulation especially, such administrative regulation will often suffice to clarify a standard with an otherwise uncertain scope.").

(U)   E.O. 13224 has not been applied to plaintiff AHIF-Oregon arbitrarily, or in a discriminatory manner.  Nor is the Executive Order susceptible to such enforcement.  *See supra* Section I.  Plaintiff therefore cannot maintain an as-applied vagueness challenge on the premise that the Executive order allows arbitrary or discriminatory enforcement.[39]

(U)  "The classification of a federal statute as void for vagueness is a significant matter."  *Columbia Natural Reources, Inc., v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995).  The terms challenged by plaintiff AHIF-Oregon are inherently clear and unmistakably apply to plaintiff AHIF-Oregon's behavior.  To the extent plaintiff AHIF-Oregon was uncertain whether its actions would fall within

---

[39] (U) To the extent plaintiff MCASO seeks to challenge IEEPA and E.O. 13224 on vagueness grounds on an arbitrary enforcement theory, it cannot do so either, as neither law has been applied to MCASO.  Courts routinely deny such pre-enforcement vagueness challenges because no evidence is available to determine whether the challenged law has been enforced in an arbitrary or discriminatory way.  *See Flipside*, 455 U.S. at 503.

the purview of E.O. 13224, plaintiff had ample administrative processes through which to seek clarification.[40]/  Accordingly, the Court must dismiss plaintiff's as-applied vagueness challenge.[41]/

### D.    Fourth Amendment (U)

(U) Plaintiff AHIF-Oregon claims that the freezing of the organization's assets and seizure of its records and property "constituted an unreasonable search and seizure without probable cause, in violation of the Fourth Amendment."  *See* Compl., ¶ 81.  This argument fails for several reasons. First, the regulatory action by the President or his delegate in levying economic sanctions is not a seizure.  Thus, the Fourth Amendment does not apply to the designation of AHIF-Oregon, or the blocking of its assets.  Second, to the extent that plaintiff is referring to the seizure of AHIF-Oregon's records and other assets, *see* Compl. ¶ 27, that search was conducted by the Internal Revenue Service, along with the Federal Bureau of Investigation, the Immigration and Naturalization Service, and local Oregon police, executing a search warrant at the Ashland property on February 18, 2004, as issued by Magistrate Judge John P. Cooney of this Court on February 13, 2004.  *See* AR0234.  While OFAC blocked AHIF-Oregon pending investigation the next day, no OFAC personnel had been present during the execution of the criminal search warrant, and OFAC did not take any further action regarding the property.  *See* Szubin Decl. ¶ 49.  To the extent plaintiff AHIF-Oregon wishes to

---

[40] (U) The same administrative avenues are open to plaintiff MCASO, through which it may determine if any proposed conduct would violate the terms of IEEPA or Exec. Order No. 13,224.

[41] (U) Plaintiff's facial vagueness challenge must also be dismissed. In *Parker v. Levy*, 417 U.S. 733, 757 (1974), the Supreme Court reversed a Third Circuit holding that even though the appellee's behavior clearly fell within the conduct prohibited by the challenged statute, he still had standing to challenge the statute on the theory that it was vague as it might hypothetically be applied to others. *Id.* at 756-57. Suggesting that this was an improper conflation of the overbreadth and vagueness doctrines, the Court held that "[i]n determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *Id.* at 757; *see also United States. v. Miller*, 771 F.2d 1219, 1225 (9th Cir. 1995) ("A defendant cannot challenge a statute on the ground that it may not give fair notice that conduct other than that with which he is charged is forbidden."); *Assi*, 414 F. Supp. 2d at 719 ("[d]efendant's facial [vagueness] challenge can succeed only if the enactment is impermissibly vague in all of its applications. To see why it is not, one need only consider the facts of the present case.") (internal quotation marks and citation omitted).

challenge either the legality of the search warrant or the search carried out on February 18, 2004, it must do so consistent with Federal Rule of Criminal Procedure 41(g).  Plaintiff provides no grounds in the Complaint for questioning the legitimacy of that action, which was based on probable cause and a warrant, and seeks no relief addressing the alleged seizures.  Finally, any subsequent activity by OFAC regarding the AHIF-Oregon premises and remaining property does not evidence a Fourth Amendment violation.[42]

