Thomas H. Nelson, OSB No. 78315 (nelson@thnelson.com)
P.O. Box 1211, 24525 E. Welches Road
Welches, OR  97067
Telephone: 503.622.3123; Fax: 503.622.1438

J. Ashlee Albies, OSB No. 05184 (Ashlee@sstcr.com)
Steenson, Schumann, Tewksbury, Creighton & Rose, P.C.
815 SW Second Avenue, Suite 500
Portland, OR  97204
Telephone: 503.221.1791; Fax: 503.223.1516

David D. Cole, DC Bar No. 438355 (Cole@law.georgetown.edu)
c/o Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
Telephone: 202.662.9078

Lynne Bernabei, DC Bar No. 938936 (Bernabei@bernabeipllc.com)
Alan R. Kabat DC Bar No. 464258 (Kabat@bernabeipllc.com)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
Telephone: 202.745.1942; Fax: 202.745.2627

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| Al Haramain Islamic Foundation, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>United States Department of the Treasury, *et al.*,<br><br>Defendants. | Case No. 07-CV-1155-KI<br><br>Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss and for Summary Judgment |

**Table of Contents**

INTRODUCTION AND SUMMARY OF ARGUMENT    .    .    .    .    1

STATEMENT OF FACTS    .    .    .    .    .    .    .    .    5

    A.    Statutory and Regulatory Scheme    .    .    .    .    5

    B.    Factual Background – Designation of AHIF-Oregon    .    .    9

    C.    Intended Activities of the Multicultural Association .    .    .    13

ARGUMENT .    .    .    .    .    .    .    .    .    .    14

I.    Standard of Review    .    .    .    .    .    .    .    14

II.    The Procedure Used to Designate AHIF-Oregon Violated Due Process    .    15

    A.    Defendants' Failure to Provide Notice of the Specific Charges Violated Due Process and the Administrative Procedure Act    .    .    .    15

    B.    Defendants' Reliance on Classified Evidence Deprived AHIF-Oregon of Notice of the Charges and Evidence Against It    .    .    .    20

III.    AHIF-Oregon's Designation and Redesignation Violate the Administrative Procedure Act .    .    .    .    .    .    .    .    24

    A.    OFAC's Redesignation Improperly Rests On New Grounds .    .    25

    B.    OFAC's Designation Process Lacks Adequate Legal Standards    .    27

    C.    OFAC Improperly Relied on Unreliable Hearsay Evidence    .    .    28

    D.    OFAC Improperly Created a One-Sided Administrative Record    .    29

    E.    The Evidence in the Administrative Record Does Not Support the Designation and Redesignation of AHIF-Oregon    .    .    .    31

        1.    The Evidence Does Not Show that Messrs. Al-Aqil or Al-Buthe Own or Control AHIF-Oregon, Or That It Acts For or On Behalf of Either Man .    .    .    .    .    .    .    32

2.      The Evidence Does Not Show that AHIF-Oregon Supported
        Terrorism or SDGTs Through Its Associations with AHIF-SA      34

IV.   IEEPA Does Not Authorize Designation of Organizations Unconnected to a
      Nation-Targeted Economic Sanction, and Therefore, AHIF-Oregon's Designation
      Is Statutorily Unauthorized      .      .      .      .      .      .      .      35

V.    The Designation Authority Is Vague and Overbroad in Violation of the First
      and Fifth Amendments      .      .      .      .      .      .      .      40

      A.    Plaintiffs Have Standing to Challenge the Designation Authority
            on Its Face and as Applied      .      .      .      .      .      .      41

      B.    The President's Designation Authority is Unconstitutionally Vague and
            Overbroad      .      .      .      .      .      .      .      .      43

      C.    The Treasury Secretary's Designation Authority Is Vague and Overbroad      46

            1.      The Power to Designate Groups that Have Never Engaged in
                    or Supported Terrorist Activity is Vague and Overbroad      .      46

            2.      The Ban on Providing "Material Support," "Services" and on
                    Being "Associated With" Designated Groups is Vague and
                    Overbroad      .      .      .      .      .      .      .      48

VI.   The Freezing of AHIF-Oregon's Assets Violated the Fourth Amendment      .      54

VII.  Defendants' Restrictions on AHIF-Oregon's Ability to Pay for its Legal Defense
      Violates Due Process      .      .      .      .      .      .      .      .      57

      CONCLUSION      .      .      .      .      .      .      .      .      59

# Table of Authorities

## Cases

*American-Arab Anti-Discrimination Committee v. Thornburgh*,
　　940 F.2d 445 (9th Cir. 1991) . 　.　 　.　 　.　 　.　 　.　 　.　 41-42

*American-Arab Anti-Discrimination Committee v. Reno*,
　　70 F.3d 1045 (9th Cir. 1995) . 　.　 　.　 　.　 　.　 　.　 　.　 21-22

*Aptheker v. Secretary of State*,
　　378 U.S. 500 (1964) . 　.　 　.　 　.　 　.　 　.　 　.　 　.　 40

*Arrington v. Daniels*,
　　516 F.3d 1106 (9th Cir. 2008) 　.　 　.　 　.　 　.　 　.　 　.　 26

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. __, 127 S. Ct. 1955 (2007) . 　.　 　.　 　.　 　.　 14

*Beobanka D.D. Belgrade v. United States*,
　　No. 95 Civ. 5138 (HB), 1997 WL 23182 (S.D.N.Y. Jan. 22, 1997) . 　.　 59

*Bismullah v. Gates*,
　　501 F.3d 178 (D.C. Cir. 2007), *pet. for reh'g en banc denied*, 514 F.3d 1291
　　(D.C. Cir. 2008), *pet. for cert. filed*, No. 07-1054 (U.S. Feb. 14, 2008) . 23-24

*Broadrick v. Oklahoma*,
　　413 U.S. 601 (1973) . 　.　 　.　 　.　 　.　 　.　 　.　 　.　 44

*Buckley v. Valeo*,
　　424 U.S. 1 (1976) 　.　 　.　 　.　 　.　 　.　 　.　 　.　 　.　 47

*California Pro-Life Council, Inc. v. Getman*,
　　328 F.3d 1088 (9th Cir. 2003) 　.　 　.　 　.　 　.　 　.　 　.　 41-42

*California Teachers' Assn v. State Bd. of Educ.*,
　　271 F.3d 1141 (9th Cir. 2001) 　.　 　.　 　.　 　.　 　.　 　.　 40

*Carlton v. Babbitt*,
　　26 F. Supp. 2d 102 (D.D.C. 1998) 　.　 　.　 　.　 　.　 　.　 29-30

*Celotex Corp. v. Catrett*,
　　477 U.S. 317 (1986) . 　.　 　.　 　.　 　.　 　.　 　.　 　.　 15

*Church of Scientology v. IRS,*
    484 U.S. 9 (1987) .   .   .   .   .   .   .   .    31

*Citizens Against Rent Control v. Berkeley,*
    454 U.S. 290 (1981) .   .   .   .   .   .   .   .    47

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) .   .   .   .   .   .   .   .    16

*D.C. Precision, Inc. v. United States,*
    73 F. Supp. 2d 338 (S.D.N.Y. 1999) .   .   .   .    55

*Esch v. Yeutter,*
    876 F.2d 976 (D.C. Cir. 1989) .   .   .   .   .    29-30

*Foti v. City of Menlo Park,*
    146 F.3d 629 (9th Cir. 1998) .   .   .   .   .    43

*Fund for Animals v. Williams,*
    245 F. Supp. 2d 49 (D.D.C. 2003) .   .   .   .    30

*Global Relief Foundation, Inc. v. O'Neill,*
    315 F.3d 748 (7th Cir. 2002) .   .   .   .   .    15

*Goss v. Lopez,*
    419 U.S. 565 (1975) .   .   .   .   .   .   .    21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .   .   .   .   .   .   .    54

*Greene v. McElroy,*
    360 U.S. 474 (1959) .   .   .   .   .   .   .    21

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) .   .   .   .   .   .   .    16

*Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) .   .   .   .   .   .   .    44, 54

*Holy Land Foundation for Relief & Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) .   .   .   .   .    8

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to
Defendants' Motion to Dismiss and for Summary Judgment

*Holy Land Foundation for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) . . . . . . . 55

*Hotel & Motel Ass'n of Oakland v. City of Oakland,*
    344 F.3d 959 (9th Cir. 2003) . . . . . . . 40

*Humanitarian Law Project v. Reno,*
    205 F.3d 1130 (9th Cir. 2000) . . . . . . . 45, 50

*Humanitarian Law Project v. Mukasey,*
    509 F.3d 1122 (9th Cir. 2007) . . . . . . . 48

*Humanitarian Law Project v. U.S. Dept. of Treasury,*
    463 F. Supp. 2d 1049 (C.D. Cal. 2006) . . . . 3, 42, 44, 50

*Humanitarian Law Project v. U.S. Dept. of Treasury,*
    484 F. Supp. 2d 1099 (C.D. Cal. 2007) . . . . . 3, 51

*INS v. St. Cyr,*
    533 U.S. 289 (2001) . . . . . . . . 36

*Information Providers' Coalition for the Defense of the First Amendment v. FCC,*
    928 F.2d 866 (9th Cir. 1991) . . . . . . . 43-44

*Initiative and Referendum Inst. v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) (*en banc*) . . . . . 42

*Islamic American Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) . . . . . . . 25

*Islamic American Relief Agency v. Unidentified FBI Agents,*
    394 F. Supp. 2d 34 (D.D.C. 2005) . . . . . . 55

*Kent County, Delaware Levy Court v. EPA,*
    963 F.2d 391 (D.C. Cir. 1992) . . . . . . . 30

*Kent v. Dulles,*
    357 U.S. 116 (1958) . . . . . . . . 40

*KeySpan-Ravenswood, LLC v. FERC,*
    348 F.3d 1053 (D.C. Cir. 1993) . . . . . . . 26

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to
Defendants' Motion to Dismiss and for Summary Judgment

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)  .    .    .    .    .    .    .    .    16, 19, 21-22

*Metropolitan Council of NAACP Branches v. FCC*,
    46 F.3d 1154 (D.C. Cir. 1995)    .    .    .    .    .    .    .    28

*Michigan Dept. of State Police v. Sitz*,
    496 U.S. 444 (1990)  .    .    .    .    .    .    .    .    56

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)    .    .    .    .    .    .    .    .    24

*Mt. Healthy School Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) . .    .    .    .    .    .    .    .    51

*Nadarajah v. Gonzales*,
    443 F.3d 1069 (9th Cir. 2006)    .    .    .    .    .    .    36

*National Council of Resistance of Iran v. Department of State*,
    251 F.3d 192 (D.C. Cir. 2001)    .    .    .    .    .    .    15-16

*New York v. Burger*,
    482 U.S. 691 (1987)  .    .    .    .    .    .    .    .    56

*Public Citizen v. Heckler*,
    653 F. Supp. 1229 (D.D.C. 1986)    .    .    .    .    .    .    30

*Rafeedie v. INS*,
    880 F.2d 506 (D.C. Cir. 1989)    .    .    .    .    .    .    22

*Regan v. Wald*,
    468 U.S. 222 (1984)  .    .    .    .    .    .    .    .    40

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)  .    .    .    .    .    .    .    .    47

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)    .    .    .    .    .    .    .    .    26

*Seagram & Sons v. Hostetter*,
    384 U.S. 35 (1966)    .    .    .    .    .    .    .    .    54

*Service Employees Int'l Union v. Fair Political Practices Comm'n,*
     955 F.2d 1312 (9th Cir. 1992)   .    .    .    .    .    .    47

*Singh-Kaur v. Ashcroft,*
     385 F.3d 293 (3d Cir. 2004)  .    .    .    .    .    .    50

*Soldal v. Cook County,*
     506 U.S. 56 (1992)  .    .    .    .    .    .    .    4, 54

*Tran Qui Than v. Regan,*
     658 F.2d 1296 (9th Cir. 1981)   .    .    .    .    .    55

*United States v. Microsoft Corp.,*
     253 F.3d 34 (D.C. Cir. 2001) (*en banc*) (*per curiam*)   .    .    .    28

*United States v. Place,*
     462 U.S. 696 (1983)  .    .    .    .    .    .    .    55-56

*United States v. Wunsch,*
     84 F.3d 1110 (9th Cir. 1996)  .    .    .    .    .    .    43

*Universal Health Services, Inc. v. Thompson,*
     363 F.3d 1013 (9th Cir. 2004)   .    .    .    .    .    15

*Virginia v. Hicks,*
     539 U.S. 113 (2003)  .    .    .    .    .    .    .    44

*Zadvydas v. Davis,*
     533 U.S. 678 (2001)  .    .    .    .    .    .    .    36

*Zemel v. Rusk,*
     381 U.S. 1 (1965)  .    .    .    .    .    .    .    40

**Constitutional Provisions**

First Amendment   .    .    .    .    .    .    .    .    .    *passim*

Fourth Amendment   .    .    .    .    .    .    .    .    4, 54-57

Fifth Amendment   .    .    .    .    .    .    .    .    *passim*

**Public Laws and Statutes**

Administrative Procedure Act,
      5 U.S.C. § 701 *et seq.*      .      .      .      .      .      .      .      15-35

Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA),
      Pub. L. No. 104-132, 110 Stat. 1214 (1996)   .      .      .      .      38-39, 45-47, 50

Classified Information Procedures Act,
      Pub. L. 96-456, 18 U.S.C. App. 3      .      .      .      .      .      .      23

Intelligence Reform and Terrorism Prevention Act of 2004,
      Pub. L. 108-458, Section 7119(a) (Dec. 17, 2004)   .      .      .      .      27

International Emergency Economic Powers Act,
      Pub. L. 95-223 (1977) ("IEEPA"), 50 U.S.C. § 1701 *et seq.*      .      .      *passim*

USA PATRIOT Act,
      Pub. L. No. 107-56, 115 Stat. 272 (2001)   .      .      .      .      .      39

8 U.S.C. § 1189      .      .      .      .      .      .      .      .      27, 39, 46, 47

18 U.S.C. § 2339A(b)(i)      .      .      .      .      .      .      .      50

18 U.S.C. § 2339B      .      .      .      .      .      .      .      .      39, 48-49

**Executive Orders**

Executive Order 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995)   .      .      .      .      6

Executive Order 12959, 60 Fed. Reg. 24757 (May 6, 1995)   .      .      .      .      5

Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001)      .      .      .      *passim*

Executive Order 13268, 67 Fed. Reg. 44751 (July 2, 2002)   .      .      .      .      6