### 1.     OFAC's Blocking and Freezing of Assets Is Not a Seizure (U)

(U) Plaintiff's Fourth Amendment claims related to the blocking or freezing of its assets are without merit, as blocking actions *per se* do not qualify as seizures and thus do not implicate the protections of the Fourth Amendment.  The Supreme Court has at least four times upheld the constitutionality of economic sanctions programs effectuated through the blocking of property without alluding to any Fourth Amendment constraints.[43]  The President's regulation of international economic transactions through designation and issuance of a blocking or freezing order under the authority granted by Congress is neither a search nor a seizure within the meaning of the Fourth Amendment.  Blocking does not vest title in favor of the government but rather merely temporarily freezes assets and property.  *See Tran Qui Than v. Regan*, 658 F.2d 1296, 1301 (9th Cir. 1981) (distinguishing "blocked" assets from assets that have been "seized," or "conveyed, transferred, assigned, delivered or paid"); *D.C. Precision, Inc. v. United States*, 73 F. Supp. 2d 338, 343 n. 1 (S.D.N.Y. 1999) (indicating that assets blocked by the government are not seized).

---

[42] (U) Plaintiff admits in the Complaint that some blocked property was removed from the blocked Ashland, Oregon property at the request of attorney Thomas Nelson. Compl. ¶ 62.  To the extent plaintiff AHIF-Oregon is attempting to characterize this action as a search, it was done at the request of plaintiff and accordingly OFAC did not require a warrant.  "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[43] (U) *See Regan v. Wald*, 468 U.S. 222, 232-33 (1984); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 481-82 (1949).

(U) Based on this principle, courts have rejected claims similar to plaintiff's assertions that blocking actions conducted without a warrant violated the Fourth Amendment. *See IARA*, 394 F. Supp. 2d at 48 (concluding that blocking of assets under IEEPA is not a seizure and not subject to the requirements of the Fourth Amendment); *Holy Land Found.*, 219 F. Supp. 2d at 78-79 (finding that OFAC's freezing of bank accounts under IEEPA is not a seizure and not entitled to Fourth Amendment protection).[44] As demonstrated, plaintiff's attempt to superimpose the Fourth Amendment's warrant and probable cause requirements on to Executive blocking actions under IEEPA is unavailing, and plaintiff's Fourth Amendment claim fails as a matter of law. Indeed, such a requirement would be flatly inconsistent with the great deference accorded the Executive in this area, and with the Supreme Court's admonition that the Executive's authority is at its zenith in this area of foreign affairs and national security.

> ## 2. To the Extent Any Blocked Assets, Records, or Property Were Taken into OFAC Custody, Such Action Did Not Violate the Fourth Amendment (U)

(U) With respect to the alleged "seizure" of plaintiff AHIF-Oregon's assets, records and property, plaintiff is not clear as to what assets, records, or property were supposedly seized without a warrant or probable cause. While OFAC blocked AHIF-Oregon pending investigation in February 2004, the blocking did not result in OFAC taking physical possession of any funds, accounts, property, or business records. *See* Szubin Decl. ¶¶ 74, 80.

_____

[44] (U) In *Holy Land*, the court did find, however, that OFAC's entry into plaintiff's offices and removal of its documents and office equipment without a warrant raised Fourth Amendment concerns. *Id.* at 79. Nevertheless, the court denied plaintiff's request for a preliminary injunction, explaining that with respect to the Fourth Amendment claim "the Court is not prepared to determine that [plaintiff] has a substantial likelihood of success on those allegations in light of the strong arguments advanced by the Government in support of its position." *Id.* at 84. The court never reached the merits, as Holy Land ultimately did not pursue that claim after *certiorari* was denied by the Supreme Court on other issues appealed by Holy Land. Holy Land revived its Fourth Amendment challenge in its criminal prosecution, however, which the court rejected. *See United States v. Holy Land Found. for Relief and Dev.*, No. 04-cr-240, slip op. at 8 (N.D. Tex. May 2, 2007) (Attach. 3).