**Regulations**

8 C.F.R. § 1240.11(c)(3)(iv)   .      .      .      .      .      .      .      23

8 C.F.R. § 1240.33(c)(4)      .      .      .      .      .      .      .      23

8 C.F.R. § 1240.49(c)(4)(iv)   .      .      .      .      .      .      .      23

31 C.F.R. § 500.801 . . . . . . . . . . 26

31 C.F.R. § 501.801 . . . . . . . . . . 26

31 C.F.R. § 501.803 . . . . . . . . . . 26

31 C.F.R. § 594.310 . . . . . . . . . . 7

31 C.F.R. § 594.406 . . . . . . . . . . 7, 51

31 C.F.R. § 594.702-704 . . . . . . . . . 7

31 C.F.R. § 594.802 . . . . . . . . . . 8

**Federal Rules of Civil Procedure**

Rule 12(b)(6), Fed. R. Civ. P. . . . . . . . . 14

Rule 56, Fed. R. Civ. P. . . . . . . . . . 14-15

**Legislative Materials**

Markup Before the Committee on International Relations, House of Representatives,
95th Congress, 1st Sess. (June 17, 1977) (Rep. Bingham) . . . . 38

**Other Sources**

Brief of Appellees in *Humanitarian Law Project v. Dept. of Treasury*, No. 07-55893
(9th Cir. filed Mar. 10, 2008) . . . . . . . . 52

Robert M. Chesney, *The Sleeper Scenario: Terrorism-Support Laws and the Demands of
Prevention*, 42 Harv. J. on Legis. 1 (2005) . . . . . . 6

G.C. HUFBAUER, ET AL., ECONOMIC SANCTIONS RECONSIDERED (3d ed. 2007) . 6

P.R. Keefe, *State Secrets: A Government Misstep in a Wiretapping Case*,
The New Yorker (Apr. 28, 2008) . . . . . . . . 56

*Merriam-Webster Collegiate Dictionary* 715, 1180 (10th ed. 2002) . . 49

OFAC, "Specially Designated Nationals and Blocked Persons," posted at
http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf . . 7

## INTRODUCTION AND SUMMARY OF ARGUMENT.

When he issued Executive Order 13224,[1] the President unilaterally assumed the power to impose draconian economic sanctions on any organization or individual he chooses – without any finding of wrongdoing, without any statement of reasons, without meeting any statutory criteria, and without any hearing.  Under this authority, Al Haramain Islamic Foundation, Inc. (AHIF-Oregon)[2] has been shut down, with all its assets frozen, since February 2004.  Yet it was not until February 2008, four years *after* its assets were frozen, more than three years *after* it was initially designated a "specially designated global terrorist," and six months *after* AHIF-Oregon filed this lawsuit, that defendants *for the first time* provided AHIF-Oregon with any notice of the factual or legal basis for its designation.

Until this lawsuit was filed, defendants never informed AHIF-Oregon of what conduct or associations allegedly warranted its designation.  Until this lawsuit was filed, defendants never even identified which provisions of the Executive Order AHIF-Oregon was alleged to have violated.  Until this lawsuit was filed, defendants never provided any statement of reasons for AHIF-Oregon's treatment.  Thus, AHIF-Oregon had to defend itself entirely in the dark, without knowing what activities of AHIF-Oregon that OFAC was considering.

After the suit was filed, defendants belatedly sought to correct these deficiencies by taking the novel and unauthorized step of "redesignating" AHIF-Oregon, a procedure nowhere

---

[1] 66 Fed. Reg. 49079 (Sept. 23, 2001).

[2] In plaintiffs' Complaint, they used AHIF to identify the Al Haramain Islamic Foundation, Inc. (U.S.A.), and AHF-SA to identify the Al Haramain Foundation in Saudi Arabia.  In defendants' memorandum, however, they used AHIF to identify Al Haramain in Saudi Arabia, and AHIF-Oregon to identify plaintiff here.  To avoid confusion, we will use AHIF-Oregon to refer to Al Haramain Islamic Foundation located in Oregon, the plaintiff here, and AHIF-SA to refer to the Saudi Al Haramain Foundation.

described or authorized in the statute, Executive Order, or regulations.  Even then, defendants

still failed to provide AHIF-Oregon with timely notice of the factual or legal basis of its

redesignation.  When OFAC informed AHIF-Oregon that it was being considered for

redesignation and gave it a deadline for submitting a defense in writing, OFAC did not tell

AHIF-Oregon on what factual or legal basis it was being considered for redesignation.  Indeed, it

was not until *after* OFAC had made its final decision to redesignate, *after* AHIF-Oregon's only

opportunity to defend itself had passed, and *after* the administrative record was closed, that

OFAC, for the first time in four years, provided AHIF-Oregon with any statement of reasons.

Even then, OFAC relied for its decision primarily on classified evidence that has never been

disclosed to AHIF-Oregon.  Roughly 80 percent of OFAC's memo explaining the redesignation

is blacked out, and the few paragraphs that are not blacked out do not support the redesignation.

For these reasons, the designation and redesignation of AHIF-Oregon violate due process and the

Administrative Procedure Act.

AHIF-Oregon's designation and redesignation is also statutorily unauthorized. The

International Emergency Economic Powers Act, pursuant to which E.O. 13224 was promulgated,

was intended to restrict the President's power to impose embargoes and economic sanctions on

*nations,* not to create an unprecedented authority to blacklist disfavored individuals and political

organizations.  The statute authorizes sanctions only against "a foreign country or a national

thereof," thereby requiring that sanctions on individuals be incident to nation-targeted

embargoes.  AHIF-Oregon is a national of the United States, not of any "foreign country," and

E.O. 13224 does not even purport to be a nation-targeted embargo. Accordingly, the designation

is *ultra vires*, and the Court can declare it invalid on statutory grounds without addressing

plaintiffs' constitutional claims.

AHIF-Oregon and the Multicultural Association of Southern Oregon ("Multicultural Association") also challenge IEEPA, 50 U.S.C. § 1701 *et seq.*, and E.O. 13224, on their face and as applied, as unconstitutionally vague and overbroad.  The Multicultural Association has standing to do so because it reasonably fears that if it does anything that might be seen as supportive of, associated with, or "for the benefit of" AHIF-Oregon, it too might find itself designated – its assets frozen, its operations shut down, its every transaction with any U.S. person made criminal – without a hearing, without charges, and without a statement of reasons.

The power assumed by the President in E.O. 13224 is both unconstitutionally vague and substantially overbroad.  As one court has already found, the President may designate organizations or individuals on the basis of mere associations, or indeed for any reason or no reason at all.  *Humanitarian Law Project (HLP) v. U.S. Dept. of Treasury*, 463 F. Supp. 2d 1049, 1067 (C.D. Cal. 2006), *reconsideration granted on other grounds*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007).  The Secretary of the Treasury's delegated designation power under E.O. 13224, only slightly less expansive, permits designations without any finding that an entity has in fact ever engaged in or supported any terrorist activity or terrorist organization.  Moreover, it authorizes designation based on the provision of "material support" and "services," and any action taken "on behalf of" a designated entity, terms that defendants claim somehow implicitly exempt "pure speech or advocacy" on behalf of or in support of a designated group.  The Multicultural Association is left to guess at whether its desired speech activities constitute permissible "pure speech" or prohibited "services," "material support," or action "on behalf of" AHIF-Oregon.

Defendants' freezing of AHIF-Oregon's assets for more than four years, without any

charge or finding of wrongdoing, much less probable cause, also violates the Fourth Amendment. A seizure of property occurs when "there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The freeze at issue here, initially imposed without any designation at all, continued on the basis of a designation that never even included a statement of reasons, and continuing today on the basis of a redesignation unsupported by the record, is patently unreasonable, and therefore violates the Fourth Amendment.

Finally, plaintiff AHIF-Oregon challenges OFAC's restrictions on its ability to use its own funds and raise funds in the U.S. in order to pay its own attorneys to defend itself. Until plaintiffs filed this lawsuit, OFAC barred AHIF-Oregon from using its own funds altogether, and barred it from seeking financial support for its attorneys' fees within the United States, arbitrarily requiring that it pay its attorneys out of funds raised overseas. Now that this policy has been challenged, OFAC has retreated, but still requires AHIF-Oregon to make a variety of showings before authorizing payment of attorneys' fees, and has placed an arbitrary limit on such fees, allowing only two of AHIF-Oregon's attorneys to receive compensation (while employing five itself to defend this lawsuit). These limitations are arbitrary and capricious, and effectively deny AHIF-Oregon its due process right to defend itself.

Cutting off financing of terrorist activity is a legitimate end, but the bludgeon-like means adopted here infringe too broadly on fundamental constitutional freedoms. The Court can resolve this case either on constitutional grounds, or by interpreting the statute, consistent with its language, history, and purpose, to be limited to nation-based economic sanctions, thereby avoiding the serious constitutional questions raised. Either ruling would leave the government

free to prohibit terrorist financing, but simply require it to effectuate that goal in a more narrowly

tailored and rights-sensitive manner.

## STATEMENT OF FACTS

### A.    Statutory and Regulatory Scheme.

The International Emergency Economic Powers Act (IEEPA) was enacted in 1977 to

regulate and restrict the President's use of economic sanctions against foreign nations as a tool of

nation-to-nation diplomacy.  It limits the President's power to impose economic sanctions to

situations in which he has formally declared a national emergency.  Once an emergency has been

declared, the President may "regulate, or prohibit" various financial transactions with "any

foreign country or a national thereof."  50 U.S.C. § 1702(a)(1)(A).  He may also "block...,

regulate, ... nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer,

withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right,

power, or privilege with respect to, or transactions involving, any property in which any foreign

country or a national thereof has any interest, or with respect to any property, subject to the

jurisdiction of the United States...."  *Id.* § 1702(a)(1)(B).  The classic instance of an IEEPA

regulation is a ban on economic transactions with Iran.  *See, e.g.,* Executive Order 12959, 60 Fed.

Reg. 24757 (May 6, 1995).

Presidents often employed economic sanctions against foreign countries before IEEPA

was enacted.  Such sanctions had *never*, however, been used against disfavored individuals or

political organizations unconnected to a sanction on a foreign nation.  IEEPA was designed to

curtail the President's traditional nation-to-nation sanctions powers, not to expand them in

wholly unprecedented ways.  For the first seventeen years that IEEPA was on the books,

executive practice conformed to the historical practice of sanctions targeted only at nations.[3]

In 1995, however, President Bill Clinton for the first time invoked IEEPA to impose economic sanctions not on a country and "nationals thereof" as a part of nation-to-nation diplomacy, but on disfavored political organizations without any nexus to a country-targeted sanction. He designated ten Palestinian organizations and two Jewish groups, froze any U.S. assets they had, and authorized the Secretary of the Treasury to make further designations. E.O. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995).

Shortly after the terrorist attacks of September 11, 2001, President Bush similarly invoked IEEPA, freezing the assets of twenty-seven political organizations and individuals, again without any nexus to a sanction directed against a nation. Exec. Order 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) ("E.O. 13224" or "Executive Order"). The Executive Order contained no finding that any of the entities had engaged in any wrongdoing, and offered no explanation or criteria as to why any of the twenty-seven groups and individuals were named. In 2002, President Bush added the Taliban and Mohammed Omar to the list, again without offering any explanation, any findings of wrongdoing, or any criteria. E.O. 13268, 67 Fed. Reg. 44751 (July 2, 2002). The President offered no explanation or statement of reasons for any of these designations.

E.O. 13224 further authorized the Secretary of the Treasury to add to the designated entities list anyone he determined "to act for or on behalf of [others on the list]; to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services

---

[3] *See, e.g.,* Robert M. Chesney, *The Sleeper Scenario: Terrorism-Support Laws and the Demands of Prevention,* 42 Harv. J. on Legis. 1, 13-14 (2005) (stating that President Clinton in 1995 "broke new ground under IEEPA by ordering sanctions targeting not a state and its citizens but, instead, terrorist organizations and their members"); G.C. Hufbauer et al., Economic Sanctions Reconsidered, at 14-15, table 1A.1 (3d ed. 2007) (reviewing all economic sanctions imposed since 1914, and identifying none against a non-state actor until 1995).

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss and for Summary Judgment

to" others on the list; or to be "otherwise associated with" others on the list.  E.O. 13224, §§ 1 (b)-(d).  Those on the list are denominated "specially designated global terrorists," or SDGTs. That term is nowhere defined by statute, but was unilaterally created by the executive branch.[4]

Designation as an SDGT has the effect of immediately blocking all of the designee's property and interests in property within the United States or in the control of U.S. persons.  E.O. 13224, § 1.  In addition, the Order prohibits all transactions with designated entities or individuals, including "the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons."  *Id.* § 2(a).  While humanitarian aid is ordinarily exempted from such sanctions, E.O. 13224 specifically prohibits all "humanitarian" donations.  *Id.* §4. Accordingly, the designation of AHIF-Oregon effectively shut it down, as it can engage in no transactions and has no access to its own property.

The Treasury Department promulgated regulations implementing E.O. 13224 on June 6, 2003.  *See* 68 Fed. Reg. 34196 (codified at 31 C.F.R. Part 594).  31 C.F.R. § 594.406 states that the "prohibitions on transactions or dealings involving blocked property" apply to "services performed in the United States or by U.S. persons, wherever located," and specifies, as examples, that "U.S. persons may not … provide legal … transportation, public relations, educational, or other services to a person whose property or interests in property are blocked."

The regulations set forth extensive procedures for imposing civil penalties.  *See* 31 C.F.R. §§ 594.702-704.  In contrast, neither the statute, the Executive Order, nor the regulations set forth any procedural guidelines for the designation process itself.  Designations are conducted by the

---

[4] *See* 31 C.F.R. § 594.310 (defining "specially designated global terrorist" as anyone "listed in the Annex or designated pursuant to Executive Order 13224"); *see also* OFAC, "Specially Designated Nationals and Blocked Persons," posted at http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf (listing designated persons and groups) (viewed May 8, 2008).

Office of Foreign Assets Control (OFAC).  31 C.F.R. § 594.802.  Thus, the regulations do not specify what notice, if any, OFAC must provide, either before or after designation.  They do not proscribe time periods for decisionmaking, or impose any limit on the time that assets may be frozen pending "investigation."  They do not require that any statement of reasons be issued.

If an organization has property in the United States, the courts have held that it has a due process right to notice of the designation and an opportunity to respond, in writing, to the designation.  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1218 (2004).  However, OFAC is authorized to rely on classified evidence for its designation, and need not disclose that evidence to the designated entity.  *Id;* 50 U.S.C. § 1702(c).  Designated entities are not granted a hearing or the opportunity to present or confront witnesses.  *Id.*  The only "notice" OFAC typically provides is a copy of the unclassified documents in its administrative record.  It does not inform the affected entity of the alleged factual or legal basis for the proposed designation, and thus the entity must guess at the nature of the charges against it.  And upon designation, it provides no statement of reasons explaining its actions, but simply announces that an entity or individual has been designated.  As a result, entities do not know why they are being considered for designation, or why they have been designated, and there is no public record of what types of activities may prompt a designation.