(U)  Shortly after blocking AHIF, OFAC filed blocking notices with the County Clerk of Jackson County, Oregon, and the Recorder of Deeds of Greene County, Missouri, with respect to properties owned by AHIF-Oregon in Ashland, Oregon, and Missouri, but OFAC did not take possession of anything inside the properties.  *Id.* ¶ 74.  In October 2005, following receipt of reports that the Ashland property was unsecured, OFAC personnel traveled to Oregon to meet with attorney Thomas Nelson and members of the Seda family to segregate personal property from that of AHIF-Oregon and survey the status of the property.  Personal property was permitted to be removed from the premises, most of which was stored in a trailer on the premises, secured by a lock owned by the Seda family.  OFAC's contractor, EG&G, also removed numerous boxes of Islamic literature from the premises and placed them into storage.  OFAC then secured the Ashland property with a new lock.  Over the course of the next two years, all property that was in OFAC's possession, including the Islamic literature moved to storage, was licensed to AHIF-Oregon through several different licenses.  *See* Szubin Decl. ¶¶ 76-78.

(U)  In February 2005, OFAC licensed the sale of the Ashland property, at AHIF-Oregon's request, with all proceeds to go to a blocked account.  *Id.* ¶ 75.  On September 20, 2005, OFAC issued a license to enable AHIF-Oregon to appoint Thomas Nelson to its Board of Directors for the purpose of carrying out the sale of the property.  *See id.*  Plaintiff has never filed a license request with regard to the blocked Missouri property.  *Id.* ¶ 76.

(U)  At the present time, all property, records, and assets not seized pursuant to the February 18, 2004 execution of the search warrant have been licensed to plaintiff. Szubin Decl. ¶ 80.  Plaintiff apparently recognizes this, as it does not request any relief with respect to allegedly seized property, records, or assets.  Plaintiff's claim related to the alleged seizure appears therefore to be moot as all

property has been licensed back to plaintiff.  Accordingly, plaintiff's argument that the blocking of

its assets violates the Fourth Amendment should be rejected.[45/]

## III.    PLAINTIFF MCASO LACKS STANDING TO BRING ITS CLAIMS.  (U)

(U) Plaintiff Multicultural Association of Southern Oregon ("MCASO") joins in AHIF-

Oregon's challenge to its designation, claiming, *inter alia*, that MCASO is "a catalyst in the southern

Oregon community to promote understanding and appreciation between cultures"; that AHIF-

Oregon was "an important organization in the community"; that "[p]rior to AHIF's designation,

MCASO was a co-sponsor or participant with AHIF" in several community outreach activities and

would "continue to cooperate similarly were it not for AHIF's designation"; and that MCASO

"would like to continue to work with AHIF in its former activities" and speak out in support of

AHIF.  *See* Compl. ¶ 5.  MCASO would also "volunteer their time to work on AHIF's behalf and

for its benefit by speaking to the press, holding demonstrations, and contacting the government."

*See* Compl. ¶ 65. MCASO claims that IEEPA, Exec. Order 13,224, and the implementing

regulations are vague and overbroad and violate MCASO's First and Fifth Amendment rights by

prohibiting it from engaging in advocacy and engaging in activities on behalf of and for the benefit

of AHIF in connection with its challenge to the designation.  However, MCASO's claims all fail for

a lack of standing.

---

[45] (U) Even if plaintiff could proceed on a Fourth Amendment claim for alleged seizures by
OFAC, to the extent OFAC did enter the premises to secure assets, property, or records, OFAC's actions
did not require a warrant, as such actions are not unreasonable under the Fourth Amendment and are not
subject to the Warrant Clause or probable cause standard.  The important national security and foreign
policy considerations supporting the blocking of property pursuant to the declaration of a national
emergency are more than sufficient to satisfy the Fourth Amendment's requirement that searches and
seizures be reasonable.  *See Regan*, 468 U.S. at 241-42.  In addition, plaintiff's corresponding interest in
this property has been diminished by operation of law, as an entity whose assets have been blocked
pursuant to IEEPA retains only minimal privacy interests.  *See Vernonia School Dist. 47J v. Acton*, 515
U.S. 646, 654 (1995).  And finally, the administrative process that occurs both before and after an IEEPA
blocking order is issued minimizes the possibility that the government will act arbitrarily, as the
designation process involves an interagency, consultative process.  *See* E.O. 13224.