OFAC is also authorized to impose all the effects of a designation – including freezing an organization's assets indefinitely and criminalizing all transactions with it – without designating it, but simply by opening an investigation into *whether* it should be designated.  *See* 50 U.S.C. § 1702(a)(1)(B) (allowing blocking "during the pendency of an investigation").  There is no time limit on how long an investigation, and its attendant sanctions, may last.

B.    **Factual Background – Designation of AHIF-Oregon.**

AHIF-Oregon was incorporated in February 1999 as a non-profit corporation.  It distributed Islamic publications, owned and operated a prayer house in Ashland, Oregon, and owned another prayer house in Missouri.  *See* SOF ¶¶ 5-8.  AHIF-Oregon worked with other community groups in southern Oregon on local issues and events, including plaintiff Multicultural Association of Southern Oregon, which seeks to support AHIF-Oregon's challenge to its designation, but is deterred by the potential threat of being designated itself.  *Id.* at ¶ 9.

In early 2003, two of AHIF-Oregon's four directors resigned – Aqeel Al-Aqeel (also known as Al-Aqil), on March 27, 2003, and Mansuor Al-Kadi, on February 22, 2003.  *Id.* at ¶ 6.

On February 19, 2004, OFAC blocked AHIF-Oregon's assets pending an investigation into whether it should be designated as a "specially designated global terrorist" (SDGT).  *Id.* at ¶ 12.  OFAC provided no statement of reasons or charges in doing so.  The government executed a search warrant, leading to the seizure of AHIF-Oregon's property, including documents and publications, as part of an investigation of alleged tax law violations.  *Id.* at ¶ 12.  As a result, all of AHIF-Oregon's assets and property were frozen, and it was effectively closed down.  *Id.*

OFAC granted licenses to AHIF-Oregon's attorneys to represent it in connection with the investigation and possible designation, but prohibited AHIF-Oregon from paying its attorneys from its blocked funds, or even from any funds raised in the United States.  It required that the attorneys be paid only from funds raised abroad.  *Id.* at ¶¶ 14-16.

While the investigation was pending, OFAC made three disclosures to AHIF-Oregon of the "unclassified information" that OFAC was relying on in considering whether to designate AHIF-Oregon.  *Id.* at ¶ 17 (Apr. 23, 2004); ¶ 28 (July 23, 2004); and ¶ 31 (Aug. 20, 2004).

OFAC did not provide AHIF-Oregon with any explanation of the specific charges being considered, or of how the evidence supported a potential designation. Thus, AHIF-Oregon had to guess at what OFAC's concerns might be.

OFAC also informed AHIF-Oregon that it was relying on classified evidence. It did not provide an unclassified summary of the classified documents or otherwise make provision for AHIF-Oregon's attorneys to review those documents under a security clearance and protective order. *Id.* at ¶¶ 18-19.

While OFAC took seven months to designate AHIF-Oregon, it repeatedly imposed very short response times, generally of only a few weeks, on AHIF-Oregon. In one case, OFAC required AHIF-Oregon to respond in only three days, over a weekend, to a disclosure. *Id.* at ¶¶ 19, 25, 29, 31, 33.

AHIF-Oregon had to guess at the grounds that OFAC was relying on, since most of the documents in OFAC's disclosures made no mention of AHIF-Oregon. Based on the few documents that related to AHIF-Oregon, it appeared that OFAC had two principal concerns: (1) AHIF-Oregon's distribution of Islamic literature, primarily Korans (Qu'rans), and (2) AHIF-Oregon's transfer of some $180,000 in support of a humanitarian relief project for Chechen refugees in Russia. *Id.* at ¶ 21. Accordingly, AHIF-Oregon responded to both concerns in its submissions to OFAC.

AHIF-Oregon maintained that the Islamic publications were constitutionally protected speech, and that the Korans were translated and published by other entities, and were therefore an improper basis for designation. *Id.* at ¶¶ 22, 27.

With respect to the Chechen relief project, AHIF-Oregon submitted detailed documents

establishing that the relief had been approved by the highest levels of both the Russian

government in Chechnya and the Saudi government, and was carried out by the Saudi Joint

Relief Commission ("SJRC"), a Saudi government entity that has never been designated.  *Id.* at

¶¶ 23-24, 26, 30, 34.  AHIF-Oregon explained that OFAC's reliance on Russian news articles

about the Chechen conflict was misplaced since the severe Russian government censorship of the

media indicated that this coverage was biased, and other Russian sources acknowledged the

Saudi humanitarian efforts in Chechnya, including those of the SJRC.  *Id.* at ¶ 35.

OFAC never responded to these submissions, either by explaining that AHIF-Oregon was

on the wrong track, or by refuting any of AHIF-Oregon's statements or evidence.  On September

16, 2004, OFAC notified AHIF-Oregon's counsel that AHIF-Oregon had been designated.

Again, OFAC provided no statement or reasons, enumerated no charges, did not indicate which

provision of E.O. 13,224 was violated, and provided no response to the substantive evidence or

the legal arguments submitted by AHIF-Oregon.  *Id.* at ¶ 36.  Soliman Al-Buthi, a director of

AHIF-Oregon, was also designated at that time, also without any statement of reasons, charges,

or explanation.  *Id.* ¶ 38.

AHIF-Oregon requested reconsideration of OFAC's designation, and made two

submissions of additional documents and information to OFAC regarding its operations.  *Id.* at ¶

39 (Feb. 14, 2005); 42 (Sept. 21, 2005).

In 2005, the U.S. government indicted AHIF and two of its directors, Mr. Al-Buthe, and

Pete Seda (Pirouz Sedaghaty), for regulatory offenses (customs and tax issues).  *Id.* at ¶ 41.  Less

than six months later, however, the indictment was dismissed as to AHIF-Oregon.  *Id.*

OFAC did not respond to AHIF-Oregon's requests for reconsideration for nearly three

years.  On August 6, 2007, plaintiffs filed this lawsuit, arguing that the designation was invalid.

On November 14, 2007, having obtained an extension of time to respond to plaintiffs' lawsuit,

OFAC informed AHIF-Oregon and Mr. Al-Buthe that it was considering "redesignating" them,

despite the fact that there is no procedure for "redesignations" under IEEPA, E.O. 13224, or the

regulations.  *Id.* at ¶¶ 40, 45.  OFAC submitted additional unclassified documents that it was

considering for the "redesignation."  *Id.* at ¶ 45 (Nov. 14, 2007), ¶ 47 (Nov. 30, 2007), ¶ 48 (Dec.

28, 2007).  But, OFAC continued to refuse to specify any factual allegations and charges against

AHIF-Oregon, failed to explain how the documents related to any potential basis for the

redesignation, and continued to rely on undisclosed classified evidence.  OFAC made no effort to

provide an unclassified summary of the classified evidence, or to make provision for counsel to

review the classified evidence under a protective order.  *Id.* at ¶¶ 45-48.  Some of the documents

comprised the government's submission at a pretrial detention hearing for Mr. Sedaghaty.

On January 4, 2008, AHIF-Oregon submitted a detailed response to the proposed

"redesignation," objecting that this agency action was unauthorized and an improper attempt to

develop post hoc justifications in response to plaintiffs' lawsuit.  *Id.* at ¶ 49.  Forced again to

guess at OFAC's concerns, AHIF-Oregon also provided information in response to the

documents disclosed by OFAC.  It submitted documents establishing that the government's

motion to detain Mr. Sedaghaty had been rejected, and Mr. Sedaghaty had been released.  And it

submitted the U.S. Department of State's human rights reports on Russia documenting the

extensive refugee problems in Chechnya, and the Russian government's censorship of press

coverage of Chechen issues, since OFAC was continuing to rely on biased press coverage about

Chechnya.  *Id.* at ¶ 50.

On February 6, 2008 – the same day that defendants' motion to dismiss was filed with this Court – OFAC notified AHIF-Oregon that it had been redesignated. *Id.* at ¶ 51. In this letter, OFAC for the first time in four years set forth reasons for its actions. It only now claimed that it was not relying on the distribution of Islamic literature as a basis for the designation. And it claimed that AHIF-Oregon was designated because it was "owned or controlled" by Aqeel Al-Aqeel (the former AHIF-SA director) and Mr. Al-Buthe, who are also SDGTs, and because AHIF-Oregon had acted (in unspecified ways) on behalf of AHIF-SA and its branch offices in other countries. *Id.* at ¶¶ 51-53. OFAC did not provide any substantive response to AHIF-Oregon's submissions on its participation in the Chechen relief efforts, other than a conclusory rejection of those documents, and did not address most of the other legal arguments raised by AHIF-Oregon. *Id.* at ¶ 53.

Finally, OFAC changed its position on the payment of attorneys' fees, and announced a new, as yet unpublished, policy under which AHIF-Oregon could obtain payments for some attorneys' fees from blocked funds, but only subject to a variety of restrictions, including limits on how many attorneys could be paid (only two), and that AHIF-Oregon is still barred from raising funds within the United States to fund its legal defense. *Id.* at ¶ 54.

On February 13, 2008, plaintiffs filed a Supplemental Complaint, addressing OFAC's redesignation process.

## C.    Intended Activities of the Multicultural Association.

The Multicultural Association of Southern Oregon is a nonprofit organization in southern Oregon dedicated to promoting diversity and understanding across cultures. *See* SOF ¶ 9 & Att. A (Bauermeister Decl.). Prior to the designation of AHIF-Oregon, it worked with AHIF-Oregon

as the principal organization doing outreach and education about Islam and the Muslim community.  *Id.*  AHIF-Oregon played a critical part, for example, in the Multicultural Association's annual "multicultural fair," held every year in September, where AHIF-Oregon manned a table and offered educational materials about Islam and Muslims to attendees.  *Id.*

The Multicultural Association would like to continue to work with AHIF-Oregon, including on its annual fair, but is afraid to do so for fear of being prosecuted, subject to civil penalties, or designated as an SDGT itself if it does so.  *Id.*  The Multicultural Association and its members would also like to work with AHIF-Oregon in connection with challenging its designation – by speaking about the case in public, writing newspaper columns and letters to the editor, contacting government officials, and holding demonstrations.  *Id.*  They are afraid, however, that these activities might be construed as prohibited services, material support, or association, and thus could result in their designation.  *Id.*  Accordingly, they seek injunctive and declaratory relief assuring them that they may engage in these core First Amendment-protected activities without fear of designation.  *Id.*

## ARGUMENT

### I.    Standard of Review.

When addressing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept plaintiffs' allegations as true, and  "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955, 1969 n.8 (2007)).

When addressing a Rule 56 motion for summary judgment, the initial burden is on the

movant to demonstrate the absence of any genuine issue of material fact, upon which the opponent has the burden to demonstrate through the production of probative evidence that there remain disputed issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The court views the evidence in the light most favorable to the party opposing summary judgment. *Universal Health Services, Inc. v. Thompson,* 363 F.3d 1013, 1019 (9th Cir. 2004).

Defendants argue that the only remedy that this Court can enter would be a remand to OFAC. Def. Mem. at 24 & n.19. In fact, this Court has the authority to direct OFAC to lift the designation of AHIF-Oregon, as the U.S. Court of Appeals for the Seventh Circuit recognized in *Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748, 750-51 (7th Cir. 2002). "A court might direct the Office of Foreign Assets Control to lift" a designation, *id.* at 750, and "could order Treasury to end the freeze" on a designated entity's assets. *Id.* at 751. Hence, the courts have authority to grant "injunctive relief directing Treasury to lift all restrictions on [designated entity's] assets and operations." *Id.*[5]

## II. The Procedure Used to Designate AHIF-Oregon Violated Due Process.

### A. Defendants' Failure to Provide Notice of the Specific Charges Violated Due Process and the Administrative Procedure Act.

As a U.S.-based organization, plaintiff AHIF-Oregon is entitled to due process in connection with the freezing of its assets and its designation and redesignation as a "specially designated global terrorist" ("SDGT"). *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 205 (D.C. Cir. 2001) (organization with presence in United States entitled to

---

[5] Defendants also argue that defendants U.S. Department of Justice, Secretary of the Treasury, and the U.S. Attorney General should be dismissed from this case, as they were not involved in the designation and redesignation of AHIF-Oregon. In fact, all three defendants have a role in enforcing IEEPA's blocking system, so that they are all appropriate defendants for purposes of plaintiffs' injunctive relief claims.

due process with respect to designation by Secretary of State as "foreign terrorist organization"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003) (same with respect to designation by OFAC as SDGT).

At a minimum, due process requires notice of the government's factual and legal case, and a meaningful opportunity to respond. *Hamdi v. Rumsfeld*, 542 U.S. 507, 536-37 (2004) (holding that enemy combatant alleged to be fighting in a war against this country has a due process right to notice of the charges against him, a meaningful opportunity to rebut the charges, and a neutral factfinder); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (due process requires "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"); *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976) (due process requires "notice of the action sought" and "the opportunity to be heard 'at a meaningful time and in a meaningful manner'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Hence, notice is inadequate if the affected person lacks an explanation of the government's charges and evidence against him, so that he is unable "to present his side of the story" to rebut that evidence.  *Loudermill*, 470 U.S. at 546.

Defendants utterly failed to provide AHIF-Oregon with notice of the charges against it or any explanation of the underlying evidence.  OFAC provided no notice of any charges or concerns when it initially froze AHIF-Oregon's assets in February 2004, simply stating in boilerplate language that it was under investigation.  *See* Szubin Dec., Exh. A.  OFAC subsequently produced a series of documents from its administrative record, but never included *any* explanation of why any of the documents were being considered, of what conduct AHIF-Oregon had allegedly engaged in that might warrant designation, or even of what

provisions of the Executive Order it thought AHIF-Oregon may have violated.  Accordingly,

plaintiffs' counsel had to guess at OFAC's concerns, and submit evidence and argument without

even knowing what AHIF-Oregon was accused of doing.

When OFAC designated AHIF-Oregon in September 2004, OFAC again failed to provide

any specification of charges, but simply issued a memorandum stating that AHIF-Oregon had

been designated.  *See* Szubin Dec., Exh. B.  The memorandum contained no statement of

reasons, no factual allegations, and no discussion of any of the material submitted by

AHIF-Oregon or even of the evidence gathered by OFAC itself.  AHIF-Oregon sought

reconsideration, but again had to act entirely in the dark, because it had never been told the legal

or factual basis for its designation.