(U)  As  evidenced  by  the  Complaint  and  MCASO's  statements  on  its  website (www.mcaso.org), *see* Compl. ¶ 5, their claims do not rise to the level of concrete injury, nor can the Court redress their injury.  Such claims cannot give them the relief they really seek, which is a finding that AHIF-Oregon's designation was unlawful and the reopening of that organization so that AHIF-Oregon and MCASO can once again work together.  Nor can their desire to advocate for AHIF-Oregon's challenge to its designation, to speak to the press, hold demonstrations, and contact the government, support standing to challenge IEEPA, the Executive Order, and the implementing regulations.  Instead of meeting the requirements for constitutional standing, MCASO raises a generalized grievance no different from that of any "friend" or former colleague of a designated entity who would like to resume a relationship with the SDGT or exercise his First Amendment rights to decry what he considers improper government action.

(U)  "To satisfy the Article III case or controversy requirement, [a plaintiff] must establish, among other things, that it has suffered a constitutionally cognizable injury-in-fact" that is caused by the government and can be redressed by a court.  *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (the threat of injury must be "real and immediate," not "conjectural" or "hypothetical") (internal citations omitted).  As was the case in *Humanitarian Law Project/IEEPA*, "[t]he harm of self-censorship that animates the more lenient First Amendment standing requirement is simply not present here, because the IEEPA does not on its face punish First Amendment activity."  *Humanitarian Law Project/IEEPA*, 484 F. Supp. 2d at 1108.[46]  "[N]either the mere existence of a proscriptive statute

---

[46] (U) The court had initially found standing for plaintiffs to challenge the President's authority to designate persons.  *See Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1066-67.  On reconsideration, the court rejected plaintiffs' claims of standing.  *See Humanitarian Law Project/IEEPA*, 484 F. Supp. 2d at 1108-09.

nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

(U) A plaintiff lacks standing to challenge a law unless it can show a "genuine threat of imminent prosecution," *Thomas*, 220 F.3d at 1139, which is shown through a three factor test: (1) has the plaintiff articulated a "concrete plan" to violate the law in question; (2) have the prosecuting authorities communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the challenged statute. *Id.* Plaintiff MCASO has not articulated a concrete plan to violate IEEPA or E.O. 13224, or claimed that it has been warned or threatened with proceedings. Nor has MCASO indicated what provisions of IEEPA or E.O. 13224 it believes it might violate. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) (refusing to hear a challenge to a TWEA provision because "the Office has never denied a license on this basis, we have no idea how it will exercise its discretion or if it ever will. We simply do not know enough to evaluate this claim.").

(U) MCASO fails to establish standing because MCASO offers only generalized, non-specific, descriptions of activities it might engage in, and has not shown that they would be barred by IEEPA or E.O. 13224. MCASO's claim that IEEPA and E.O. 13224 would bar it from engaging in advocacy is incorrect. The *Humanitarian Law Project* court examining IEEPA expressly held in its initial opinion that E.O. 13224 does not prohibit a party from "vocally supporting the activities" of an SDGT. *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1059; *see also Holy Land Found.*, 219 F. Supp. 2d at 81 ("IEEPA, the two Executive Orders [including E.O. 13224] and the blocking order do not prohibit membership in Hamas or endorsement of its views, and therefore do not implicate HLF's associational rights."). As explained in section II.B. of this Memorandum, pure speech, or advocacy, is not barred by E.O. 13224 or IEEPA. Further, the activities MCASO claims

to have engaged in with AHIF-Oregon, and supposedly seeks to again, are dependent on AHIF-Oregon's designation being lifted and therefore cannot constitute "concrete plans" to violate the law.