When OFAC responded to the filing of this lawsuit by notifying AHIF-Oregon that it was

considering whether to "redesignate" it, OFAC again provided no statement of charges, no

factual allegations, and no specification of the provisions under which it was considering

redesignating AHIF-Oregon.  *See* SOF ¶ 44-48.  Once again, AHIF-Oregon was forced to present

a "defense" without even knowing the charges against it.

On February 6, 2008, the same day that defendants filed their motion to dismiss and/or

for summary judgment in this Court, OFAC informed plaintiffs' counsel that it had

"redesignated" AHIF-Oregon.  *See* Szubin Dec., Exh. E.  In a letter and accompanying

memorandum, OFAC *for the first time informed AHIF-Oregon of the basis for its designation.*

*See* SOF ¶¶ 51-53.  The letter maintained that AHIF-Oregon was being redesignated because it

was owned or controlled by Soliman al-Buthe and Aqeel al-Aqil, because it had acted by or on

their behalf, and because it was a "branch office of [AHIF-SA]."  *See* AR 2338.  This *was the*

*first time that AHIF-Oregon was informed of the charges against it* – four years after its assets had been frozen, three years after its initial designation (on grounds that the government has *never* disclosed), six months after plaintiffs filed this lawsuit challenging the original designation, and most importantly, *after the opportunity for AHIF-Oregon to present a defense had passed and the administrative record was closed.*

Defendants' failure to provide AHIF-Oregon with notice of the factual and legal basis for the government's actions meant that AHIF-Oregon never had a meaningful opportunity to respond. As is evident from a review of the record, AHIF-Oregon's counsel had to guess at OFAC's concerns. Because the administrative record contained evidence concerning a donation to Chechnya and the distribution of Korans in the United States, AHIF-Oregon responded to those issues. AHIF-Oregon argued that the distribution of Korans was constitutionally protected speech, and documented in detail that the donation to Chechnya was through an official humanitarian project officially approved by *both* the Russian and Saudi Arabian governments. Defendants did not dispute any of that information, and did not inform AHIF-Oregon that these were not its concerns. But it then based its redesignation on entirely different factors – namely, AHIF-Oregon's relationship to Messrs. al-Aqil and al-Buthe, and AHIF-SA. Because defendants never informed AHIF-Oregon that these were the specific factors it was considering, AHIF-Oregon was denied a meaningful opportunity to respond.

OFAC's belated statement of reasons, contemporaneous with its filing of a motion to dismiss in this Court, comes too late in the day, since AHIF-Oregon was denied any meaningful opportunity to respond to these issues while the redesignation was under consideration and the administrative record was open. To have addressed these issues prior to the redesignation,

AHIF-Oregon should have been notified that these were the factors under consideration.  It then would have sought to *inter alia*, (1) obtain, review, and rebut the full evidentiary record used to designate Messrs. Al-Aqil and Al-Buthe (and to redesignate Mr. Al-Buthe); (2) obtain and present information demonstrating that Mr. Al-Aqil and Mr. Al-Buthe neither own nor control AHIF-Oregon, before or after their designations as SDGTs; (3) obtain and present information about Mr. Al-Aqil's role with the daily operations of AHIF-SA, and his role, if any, with the operations of AHIF-SA's affiliates; and (4) obtain and present information about AHIF-Oregon's relationship with AHIF-SA, showing that it did not support any SDGTs or "acts of terrorism" through any of its contacts with AHIF-SA.  This undertaking would have plainly resulted in a very different factual and legal rebuttal to OFAC's proposed designation and redesignation.

A straightforward application of the balancing factors set forth in *Mathews v. Eldridge*, 424 U.S. at 335, makes clear that due process requires notice of OFAC's specific charges and concerns, especially where, as here, the charges can be set forth without revealing classified evidence.  *Mathews* requires the Court to balance the private interest, the risk of error created by the procedures used, and the public interest.  *Id.*  Here, the private party has an interest in its property, which has in this instance been fully deprived for more than four years.  Failing to notify entities under consideration of designation of the factual and legal grounds upon which they are being considered for designation creates a substantial risk of error, as the parties will not be able to provide a meaningful response if they do not know what is at issue.  And where, as here, the entity's assets are frozen pending investigation, providing such notice would impose no burden on the government's interest, as the government purportedly must identify those grounds in the course of the designation process in any event.  Indeed, defendants have submitted in this

Court a memorandum prepared by OFAC for just this purpose. AR 1874-1899. Defendants have

offered no reason why such a memorandum, or at least a notice of the charges being considered,

could not have been produced at a time when it would be meaningful – that is, when

AHIF-Oregon still had an opportunity to defend itself.

      **B.**     **Defendants' Reliance on Classified Evidence Deprived AHIF-Oregon of**
          **Notice of the Charges and Evidence Against It.**

OFAC also violated AHIF-Oregon's due process rights by relying in significant part on

classified evidence in reaching its redesignation decision, without making any provision to

ensure that AHIF-Oregon had a meaningful opportunity to respond. A cursory review of the

memorandum written to justify AHIF-Oregon's redesignation makes clear that the decision was

based almost entirely on classified evidence. *See* AR 1874-1899. Approximately 22 of the 26

pages are partially or completely blacked out. All of the pages concerning Mr. Al-Aqil are

blacked out, as are four of the five pages concerning Mr. Al-Buthe – notwithstanding that two of

the three grounds asserted for redesignation concern these two individuals. Of thirteen pages

devoted to AHIF-SA and its branch office, more than eleven are blacked out. And three out of

the four pages concerning AHIF-Oregon itself are also blacked out. Thus, the vast majority of

OFAC's evidence is classified, and has never been disclosed to AHIF-Oregon.

Moreover, as discussed more fully below, *see infra* Section III.E, the unclassified

evidence does not support the grounds asserted for redesignation. It does not show that Mr.

Al-Aqil or Mr. Al-Buthe own or control AHIF-Oregon, or that AHIF-Oregon acted on their

behalf. Nor does it show that AHIF-Oregon supported any terrorist activity or SDGTs through

AHIF-SA, or that AHIF-Oregon had anything to do with other branches of AHIF around the

world.  It appears, then, that if OFAC's designation or redesignation is supported by evidence at all, the evidence is classified.  But AHIF-Oregon has never seen that classified evidence, and therefore has had no opportunity to respond to it.

The Supreme Court and the Ninth Circuit have recognized that deprivations of property or liberty on the basis of secret evidence raises such serious due process problems that it is "presumptively unconstitutional."  *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995).  As the Supreme Court has explained, "[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Goss v. Lopez*, 419 U.S. 565, 580 (1975) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)).  Classified evidence violates due process because:

> Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

*Greene v. McElroy,* 360 U.S. 474, 496 (1959).

In *American-Arab Anti-Discrimination Comm.*, the Ninth Circuit held that the use of secret evidence to deny an immigration benefit to foreign nationals allegedly tied to a terrorist organization violated due process.  Applying *Mathews v. Eldridge*, the Court balanced the private interest affected, the risk of erroneous deprivations, and the government's interest.  70 F.3d at 1070.  In that case, the private interest was an out-of-status alien's interest in obtaining an immigration benefit; the government's interest was in not disclosing classified evidence and not granting permanent residence to individuals it considered to be tied to terrorists.  The Court ruled that the use of classified evidence was "inherently unfair" and created an "enormous risk of

error," and was therefore "presumptively unconstitutional." *Id.* As the Court said, "Because of the danger of injustice when decisions lack the procedural safeguards that form the core of constitutional due process, the *Mathews* balancing suggests that use of undisclosed information in adjudications should be presumptively unconstitutional. Only the most extraordinary circumstances could support [such a] one-sided process." *Id.*

The D.C. Circuit ruled similarly in barring the use of classified evidence to deny admission to a returning resident alien accused of terrorist ties. *Rafeedie v. INS*, 880 F.2d 506, 516 (D.C. Cir. 1989) ("Rafeedie – like Joseph K. in *The Trial* – can prevail . . . only if he can rebut the undisclosed evidence against him, <u>i.e.</u>, prove that he is not a terrorist regardless of what might be implied by the Government's confidential information. It is difficult to imagine how even someone innocent of all wrongdoing could meet such a burden.").

If classified evidence violates due process when the government is merely denying immigration benefits, as in *American-Arab Anti-Discrimination Comm.* and *Rafeedie*, then surely it violates due process where, as here, the government freezes all of a U.S.-based entity's property and effectively shuts it down, preventing it from operating altogether. Defendants rely on decisions from the D.C. Circuit upholding reliance on classified evidence to designate, *see, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003), but the D.C. Circuit did not even apply the *Mathews* balancing test, nor did it seek to distinguish its own earlier decision in *Rafeedie*. In any event, it is Ninth Circuit law that governs here.

Moreover, even if it were permissible to rely on classified evidence in some measure, there are less onerous alternatives available, none of which defendants explored. (The D.C. Circuit in *Holy Land* did not address the availability of alternatives). Defendants here belatedly

requested that the information be declassified, apparently only after plaintiffs filed this lawsuit, even though AHIF-Oregon's assets have been frozen for more than four years. Defendants made no effort to produce an unclassified summary of the classified evidence, as is done in the immigration and criminal contexts. *See* 18 U.S.C. App. 3 (Classified Information Procedures Act, Pub. L. 96-456); 8 C.F.R. § 1240.11(c)(3)(iv) (unclassified summary of evidence in immigration proceeding), § 1240.33(c)(4) (same), § 1240.49(c)(4)(iv) (same). While plaintiffs do not concede, in the abstract, that such a summary would be adequate to protect their due process rights, it is significant that defendants have not even *attempted* to draft such a summary.

Defendants have also made no provision for AHIF-Oregon's counsel to review the classified evidence, pursuant to a security clearance and protective order. In the Guantanamo detainees litigation, by contrast, where it has not even been determined that the detainees, as foreign nationals held outside our borders, have any constitutional rights, the D.C. Circuit ordered that the detainees' counsel were entitled to review most of the classified evidence relating to their clients, so that there would be meaningful judicial review:

> In addition, we must implement such measures to govern these proceedings as are necessary to enable us to engage in meaningful review of the record as defined above. **Therefore, we will enter a protective order adopting a presumption, as proposed by the petitioners, that counsel for a detainee has a "need to know" the classified information relating to his client's case**, except that the Government may withhold from counsel, but not from the court, certain highly sensitive information. . . .

*Bismullah v. Gates*, 501 F.3d 178, 180 (D.C. Cir. 2007) (emphasis added), *pet. for reh'g en banc denied*, 514 F.3d 1291 (D.C. Cir. 2008), *pet. for cert. filed*, No. 07-1054 (U.S. Feb. 14, 2008). Hence, the D.C. Circuit held that the detainees' counsel were entitled to access to the classified information in order to represent their clients:

> **We think it clear that this court cannot discharge its responsibility** under the DTA [Detainee Treatment Act], particularly its responsibility to determine whether a preponderance of the evidence supports the Tribunal's determination, **unless a petitioner's counsel has access to as much as is practical of the classified information regarding his client.  Counsel simply cannot argue, nor can the court determine, whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence.** Therefore, we presume counsel for a detainee has a "need to know" all Government Information concerning his client, not just the portions of the Government Information presented to the Tribunal.

*Id.* at 187 (emphasis added).  Similarly, in order for AHIF-Oregon to have a meaningful opportunity to challenge its designation, and for this Court to exercise meaningful judicial review of that designation, AHIF-Oregon or its counsel must have "access to as much as is practical of the classified information" regarding AHIF-Oregon.  Thus far, OFAC has taken no steps whatsoever to ensure that such access is made available.  Where, as here, the vast majority of the evidence relied upon is classified, and the unclassified evidence reveals only lawful activity, due process is violated by a designation based on classified evidence.

### III.    AHIF-Oregon's Designation and Redesignation Violate the Administrative Procedure Act.

Defendants' designation and redesignation of AHIF-Oregon are not supported by the underlying administrative record, and therefore violate the Administrative Procedure Act.  Under the APA, a court must set aside an agency decision if it finds that the decision is (1) arbitrary and capricious; (2) an abuse of discretion; or (3) otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).  An agency decision is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v.*

*United States*, 371 U.S. 156, 168 (1962)); *accord Islamic American Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (applying *Motor Vehicle* standard to OFAC designation).

Defendants' actions violated the APA in a number of respects: (1) defendants have improperly sought to invoke post hoc rationales by "redesignating" AHIF-Oregon after this lawsuit was filed, based on charges not previously disclosed; (2) defendants acted without sufficient procedural safeguards, thereby rendering their decisionmaking arbitrary and capricious; (3) defendants improperly relied on unreliable hearsay evidence; (4) defendants improperly created a one-sided administrative record, and compounded that failure by omitting numerous relevant, exculpatory documents provided by AHIF-Oregon to OFAC from their filing of the administrative record in this Court; and (5) the evidence in the Administrative Record does not support the designation or redesignation.

### A.    OFAC's Redesignation Improperly Rests On New Grounds.

Plaintiffs filed this suit to challenge OFAC's designation decision of September 2004. OFAC obtained an extension of time to answer the lawsuit, and then unilaterally undertook a novel "redesignation," apparently as a way to present post hoc rationales in this Court. It now argues that the actions that prompted plaintiffs to file this lawsuit are now moot, and that the only issue is the propriety of the belated "redesignation." As a threshold matter, OFAC should not be permitted to manipulate its administrative processes to frustrate judicial review of its actions. The Court should require OFAC to defend its designation based on the record – and the reasons – that existed in September 2004, and should not permit it to employ a "redesignation" in order to shield its allegedly unconstitutional actions from legal review after-the-fact.

It is settled law that an agency's decision must be based on the grounds or rationales set

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to
Defendants' Motion to Dismiss and for Summary Judgment

forth by the agency during its deliberative process, and not on post hoc justifications. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("In either event the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained."). Hence, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* at 87. Post hoc arguments raised for the first time after the complaint seeking review was filed cannot substitute for clear disclosure of the grounds upon which the agency initially acted. *Id.*; *see also Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008) ("Post hoc explanations of agency action by appellate counsel cannot substitute for the agency's own articulation of the basis for its decision.") (citing *Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)); *KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1059 (D.C. Cir. 1993) ("'post hoc salvage operations of counsel' cannot overcome the inadequacy of the Commission's explanation") (quoting *Florida Power & Light Co. v. FERC*, 85 F.3d 684, 689 (D.C. Cir. 1996)).