(U) Nor does MCASO's desire to "otherwise assist[]" and "provid[e] support to" AHIF-Oregon, *see* Compl. ¶¶ 82-85, without more specificity, satisfy the concrete plan requirement. Further, to the extent MCASO wished to ascertain whether it would be in violation of either law prior to engaging in specific conduct that would fall under these general categories, MCASO can avail itself of the numerous administrative channels available for clarification. *See* Szubin Decl. ¶¶ 86-87. MCASO also makes no effort to meet the other two requirements for establishing standing for pre-enforcement review. There is no claim of a threat of prosecution, and no showing that anyone has been prosecuted for mere advocacy. Nor has plaintiff "argued or shown that any of the[] designated individuals or organizations are similar to them, or that these SDGTs engaged in conduct similar to [plaintiff'] conduct." *See Humanitarian Law Project/IEEPA*, 484 F. Supp. 2d at 1108. Thus, MCASO's fear of prosecution or designation "is ultimately based on speculation," and cannot support standing. *See also Sacks v. OFAC*, 466 F.3d 764, 774-75 (9th Cir. 2006) (plaintiff who admitted violating the IEEPA-based Iraq sanctions provision at issue nonetheless lacked standing because he failed to show OFAC communicated a specific warning or threat to initiate proceedings against him for that violation).

(U) Plaintiff MCASO makes clear its actual purpose in joining this lawsuit on its website, where it states, "The First Amendment guarantees freedom of speech, the right to associate with whomever we choose, and the right to petition our government for redress of grievances — a right which we are exercising in this case." *See* "So Why is A Small Nonprofit Organization Suing The Federal Government," *available at* http://www.mcaso.org/Articles.html. Plaintiffs do not, however, have a First Amendment right to sue federal agencies over generalized grievances unless they can

first establish standing to do so.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) ("[W]e have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.").  MCASO has shown no concrete injury that can be redressed by judicial relief; has failed to adequately describe its planned activities; has not shown any threat of enforcement against it; and has shown no history of designations based upon mere advocacy.[47]/ Therefore, it cannot maintain this lawsuit.

(U)  Finally, even if MCASO did have standing to challenge IEEPA, E.O. 13224 and its implementing regulations, for the reasons described earlier, its claims would fail.  *See* Sections II.B. and C.  Just as IEEPA, E.O. 13224, and its implementing regulations are constitutional both facially and as applied to plaintiff AHIF-Oregon, so they are constitutional with respect to MCASO.

## <u>CONCLUSION</u> (U)

(U)  For all the foregoing reasons, defendants' Motion to Dismiss and for Summary Judgment should be granted, and this case should be dismissed.

---

[47] (U) The *Humanitarian Law Project* court examining IEEPA and E.O. 13224 found that the plaintiffs, despite having not been blocked or designated, and without any threat of prosecution or designation, did have standing to bring a First Amendment challenge to the term "otherwise associated with."  While the government's position remains that those plaintiffs did not have standing to raise that challenge, those plaintiffs were nevertheless much more specific about the conduct they planned to engage in, as well as the provision of E.O. 13,224 they were challenging.  The plaintiffs claimed that they intended to provide to SDGTs training in human rights advocacy and peacemaking negotiations, legal services in aid of setting up institutions for providing humanitarian aid, engineering services and technological support to help rebuild infrastructure in tsunami-afflicted areas, and psychiatric counseling for survivors of the tsunami.  *Humanitarian Law Project/IEEPA*, 463 F. Supp. 2d at 1053.  Further, in addition to these descriptions of intended conduct, the court expressly rested its finding of standing on the fact that the plaintiffs' intended conduct could violate the "otherwise associated with" provision of E.O. 13,224, which plaintiffs specifically challenged, and that the "otherwise associated with" prong had previously been the basis for at least two designations.  *Id.* at 1068-69.

PAGE 60 –    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
             MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Dated:  February 6, 2008              Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director
Federal Programs Branch


   /s/
ANDREA GACKI
JONATHAN E. ZIMMERMAN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone:    (202) 514-4336/(202) 353-0441
Fax:           (202) 318-2461/(202) 318-7610
andrea.gacki@usdoj.gov
jonathan.zimmerman@usdoj.gov

*Attorneys for Defendants*