There is no provision in E.O. 13224, or IEEPA, or the applicable regulations, that authorizes OFAC to "redesignate" an individual or entity that is already designated. While OFAC's regulations do allow it to de-list a designated individual or entity pursuant to 31 C.F.R. § 501.801, OFAC has not done so here with respect to AHIF-Oregon. In addition, 31 C.F.R. § 500.801 and § 501.803 authorize OFAC to engage in "amendment, modification, or revocation" of its administrative actions. But the redesignation of AHIF-Oregon does not fall into any of these three specifically enumerated categories, as OFAC did not state that it intends to amend, modify, or revoke its original designation. (Instead, defendants now argue that the original designation is moot). Since OFAC's proposed redesignation is an unauthorized agency action, it

is arbitrary and capricious.[6]

Accordingly, the Court should rule that OFAC's redesignation is an improper attempt to create post hoc rationalizations, and is arbitrary and capricious.

### B.    OFAC's Designation Process Lacks Adequate Legal Standards.

OFAC's designation and redesignation process is arbitrary and capricious because it lacks adequate substantive and procedural standards.  As detailed below, IEEPA sets forth no substantive criteria for "terrorists" at all, and the criteria promulgated by the President in E.O. 13224 are unconstitutionally vague and overbroad.  *See infra* Section V.  Further, the designation process lacks even the most basic of procedural safeguards.  There are no requirements regarding the timing or substance of notice, the burdens of proof or evidentiary standards, or even that OFAC issue a statement of reasons for its designations.  There are no time limits on how long OFAC may freeze an entity's assets "pending investigation" or on when OFAC will decide any matter whatsoever.  OFAC itself took many months to make its decisions, but placed onerous time limits on plaintiffs' counsel, in one case demanding that they respond over the weekend to a last-minute OFAC production of materials.  OFAC did not acknowledge plaintiffs' motion for reconsideration, filed on February 14, 2005, until the proposed redesignation in November 2007, over 2.5 years later, and even then, did not provide any substantive response.

Neither IEEPA, E.O. 13224, or the regulations create any procedural or substantive

---

[6] Congress knows how to authorize redesignation when it chooses to.  The absence of any provision for redesignation in IEEPA or the OFAC regulations is in direct contrast to the former requirement for redesignation in the separate Department of State process for designating Foreign Terrorist Organizations ("FTO").  Before 2004, FTO's had to be redesignated every two years.  *See* 8 U.S.C. § 1189(a)(4).  Pub. L. 108-458, Section 7119(a) (Dec. 17, 2004), removed the two-year time limit to those designations.  Since Congress expressly included a redesignation process in the original statute governing FTO's, but neither Congress nor the President ever included such a procedure with respect to SDGT's under IEEPA and E.O. 13224, OFAC has no authority to pursue a "redesignation" process it has made up out of whole cloth and applied to AHIF-Oregon.

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss and for Summary Judgment

safeguards to guide the designation process, and for that reason the designation process is by definition arbitrary and capricious.

### C.     OFAC Improperly Relied on Unreliable Hearsay Evidence.

OFAC impermissibly based its decisions in substantial part on unreliable hearsay evidence, particularly news articles, often relaying statements of unidentified sources. *See, e.g.*, AR 0192-0199, AR 0242-0257, AR 0294-0302, AR 0738-0749, AR 0785-0786, AR 0793-0794, AR 1000-1002, AR 1094-1098. In so doing, OFAC denied AHIF-Oregon any meaningful opportunity to confront its "accusers," and rested its decision on inherently unreliable evidence.

The courts have recognized the problems with relying on hearsay evidence, even that published in well-known sources. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) (*en banc*) (*per curiam*) ("[W]e need to state a few words about the state of the record. All we have are the published accounts . . . . These accounts were not admitted in evidence. They may be hearsay."); *Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a *New York Times* article is admissible evidence of the truthfulness of its contents.").

Many of the news articles come from Russia, where there is heavy censorship of the press and suppression of dissent, thus raising substantial questions about the reliability of any news account. AHIF-Oregon informed OFAC, as early as September 7, 2004, that OFAC's reliance on Russian press coverage of the Chechen conflicts, *see, e.g.*, AR 0738-0749, AR 0785-0786, AR 1000-1001, was misplaced given the biased nature of many Russian news sources caused by government censorship. *See* SOF ¶ 35 (AR 0986-0999). AHIF-Oregon submitted an affidavit by a retired journalist who worked on Russian broadcasting at Radio Free Europe, who explained

these issues, and that other coverage of the Chechen conflict presented a more balanced and accurate description of those events. *Id.* OFAC offered no response. Instead three years later, OFAC submitted yet more Russian articles about the Chechen conflict. *See* SOF ¶¶ 47-48. AHIF-Oregon again explained the biased, one-sided nature of this coverage, and specifically referenced numerous reports of the U.S. Department of State which discussed the severe problems with the suppression of Russian press coverage of Chechen issues. *See* SOF ¶ 50 (AR 1099-1871). OFAC ignored this response, other than to state, in a conclusory manner, that "your arguments regarding AHIF-Oregon activities in Chechnya were considered, but rejected in light of the classified and unclassified administrative record" and that "the media reporting provided to AHIF-Oregon has been used in conjunction with classified materials." *See* SOF ¶¶ 51, 53.

This Court should find that OFAC's heavy reliance on unreliable hearsay evidence is fundamentally improper, as AHIF-Oregon cannot provide a meaningful response to hearsay evidence, and because such material is not a reliable basis for AHIF-Oregon's designation.

### D.    OFAC Improperly Created a One-Sided Administrative Record.

OFAC improperly created a one-sided record by omitting from the Public Administrative Record filed in this Court numerous exculpatory documents that AHIF-Oregon submitted to OFAC. *See* Mot. to Correct the Admin. Record (May 8, 2008).[7] Defendants also omitted numerous letters between OFAC and AHIF-Oregon's counsel, even though that correspondence provides context for the documents in the Administrative Record and relates to plaintiffs' claims

---

[7]    While this Court reviews the administrative record as assembled by the agency, it has the authority to order the agency to supplement or correct the administrative record if it is incomplete or one-sided. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (supplementation of the administrative record proper when "the agency failed to consider factors which are relevant to its final decision"); *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C. 1998) (ordering agency to include relevant documents that undermine the agency's administrative record).

in this litigation.  *Id.*

It is settled law that an agency "may not skew the record in its favor by excluding pertinent but unfavorable information."  *Fund for Animals v. Williams*, 245 F. Supp. 2d 49, 55 (D.D.C. 2003).  An agency cannot "exclude[] from the record evidence adverse to its position," which warrants supplementing the administrative record with such documents.  *Kent County, Delaware Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (supplementation of the administrative record proper when "the agency failed to consider factors which are relevant to its final decision").

OFAC's administrative record included the indictment of Sami Al-Hussayen, and several news articles relating to the indictment.  *See* AR 0270-0293.  Yet, as AHIF-Oregon pointed out to OFAC, the jury had acquitted Mr. Al-Hussayen of all terrorism-related charges.  *See* SOF ¶ 30 (AR 0426, AR 0585-0591).  OFAC's reliance on the indictment and news articles, while failing to include the widely-reported acquittal, resulted in a one-sided administrative record. Additional documents about the Al-Hussayen trial were "publicly available" at the time OFAC compiled its Administrative Record, as they "were official records from court proceedings, they should have been considered by the agency."  *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C. 1998) (ordering agency to include relevant public documents and court records that undermine the agency's administrative record); *see also Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) (documents improperly excluded from administrative record "are indicative of a lack of rationality on the part of HHS in the decisionmaking process" and "indicates that the Secretary's stated reason may very well be pretextual").

Even after AHIF-Oregon alerted OFAC to these problems, OFAC continued its failure to

include all relevant documents, including court records, relating to AHIF-Oregon.  On November 14, 2007, when OFAC notified AHIF-Oregon that it was considering a "redesignation," OFAC submitted the government's motion in support of the pretrial detention of Mr. Sedaghaty, with several exhibits thereto.  *See* SOF ¶ 46.  But OFAC included only the prosecution's evidence in that case, despite the fact that OFAC had available to it the full record of the detention hearing. OFAC failed to acknowledge the most critical fact about the proceeding – namely that U.S. Magistrate Judge Thomas M. Coffin and U.S. District Judge Michael R. Hogan both *rejected* the government's arguments that Mr. Sedaghaty should be held in pretrial detention, and ordered his release.  AHIF-Oregon provided OFAC with the relevant documents and court filings, which confirmed that Mr. Sedaghaty was released and that the courts rejected the government's arguments relating to the documents that OFAC included in the administrative record.  *See* SOF ¶ 46.  Yet OFAC omitted all evidence submitted and relied upon by those judges in finding no basis for concluding that Mr. Sedaghaty posed a danger to the community, and did not even acknowledge that the prosecution's arguments had been rejected.

OFAC's failure to include and discuss all relevant and exculpatory evidence – a failure compounded by DOJ's improper exclusion from the Public Administrative Record of numerous documents that AHIF-Oregon submitted to OFAC – violates the APA.

### E.  The Evidence in the Administrative Record Does Not Support the Designation and Redesignation of AHIF-Oregon.

The evidence in the Public Administrative Record does not provide a sufficient basis to support the redesignation of AHIF-Oregon.  As set forth below, the administrative record does not support any of OFAC's three assertions:  (1) that Messrs. Al-Aqil and Al-Buthe own or

control AHIF-Oregon; (2) that AHIF-Oregon is "acting for or on behalf of" Messrs. Al-Aqil and

Al-Buthe; and (3) that AHIF-Oregon is a "branch office" of AHIF-SA, and that AHIF-SA

supports al-Qaeda and other SDGTs.  *See* SOF ¶ 52.[8]

### 1.    The Evidence Does Not Show that Messrs. Al-Aqil or Al-Buthe Own or Control AHIF-Oregon, Or That It Acts For or On Behalf of Either Man.

E.O. 13224 authorizes designation of individuals or entities that the Secretary of the

Treasury deems to be owned or controlled by designated entities, or to act for or on behalf of

designated entities. E.O. 13224, § 1(c).  To meet this criteria, defendants must therefore establish

that AHIF-Oregon today is owned or controlled, or acts for or on behalf of, a designated entity or

person.  Defendants initially point to Mr. Al-Aqil and Mr. Al-Buthe, both of whom were on the

board of AHIF-Oregon when it was founded.  But neither man was a designated SDGT at that

point.  OFAC designated Mr. Al-Aqil in June 2004, but he had resigned from the AHIF-Oregon

board the year before, in March 2003.  *See* SOF ¶ 6.  Thus, by the time he was designated, he had

no formal position whatsoever in relation to AHIF-Oregon.  And there is certainly no evidence

that as of February 6, 2008, when the redesignation was made, Mr. Al-Aqil had any role in

AHIF-Oregon.  The E.O. speaks only in the present tense, and therefore absent evidence of

current ownership or control, there is no basis for designation under § 1(c).

Defendants state that "classified and unclassified information indicates that Mr. Al-Aqil

retained effective control over the activities of all branches until his departure from [AHIF-SA

---

[8] As noted above, plaintiffs are obviously unable to address the classified evidence, as it has neither been disclosed nor summarized to them.  By necessity, then, plaintiffs' argument must be limited to the public administrative record.  For the same reason, plaintiffs maintain that this Court should limit itself to the public administrative record.  If this Court concludes that the public record does not support redesignation, and decides, over plaintiffs' objection, that it needs to examine the classified evidence, it must first ensure that plaintiffs are given sufficient access to that information to satisfy due process.

in 2004, and according to some reports, even following his purported departure from the parent organization." *See* AR 2198, at n.2.  But this is playing fast and loose.  Nothing in the unclassified evidence shows that Mr. Al-Aqil plays any role whatsoever in AHIF-Oregon's activities today, or that he played any role as of September 2004, when AHIF-Oregon was initially designated, given that he had resigned in March 2003.  *See* SOF ¶ 6.  Moreover, the statement in the letter is not specific to AHIF-Oregon, but claims that somehow he controlled *every* branch of AHIF while he was in control at AHIF-SA.

The public record certainly does not support that claim.  The record includes news articles that discuss in a very general sense Al-Aqil's desire to "centralize" control of AHIF-SA and its branches.  *See, e.g.*, AR 0247-0255, AR 0258-0266.  But a desire to centralize, and the reality of ownership and control, are two very different things, and there is *nothing* in the record that shows Mr. Al-Aqil playing a deciding role in *anything* that AHIF-Oregon did or does.  Nor is there any evidence that AHIF-Oregon is acting at this time (or was acting at any time) for or on behalf of Mr. Al-Aqil.

Nor is there any evidence that Mr. Al-Buthe owns or controls AHIF-Oregon, or that it acts for him or on his behalf.  Mr. Al-Buthe was on the board of AHIF-Oregon, but that does not mean that he owns or controls the corporation or that it acts for him or on his behalf.  Thus, OFAC needs to point to something other than Mr. Al-Buthe's position on the AHIF-Oregon board to establish that he currently owns or controls the organization, or that it acts for him or on his behalf.  There is literally *nothing* in the record that suggests that AHIF-Oregon is somehow a shell, actually owned or controlled by Mr. Al-Buthe, or acting on his behalf.

In addition, Mr. Al-Buthe was not designated until AHIF-Oregon was designated, in

September 2004.  Thus, even if there were any evidence that Mr. Al-Buthe owned or controlled

AHIF-Oregon before that date, or that AHIF-Oregon acted for or on behalf of him before that

date, he was not then designated, and therefore any such evidence would not support designation.

In any event, defendants can point to nothing in the administrative record to establish that Mr.

Al-Buthe either owns or controls AHIF-Oregon, or that it acts for or on his behalf.

### 2.    The Evidence Does Not Show that AHIF-Oregon Supported Terrorism or SDGTs Through Its Associations with AHIF-SA.

OFAC's final rationale for redesignating AHIF-Oregon is that it is a "branch office" of

AHIF-SA, and AHIF-SA has supported SDGTs and terrorism.  The problem with this theory is

two-fold.  First, OFAC has never designated AHIF-SA, so support of AHIF-SA as such is not a

basis for designation.  The Executive Order authorizes designation of those who have provided

support for SDGTs, but does not authorize designation of those who have not provided support

to an SDGT.  Since AHIF-SA is not and has never been designated, AHIF-Oregon cannot be

designated for supporting AHIF-SA.  Nor can it be designated on the grounds that it is a "branch

office" of a designated parent, even if it were, because the parent was not designated.

Second, AHIF-SA does not even exist today.  It was closed by Saudi Arabia in 2004, as

defendants concede. Accordingly, AHIF-Oregon cannot be designated today for a relationship to

an entity that has never been designated, and that does not even exist.

The only way that AHIF-Oregon could conceivably be designated for its support of

AHIF-SA would be if defendants could show that AHIF-Oregon supported acts of terrorism or

other SDGTs by using AHIF-SA as a front or pass-through.  E.O. 13224, § 1(d)(i), authorizes

designation of persons who "assist in, sponsor, or provide financial, material, or technological

support for, or financial or other services to or in support of, such acts of terrorism." But defendants have made no showing that AHIF-Oregon supported any act of terrorism through AHIF-SA or otherwise. All other bases for designation under E.O. 13224 require proof of support for or ownership or control by, or acting for or on behalf of, an SDGT. Since AHIF-SA is not an SDGT, AHIF-Oregon could be designated only if OFAC showed that it used AHIF-SA to support another designated entity. It has made no such showing. At most, it has made conclusory allegations – not proven – that AHIF-SA had *other* branches that supported terrorism and were later designated by OFAC. But there is no evidence – or even allegation – that AHIF-Oregon sought to support the alleged illegal activities of any of those designated entities through AHIF-SA or otherwise.

Indeed, much of the record concerns AHIF-Oregon's donation of $180,000 to AHIF-SA for a Chechen relief project. AHIF-Oregon submitted unrebutted evidence that this money went to a government-authorized humanitarian relief project, approved by both the Saudi and Russian governments, and carried out by the Saudi Joint Relief Committee. There is nothing in the record to suggest that this money was used to support "acts of terrorism" or any SDGT. Absent such evidence, the donation provides no support for the designation or redesignation.

## IV.    IEEPA Does Not Authorize Designation of Organizations Unconnected to a Nation-Targeted Economic Sanction, and Therefore, AHIF-Oregon's Designation Is Statutorily Unauthorized.

AHIF-Oregon's designation is statutorily unauthorized because it is not a "national thereof" of any country against which the President has issued economic sanctions. IEEPA's language, history, and purpose make clear that it authorizes the designation of organizations and individuals only as an incident to an economic sanction against a foreign country. As such, the

designation of AHIF-Oregon is invalid on statutory grounds, and the Court need not reach the many constitutional questions plaintiffs' suit otherwise presents.

Statutes should be construed to avoid serious constitutional questions. *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems"); *Zadvydas v. Davis,* 533 U.S. 678 (2001) (same); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006).

The statutes at issue in *St. Cyr*, *Zadvydas*, and *Nadarajah* contained no limiting language on their face, but the courts nonetheless read limitations into the statutes to avoid the serious constitutional questions that would otherwise have been presented. In *Nadarajah* and *Zadvydas*, the courts interpreted detention statutes with no express time limit to incorporate a presumptive six-month limitation. In *St. Cyr*, the Court interpreted a statute that appeared to preclude all judicial review of certain removal decisions not to bar review by habeas corpus.

Here, this Court need not read any limitation into IEEPA, because the statute contains limiting language on its face. IEEPA authorizes actions only against any "foreign country or a national thereof." Thus, 50 U.S.C. § 1702(a)(1)(B) empowers the President, *inter alia*, to "prevent or prohibit, any … transactions involving any property in which *any foreign country or a national thereof* has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States" (emphasis added). Similarly, 50 U.S.C. § 1702(a)(1)(A)(ii) empowers the President to block "transfers or payments [to the extent they] involve any interest of *any foreign country or a national thereof*" (emphasis added). Notably, IEEPA *never* refers to foreign nationals generally, absent a connection to foreign countries, but *always* uses the phrase

"foreign country or a national *thereof*."

The word "thereof" requires a nexus between a sanction against a national and a sanction against its country.  Thus, an economic sanction on Libya might prohibit transactions not only with the Libyan state, but also with Libyan businesses or individuals, *i.e.*, Libya and "nationals thereof."  But AHIF-Oregon is not a "national" of any country that has been targeted for sanctions; if it is a "national" of any country, it is a national of the United States, the country in which it is incorporated and located.  Accordingly, its designation is not authorized by IEEPA.

IEEPA's limiting language is in keeping with its history and purpose.  IEEPA was designed to *restrict* the President's power to impose embargoes on foreign *nations*.  The power it sought to restrict was a tool of nation-to-nation diplomacy.  In the long history of economic sanctions and embargoes that preceded IEEPA, no President had ever imposed an embargo on an individual or political groups except as an incident to a nation-targeted sanction.  Moreover, for the first seventeen years that IEEPA was on the books, Presidential practice conformed to that history.  There is no evidence that in enacting IEEPA, a statute expressly designed to *restrict* Presidential power, Congress gave the President an entirely new and unprecedented power to blacklist political organizations or individuals, wholly apart from nation-targeted sanctions.

IEEPA was designed to codify and rein in the longstanding practice of economic sanctions on foreign nations.  All the discussion in IEEPA's legislative history concerns sanctions on nations.  For example, in the Subcommittee on Economic Policy and Trade Report of Recommendations, Committee Chairman Bingham was asked to give an example of a national emergency unrelated to war that would fall within IEEPA.  Bingham responded:

A very obvious example would be a case where the United States was engaged in

hostilities where there was no declaration of war, such as the war in Korea, or the war in Vietnam. . . . [T]he President could declare an emergency and take certain action if there were a sudden drain on the resources of the United States through such a serious imbalance of trade as to require emergency action.[9]

Chairman Bingham also agreed that an oil embargo would constitute a non-war national emergency, and noted that the President would be empowered to freeze the assets of the country that established the oil embargo.  *Id*.  He further opined that the President would be permitted to establish an embargo on exports to that country.  *Id*.  No one, in any of the debates on IEEPA, even mentioned the possibility that it would empower the President to target disfavored political organizations and individuals, without any nexus to an embargo on a foreign country.  Given that no President had ever done so in the past, and that no one in Congress even suggested that they were creating such a new authority in enacting IEEPA, it makes no sense to read the statute to create such an unprecedented and constitutionally dubious power.  As the Supreme Court said of another statute, "this is a case where common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor, and not nearly as readily accepted."  *Church of Scientology v. IRS,* 484 U.S. 9, 17-18 (1987).

Other statutes reinforce this reading.  Where Congress sought to empower the executive branch to designate foreign terrorist organizations and criminalize material support to them, it did so explicitly.  In sharp contrast to IEEPA, the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), expressly authorizes designation of terrorist organizations, sets forth an objective definition of which organizations may be so

---

[9]  Markup Before the Committee on International Relations, House of Representatives, 95th Congress, 1st Sess., at 4 (June 17, 1977) (Rep. Bingham).

designated, and creates formal review mechanisms in the courts and Congress.  *See* 18 U.S.C. §

2339B; 8 U.S.C. § 1189.  If IEEPA were as broad as defendants have treated it, AEDPA, passed

in 1996 long after IEEPA was on the books, would not have been necessary, as everything

accomplished through AEDPA could have been accomplished through IEEPA, with far less

oversight.  (It is noteworthy that while only about 36 organizations have been designated

pursuant to the statutory criteria Congress set forth in 8 U.S.C. § 1189, the executive branch has

employed the open-ended terms of E.O. 13224 to designated hundreds if not thousands of

individuals and organizations without finding that they fit any statutory criteria whatsoever).  The

Court should not construe a statute that does not even mention terrorism or terrorist organizations

to afford the President far more expansive powers than those explicitly set forth in AEDPA,

particularly where doing so raises a plethora of difficult constitutional questions.

Similarly, in the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), enacted

shortly after the terrorist attacks of September 11, 2001, Congress amended IEEPA, adding a

provision that expressly authorized the President, when the nation has been attacked, to

confiscate the property of "any foreign person, foreign organization, or foreign country that he

determines has planned, authorized, aided, or engaged in … attacks against the United States."

50 U.S.C. § 1702(a)(1)(C).  That provision, evidently prompted by the fact that we were attacked

by a non-state actor, for the first time expressly authorizes action against foreign organizations or

persons, without any requirement of a nexus to a country-based embargo, but instead limited by

the requirement that they be found to have participated in or supported an armed attack against

us.  By contrast, the provisions at issue here, 50 U.S.C. §§ 1702(a)(1)(A) and (B), expressly limit

sanctions authority to "a foreign country or a national thereof," without reference to armed attack,

terrorism, or any other offense.

This interpretation makes constitutional sense.  It is well-established that the President has far broader leeway in imposing sanctions on foreign nations than on political groups.  Thus, in *Regan v. Wald*, 468 U.S. 222, 241-42 (1984), the Supreme Court upheld a general ban on travel to Cuba, but carefully distinguished restrictions on travel by Communist Party members, imposed "on the basis of political belief or affiliation," which were previously invalidated in both *Aptheker v. Secretary of State*, 378 U.S. 500 (1964), and *Kent v. Dulles*, 357 U.S. 116, 127-29 (1958); *see also Zemel v. Rusk*, 381 U.S. 1, 13, 17-18 (1965) (same).

All indications are that Congress intended to authorize only nation-targeted sanctions when it enacted IEEPA, and to authorize actions against "nationals thereof" only as an incident to a nation-targeted sanction.  The designation of AHIF-Oregon, which is not a "national thereof" of any sanctioned country, is therefore unauthorized by law.

## V.    The Designation Authority Is Vague and Overbroad in Violation of the First and Fifth Amendments.

The IEEPA scheme challenged here contains two separate designation authorities – one exercised by the President directly under IEEPA, and the other exercised by the Secretary of the Treasury under authority delegated by E.O. 13224.[10]  AHIF-Oregon was designated under the latter authority.  The Multicultural Association faces a credible threat that it could be designated under either authority if it works with or supports AHIF-Oregon.  Accordingly, plaintiffs

---

[10] Defendants are mistaken in claiming that in order to invalidate these laws as facially vague, plaintiffs must establish that they are vague in all their applications. Def. Br. 52 n.41.  That rule applies only "outside the First Amendment context."  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971-72 (9th Cir. 2003).  A different rule applies where, as here, First Amendment freedoms are at stake, because of the concern about chilling effects.  Statutes that affect First Amendment freedoms are vague on their face when they are unclear and reach a "substantial amount of legitimate speech."  *California Teachers' Assn v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001).

challenge both the President's and the Secretary of the Treasury's designation authorities on their face and as applied.

A.      **Plaintiffs Have Standing to Challenge the Designation Authority on Its Face and as Applied.**

Defendants do not dispute that AHIF-Oregon has standing to challenge the designation authority employed by defendants against it as vague and overbroad.  Plaintiff Multicultural Association and its members also have standing to challenge the designation authority, before it has been enforced against them, because it appears to prohibit them from working with and supporting AHIF-Oregon in virtually any capacity.

Where a law even "arguably" implicates First Amendment rights, pre-enforcement standing is permitted.  *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)).  Quoting Judge Posner, the Ninth Circuit held that "'a plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute.'"  328 F.3d at 1095.  The Court acknowledged that if the statute "'clearly fails to cover his conduct,'" standing would not lie.  *Id.*  "'But if it arguably covers it … there is standing.'"  *Id.*  Thus, pre-enforcement standing is permitted where a law "arguably covers" a plaintiff's First Amendment conduct.

In addition, pre-enforcement standing is appropriate where First Amendment interests are at issue, and plaintiffs (1) challenge a "regulatory and proscriptive" statute (2) that has been enforced in the past, and (3) seek to engage in the proscribed conduct in the future but are chilled from doing so.  *See American-Arab Anti-Discrimination Committee v. Thornburgh*, 940 F.2d

445, 450-52 (9th Cir. 1991).[11]  *See also Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (*en banc*) (holding, *per* Judge Michael McConnell, that plaintiffs have pre-enforcement standing based on a chilling effect on speech if they show (1) that they have engaged in the type of speech affected by the statute in the past; (2) that they currently desire to engage in such speech; and (3) that they are deterred from doing so because of a credible threat that the statute will be used against them).

The Multicultural Association has standing under both tests.  IEEPA, as implemented through E.O. 13224, "arguably covers" plaintiffs' First Amendment protected activity.  The President has officially construed IEEPA to authorize designation on "associations" alone, as set forth in E.O. 13224, § 1(d)(ii).[12]  The Multicultural Association's intended activities, including advocating for AHIF-Oregon's rights, volunteering its time to work in support of its designation challenge, and collaborating with AHIF-Oregon at its annual Multicultural Fair in September, as they did prior to AHIF-Oregon's designation, all arguably constitute "material support," "services" or "associations" with AHIF-Oregon.  Under *California Pro-Life Council*, that is more than sufficient to establish standing.

In addition, plaintiffs face a credible threat of enforcement under this "regulatory and proscriptive" scheme if they engage in their intended activities.  The President has already

_____

[11] While the plaintiffs in *American-Arab* had previously been charged under the challenged statute, the charges had been dropped, and the Court specified that "even if they had not already been charged with violating the challenged provisions, the individual appellees would have standing" for the reasons stated above.  940 F.2d at 450.

[12] While the Secretary of the Treasury, in response to a judicial decision declaring this provision unconstitutional, has narrowed the definition of the "associated with" provision that governs designations by OFAC, that regulation does not govern Presidential designations.  E.O. 13224 itself has *not* been amended and continues to target association.  Accordingly, the Multicultural Association must fear engaging in any activity that the President might construe as "association" with AHIF-Oregon.  Moreover, defendants have admitted that entities have been designated in the past solely for their associations, and have not stated that any of those entities have been removed from the list.  *See HLP v. Dept. of Treasury*, 463 F. Supp. 2d at 1069.

designated twenty-nine entities, and has formally indicated that he reads the law to authorize
designation on the basis of, *inter alia*, mere association, or any speech conducted "for the benefit
of" a designated entity.  He has further authorized the Secretary of the Treasury to designate
others based on "services," "material support," and a variety of associations, which threaten the
Association with designation if they engage in any of the specific conduct they would like to
pursue to support AHIF-Oregon.  And defendants have designated AHIF-Oregon, making the
Multicultural Association's fears about working with AHIF-Oregon especially credible.
Accordingly, because IEEPA and E.O. 13224 arguably cover their intended conduct, and because
they face a threat that they will be designated or penalized if they pursue conduct that the E.O.
prohibits on its face, the Multicultural Association has standing to sue on its own behalf and on
behalf of its members.

> **B.**     **The President's Designation Authority is Unconstitutionally Vague and
> Overbroad.**

A law is impermissibly vague if it "cause[s] persons of common intelligence ...
necessarily [to] guess at its meaning and [to] differ as to its application.'" *United States v.
Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (quoting *Connally v. General Constr. Co.*, 269 U.S.
385, 391 (1926)).  A central purpose underlying the due process and First Amendment
prohibition on vague statutes is to "avoid subjective enforcement of the laws based on 'arbitrary
and discriminatory enforcement' by government officers."  *Foti v. City of Menlo Park*, 146 F.3d
629, 638 (9th Cir. 1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).
"The requirement of clarity is enhanced when criminal sanctions are at issue or when the statute
abuts upon sensitive areas of basic First Amendment freedoms."  *Information Providers'*

*Coalition for the Defense of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir. 1991)

(internal quotation marks and citations omitted).[13]

A law is overbroad if it punishes a "substantial amount of protected free speech, judged in

relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118 (2003);

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  The law must punish a substantial amount of

speech, both in absolute terms and as compared to its coverage of illegal activities.  *Id.*

The President's authority to designate is vague and overbroad because it is a virtual blank

check.  As interpreted by defendants, IEEPA gives the President sweeping power to shut down

disfavored groups and individuals, without substantive charges, without findings of wrongdoing,

and without statutory guidance.  One court correctly concluded that the law gives the President

the power to designate anyone he chooses, for merely "associating," or for "no reason" at all.

*HLP v. Dept of the Treasury*, 463 F. Supp. 2d at 1067.  Such untrammeled power to shut down

disfavored political groups and individuals cannot be squared with the First Amendment.

IEEPA neither defines nor uses the terms "terrorist organizations," "specially designated

global terrorists," or any other term relating to "terrorism."  The President nonetheless construes

---

[13] While IEEPA and E.O. 13224 impose civil as well as criminal sanctions, the same stringent vagueness standard applies to both, for two reasons.  First, stringent standards are required by civil laws that affect First Amendment rights: "the requirement of clarity is enhanced … when the statute abuts upon sensitive areas of First Amendment freedoms."  *Information Providers' Coalition*, 928 F.2d at 874; *see also Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) ("perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights").

Second, stringent vagueness standards apply to civil laws that impose "quasi-criminal" penalties or have "prohibitory and stigmatizing effects."  *Hoffman Estates*, 455 U.S. at 499.  The civil provisions at issue here are not designed to compensate the government, but explicitly to penalize.  18 U.S.C. § 1705(a) (authorizing a "civil penalty").  And the designation sanction, effectively a death knell for an organization, is in many respects more draconian than a criminal penalty.  Organizations can generally survive the imposition of criminal penalties.  But an organization designated as terrorist is effectively closed down.  Thus, both the effects on First Amendment rights and the severity of the civil sanctions here require the application of the most stringent vagueness standards.

this authority to permit designation on the basis of mere associations, as he delegated that

authority to the Secretary of the Treasury in E.O. 13224, § 1(d)(ii).  As interpreted and employed

by the President, designations may be made without providing any notice, any hearing, or even

any statement of reasons.  Thus, the President has designated twenty-nine individuals and groups

under E.O. 13224, but has never offered *any* explanation as to why those entities were selected.

A power that allows the executive branch to blacklist groups and individuals without

substantive criteria or procedural protections is both vague and overbroad.  It allows the

designation for any reason at all, and forces ordinary citizens to guess at what might prompt the

President's displeasure.  The unconstitutionality of the President's sweeping IEEPA authority is

cast in relief by comparison to the power to designate "foreign terrorist organizations" under

AEDPA previously upheld by the Ninth Circuit.  *HLP v. Reno*, 205 F.3d 1130, 1136-37 (9th Cir.

2000).  AEDPA authorizes designation only of foreign organizations that meet specific statutory

criteria requiring findings of terrorist activity that threatens our national security.  The Ninth

Circuit upheld AEDPA precisely because it "does not grant the Secretary unfettered discretion in

designating the groups to which giving material support is prohibited."  *See* 205 F.3d at 1137.

The Court emphasized that because of AEDPA's statutory criteria, the Secretary could not

designate "the International Red Cross" as a terrorist organization.  *Id.*  Rather, "the Secretary

must have reasonable grounds to believe that an organization has engaged in terrorist acts –

assassinations, bombings, hostage-taking, and the like – before she can place it on the list."  *Id.*

IEEPA, by contrast, does give the President "unfettered discretion in designating the

groups to which giving material support is prohibited," and would permit him to designate the

Red Cross.  *Id.*  As interpreted by defendants, once the President declares an emergency, he can

block the assets of and bar transactions with any entity or individual in whose transactions a

foreign national has an interest – without any finding that the individual or organization engaged

in or supported terrorism.  In short, IEEPA gives the President the very "unfettered discretion"

that the Ninth Circuit emphasized AEDPA did not afford.

> ### C.    The Treasury Secretary Designation Authority Is Vague and Overbroad.

Plaintiffs advance two distinct but overlapping challenges to the Secretary's designation

authority:  (1) that the Secretary's designation authority as a whole is unconstitutionally vague

and overbroad; and (2) that the authority to designate on the basis of "material support,"

"services," and "associations" is unconstitutionally vague and overbroad.  Defendants argue that

the authority is not overbroad because it reaches only "the provision of support to terrorism," and

not vague because its terms are clearly comprehensible.  Def. Br. 43.  In fact, however, the E.O.

reaches support of and association with groups and individuals who have *never* engaged in

terrorism.  And its terms force the Multicultural Association and its members to guess at what if

anything they may do in support of and in conjunction with AHIF-Oregon.

> ### 1.    The Power to Designate Groups that Have Never Engaged in or Supported Terrorist Activity is Vague and Overbroad.

The Secretary of the Treasury's designation authority under E.O. 13224 is almost as

extensive as the President's, and for similar reasons is also vague and overbroad.  Here, too, the

E.O.'s invalidity is established by comparison to the Secretary of State's authority to designate

"foreign terrorist organizations" under 8 U.S.C. § 1189.  Unlike that authority, the Secretary of

the Treasury's authority under E.O. 13224, permits designation of groups that have never

engaged in or supported terrorist activity or groups, and would authorize not only designation of

the Red Cross, but of anyone who ever donated to or worked for the Red Cross.

This is because the E.O., unlike 8 U.S.C. § 1189, authorizes a kind of infinite regression of designations by association, in which groups and individuals may be designated without having ever engaged in terrorist activity, but merely for having supported or associated with other groups that have supported other groups – even where the new designee has no connection to any group that ever engaged in terrorism. Thus, the Secretary could designate the Red Cross for providing "services" to detainees in Guantanamo by visiting them and advocating for their humane treatment. The Secretary could then designate any individual who had ever donated to the Red Cross, even though the Red Cross has never engaged in terrorism, and even if the donors had no idea that the Red Cross had been designated. Once OFAC designated John Smith for donating to the Red Cross, it could then designate Smith's barber for cutting Smith's hair. Then the barber's suppliers could be designated as well, and so on, ad infinitum.

As AEDPA illustrates, there are more narrowly tailored ways to target terrorist financing. And while the Ninth Circuit has ruled that support for organizations that engage in terrorism is not constitutionally protected, support for groups – such as the Red Cross – that do *not* engage in terrorism is constitutionally protected.[14] Since the E.O. prohibits support to groups that are many times removed from any terrorist activity of any kind, it is substantially overbroad.

The E.O. authority is also vague, as citizens must guess at what sort of second-, third-, and fourth-generation connections might cause them to be designated. The fact that designations

---

[14]   Monetary contributions to political organizations are a protected form of association and expression. *Buckley v. Valeo*, 424 U.S. 1, 16-17, 24-25 (1976); *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (First Amendment protects nonprofit group's right to solicit funds); *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295-96 (1981) (monetary contributions to a group are a form of "collective expression" protected by the right of association); *Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1316 (9th Cir. 1992) ("contributing money is an act of political association that is protected by the First Amendment").

require no statement of reasons or findings of wrongdoing greatly exacerbates this vagueness. Designations are published in the Federal Register, but those notices simply announce the name of the designee, and provide no indication of *why* the designation was made.  As a result, they provide no guidance as to what types of activities are permitted or proscribed.  The Secretary's designation authority is both overbroad and vague.

> 2.    **The Ban on Providing "Material Support," "Services" and on Being "Associated With" Designated Groups is Vague and Overbroad.**

The Secretary of the Treasury's designation authority is also unconstitutional because it permits designation on the basis of "material support," "services" and "associat[ions]," sweeping and vague terms that encompass a substantial amount of First Amendment-protected activity. The E.O. authorizes designation and civil and criminal penalties if individuals or groups are deemed to have provided "material support" or "services" to designated entities, or to be "otherwise associated with" such groups.  E.O. 13224, §§ 1(d)(ii), 2(a).  The Ninth Circuit has already declared unconstitutionally vague a similar ban in 18 U.S.C. § 2339B on providing "services," "training," and "expert advice or assistance" to designated foreign terrorist organizations.  *Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1135-36 (9th Cir. 2007). The E.O.'s bans are even more sweeping and vague, for several reasons.

First, as noted above, while § 2339B limits the provision of services only to groups that have been determined to engage in terrorist activities, the E.O. bans the provision of material support and services to, and associations with, groups and individuals that have *never* engaged in or supported any terrorist activity or any group engaged in terrorist activity.  Thus, the reach of the identical term "services" is even more extensive here than under § 2339B.

Second, violations of § 2339B require proof of knowing provision of support to designated groups; designation and civil penalties under the E.O., which can be even more harsh than a criminal conviction, require *no showing of knowledge whatsoever*. Thus, the Multicultural Association has even more reason to fear that anything it does with respect to AHIF-Oregon will render it vulnerable to being designated.

Third, while a conviction under § 2339B would require a criminal trial, with full adversarial presentation of the evidence, designation under the E.O. is effectuated, as this case illustrates, without a hearing, on secret evidence, without notice of any offending conduct or of the legal provisions at issue, and without a statement of reasons. Accordingly, plaintiffs must steer far more widely of the potentially prohibited zone with respect to the bans established by IEEPA and E.O. 13224 than with respect to § 2339B.

Fourth, the term "material support," while defined in § 2339B, has no statutory definition in IEEPA or the E.O. Defendants maintain in their brief that "material support" covers anything done "to promote the interests or cause of" a designated group that has "real importance or great consequences." Def. Br. 48 (quoting *Merriam-Webster Collegiate Dictionary* 715, 1180 (10th ed. 2002)). This definition is at once extremely sweeping and profoundly opaque. Joining this lawsuit might be seen as "promot[ing] the interests" of AHIF-Oregon, and if so, then the Multicultural Association is vulnerable to designation if defendants deem their participation to have "real importance or great consequences." Does that mean that if the Multicultural Association prevails on its claims, it can be designated (as that might constitute a "great consequence"), but that if it loses, its support will have been permissible? If the Association publishes a leaflet or takes out an advertisement urging people to protest AHIF-Oregon's

designation, would it be subject to designation if many people responded by writing letters in support of AHIF-Oregon's cause? Would Multicultural Association members who wrote such letters themselves be deemed to have provided "material support" by doing so? What does it mean for support to have "real importance or great consequences?" Is support having only "false importance" or "moderate consequences" permissible? There is simply no way, short of guessing, for a citizen to know whether something he does for AHIF-Oregon will be deemed to constitute "material support" under this definition.

Defendants contend that the term "material support" has been upheld in other statutes, but the only cases they cite that addressed a vagueness challenge concerned only AEDPA. Def. Br. 48-49. Those cases are distinguishable, because AEDPA has a lengthy definition of "material support," 18 U.S.C. § 2339A(b)(i), while the E.O. contains no definition whatsoever, forcing defendants to invoke the dictionary. Moreover, as noted above, the Ninth Circuit has held several of the terms in AEDPA's "material support" definition to be unconstitutionally vague, so those cases hardly establish that the term, standing alone, is impervious to constitutional attack.[15]

Fifth, the E.O. targets association as such, while the Ninth Circuit emphasized that AEDPA permitted individuals to associate with and even join "foreign terrorist organizations," but merely prohibited the provision of financial and other tangible support to them. *HLP v. Reno*, 205 F.3d at 1133-34. A district court recently declared the "otherwise associated with" provision unconstitutionally vague and overbroad, *HLP v. Dept of the Treasury*, 463 F. Supp. 2d

---

[15] Defendants also claim that the Third Circuit upheld "material support" against a vagueness challenge in *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298-99 (3d Cir. 2004). The court did no such thing. No vagueness challenge was even presented. Instead, the court addressed only the question whether an immigrant's activities amounted to "material support" under immigration law, a question of statutory construction only.

at 1070, because it penalized association as such.  OFAC subsequently issued regulations

narrowing the "otherwise associated with" provision.  *See HLP v. Dept. of the Treasury*, 484 F.

Supp. 2d at 1105 (quoting new regulation).  But AHIF-Oregon was initially designated under the

unamended and unconstitutional "otherwise associated with" provision, and if defendants relied

upon that provision, the designation is invalid.[16]  And as explained above, the regulations do not

affect the President's designation authority, which as the E.O. itself illustrates, the President

construes to authorize designation on mere associations.

      Defendants argue that the regulations have sufficiently clarified the "services" ban to save

it from a vagueness challenge, *see* Def. Br. 47, and that the ban clearly *does not* prohibit "pure

speech, or advocacy."  *Id.* at 50.  But defendants' argument here and in another case raising

similar issues only underscores the impenetrable ambiguity of the E.O. prohibition.

      The regulations have "examples" of prohibited "services," including "legal, accounting,

financial, brokering, freight forwarding, transportation, public relations, educational, or other

services" to designated entities.  31 C.F.R. § 594.406.  (The regulations offer no definition of

"material support.")  But whatever clarity these regulations might otherwise provide is erased by

defendants' simultaneous contention that the IEEPA bans do not bar "pure speech or advocacy"

on behalf of a designated entity.  Def. Br. 50.  Many "educational" or "public relations" or

---

[16]  Because defendants never provided plaintiffs with any statement of reasons for the initial designation, AHIF-Oregon cannot know whether they were designated under this provision, but it appears that it may have been a factor in the designation, as defendants relied on associations with other designated entities and AHIF-SA in their February 2008 "redesignation," and assert in their brief only that AHIF-Oregon was not initially designated "on association *alone*."  Def. Br. 40 (emphasis added).  Any reliance on associations is presumptively unconstitutional, whether as the sole factor or as one factor among many, unless defendants can prove that they would have designated AHIF-Oregon even without consideration of its associations.  *Mt. Healthy School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977) (where illegitimate consideration is a "motivating factor" in a decision with mixed motives, government bears burden of proving that it would have reached the same decision without consideration of the impermissible factor).  Defendants have not even attempted to make such a showing.

"legal" services, for example, would consist of "pure speech or advocacy," so are they proscribed by the regulations, or permitted by the implicit exemption asserted by defendants' brief?

In a pending appeal in *HLP v. Dept. of Treasury*, moreover, the same defendants have argued that the ban on "services" reaches "any act done for the benefit … of another," *see* Br. of Appellees in *HLP v. Dept. of Treasury*, No. 07-55893, at 35 (9th Cir. filed Mar. 10, 2008), but does not include "independent advocacy on behalf of a designated person." *Id.* at 42. This only further confuses matters, for it requires citizens to guess at the difference between permissible advocacy "on behalf of" another, and prohibited advocacy "for the benefit of" another, and also requires individuals to guess at when their advocacy is "independent" and when it is coordinated or non-independent. Since neither the "pure speech or advocacy" exemption claimed by defendants here nor the "independent advocacy" exemption claimed by defendants in their Ninth Circuit brief are found anywhere in the statute, Executive Order, or regulations, there is literally no law to guide citizens in traversing this landscape.

How is the Multicultural Association to know whether advocating the rights of AHIF-Oregon, its support of the designation challenge, or its inclusion of AHIF-Oregon in its Multicultural Fair, constitute prohibited "services … for the benefit of" AHIF-Oregon, or permissible "pure speech or advocacy" on its behalf? If any attempt to "promote the interests or cause of" AHIF-Oregon is prohibited "material support" if it has "real importance or great consequences," Def. Br. 48, how are the Multicultural Association and its members to determine when their "pure speech or advocacy" undertaken to promote AHIF-Oregon's cause or interests is permissible or proscribed? What is the difference between "educational services" about this lawsuit done for the benefit of AHIF-Oregon, which are prohibited by the express terms of the

E.O., and "pure speech or advocacy" defending AHIF-Oregon's rights, which defendants claim is somehow implicitly permitted?

These questions are further complicated by the revised "otherwise associated" provision, which provides that even an "attempt" to act on behalf of an organization is grounds for designation. *Any* activity in conjunction with AHIF-Oregon could be deemed an "attempt" to act "on behalf of" that organization, including contacting it to see how one might support its designation challenge, or to ask if it would like to participate in the Multicutural Fair.

Thus, if the Court agrees with defendants that "pure speech or advocacy" or "independent advocacy on behalf of a designated person" are implicitly exempted from the E.O.'s prohibitions on "services for the benefit of" or actions to "promote the interests or cause of" a designated person, the "services" and "material support" prohibitions are rendered even more vague, because there are no guideposts as to whether the kinds of activities plaintiffs seek to engage in would be permitted or proscribed.

If, by contrast, the Court concludes that there is no such exemption – because the E.O. and regulations on their face prohibit *all* activity done "for the benefit of" or "on behalf of" a designated entity, and contain no exemption for "pure speech or advocacy" -- then the prohibition is both vague and overbroad, because it would then penalize a wide range of advocacy and associations that are clearly protected by the First Amendment.

Defendants argue that plaintiffs may seek clarification from the Treasury Department in cases of doubt. But the possibility of seeking guidance from authorities is available for every civil and criminal statute, so if that possibility were sufficient to defeat vagueness, no law would be unconstitutionally vague. It is true that rules governing regulated entities may be somewhat

Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss and for Summary Judgment

less clear, on the theory that the regulated entity may consult with its regulator. *Hoffman Estates*, 455 U.S. at 498 (applying this rule to regulated businesses selling drug paraphernalia); *see also Seagram & Sons v. Hostetter*, 384 U.S. 35, 49 (1966) (applying this rule to regulated liquor distillers and wholesalers). But that rule applies only to regulated entities, and has no applicability to the general public. Unlike a closely regulated business, members of the public are not likely to feel free to call the Treasury Department to say that they are thinking about supporting a "specially designated global terrorist" and would like advice on whether they can do so. The public will simply steer clear of the prohibited zone. And that is exactly the problem that the vagueness doctrine is designed to alleviate.[17]

## VI.    The Freezing of AHIF-Oregon's Assets Violated the Fourth Amendment.

AHIF-Oregon's assets have been frozen for more than four years without even a finding of probable cause that it committed any wrongdoing. Plaintiff contends that such action constitutes a seizure, and that the seizure is unreasonable in the absence of any probable cause.[18] Defendants respond by disputing the premise of plaintiff's claim: they contend that the freezing of AHIF-Oregon's assets is simply not a seizure, and therefore the Fourth Amendment is not implicated by their actions in any way.

Defendants are incorrect. A seizure of property occurs when "there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). It can

---

[17]    In addition, the opportunity to seek clarification does *nothing* to respond to one of the core concerns of the vagueness doctrine – namely, limiting arbitrary enforcement by government officials granted too much discretion by open-ended laws. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

[18]    The government, when presented with the opportunity to prove its charges against AHIF-Oregon in the criminal prosecution, instead dismissed AHIF-Oregon as a defendant. *See* SOF ¶ 41.

hardly be denied that having all of their assets frozen for four years is "some meaningful

interference" with plaintiff's possessory interest in their property.  In *United States v. Place*, 462

U.S. 696 (1983), the Court held that holding an individual's luggage for ninety minutes was an

unconstitutional "seizure" where police had only reasonable suspicion, and not probable cause,

of criminal activity.  If holding a bag for ninety minutes is a seizure implicating the Fourth

Amendment, then surely freezing AHIF-Oregon's property for more than four years is a seizure.

Defendants' reliance on *Tran Qui Than v. Regan*, 658 F.2d 1296 (9th Cir. 1981), and

*D.C. Precision, Inc. v. United States*, 73 F. Supp. 2d 338, 343 n.1 (S.D.N.Y. 1999), is misplaced,

because neither court addressed a Fourth Amendment question.  They addressed only whether

blocking and freezing orders were a "taking" requiring just compensation under the Fifth

Amendment.  But the threshold for a seizure under the Fourth Amendment, as set forth above, is

significantly lower than for a "taking" under the Fifth Amendment.  The luggage held for 90

minutes in *Place* for a drug-sniffing dog was not "taken" in the Fifth Amendment sense requiring

just compensation, but was "seized" from the standpoint of the Fourth Amendment.

Two district courts have made the same mistake that defendants make here, citing *Tran

Qui Than* and *D.C. Precision* for the proposition that a freeze is not a seizure for Fourth

Amendment purposes.  *See Islamic American Relief Agency v. Unidentified FBI Agents,* 394 F.

Supp. 2d 34, 48 (D.D.C. 2005); *Holy Land Foundation for Relief & Dev. v. Ashcroft*, 219 F.

Supp. 2d 57, 78-79 (D.D.C. 2002).  These decisions are unpersuasive, however, as they plainly

misread *Tran Qui Than* and *D.C. Precision*, offer no further reasoning, and do not even cite,

much less apply, the Supreme Court standard from *Soldal* for what constitutes seizure of property

under the Fourth Amendment.  When that standard is applied, it is indisputable that freezing

assets for four years constitutes a "meaningful interference" with AHIF-Oregon's possessory interests, and therefore amounts to a seizure.[19]

Defendants do not even attempt to defend the freeze by pointing to any probable cause, or by making any other argument that the seizure was "reasonable." No such argument is available where, as here, defendants initially froze all of plaintiff's funds without any designation at all, and then continued to do so on the basis of a designation that never even included a statement of reasons. Even brief (less than 90 minute) seizures of property require reasonable articulable suspicion, and seizures longer than that require probable cause. *Place*, 462 U.S. 696.

Defendants may seek to justify the seizure as a reasonable administrative seizure serving interests above and beyond ordinary law enforcement needs. But administrative search and seizure schemes may be upheld only where they serve interests beyond law enforcement, impose minimal intrusions on privacy and property interests, contain standardized procedures or otherwise substitute for a warrant requirement, and provide notice so that individuals can avoid their regulatory mechanisms if they choose. *See, e.g.*, *New York v. Burger*, 482 U.S. 691 (1987) (administrative search scheme must provide controls that substitute for warrant); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (upholding standardized traffic stops where they impose minimal intrusion, and are conducted subject to standardized regime). The freeze order here is anything but minimal in its effects; it has essentially shut down AHIF-Oregon for four

---

[19] David Aufhauser, who was the General Counsel at Treasury through 2003, prior to the blocking of AHIF-Oregon, recently stated that a designation "effectively denies people province over their own property in a largely unreviewable way," and that "such an extraordinary power needs to be exercised with discretion, because it could be constitutionally suspect." *See* P.R. Keefe, *State Secrets: A Government Misstep in a Wiretapping Case*, The New Yorker, Apr. 28, 2008, at 29-30. Mr. Aufhauser's public statement, if correct, renders suspect the government's argument that the designation of AHIF-Oregon was constitutional. Cari Stinebower, the OFAC attorney who worked on the designation of AHIF-Oregon in 2004 and early 2005, stated that she "was unaware of any internal definition of 'direct links'" used to connect a designated group with Al Qaeda. *Id.* at 34. This article is online at: http://www.newyorker.com/reporting/2008/04/28/080428fa_fact_keefe?currentPage=all.

years.  The power to freeze is not standardized at all, but affords the Secretary of the Treasury extraordinarily broad discretion in targeting individuals and groups.  And there was nothing AHIF-Oregon could to avoid being subjected to the scheme.  Thus, even under the administrative search and seizure doctrine, the seizure here is plainly unreasonable.

### VII.   Defendants' Restrictions on AHIF-Oregon's Ability to Pay for its Legal Defense Violates Due Process.

Until this lawsuit was filed, OFAC barred AHIF-Oregon from using its own funds or raising any money in the United States to pay for its legal expenses in responding to the government's freezing of its assets and designation.  Once plaintiffs filed this suit claiming that these restrictions violated due process, OFAC changed its policy.  It now will authorize AHIF-Oregon to use its own funds, but only subject to various conditions imposed by OFAC. Those conditions find no support in the statute, Executive Order, or regulations, and impermissibly interfere with AHIF-Oregon's right to defend itself.

It is undisputed that AHIF-Oregon is entitled to due process in connection with its designation, and that due process includes a meaningful opportunity to present a defense.  By refusing to allow AHIF-Oregon to use its own funds, or to raise any funds in the U.S., to defend itself, OFAC has arbitrarily undermined AHIF-Oregon's due process rights.  OFAC evidently has used substantial legal resources in the designation process.  Countless government lawyers have been employed to create the administrative record, to decide which information was classified or privileged, to address licensing issues, and to brief Mr. Szubin on his decision.  In addition, the Executive Order requires consultation with the Attorney General and the Secretary of State, which no doubt involved many more lawyers from each of those departments.  And the

government has at least five lawyers at one time litigating this case, and possibly yet others not listed on defendants' briefs.

OFAC's new policy, set forth in a letter dated April 14, 2008, *see* Cole Decl., Ex. A, provides that AHIF-Oregon may pay only two lawyers out of its blocked funds.  AHIF-Oregon still may not raise funds in the United States to support its defense.  And it must disclose to OFAC all sources of overseas funds used to pay counsel before being permitted to pay counsel out of its own funds.  This policy is, as far as we know, not published anywhere.  (Plaintiffs intend to submit a fee petition to OFAC, but do not waive their right to challenge this policy.)

These restrictions continue to violate AHIF-Oregon's due process rights by arbitrarily undermining its ability to defend itself.  AHIF-Oregon has five lawyers working on this case, the same number as the government, yet OFAC has authorized payment of only two lawyers.

AHIF-Oregon has a right to employ the legal team it needs to challenge its designation, and should also be free to raise funds within the United States to further support its challenge. By denying AHIF-Oregon that ability, OFAC has violated its due process right to defend itself.

Defendants' reliance on cases barring the use of forfeitable assets to pay attorneys' fees are distinguishable, as in those cases the government has an interest in acquiring the funds through the forfeiture.  Def. Br. 32.  By contrast, E.O. 13224 does not provide for forfeiture, but only for freezing of funds. The government's interest is not in preserving forfeitable assets so that it can obtain them for itself, but simply in stopping them from being used to support terrorism. Spending them on legal defense does not undermine the government's interest in any way.  Since plaintiffs' lawyers are already licensed by OFAC, that protects the government's interest in ensuring that blocked funds are not used for improper purposes.

Similarly, *Beobanka D.D. Belgrade v. United States*, No. 95 Civ. 5138 (HB), 1997 WL 23182 (S.D.N.Y. Jan. 22, 1997), does not support defendants' position.  In that case, an entity that *did not dispute its designation* subject to a country-based embargo sought to use blocked funds for litigation purposes *unrelated* to its designation.  The court noted that there is no right to counsel in civil litigation, and that the executive branch had an interest in freezing the funds as a potential bargaining chip with the nation (Serbia) subject to the embargo.  *Id.* at *2.

Here, by contrast, AHIF-Oregon seeks to challenge the validity of its designation, and it plainly has a due process right to do so.  Moreover, AHIF-Oregon has not been designated as an incident to a nation-based embargo, and thus the government has no interest in barring it from using its own funds to defend itself.

## CONCLUSION

This Court should find that the defendants' procedure for designating and redesignating AHIF-Oregon violated its due process rights, since defendants failed to provide AHIF-Oregon with notice of the specific charges, including through defendants' reliance on classified evidence. This Court should further find that defendants' designation and redesignation of AHIF-Oregon violated the Administrative Procedure Act, since the redesignation relied on new grounds, the process lacks adequate legal standards, OFAC impermissibly relied on unreliable hearsay evidence and created a one-sided administrative record, and the evidence in that administrative record does not support the designation or redesignation.

This Court should further find that IEEPA, 50 U.S.C. § 1701 *et seq.*, does not authorize designations of organizations absent a connection to a specific nation-targeted economic sanctions program, so that the designation of AHIF-Oregon is not authorized by statute.

This Court should find that the authority used to designate individuals and entities by the President and the Secretary of the Treasury is vague and overbroad in violation of the First and Fifth Amendments, so that the designation violates the constitutional rights of AHIF-Oregon, and of the Multicultural Association, which seeks to support the designation challenge.

This Court should further find that the freezing and seizure of AHIF-Oregon's assets for over four years, absent a probable cause finding, constitutes a constitutionally impermissible violation of AHIF-Oregon's rights under the Fourth Amendment.

Finally, this Court should find that defendants' restrictions on AHIF-Oregon's ability to pay for its legal defense violates due process, by limiting its opportunity to present a meaningful defense, where the government lacks a justification to preserve the blocked assets for its own use.

Respectfully submitted this 8th day of May, 2008.

/s/ Lynne Bernabei
_____
Thomas H. Nelson, OSB No. 78315
  (503) 622-3123
J. Ashlee Albies, OSB No. 05184
  (503) 221-1791
David Cole DC Bar No. 438355
  (202) 662-9078
Lynne Bernabei, DC Bar No. 938936
Alan R. Kabat, DC Bar No. 464258
  (202) 745-1942
Attorneys for Plaintiffs

## Certificate of Service

Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 100.1(b), 100.2(c), and 100.7(a), I certify that a copy of the foregoing Memorandum of Points and Authorities was served on counsel for defendants by this Court's Electronic Case Filing system this 8th day of May 2008.


/s/ Alan R. Kabat
_____
Alan R. Kabat, DC Bar No. 464258
Attorney for Plaintiffs