FILED'08 NOV 06 14:37 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AL HARAMAIN ISLAMIC FOUNDATION,  )
INC., AND MULTICULTURAL ASSOCIATION )
OF SOUTHERN OREGON,               )
                                  )
                Plaintiffs,       )        Civil Case No. 07-1155-KI
                                  )
        vs.                       )        OPINION AND ORDER
                                  )
UNITED STATES DEPARTMENT OF THE   )
TREASURY, HENRY M. PAULSON, JR.,  )
OFFICE OF FOREIGN ASSETS CONTROL, )
ADAM J. SZUBIN, UNITED STATES     )
DEPARTMENT OF JUSTICE, AND ALBERTO )
R. GONZALES,                      )
                                  )
                Defendants.       )
                                  )
_____ )

Thomas H. Nelson
P. O. Box 1211, 24525 E. Welches Road
Welches, Oregon 97067

J. Ashlee Albies
205 S. E. Spokane Street, Suite 319
Portland, Oregon 97202
David D. Cole
c/o Georgtown University Law Center

Page 1 - OPINION AND ORDER

600 New Jersey Avenue, N. W.
Washington, D. C.  20001

Lynne Bernabei
Alan R. Kabat
Bernabei & Wachtel, PLLC
1775 T Street, N. W.
Washington, D. C.  20009-7124

     Attorneys for Plaintiffs

Jeffrey S. Bucholtz
Jonathan Eli Zimmerman
Eric Joseph Beane
Sandra M. Schraibman
Anthony J. Coppolino
U. S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N. W.
Washington, D. C.  20001

     Attorneys for Defendants

KING, Judge:

Plaintiffs Al Haramain Islamic Foundation, Inc. ("AHIF-Oregon"[1]) and Multicultural

Association of Southern Oregon ("MCASO") challenge AHIF-Oregon's designation as a

terrorist organization, and the associated freezing of its assets, by bringing suit against the

United States Department of the Treasury, the Office of Foreign Assets Control ("OFAC"), the

United States Department of Justice, and individuals associated with those agencies.[2]  Before the

---

[1] I refer to plaintiff Al Haramain Islamic Foundation, Inc. as AHIF-Oregon throughout this
opinion to distinguish it from the world-wide organization of the Al Haramain Islamic
Foundation headquartered in Saudi Arabia, which I refer to as AHIF or AHIF-SA.

[2] OFAC is a component of the United States Department of the Treasury.

court are Defendants' Motion to Dismiss and for Summary Judgment (#36) and Plaintiffs'

Motion for Summary Judgment (#60).

## BACKGROUND

I.     Statutory and Regulatory Framework

Plaintiffs' claims arise out of the President's actions under the International Emergency

Economic Powers Act ("IEEPA").  Pursuant to the IEEPA, the President may declare a national

emergency to "deal with any unusual or extraordinary threat, which has its source in whole or

substantial part outside the United States[.]"  50 U.S.C. § 1701(a).  Such threat is described as a

threat to "the national security, foreign policy, or economy of the United States."  Id.  After

declaring a national emergency, the President may:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding,
> use, transfer, withdrawal, transportation, importation or exportation of, or dealing
> in, or exercising any right, power, or privilege with respect to, or transactions
> involving, any property in which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the jurisdiction
> of the United States[.]

50 U.S.C. § 1702(a)(1)(B).  He may do so without providing notice or an opportunity to be

heard.  When the President exercises this authority, he must immediately provide a report to

Congress identifying the reasons for his declaration, including why the circumstances "constitute

an unusual and extraordinary threat[.]"  50 U.S.C. § 1703.  In any designation subject to judicial

review, the government may submit to the court *ex parte* and *in camera* any classified

information on which it relied.  50 U.S.C. § 1702(c).

President Bush declared a national emergency on September 23, 2001, stating that the

"grave acts of terrorism" and the "continuing and immediate threat of future attacks" on the

United States "constitute an unusual and extraordinary threat to the national security, foreign

Page 3 - OPINION AND ORDER

policy, and economy of the United States." Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ("E.O. 13,224"). By this executive order, he authorized the Secretary of the Treasury to block contributions of funds, goods or services "to or for the benefit of" 27 individuals and entities he listed in an annex to the executive order. Id. at § 1(a).

Pursuant to IEEPA's requirement that he provide a report to Congress, on September 24, 2001, President Bush explained in a Message to Congress:

> I have identified in an Annex to this order eleven terrorist organizations, twelve individual terrorist leaders, three charitable or humanitarian organizations that operate as fronts for terrorist financing and support, and one business entity that acts as a front for terrorist financing and support. I have determined that each of these organizations and individuals have committed, supported, or threatened acts of terrorism that imperil the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

President Declares National Emergency, Sept. 24, 2001, available at http://www.whitehouse.gov /news/releases/2001/09/20010924.html.

In his executive order, the President also delegated authority to the Secretary of Treasury to designate other foreign groups or individuals who have committed or pose a risk of committing acts of terrorism, or who are "owned or controlled by, or . . . act for or on behalf of those" entities designated by the President or those subsequently designated by the Secretary of Treasury. E.O. 13,224 at § 1(b) and (c). Finally, the President delegated authority to the Secretary of Treasury to designate entities who "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons" designated by the President or by the Secretary of Treasury, or for being "otherwise associated" with a designated entity. Id. at §1(d)(i) and (ii). The Secretary of Treasury may utilize his designation authority only after consulting with the Secretary of State

and Attorney General.  The entities designated by the President or by the Secretary of Treasury

are referred to as specially designated global terrorists ("SDGT").[3]

The President authorized the Secretary of the Treasury to issue regulations to implement

the executive order and to redelegate those functions if necessary.  Pursuant to regulations issued

by OFAC, a designated entity may seek a license to engage in any transaction involving blocked

property.  31 C.F.R. § 501.801-.802.  Such an entity may also seek "administrative

reconsideration" of a designation.  31 C.F.R. § 501.807.

In 2002, President Bush amended E.O. 13,224 and added the Taliban and Mohammed

Omar to his initial list of twenty-seven SDGTs.  Exec. Order No. 13,268, 67 Fed. Reg. 44,751

(July 2, 2002).

The IEEPA and regulations implementing the executive order specify criminal and civil

penalties for violations of licenses, rulings, regulations, or orders.  50 U.S.C. § 1705; 31 C.F.R. §

594.701.

II.    Al-Haramain Islamic Foundation ("AHIF")

The unclassified administrative record reflects the following:

AHIF, the headquarters of AHIF-Oregon, is a Saudi Arabian-based charity that at one

point purportedly operated in fifty countries, with an annual budget of between $30 and $80

million.  The Treasury Department describes the organization as:

> one of the principal Islamic NGOs [non-governmental organization] providing
> support for the al Qaida network and promoting militant Islamic doctrine
> worldwide. . . . Terrorist organizations designated by the U.S. including Jemmah
> Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS, and Lashkar
> E-Taibah received funding from [AHIF] and used [AHIF] as a front for
> fundraising and operational activities.

---

[3] See 31 C.F.R. § 594.310 (SDGT defined to mean "any foreign person or persons listed in the
Annex or designated pursuant to Executive Order 13224 of September 21, 2001").

Page 5 - OPINION AND ORDER

AR0346.

AHIF was involved in planning attacks against the U.S. Embassies in Kenya and

Tanzania in 1998.  In addition, AHIF supplied financial assistance to  Jemmah Islammiya, which

bombed a nightclub in Bali in 2002.  A senior AHIF official was involved in directing a

Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist

attacks.  When the Bangladeshi national was arrested in 1999, he was carrying explosives and

detonators to attack U.S. diplomatic missions in India.  An AHIF branch in Pakistan supported

the Taliban before it was removed from power.  The government believes Osama bin Laden may

have provided the financial support necessary to found an AHIF branch in Albania.  AHIF's

Ethiopian branch financed an al Qaida-associated terrorist organization, Al-Ittihad Al-Islamiya.

The United States cooperated with Saudi Arabia to stop the activities of AHIF, with each

government acting jointly as well as unilaterally.  Between 2002 and 2004, pursuant to its

authority under E.O. 13,224, the Secretary of Treasury designated AHIF offices in Afghanistan,

Albania, Bangladesh, Bosnia-Herzegovina, the Comoros Islands, Ethiopia, Indonesia, Kenya, the

Netherlands, Pakistan, Somalia, and Tanzania.  Even though these offices were designated, and

assets frozen, the United States and Saudi Arabia obtained reports that the offices in Bosnia and

Somalia had reopened or were still active in 2002.  Saudi Arabia dissolved "the Riyadh-based

Al-Haramain Islamic Foundation" and directed its assets to the "Saudi National Commission for

Relief and Charity Work Abroad" in February of 2004.  AR0327; AR0948.  Until June 19, 2008,

AHIF's headquarters in Saudi Arabia had not been designated.  Then-Secretary of the Treasury,

Paul O'Neill, reported that AHIF was not designated because it "is dedicated to promoting

Islamic teachings."  AR0103.  AHIF does, however, have the distinction of being named in the

9-11 Commission's Staff Report on Terrorist Financing, published in 2004, as an organization that supports al Qaeda and related terrorist groups. AR0935.

On June 19, 2008, the day before plaintiffs' reply brief was due, the government filed a notice with the court that OFAC had designated "the world-wide organization of the Al Haramain Islamic Foundation" for the reason that it has "acted for or on behalf of, has assisted in, sponsored, or provided financial, material or technological support for, or other services to or in support of acts of terrorism and al Qaida and other SDGTs" and is owned or controlled by Aqeel Al-Aqil. Defs.' Not. of Filing at 2.

III.    Aqeel Al-Aqil[4]

The unclassified administrative record reflects the following:

Aqeel Al-Aqil, a Saudi national, was the Director of AHIF until he was purportedly removed in January of 2004. AR0948. He was also one of the founders, the President, and one of four members on the board of directors of AHIF-Oregon, until he resigned in March of 2003.

Al-Aqil maintained "tight control over the affiliated offices;" Al-Aqil himself described the directors of the other offices as "employees who follow the directions of the main office with regards to hiring workers . . . and making any decisions on cooperation with any party." AR0595. A leader of AHIF resigned from AHIF due to Al-Aqil's "autocratic and centralist governance." AR0258. In a press report, Al-Aqil's leadership is described as "absolute centralization." AR0254; AR0259-0260. When Pete Seda, another member of AHIF-Oregon's board of directors and the head of that office, applied for a license from OFAC in 2001 to help Afghan refugees in Iran, Seda reported that Al-Aqil had agreed to the proposal.

---

[4] His name is also spelled Al-Aqeel. For purposes of consistency, I will refer to him as Al-Aqil.
Page 7 - OPINION AND ORDER

Although Al-Aqil was removed from his position with AHIF, Al-Aqil "retained effective control over the activities of all branches . . . and according to some reports, even following his purported departure from the parent organization." AR2198, n.2. Al-Aqil reported to the Saudi Gazette that he resigned as AHIF's Director willingly, rather than that he was removed, but "I will stay on as an active member and as an advisor." AR1902. According to the Gazette, Al Aqil had been head of AHIF for 13 of the organization's 16-year history, and was one of its founders.

Al-Aqil was designated as an SDGT in June 2004. He challenged his designation in the U.S. District Court for the District of Columbia, alleging a violation of his constitutional rights. The court dismissed his Complaint. Al-Aqeel v. Paulson, 568 F. Supp. 2d 64 (D.D.C. 2008). Al-Aqil did not challenge the designation on the merits.

IV.    Soliman H.S. Al-Buthe

The unclassified administrative record reflects the following:

Soliman H.S. Al-Buthe, a Saudi national, was an AHIF official, primarily responsible for AHIF's internet and charitable works in the United States. He resigned from AHIF in September 2002.

Al-Buthe was one of the founders of AHIF-Oregon. He is AHIF-Oregon's treasurer, and a member of the board of directors. He signed contracts for AHIF-Oregon and was one of two individuals with access to AHIF-Oregon's bank account. He also assisted in the purchase of a mosque in Springfield, Missouri through AHIF-Oregon. He raised funds to support AHIF-Oregon from Saudi Arabian sources, and "under the immediate and close supervision of Mr. Al-Aqil" disbursed operational funds for AHIF-Oregon. AR0600.

The government alleges that Al-Buthe worked with an individual, Sami Omar Al-Hussayen, a Saudi Arabian student, who it prosecuted for material support of terrorism. Al-Buthe hired Al-Hussayen to work on the website for AHIF, www.islamtoday.net. Jurors in Idaho found Al-Hussayen not guilty of the terrorism-related criminal charges, and he has never been designated a terrorist. AHIF's website in 1999 and 2000 contained articles supportive of Chechen mujahideen. One article was entitled, "The Latest News About Jihaad in Chechnya." AR0764. The website also contained a prayer for the "Mujahideen brothers in Chechnya." Id.

Al-Buthe was designated, along with AHIF-Oregon, in September of 2004.

Al-Buthe was redesignated, along with AHIF-Oregon, in June of 2008 because "by serving as a senior [AHIF] official, AL-BUTHE has acted for or on behalf of, has assisted in, sponsored, or provided financial, material or technological support for, or financial or other services to or in support of Al Qaida and other SDGTs." AR1899.

V.      AHIF-Oregon

The unclassified administrative record reflects the following:

AHIF-Oregon registered the name "Al Haramain Foundation" with the Oregon Secretary of State on October 22, 1997, and incorporated as a nonprofit public benefit corporation under Oregon law on February 11, 1999. Its Articles of Incorporation specify that the foundation "stands against terrorism, injustice, or subversive activities in any form, and shall oppose any statement or acts of terrorism. [AHIF] believes such conduct is contrary to Islamic principles." AR0531-0535; AR0809-0817.

AHIF-Oregon's office is in Ashland, Oregon and, at the time of its incorporation, its board of directors were Al-Aqil, Mansuor Al-Kadi (Al-Aqil's deputy), Al-Buthe, and Perouz Sedaghaty (a/k/a Pete Seda).

Page 9 - OPINION AND ORDER

AHIF-Oregon distributed Islamic books and pamphlets, and owned and operated prayer houses in Ashland and Springfield, Missouri.

AHIF donated funds to support AHIF-Oregon.  In addition, AHIF-Oregon admits that it "transferred approximately $180,000 to [AHIF] for Chechen humanitarian relief activities" in 2000.  Compl. ¶¶ 35, 63.  AHIF-Oregon explains that a donor gave it $150,000 to support charitable efforts in Chechnya, and several other donors gave smaller amounts.[5]

The donor of the $150,000 was Dr. Mahmoud Talaat El-Fiki, an Egyptian.  Dr. El-Fiki sent an e-mail to "haramain" on February 20, 2000, as follows:

> Dear Brothers
>
> Al-Salamu Alaikom.
> May Allah bless your efforts supporting our muslim brothers everywhere.
>
> In regard to our previous correspondence, I have the pleasure of informing you that I have already asked my bank in London to make a transaction to your USA account, using the details you provided in an earlier e-mail, as Zakat[6] in order to participate in your nobel [sic] support to our muslim brothers in Chychnia [sic], and here are the transaction details.
>
> Donation made by    Dr. Mahmoud Talaat El-Fiki
> From his account in   Nation Bank of Kuwait (International) Plc. London
> To your account in    Bank of America
> Transferred amount   US$150,000 (A Hundred & Fifty Thousand US Dollars)
>
> Value      24/2/2000
>
> What I am asking you to do, is to kindly:
> 1) Confirm that this amount would be used as ZAKAT

_____

[5] The government recognizes some confusion about this amount.  Plaintiffs refer to it as $180,000, the government knows of only the $150,000 donation, but Seda and Al-Buthe withdrew a total of $151,000 from the bank.  Plaintiffs have not indicated whether the $180,000 they mention includes the $150,000 donation.

[6] Zakat is one of the five pillars of Islam, requiring the payment of a percentage of annual income to support the poor.  The government contends that such income can be used to support terrorist organizations.  AR0598.

> 2) Inform me by e-mail as soon as you get the transaction
> 3) Send me a letter (original document from your establishment) confirming that
> the US$150,000 donation has been received as Zakat from Dr. Mahmoud Talaat
> El-Fiki.
> . . .

AR1059.

Al-Buthe learned about the donation, and made arrangements to meet Seda in Ashland to

pick the donation up. He explained to OFAC later that he was traveling to the United States

anyway to establish an Islamic website, www.islamtoday.net. He and Seda went to the Bank of

America branch and obtained $130,000 in travelers' checks, rather than a cashier's check,

because they transport easily and do not take time to clear. The bank did not have enough

travelers' checks for the entire amount, so the following day, Al-Buthe obtained a cashier's

check for $21,000. He provided the money to AHIF in Riyadh.

AHIF-Oregon asserts that Al-Buthe never met Dr. El-Fiki, and did not know why he had

sent the money to the United States. Al-Buthe hypothesizes that Dr. El-Fiki was responding to

"website instructions or advertisements that had been published in Islamic magazines directing

contributions to the United States." AR0600. Al-Buthe claims he never went to Chechnya, "has

no first hand knowledge of [AHIF] activities there," has had "no control over activities there,"

and that "any funding of activities in Chechnya was by officials in Saudi Arabia." AR0601.

AHIF-Oregon contends funds it gave AHIF were officially approved for use in a

Chechnya project by Saudi Arabia and Russia, the funds were used exclusively for humanitarian

purposes, and had nothing to do with terrorist or violent activities.

Specifically, AHIF-Oregon asserts that the project was formally approved in 1999 by a

Memorandum of Understanding between the Saudi Joint Relief Committee for Kosovo and

Chechnya ("SJRC"), a Saudi Arabian governmental entity, and the Russian government in

Page 11 - OPINION AND ORDER

Chechnya.  The Memorandum permitted the SJRC to provide humanitarian aid to refugees in the region with funds provided by AHIF-Oregon and other Muslim charities.  AHIF-Oregon provided a copy of the documents formalizing the SJRC to OFAC in its May 14, 2004, response to OFAC's notice of possible designation.

The documents supporting the creation of the SJRC are as follows:  (1) a memorandum from Crown Prince Abdullah bin Abdulaziz Al-Saud (now King Abdullah), dated November 9, 1999, which reported on favorable discussions with the Russian Ambassador and ordered the SJRC to provide humanitarian aid to the Chechen refugees; (2) a memorandum from the SJRC, through Prince Turki bin Fahd bin Jilawi Al-Saud, dated November 30, 1999, which requested that AHIF collect donations for Kosovo and Chechnya, and set forth guidelines for raising and accounting for the donations; (3) a Memorandum of Understanding, between the Russian Ministry of Civil Defense Affairs and the SJRC, dated December 8, 1999, which allowed the SJRC to provide humanitarian aid in Northern Chechnya with the cooperation of the Russian Ministry; (4) a document, dated January 1, 2000, recording the meeting of the SJRC Chechnya Committee and setting forth its approved action plan for relief in Chechnya; and (5) receipts issued by AHIF to AHIF-Oregon for funds transferred by AHIF-Oregon to AHIF for these relief efforts.

AHIF-Oregon also submitted to OFAC a declaration from Vladimir Matusevitch, a Russian emigre and former head of the Russian Broadcasting Service for Radio Liberty (a U.S. funded entity).  Dr. Matusevitch discussed a 2000 report by a news agency describing Russia's approval of the SJRC's work in Chechnya, and acknowledging the help it provided Chechens.

Other than the Saudi Arabian branch, AHIF-Oregon asserts it never had any ties to any of the other designated entities. In April 1999, however, Seda sent $2,000 to AHIF-Albania for freelance mujahidin in Kosovo. AHIF-Albania was not yet designated at the time.

Al-Aqil resigned from AHIF-Oregon on March 27, 2003, and Al-Kadi resigned on February 22, 2003.

On February 18, 2004, the FBI, IRS, ICE and Oregon police executed a search warrant on AHIF-Oregon's Ashland office. Agents found photographs of the Islamic Army of the Caucasus ("IAC") Commander-in-Chief Shamil Basayev (who was designated as an SDGT on August 8, 2003), along with Ibn Ul Khattab of the IAC loyal foreign mujahideen brigade, and Khattab's successor after Khattab's death in March 2002, Abu Al-Walid Al-Ghamidi. Other items seized at the office include passports from deceased Russian soldiers, a map depicting mujahideen military engagements, videos showing mujahideen in Chechnya committing violent acts against Russian soldiers, and photographs of deceased mujahideen and Russian soldiers.

OFAC froze AHIF-Oregon's assets and property on February 19, 2004, pending investigation.

On April 23, 2004, OFAC provided unclassified information that it said it was relying on in considering designating AHIF-Oregon as an SDGT, in addition to classified documents it did not disclose.

AHIF-Oregon responded to OFAC's information, but alleges it was forced to speculate as to the reasons for the government's concern. It thought two of its activities might be at issue: distribution of Korans to prisoners and others, and participation in a fundraising project for Chechen refugees. OFAC mailed a supplemental record on July 23, 2004. AHIF-Oregon objected to the inclusion of documents related to AHIF because AHIF-Oregon had no control

over it, and the inclusion of documents related to other AHIF branches overseas because AHIF

had no relationship with them.  AHIF-Oregon also provided documentation supporting its

contention that its humanitarian efforts in Chechnya were supported by the Russian government.

OFAC provided yet another supplement to the administrative record on August 20, 2004,

and on September 9, 2004, OFAC designated AHIF, as well as AHIF's director Soliman Al-

Buthe, as SDGTs.  The designation letter identified the applicable executive order criteria as

being sections 1(c) and (d) without giving any further reasoning.  AR2031.

About three months after plaintiffs' filed this lawsuit, OFAC informed AHIF-Oregon and

Al-Buthe on November 14, 2007, that it was considering redesignating them.  The government

provided several packets of unclassified documents, including translations of Russian and Arabic

newspapers from 2000 to 2004, that had not been produced earlier.  AHIF-Oregon objected to

the proposed redesignation.

On February 6, 2008, OFAC redesignated AHIF-Oregon and Al-Buthe.  OFAC contends

that the decision to redesignate was "based upon, *inter alia*, OFAC's desire to incorporate all of

AHIF-Oregon's submissions into the Administrative Record; to update the record with

information developed over the intervening period; and to remove certain documents from the

record."  Decl. of Adam J. Szubin ¶ 67 ("Szubin Decl.").  The Director of OFAC states the

agency did not consider or rely upon the documents that had been removed from the record.

OFAC informed AHIF-Oregon it was redesignated because it is "owned or controlled"

by Al-Buthe and Al-Aqil, or acted on behalf of them.  In addition, AHIF-Oregon was

redesignated because, "[a]s a branch of the Saudi charity Al-Haramain Islamic Foundation,

[AHIF-Oregon] has acted for or on behalf of, or has assisted in, sponsored, or provided financial,

material, or technological support for, or financial or other services to or in support of Al Qaida

and other SDGTs." AR1899.

OFAC submitted a classified record *ex parte* and *in camera* to the court. OFAC sought

permission from the originating agencies to determine whether declassification of any of the

documents was permitted, and OFAC obtained approval for declassification of some of them.

Several agencies did not permit submission of some classified documents to the court at all.

"These records were not considered or relied upon as a basis for redesignation and are not

included in OFAC's Administrative Record." Szubin Decl. ¶ 69.

The government reports that approximately $20,310 of AHIF-Oregon's funds have been

blocked. Plaintiffs state that this figure does not include the proceeds from the sale of AHIF-

Oregon's Ashland property, which totals some $440,000. AHIF-Oregon reports the organization

is "effectively closed down" as a result of the blocking order and designation. Pls.' Statement of

Facts ¶ 12.

VI.    Payment of AHIF's Counsel

AHIF-Oregon's attorneys have unsuccessfully sought licenses from OFAC to use frozen

funds for legal fees. Subsequent to the filing of this lawsuit, OFAC modified its policy. The

new policy authorizes licenses to release some blocked funds to pay legal fees and costs in some

circumstances. The blocked funds may be used to pay fees and costs incurred "in seeking

administrative reconsideration or judicial review of the designation or blocking pending

investigation of a U.S. person . . . , where alternative funding sources are not available." Pls.'

Fed. R. Civ. P. Rule 56(f) Decl. of Counsel Ex. A. OFAC issued guidance on the new policy.

See Pls.' Notice of OFAC's Guidance on Legal Fees and Expenses Ex. 1.

OFAC denied AHIF-Oregon's recently submitted request because AHIF-Oregon's attorneys "have already been paid from alternative funding sources in excess of the fee caps set forth in the policy." Defs.' Notice of OFAC's Decision.

VII.   Plaintiffs' Claims

AHIF-Oregon first challenges the designation and redesignation decisions on various grounds. Specifically, it argues that redesignation is not an authorized agency action, that the designation and redesignation were not supported by substantial evidence because OFAC's administrative record contains no evidence AHIF-Oregon engaged in or supported terrorist activity, and that the designation and redesignation was improperly based on its associations. AHIF-Oregon also argues OFAC violated its Fifth Amendment right to due process because AHIF-Oregon did not have adequate notice and the government did not explain its decisions and that the designation and redesignation were improperly based on a secret and flawed administrative record.

AHIF-Oregon next challenges the government's authority to designate it, arguing that the IEEPA authorizes the designation of foreign nationals only after the host nation has been designated.

AHIF-Oregon also alleges that the seizure of its assets without a warrant violated its Fourth Amendment rights.

MCASO argues the designation authority of the President is vague and overbroad in violation of its First and Fifth Amendment rights, and both AHIF-Oregon and MCASO contend the Secretary of Treasury's designation authority violates their constitutional rights.

Finally, AHIF-Oregon challenges OFAC's policy on attorneys' fees.[7]

---

[7] AHIF-Oregon does not pursue Count IV of its Supplemental Complaint (that OFAC's designation/redesignation was based on privileged attorney-client communications). As I stated

Page 16 - OPINION AND ORDER

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party. Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.    AHIF-Oregon's Challenge to its Designation and Redesignation

AHIF-Oregon argues that OFAC had no authority to "redesignate" it under the applicable

regulations. AHIF-Oregon also asserts that the designation and redesignation were not

supported by substantial evidence because OFAC's administrative record contains no evidence

AHIF-Oregon engaged in or supported terrorist activity and that the decision is

unconstitutionally based on its associations. In addition, AHIF-Oregon argues the designation

and redesignation decisions violated its Fifth Amendment right to due process because it did not

have adequate notice and the government did not explain its decisions, and the designation and

redesignation were improperly based on a classified administrative record.

The government responds that the agency action at issue here is OFAC's redesignation of

AHIF-Oregon, which is an authorized agency action, and that the original designation is no

---

in ruling on plaintiffs' Motion for Preliminary Injunction (Docket #69), the Sealed Document
has been removed from the administrative record. Accordingly, I dismiss Count IV of plaintiffs'
Supplemental Complaint.

longer OFAC's final agency action. Additionally, the government contends that the decision is supported by substantial evidence in the record both classified and unclassified, and not based on associations alone, and that AHIF-Oregon received all the process to which it was due.

    A.    Whether "Redesignation" is an Authorized Agency Action

AHIF-Oregon argues at the outset that the law does not provide for a redesignation process. Neither E.O. 13,224, the IEEPA, nor OFAC's regulations describe a redesignation process. The regulations allow for "amendment, modification, or revocation" of an order, which is not what occurred here according to AHIF-Oregon. 31 C.F.R. § 501.803. In a footnote, as a means of comparison, AHIF-Oregon points to the process of designating Foreign Terrorist Organizations under the Antiterrorism Effective Death Penalty Act ("AEDPA"), which before 2004 required every two years what the law called "redesignation." 8 U.S.C. § 1189 (a)(4); Pub. L. 108-458, Section 7119(a) (Dec. 17, 2004). AHIF-Oregon also suggests that the redesignation decision is a post hoc rationalization, and the court is limited to reviewing the challenged decision–the original designation. AHIF-Oregon's main concern is that the government may have changed its reasons for designating AHIF-Oregon, and AHIF-Oregon would never know whether the designation and redesignation were consistent with each other or whether the government made different decisions in the face of this litigation.

The government responds that redesignation during litigation was implicitly accepted in Holy Land Found. for Relief and Dev. v. Ashcroft, 219 F. Supp. 2d 57, 66 n.8 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003), and in Global Relief Found., Inc. v. O'Neill, 315 F.3d 748, 750-51 (7th Cir. 2002). The government asserts that the redesignation is the outcome of considering AHIF-Oregon's request for reconsideration and denying it, considering information gathered subsequent to the initial designation, and removing documents from the administrative

Page 18 - OPINION AND ORDER

record. The government used the same standards and procedures as it used to make the initial designation, but it relied on a revised administrative record.

Courts give deference to an agency's interpretation of the executive orders it is charged with administering. American Fed'n of Gov't Employees v. Fed. Labor Relations Auth., 204 F.3d 1272, 1274-75 (9th Cir. 2000). "To be sustained, the agency's interpretation need not be the only reasonable interpretation. All that is required is that the interpretation adopted by the agency be reasonable." Kester v. Campbell, 652 F.2d 13, 15-16 (9th Cir. 1981).

Here, OFAC has interpreted its designation authority to allow it to "update[] and supersede[] its original designation on the basis of a revised administrative record." Szubin Decl. ¶ 66 n.5. OFAC has the authority to amend and modify any order at any time,[8] but OFAC has determined that redesignating an entity "provides more process for the benefit of the designated party than they [sic] would receive were OFAC simply to amend the record administratively[.]" Id. (citing 31 C.F.R. §501.803).

The agency's interpretation of the executive order as allowing for the alteration of a designation once it has been made is a reasonable one. OFAC has authority under its rules to amend or modify any order, but it has reasonably concluded that a redesignation process benefits the affected entity. In addition, this is not the type of post hoc rationalization of which the courts disapprove. The government issued a new decision to replace an initial decision which *is* agency action, not a post hoc rationalization of an agency action in subsequent litigation. See Independence Min. Co., Inc. v. Babbitt, 105 F.3d 502, 511 (9th Cir. 1997) (post hoc

---

[8] Under the IEEPA, "[t]he President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by" the IEEPA. 50 U.S.C. § 1704. Similarly, the President through Executive Order 13,224, delegated authority to the Secretary of Treasury to "promulgat[e] . . . rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order." E.O. 13,224 at § 7.

rationalization is where "an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that *same determination* when it is later reviewed by another body") (emphasis added).

OFAC had authority to redesignate AHIF-Oregon.

B.   Whether the Redesignation is Arbitrary and Capricious or Based on Mere Association

The government redesignated AHIF-Oregon as an SDGT because it is "owned or controlled" by Al-Aqil and Al-Buthe and because AHIF-Oregon provided financial, material, or other support to SDGTs as a branch office of the larger AHIF organization.

Under the APA, the court may overturn an agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999). In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh, 490 U.S. at 378.

> A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm., 92 F.3d 940, 942 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The agency must articulate a rational connection between the facts found and the conclusions made. Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. O'Keeffe's, 92 F.3d at 942. Furthermore, the government properly asserts that in the arena of foreign affairs, deference due to the Secretary is "at its zenith." Defs.' Mem. in Supp. of Mot. to Dismiss at 14-15. Citing seven cases or so, the government notes that courts have given broad deference to sanctions decisions under the IEEPA, and its predecessor statute, the Trading with the Enemy Act ("TWEA").

        1.    <u>Plaintiffs' Fed. R. Civ. P. 56(f) Request</u>

As a threshold matter, I must rule on plaintiffs' request for discovery given the government's submission of a declaration made by Adam Szubin, the Director of the Department of the Treasury's Office of Foreign Assets Control.

AHIF-Oregon challenges the statements made by Szubin as hearsay and based on information not in the administrative record, and seeks discovery if the court relies on his declaration. In addition, AHIF-Oregon seeks discovery about the United Nations' ("UN") designation process. Finally, AHIF-Oregon objects to the use of classified material. If the court relies on the classified evidence, AHIF-Oregon seeks access to the materials, and is willing to obtain security clearances and agree to a protective order. It also seeks an unclassified summary so it has an opportunity to respond in a meaningful way.

In a court's review of an administrative agency's decision, extra-record materials may be relied upon by the court under a few exceptions: (1) if necessary to determine if the agency considered all relevant factors and explained its decision; (2) if the agency relied on documents not in the record; (3) to explain technical or complex subject matter; or (4) if plaintiff makes a showing of agency bad faith. The Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005).

Much of Szubin's declaration merely presents background information to explain how OFAC designates individuals and organizations, and I will consider that information presented by Szubin. See Clifford v. Pena, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (declaration provided "court with background information . . ., information underlying the [agency's] decision and well known to the agency and to the parties."). I will disregard any statements Szubin makes about the agency's decision and will rely on the actual decision letter and the administrative record in support of it in evaluating the redesignation since the government relies on none of the exceptions identified by The Lands Council.

To avoid any need for AHIF-Oregon to engage in discovery, I will not consider the UN designations of AHIF and related individuals; AHIF-Oregon presents evidence that the UN designations were merely repetitive of OFAC's designations. AHIF-Oregon's objections to use of the classified record will be dealt with below.

Accordingly, I deny AHIF-Oregon's request for discovery.

2.    History of AHIF-Oregon

AHIF-Oregon contends that the government must assess the affected entity's activities at the time of designation, to determine whether an entity is owned or controlled by an SDGT or providing support to SDGTs, and may not rely on information of past activities.

The government argues that AHIF-Oregon's view of the statute as requiring current information to justify the designation or redesignation is incorrect. The government asserts it can rely on historical information. The government cites Holy Land, which allowed the government to rely on information about the designated entity's activities with Hamas before Hamas was designated. 219 F. Supp. 2d at 74, aff'd, 333 F.3d at 162. The government points

out that a contrary interpretation would allow the entity to change officers, directors, and temporarily stop supporting SDGTs in order to avoid designation.

The government is correct that OFAC may consider "the genesis" of AHIF-Oregon and "the totality of its history" in its designation decision. Id. at 74. At least with respect to the "owned or controlled" criteria, however, the government cannot rely solely on historical evidence. Absent other evidence of continuing control, where officers or directors are no longer "in their respective capacities," designation is not reasonable. Holy Land, 333 F.3d at 162 (officers and directors remained until Holy Land Foundation was designated).

3.      Whether AHIF-Oregon was Owned or Controlled by Al-Aqil

AHIF-Oregon does not dispute the reasons for Al-Aqil's designation, only whether there is any evidence he owned or controlled AHIF-Oregon at the time AHIF-Oregon was redesignated.

I agree with AHIF-Oregon. Although Al-Aqil was a founding member of and the President of AHIF-Oregon, he resigned in March of 2003. AHIF-Oregon was not designated until September of 2004 and was not redesignated until February of 2008. There is no evidence Al-Aqil was involved with AHIF-Oregon after his resignation, or at the time AHIF-Oregon was designated. The only evidence of his control over AHIF-Oregon are statements made by Seda in a license application in 2001, and statements made by Al-Aqil and others about Al-Aqil's management approach; these statements were made before Al-Aqil was removed from his position as Director of AHIF. The government seized AHIF-Oregon's documents, and it does not point to one demonstrating Al-Aqil exercised control over AHIF-Oregon after he resigned from AHIF-Oregon, and after he was removed from his position as Director at AHIF.

The government states that "according to some reports, even following [Al-Aqil's] purported departure from the parent organization," Al-Aqil "retained effective control over the activities of all branches[.]" AR2198, n.2. The administrative record does not support this statement. Although he commented that he would stay on as an active member and as an advisor, there is no evidence Al-Aqil retained ownership or control over AHIF-Oregon such that the government could have a rational concern about Al-Aqil's continuing to engage in illegal conduct.

Since the evidence in the administrative record is not sufficient to support OFAC's conclusion that Al-Aqil exercised control over AHIF-Oregon at the time of redesignation in 2008, or even at the time of designation in 2004, OFAC's conclusion is not a rational one.

4.     Whether AHIF-Oregon was Owned or Controlled by Al-Buthe

While OFAC does not present sufficient evidence of Al-Aqil's ownership or control over AHIF-Oregon at the time of AHIF-Oregon's designation and redesignation, there is substantial evidence of Al-Buthe's ownership or control over AHIF-Oregon that continued until AHIF-Oregon's redesignation.

Al-Buthe was one of the founders of AHIF-Oregon, is listed as its Treasurer on AHIF-Oregon's tax return, and he has not resigned from its Board of Directors, nor has AHIF-Oregon removed him. Prior to its designation, Al-Buthe signed contracts for AHIF-Oregon, and was one of only two individuals with access to its bank account. He raised funds from Saudi-Arabian sources for AHIF-Oregon and disbursed those funds to AHIF-Oregon. Unlike Al-Aqil, AHIF-Oregon and Al-Buthe never severed ties. See Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007) ("IARA") ("genesis and history" may be considered "at least where ties have not been severed.").

Page 24 - OPINION AND ORDER

AHIF-Oregon argues there is no basis for Al-Buthe's designation, and it suggests that the government has designated AHIF-Oregon because of its relationship with Al-Buthe, and may have designated Al-Buthe because of his relationship with AHIF-Oregon, without showing that either of them supported terrorism.

The government asserts that Al-Buthe was designated for serving as a senior AHIF official. There is sufficient evidence in the administrative record to support OFAC's conclusion that AHIF supported SDGTs and terrorist activities, some of which is summarized in the Background section above, and that Al-Buthe participated as a senior AHIF official. There is also evidence in the classified record to give the government reasonable concern about Al-Buthe's activities. AR1894-99. Accordingly, OFAC's conclusion that AHIF-Oregon should be redesignated based on Al-Buthe's ownership or control over AHIF-Oregon is rational and is supported by the administrative record.

5.      Whether AHIF-Oregon Supported SDGTs as a Branch Office of AHIF

Similarly, there is sufficient evidence in the classified and unclassified record demonstrating that AHIF-Oregon supported SDGTs as a branch of AHIF. The record contains substantial evidence to support OFAC's reasonable belief that AHIF provided financial, material, technological and other support to SDGTs and to support OFAC's decision to block the assets of branch offices deemed a threat to the interests of the United States. AHIF-Oregon has not attempted to separate itself from the larger organization, and has not sought delisting under OFAC's regulations. It was founded with money from the larger organization, identified itself with the same name as the larger organization, and its board significantly overlapped with the leadership of the larger organization. Indeed, when seeking a license to provide money to refugees in 2001, Seda described AHIF-Oregon as the "Oregon chapter" of the Saudi

Page 25 - OPINION AND ORDER

headquarters, and identified the money as coming from "our organization," referring to Al-Aqil

and himself, making it clear that AHIF-Oregon is part and parcel of AHIF. Similarly, in a 2002

press conference after AHIF's Bosnia and Somalia offices had been designated, Al-Aqil noted

that AHIF's offices in the United States "continue to operate until this moment and have not

been closed. We have two offices in Oregon and Missouri." AR2194.

Furthermore, AHIF-Oregon and AHIF had a close financial relationship. On at least one

occasion, AHIF-Oregon supported AHIF financially. The combination of circumstances

surrounding Al-Buthe's personal delivery of over $150,000 to AHIF from AHIF-Oregon's bank

account could reasonably be construed by OFAC as evidence of financial support for terrorist

activities. The donator intended the money to be used for "our muslim brothers in Chychnia,"

and Al-Buthe transported the money in travelers' checks and a cashier's check rather than wiring

the money and avoiding fees, at a time when AHIF's website carried articles supportive of

Chechen mujahideen and a link through which funding could be provided to the mujahideen.

Furthermore, as government counsel explained in oral argument, AHIF-Oregon's financial

assistance occurred during a time when AHIF was providing both humanitarian support in

Chechnya as well as supporting terrorist activities there. Indeed, photographs of mujahideen

leaders were found at AHIF-Oregon's office in 2004, well after the donation, along with

passports belonging to deceased Russian soldiers, a map noting the location of mujahideen

military battles, videos showing violence against Russian soldiers by mujahideen in Chechnya,

and photographs of deceased mujahideen and Russian soldiers.[9]

------

[9] Then-Secretary of State Colin Powell designated three Chechen organizations as terrorist
groups in February of 2003 pursuant to Exec. Order 13,224. The organizations were
"responsible for committing numerous acts of terrorism in Russia, including hostage-taking and
assassination, that have threatened the safety of U.S. citizens and U.S. national security or
foreign policy interests." AR0713.

Finally, the government points out that money is fungible, which makes it possible that money can be used directly or indirectly to support terrorist activities.  In addition, even if the money is used for charitable purposes, the use of that money frees up other money for violent activities.  Humanitarian Law Project v. Reno, 205 F.3d 1130, 1136 (9th Cir. 2000), partly aff'd en banc, 393 F.3d 902 (9th Cir. 2004) (money is fungible and even contributions for peaceful purposes can be used for unlawful purposes)[10]; Farrakhan v. Reagan, 669 F. Supp. 506, 512 (D.D.C. 1987) ("no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security").  The law prohibits giving *any* financial support "to or in support of" terrorist acts.  E.O. 13,224 at § (d)(i).

Contrary to AHIF-Oregon's contention, the government need not show AHIF-Oregon intended to support terrorism, merely that OFAC held a reasonable belief that AHIF-Oregon is a component of a larger organization that funds terrorism.  HLP/AEDPA, 205 F.3d at 1134 (the First Amendment does not require "the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds"); IARA, 477 F.3d at 737 ("we do not require a showing that IARA-USA intended its funding to support terrorist activities").  It is sufficient that AHIF-Oregon engaged in affirmative conduct in

---

[10] There are a number of cases brought by the Humanitarian Law Project challenging the criminal sanctions for providing "material support or resources" to foreign terrorist organizations under the AEDPA, 18 U.S.C. § 2339B.  See Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000), partly aff'd en banc, 393 F.3d 902 (9th Cir. 2004), and on remand, Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134 (C.D. Cal. 2005), aff'd, 509 F.3d 1122 (9th Cir. 2007).  These cases will be referred to as "HLP/AEDPA" in order to distinguish them from another case brought by the Humanitarian Law Project challenging the IEEPA and E.O. 13,224, in which there are two opinions–Humanitarian Law Project v. Treasury, 463 F. Supp. 2d 1049 (C.D. Cal. 2006), and on reconsideration, Humanitarian Law Project v. Treasury, 484 F. Supp. 2d 1099 (C.D. Cal. 2007), appeal docketed, No. 07-55893 (9th Cir. June 22, 2007)–will be cited in short form as HLP/IEEPA.

providing financial support and services to AHIF, which in turn supported SDGTs and terrorist acts. Both the unclassified and classified record support OFAC's reasonable belief that AHIF-Oregon provided support to SDGTs as a branch of AHIF, warranting redesignation of AHIF-Oregon.

The government is entitled to summary judgment on AHIF-Oregon's Counts I, V and VII of the Supplemental Complaint.

> C.    Whether the Redesignation Violated AHIF-Oregon's Fifth Amendment Rights or the APA

AHIF-Oregon first claims the designation process is arbitrary and capricious because none of the regulations identify any procedural or substantive criteria to guide the process. AHIF-Oregon also alleges a violation of its Fifth Amendment due process right because the government failed to give it adequate notice of the charges, or time to respond, and did not give any reasons for its actions until it issued its final redesignation decision. In addition, the government relied on classified material, hearsay evidence, and created a biased administrative record.

> 1.    Standards for OFAC Designation

Aside from vagueness and overbreadth arguments, which are dealt with below and which form the basis of its complaint about lack of substantive criteria, AHIF-Oregon complains that the designation process lacks procedural safeguards. The regulations do not require OFAC to make any statement as to why an entity is designated, do not require the agency to comply with any deadlines for providing notice, and do not identify the burden of proof the agency carries.

There is no mandatory duty requiring OFAC to adopt the regulations AHIF-Oregon demands. As a result, the agency's failure to do so cannot be deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" under the APA. 5 U.S.C. §

Page 28 - OPINION AND ORDER

706(2)(A). In the absence of regulations, the requirements of due process apply. See Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 919 (9th Cir. 1995).

>    2.    Notice of the Reasons for the Proposed Designation and Redesignation

"Due process is flexible and calls for such procedural protections as the particular situation demands." Armstrong v. Meyers, 964 F.2d 948, 950 (9th Cir. 1992) (termination of public employee) (citing Mathews v. Eldridge, 424 U.S. 319, 334 (1976)). "The administrative proceedings are based on civil process and thus the full panoply of safeguards applicable to a review of criminal proceedings are not required." Whetstone v. Immigration and Naturalization Service, 561 F.2d 1303, 1306 (9th Cir. 1977).

At a minimum, however, due process requires the "opportunity to be heard . . . at a meaningful time and in a meaningful manner." Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (citations and internal quotations omitted). In addition, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

Three factors are considered in determining if particular notice and hearing procedures satisfy due process: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335.

As a threshold matter, although I found in favor of the government and treated the redesignation as the final agency action when I evaluated the merits of the agency's action

Page 29 - OPINION AND ORDER

above, for purposes of the due process analysis I consider the process provided after the blocking

order. Due process generally requires the government to provide notice and an opportunity to be

heard *before* depriving a person of property interests. See Mathews, 424 U.S. 333 ("This Court

consistently has held that some form of hearing is required before an individual is finally

deprived of a property interest."). While AHIF-Oregon does not argue that a due process

violation occurred when its assets were frozen in February 2004 pending investigation,[11]

OFAC's September 9, 2004 designation represented the culmination of that investigation and

finalization of the blocking order. Accordingly, AHIF-Oregon was entitled to post-deprivation

notice without "unreasonable delay," and certainly before the September 9, 2004 designation

finalizing the blocking order. See Gete v. I.N.S., 121 F.3d 1285, 1296 (9th Cir. 1997) (civil

forfeiture proceeding).

     In an analogous situation, the Ninth Circuit reviewed the administrative forfeiture

proceedings of the INS and concluded that plaintiffs raised substantial due process claims.

Individuals challenged the INS' seizure of their vehicles, alleging violations of their due process

rights, after unlawfully crossing into the United States with illegal aliens. Id., 121 F.3d 1285.

Specifically, plaintiffs challenged the INS' notice following the seizure; the INS sent each

individual a form letter stating that property had been seized, but did not identify the statutory

provisions allegedly violated, and did not state the factual basis for the alleged violation.

     In applying the standard requiring that due process provide sufficient notice, the court

determined notice that lacked the "factual and legal bases" for the vehicle seizure was

---

[11] Indeed, AHIF-Oregon could not likely successfully argue that it was entitled to notice prior to
the blocking order. Other courts have determined that the government's interest in protecting
assets from dissipation overrides the individual's interest in a pre-blocking hearing. Holy Land
Found., 333 F.3d at 163-64; Global Relief Found., 315 F.3d at 754; IARA, 394 F. Supp. 2d 34,
49-50 (D.D.C. 2005), aff'd, 477 F.3d 728 (D.C. Cir. 2007).

inadequate.  Without knowing the "statutory provisions and regulations they are accused of having violated," even owners who are present for the seizure "may not be able to clear up simple misunderstandings or rebut erroneous inferences drawn by the INS." Id. at 1297-98. Furthermore, "ambiguous factual circumstances may in many cases cause vehicle owners to guess incorrectly why their vehicle has been seized, thus preventing them from responding effectively to the unspecified accusations[.]" Id. at 1298.

The court noted that requiring INS to disclose the reasons for the seizures would prevent "erroneous and fundamentally unfair forfeiture decisions that inevitably flow from so haphazard a process" and would simply require that INS "provide to vehicle owners information that is already in its possession." Id; see also Goldberg, 397 U.S. at 267-68 (affected party must have notice "detailing the reasons for a proposed termination" where challenge is to "incorrect or misleading factual premises or on misapplication of rules or policies"); Mullane, 339 U.S. at 314 (notice must "reasonably . . . convey the required information").

Here, after AHIF-Oregon was told it was under investigation, it received in batches the documents on which the government was relying–totaling some 260 pages.  Many of the documents did not refer to AHIF-Oregon by name, and were press releases and newspaper articles.  AHIF-Oregon was not told which provisions of the executive order were applicable, and was not given an explanation of why the documents were relevant.  The blocking notice issued in February of 2004 stated only that the government "has reason to believe that [AHIF-Oregon] may be engaged in activities that violate" the IEEPA. Szubin Decl. Attach A.  As a result, AHIF-Oregon speculated that its provision of Korans to prisoners might be troubling OFAC; after all, OFAC asked for a copy of the Koran AHIF-Oregon had been distributing.  It

also believed that OFAC might view its provision of funds to Chechnya as problematic, based on some of the documents provided by OFAC.

In September 2004, AHIF-Oregon received the designation. OFAC's letter stated only that AHIF-Oregon "falls within the criteria for designation set forth in the [Executive] Order at § 1(c)-(d)." AR2031. In other words, OFAC designated AHIF-Oregon for being owned or controlled by a designated entity, and for providing financial, material or technological support for, or financial or other services to acts of terrorism or to designated entities. While the press release gave reasons for the designation, it stated that AHIF-Oregon, Al-Buthe, and AHIF-Comoros Islands were designated pursuant to sections (d)(i) and (d)(ii), and did not cite the "owned or controlled" provision.

Furthermore, many of the reasons given in the press release for the designation were not contemplated by AHIF-Oregon. The press release stated "[t]he investigation shows direct links between the U.S. branch and Usama bin Laden," which is not a statement supported by the unclassified record and not an issue about which AHIF-Oregon knew OFAC was concerned. The press release mentioned the allegations of criminal violations of tax laws, which is not an activity for which AHIF-Oregon may be designated under the executive order. Although the press release mentioned Al-Aqil and the fact that he had been previously designated, it did not state that Al-Aqil owns or controls AHIF-Oregon. The only item mentioned in the press release AHIF-Oregon correctly suspected was at issue was its donation of funds to Chechnya.

Similarly, OFAC gave no information accompanying its notification to AHIF-Oregon that it was evaluating whether to redesignate the organization. OFAC finally gave specific reasons for AHIF-Oregon's redesignation in its February 2008 notice–four years after AHIF-Oregon's assets had been frozen, three years after its initial designation, and six months after

AHIF-Oregon filed this lawsuit. In that letter, it informed AHIF-Oregon that the distribution of the Koran was not a basis for the September 2004 designation. Instead, it redesignated AHIF-Oregon for being owned or controlled by Al-Aqil and Al-Buthe, and that as "an active arm" of AHIF, "including its direct provision of funding to AHIF in Saudi Arabia," AHIF-Oregon allowed AHIF to "continue supporting terrorist activities." AR2198-99. In defending the possibility of redesignation, AHIF-Oregon could have assumed that OFAC would consider the items it mentioned in the press release accompanying the initial designation, but many of those items were not referenced in the redesignation notice. Notably, OFAC did not repeat the assertion that there were "direct links between the U.S. branch and Usama bin Laden."

It is true that the process used by OFAC satisfied the requirements of Nat'l Council of Resistance of Iran v. Dep't. of State, 251 F.3d 192, 209 (D.C. Cir. 2001) ("NCRI"). NCRI directed that, "as soon as the Secretary has reached a tentative determination that the designation is impending, the Secretary must provide notice of those unclassified items upon which he proposes to rely to the entity to be designated," and give the entity an "opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." 251 F.3d at 209.

I am not persuaded by NCRI. The court was not asked to consider whether notice should identify the statutory and factual reasons for the designation. Furthermore, in determining what process was due, NCRI did not apply the Mathews criteria and the process it called for does not meet the Mathews criteria in this particular situation.

Applying the first Mathews factor, AHIF-Oregon faced a final decision depriving it of its assets, with the added possibility of being designated an SDGT. Its interests in receiving notice

outlining the reasons for the proposed continued deprivation were substantial.  Although AHIF-Oregon could file a request for reconsideration after OFAC issued a designation decision, it was not assured that the request would be considered in a timely manner since OFAC's regulations impose no time limits on OFAC's decision making.  Indeed, it took OFAC three years to issue a decision on AHIF-Oregon's request for reconsideration, and in the meantime AHIF-Oregon's assets were frozen.

Additionally, evaluating the second <u>Mathews</u> criteria, in a situation where the government has not leveled specific charges at an organization, the risk of erroneous designation is possible, and the value of additional safeguards is substantial.  AHIF-Oregon obtained the record OFAC proposed to rely on, but the record consisted of over 260 pages, contained many documents seemingly unrelated to AHIF-Oregon, and contained no documents that could be considered the "smoking gun."  The government lists the information of which AHIF-Oregon was purportedly aware at the time OFAC was considering designating it–AHIF supported al Qaeda and Al-Aqil had been designated–but as <u>Gete</u> recognized, a summary of OFAC's reasons for considering the designation prior to that decision would have saved AHIF-Oregon the effort of responding to imagined concerns and may have increased its likelihood of success.  Finally, the designation decision and press release were too late to qualify as notice prior to the deprivation.

With regard to the third <u>Mathews</u> criterion, the government does not argue it is unable to provide a summary of the charges, only that it is not required to do so.  The government provides no explanation for its inability to provide earlier the kind of lengthy explanation it issued in support of its redesignation decision, or even a summary of the contents of that explanation.

Finally, when facing redesignation, although AHIF-Oregon had the benefit of the press release announcing its designation, the press release did not specify SDGT ownership or control of AHIF-Oregon as a reason for the designation. Furthermore, OFAC included at least one of the reasons in the press release that it did not mention in its redesignation decision–that AHIF-Oregon had "direct links" to "Usama bin Laden."

The question is whether, despite the government's unconstitutional notice procedures, I can say "any due process violation was harmless beyond a reasonable doubt." <u>Tennessee Secondary School Athletic Ass'n v. Brentwood Academy</u>, 127 S. Ct. 2489, 2497 (2007). AHIF-Oregon claims that had it known the specific charges it faced it would have sought to:

> (1) obtain, review, and rebut the full evidentiary record used to designate Messrs. Al-Aqil and Al-Buthe (and to redesignate Al-Buthe); (2) obtain and present information demonstrating that Mr. Al-Aqil and Mr. Al-Buthe neither own nor control AHIF-Oregon, before or after their designations as SDGTs; (3) obtain and present information about Mr. Al-Aqil's role with the daily operations of AHIF-SA, and his role, if any, with the operations of AHIF-SA's affiliates; and (4) obtain and present information about AHIF-Oregon's relationship with AHIF-SA, showing that it did not support any SDGTs or 'acts of terrorism' through any of its contacts with AHIF-SA.

Pls.' Mem. in Supp. of Mot. for Summ. J. at 19.

Neither party briefed the question of whether any due process violation was harmless. Accordingly, I find it appropriate to give the parties an opportunity to address this question. The parties should consider my conclusion that OFAC's redesignation was rational and supported by substantial evidence.

Accordingly disposition on Count II of AHIF-Oregon's Supplemental Complaint is deferred.

Page 35 - OPINION AND ORDER

3.    Administrative Record

AHIF-Oregon raises several issues with respect to the administrative record, arguing that

OFAC violated its due process rights and that OFAC's actions were arbitrary and capricious.

Specifically, AHIF-Oregon complains that the evidence underlying the redesignation is hearsay,

the administrative record is one-sided, and it is a violation of AHIF-Oregon's due process rights

not to have access to the classified record.

AHIF-Oregon challenges the news accounts in the administrative record, suggesting that

articles from Russia are not accurate because news is subject to censorship there. In support of

its argument, it points to the declaration from a retired journalist who, at the request of AHIF-

Oregon, explained the problem of Russian censorship of news about the Chechen conflict. It

also challenges the government's reliance on press releases issued by the Department of the

Treasury, and argues the reports are not substantiated by evidence. See Parhat v. Gates, 532

F.3d 834, 846 (D.C. Cir. 2008).

The APA permits the agency's use of "[a]ny oral or documentary evidence" so long as

the evidence is not "irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d).

Generally, hearsay needs to "be probative and its use fundamentally fair." Calhoun v. Bailar,

626 F.2d 145, 148 (9th Cir. 1980). Accordingly, I have evaluated AHIF-Oregon's concerns

regarding news accounts, and have considered the press releases only to the extent they are

supported by other evidence, whether classified or not. In addition, I have kept in mind that

courts must evaluate whether the government's documents "say who 'reported' or 'said' or

'suspected'" certain things and whether the government has provided "the underlying reporting

upon which the documents' bottom-line assertions are founded[.]" Parhat, 532 F.3d at 846-47.

In other words, in considering whether OFAC's decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law," I have evaluated the quality of the

contents of the administrative record, including whether the objectionable material is sufficiently

relevant and fair to be used.

AHIF-Oregon also initially argued that the administrative record is one-sided. The court

granted AHIF-Oregon's unopposed motion to correct the administrative record to include

correspondence from AHIF-Oregon's counsel that the government had failed to include, among

other items, and this should resolve the concern. AHIF-Oregon's assertion that the government

failed to include the jury's verdict of acquittal in the case against Sami Al-Hussayen is

unsupported. See AR0297 (article about acquittal); AR0585-589 (not guilty verdict). Similarly,

AHIF-Oregon's complaint that the government included only the prosecution's evidence from

Seda's detention hearing, without acknowledging that both Judges Coffin and Hogan ordered his

release, is also unsupported. See AR1121; AR1458-59.

With regard to OFAC's use of classified documents, the statute permits the government

to rely on a classified record and to submit classified evidence *in camera* and *ex parte* to support

a designation under the IEEPA. 50 U.S.C. § 1702(c). Courts have upheld the government's

decision to withhold classified information in other IEEPA challenges. See Holy Land Found.,

333 F.3d at 162; IARA, 394 F. Supp. 2d 34, 45 (D.D.C. 2005), aff'd, 477 F.3d 728 (D.C. Cir.

2007). Indeed, the Seventh Circuit noted:

> Administration of the IEEPA is not rendered unconstitutional because that statute
> authorizes the use of classified evidence that may be considered *ex parte* by the
> district court . . . . The Constitution would indeed be a suicide pact if the only way
> to curtail enemies' access to assets were to reveal information that might cost
> lives.

Global Relief Found., 315 F.3d at 754 (internal citations omitted).

AHIF-Oregon argues that because OFAC's redesignation decision is based largely on classified evidence, as illustrated by the fact that much of the redesignation decision is completely or partly redacted, AHIF-Oregon had no meaningful opportunity to respond to OFAC's allegations. It argues that use of classified evidence is "presumptively unconstitutional" and "[o]nly the most extraordinary circumstances could support [such a] one-sided process." American-Arab Anti-Discrimination Committee v. Reno, 70 F.3d 1045, 1070 (9th Cir. 1995). AHIF-Oregon particularly questions the government's failure to explore alternatives. Only after plaintiffs filed this action did the government seek declassification of documents, the government has never provided a summary of the classified evidence, and the government has never considered granting counsel a security clearance to review the documents.

In evaluating the effect of maintaining the secrecy of classified information on AHIF-Oregon's due process rights, Mathews instructs that I consider (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335.

The private interest is substantial. The effect of the government's blocking and designation orders is effectively to close AHIF-Oregon's doors. On the other hand, it does not rise to the level of the liberty interest asserted by the Guantanamo detainees. Bismullah v. Gates, 501 F.3d 178, 180 (D.C. Cir. 2007). As for the second factor, as American-Arab Anti-Discrimination Committee recognized, the risk of erroneous deprivation in the government's reliance on secret and classified material is high. Indeed, I agree that "'[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations.'" American-Arab

Page 38 - OPINION AND ORDER

Anti-Discrimination Committee, 70 F.3d at 1069 (quoting Goss v. Lopez, 419 U.S. 565, 580 (1975)).

With regard to the third factor, however, the government's interest in maintaining the secrecy of these materials is compelling. Although Holy Land did not cite Mathews it recognized "the primacy of the Executive in controlling and exercising responsibility over access to classified information, and the Executive's '"compelling interest" in withholding national security information from unauthorized persons in the course of executive business.'" Holy Land, 333 F.3d at 164 (quoting People's Mojahedin Organization of Iran v. Dep't of State, 327 F.3d 1238, 1242 (D.C. Cir. 2003)). Indeed, "[c]ertainly the United States enjoys a privilege in classified information affecting national security so strong that even a criminal defendant to whose defense such information is relevant cannot pierce that privilege absent a specific showing of materiality." NCRI, 251 F.3d at 207 (citing United States v. Yunis, 867 F.2d 617, 623-24 (D.C. Cir. 1989)). In contrast, in concluding the government's interest was not sufficient to preclude access to classified materials, American-Arab Anti-Discrimination Committee noted that the individuals seeking access to the material had not participated in terrorist activities. As I have concluded above, however, AHIF-Oregon is owned or controlled by a designated terrorist, and has provided support to designated terrorists as a branch of AHIF.

The government's interest in keeping materials secret takes precedence over AHIF-Oregon's due process right to review the record against it. Congress concluded that the record could be submitted to the court *ex parte* and *in camera*, the government has made an effort to declassify documents, and has provided summaries of the classified record in the form of press releases. It is not required by the Constitution to give AHIF-Oregon access to the classified record or to try to give the attorneys security clearances. The Constitution "only requires the

government to take reasonable measures, not perfect ones . . . . Though the procedures now in

place are not perfect, they are reasonable." Briggs v. Sullivan, 954 F.2d 534, 540 (9th Cir. 1992).

      In sum, I find OFAC did not violate the APA or the Due Process clause in its

composition of the administrative record.

II.     AHIF-Oregon's Statutory Challenge to the IEEPA

      AHIF-Oregon argues the IEEPA does not contain language that allows for the

sanctioning of an organization like AHIF-Oregon.  IEEPA allows the government to block the

transfer of property in which "any foreign country or a national thereof has any interest . . . ," 50

U.S.C. § 1702(a)(1)(B), and prohibits "transfers of credit or payments between, by, through, or

to any banking institution . . . involv[ing] any interest of any foreign country or a national

thereof." 50 U.S.C. § 1702(a)(1)(A)(ii).  AHIF-Oregon contends that the statute requires a nexus

between a sanction against a national and a sanction against its country, so that the government

could prohibit transactions with Libya, and any "nationals thereof."  AHIF-Oregon is not a

"national" of any country that has been the subject of sanctions and as a result AHIF-Oregon

asserts its designation is not authorized by statute.

      In construing a statute, the court must first consider the text of the provision at issue, as

well as the statute as a whole "including its object and policy," in order to determine whether the

provision has a plain meaning.  Children's Hosp. and Health Center v. Belshe, 188 F.3d 1090,

1096 (9th Cir. 1999).  If the court concludes that the provision is ambiguous, the court may resort

to legislative history to shed light on the meaning of the provision.  Id.

      In setting forth the President's blocking authority, the text refers to "any property in

which any foreign country or a national thereof has any interest" without requiring that blocking

decisions be made in any order.  In other words, the statute does not require that the foreign

nation be sanctioned prior to blocking the assets of a foreign national.  The statute contains

specific limitations on the President's power, but this particular limitation is not among them.

See 50 U.S.C. § 1702(b).  In short, the term "thereof" simply directs that the "national" must be

"foreign," without imposing any other conditions.  See HLP/IEEPA, 463 F. Supp. 2d at 1072-73

(the Court "sees no reason to read additional terms and limitations into either the IEEPA or the

E.O.").

        Nothing in the "object and policy" of the statute require a contrary conclusion.  The

President's authority under the IEEPA has been repeatedly described as "broad," limited only by

his need to deal with a declared emergency.  Id. at 1054; Holy Land Found., 219 F. Supp. 2d at

63; Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic

Defense Systems, Inc., 495 F.3d 1024, 1032-33 (9th Cir. 2007).

        AHIF-Oregon suggests that Congress amended the IEEPA to allow "for the first time"

confiscation of assets belonging to a non-state actor, and this amendment should inform the

narrowness of the term "foreign country or a national thereof" used in 50 U.S.C. §

1702(a)(1)(B).  It is true Congress amended the IEEPA in 2001 to add a section allowing the

President to confiscate and liquidate assets of "any foreign person, foreign organization, or

foreign country" when such an entity has planned or engaged in any attack against the United

States.  USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), 50 U.S.C. §

1702(a)(1)(C).  AHIF-Oregon, however, cites to nothing in the USA PATRIOT Act's legislative

history supporting its argument.  Instead, members of the Senate repeatedly characterized the

amendment as expanding the President's power to confiscate and *liquidate* the assets of terrorist

organizations, as opposed to simply freezing assets and blocking transactions.  I found no

suggestion that Congress placed any significance on the use of "foreign person, foreign

Page 41 - OPINION AND ORDER

organization, or foreign country," rather than "foreign country or national thereof." See 147

Cong. Rec. S10990-02 (Oct. 25, 2001) (Section-by-Section Analysis by Sen. Leahy; Department

of Justice Analysis submitted by Sen. Hatch).

AHIF-Oregon points to the AEDPA, where Congress explicitly permitted designation of

organizations, as opposed to nations, and questions why the legislation was necessary if the

IEEPA is as broad as the government has interpreted it. See 18 U.S.C. § 2339B (authorizes

designation of "foreign terrorist organization" if criteria met).

Again, AHIF-Oregon points to no suggestion in the legislative history, and I could find

none, implying that Congress enacted the AEDPA to cover entities the IEEPA did not. Indeed, it

is noteworthy, as the government points out, that a year before the AEDPA was enacted,

President Clinton issued executive orders sanctioning "foreign terrorists that disrupt the Middle

East peace process" and "significant foreign narcotics traffickers centered in Colombia" pursuant

to his authority under the IEEPA, none of whom were associated with any "foreign country"

subject to sanctions by the United States. Exec. Order 12,947, 60 Fed. Reg. 5079 (Jan. 25,

1995); Exec. Order 12,978, 60 Fed. Reg. 54,579 (Oct. 24, 1995). Congress made no mention

that I could find of these executive orders in enacting the AEDPA.

In summary, foreign nationals Al-Aqil and Al-Buthe served as the President and

Treasurer of AHIF-Oregon, and served on its board. As a result, pursuant to the IEEPA, foreign

nationals had an interest in property subject to the jurisdiction of the United States, which

lawfully subjected AHIF-Oregon's assets to the blocking order.

III.   AHIF's Fourth Amendment Claim

AHIF-Oregon claims its Fourth Amendment right against unreasonable government

seizure of property was violated when OFAC froze its assets. It claims to have a possessory

interest in the funds, and the government has seized the funds for over four years. The

government's blocking order was based on its "reason to believe" that AHIF "may be engaged in

activities that violate" the IEEPA. Szubin Decl. Attach. A.

The government responds by arguing that economic sanctions are not a seizure under the

Fourth Amendment because the freezing of assets does not transfer property to the government.

See IARA, 394 F. Supp. 2d at 48; Holy Land Found., 219 F. Supp. 2d at 78-79. Indeed, Szubin

declares that "[b]locking actions are not permanent and do not constitute a forfeiture or seizure

of assets." Szubin Decl. ¶ 9. The government also contends that the Supreme Court has never

imposed Fourth Amendment obligations on executive asset freezes. See Regan v. Wald, 468

U.S. 222, 232-33 (1984); Dames & Moore, 453 U.S. 654 (1981); Orvis v. Brownell, 345 U.S.

183, 187-88 (1953); Propper v. Clark, 337 U.S. 472, 481-82 (1949).

Alternatively, even if the blocking constituted a seizure, it was reasonable and should be

upheld, according to the government. It was done for the purpose of national security and

foreign policy considerations, and requiring the government to get a warrant from a magistrate

prior to issuing an executive order imposing economic sanctions would conflict with the notion

that the judiciary's role is limited in foreign affairs. See Regan, 468 U.S. at 242 ("matters

relating to the conduct of foreign relations . . . are so exclusively entrusted to the political

branches of government as to be largely immune from judicial inquiry or interference.") (internal

quotation omitted).

The Fourth Amendment provides that the "right of the people to be secure in their

persons, houses, papers and effects, against unreasonable searches and seizures, shall not be

violated . . . ." U.S. Const. amend. IV. A seizure of property occurs when "there is some

meaningful interference with an individual's possessory interests in that property." Soldal v.

Cook County, 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113

(1984)).[12]

As an initial matter, the government's assertion that the Supreme Court has never

considered a blocking order to be a Fourth Amendment violation is unpersuasive; I note that no

litigant asked it to do so. Furthermore, the cases on which the government relies, IARA and

Holy Land Found., cite inapplicable precedent in concluding freezing of assets is not a seizure

under the Fourth Amendment. Both courts rely on Tran Qui Than v. Regan, 658 F.2d 1296,

1304 (9th Cir. 1981), D.C. Precision, Inc. v. United States, 73 F. Supp. 2d 338, 343 n.1 (S.D.N.Y.

1999), Can v. United States, 820 F. Supp. 106, 109 (S.D.N.Y. 1993), and others, all of which

held that freezing assets was not a "taking" under the Fifth Amendment. The Fourth

Amendment imposes a lower threshold than does the Fifth Amendment, however. Generally

speaking, a blocking order would constitute a violation of the Fifth Amendment only if it

resulted in an appropriation of property for the government's use or, if it could be deemed a

"regulatory" taking, eliminated "all economically valuable use" of the property. See Tahoe-

Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 323 (2002)

(summarizing takings precedent).

Additionally, I do not agree with the government that Tran Qui Than's definition and

application of the statutory term "seizure" in the TWEA ends the matter. The court concluded

that a blocking of assets in that case "merely suspend[ed] indefinitely the right to transfer" funds,

and were not "'conveyed, transferred, assigned, delivered or paid' or otherwise seized" by the

government. 658 F.2d at 1301 (quoting 50 U.S.C. App § 9(a)).[13] The court did not apply the

---

[12] The government suggests that this test is inapplicable since the blocking action is not the
normal law enforcement undertaking, but it offers no alternative standard to apply.

[13] Indeed, Can explained that under the TWEA "[w]hen property is seized, all title to the
property vests in the United States . . . ." 820 F. Supp. at 109.

Fourth Amendment standard of "meaningful interference with a possessory interest" and, as a result, the case is not of assistance. Accordingly, the government is wrong to equate a seizure with the transfer of property to the government.

The government's blocking order is a seizure of property. Szubin himself describes the process as "depriving the designated person of the benefit of the property, including services, that might otherwise be used to further ends that conflict with U.S. interests." Szubin Decl. ¶ 11. More specifically, here for example, OFAC sent a notice to the Jackson County Recorder of Deeds notifying the clerk that AHIF-Oregon's real property is "blocked pending investigation by the order of the United States Treasury Department" and prohibiting "[a]ny and all transactions" including "the sale and conveyance of title or deed" unless "specifically licensed" by OFAC. Szubin Decl. Attach. C. Indeed, as Szubin explains more generally, "The blocking notice provided to AHIF-Oregon on February 19, 2004, explained that, pursuant to E.O. 13224 and IEEPA, any transfer, withdrawal, export, payment or other dealing in AHIF-Oregon's blocked assets was prohibited without OFAC's prior authorization." Szubin Decl. ¶ 73. It is apparent that the assets are blocked by order of the government and remain under its control. Even a temporary deprivation of property, as a blocking is, constitutes a meaningful interference with property and qualifies as a "seizure" for purposes of the Fourth Amendment. See United States v. Place, 462 U.S. 696 (1983) (holding luggage for 90 minutes constituted seizure); Flores v. United States, 551 F.2d 1169, 1175 n. 6 (9th Cir. 1977) (seizure "can ripen into a permanent taking").

Although the blocking constituted a seizure, such an action is constitutional if it is reasonable. Courts look first to whether the seizure would have been unreasonable at the time the Fourth Amendment was framed. If historical practices provide no insight, "we have

Page 45 - OPINION AND ORDER

analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on

the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the

degree to which it is needed for the promotion of legitimate governmental interests." Virginia v.

Moore, 128 S. Ct. 1598, 1604 (2008) (internal quotations omitted).  One purpose of the

"reasonableness" inquiry is to impose limitations

> upon the exercise of discretion by government officials . . . to safeguard the
> privacy and security of individuals against arbitrary invasions . . . .  [T]he
> reasonableness standard usually requires, at a minimum, that the facts upon which
> an intrusion is based be capable of measurement against an 'objective standard,'
> whether this be probable cause or a less stringent test.

Delaware v. Prouse, 440 U.S. 648, 654 (1979) (internal quotation and citation omitted).

The government devotes one paragraph to the question of reasonableness, asserting

without citation to any law that national security and foreign policy considerations make the

seizure reasonable.  Neither party addresses the standard set forth in Virginia v. Moore.

Accordingly, I request additional briefing on the following issues:  (1) historical law that might

shed light on application of the Fourth Amendment in this context; (2) privacy issues affected by

the blocking order as compared with governmental interests; (3) whether probable cause or a

lesser standard is applicable; (4) AHIF-Oregon's remedy in the event OFAC violated its Fourth

Amendment rights, given my conclusion on the merits of the redesignation.

The cross-motions for summary judgment on AHIF-Oregon's Count VIII are deferred

pending additional briefing.[14]

---

[14] AHIF-Oregon did not pursue its claim that the seizure of its records constituted an
unreasonable search and seizure without probable cause.  The government acted pursuant to a
warrant.  This portion of AHIF-Oregon's Count VIII is dismissed with prejudice.

IV.     Plaintiffs' Vagueness and Overbreadth Claims

AHIF-Oregon and MCASO allege violations of their First and Fifth Amendment rights,

alleging specifically that the President's designation authority under the IEEPA and the

Secretary of Treasury's designation authority under the executive order are unconstitutionally

overbroad and vague.[15]

     A.     Whether Plaintiffs have Standing to Make Overbreadth and Vagueness
         Challenges to Designation Authorities

To satisfy standing requirements under Article III of the United States Constitution, a

plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical; (2) the injury is fairly
> traceable to the challenged action of the defendant; and (3) it is likely, as opposed
> to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. 167, 180 (2000).

The government does not dispute that AHIF-Oregon may challenge the constitutionality

of the provisions used to designate it.[16]  Plaintiffs argue MCASO may challenge the President's

designation authority as well as the Secretary of Treasury's authority because it has a credible

fear that the government will enforce those provisions against it.

The parties contend that to make a pre-enforcement challenge, as MCASO attempts, I

should consider the following factors:  "[1] whether [MCASO has] articulated a 'concrete plan'

---

[15] AHIF-Oregon also alleges in the Complaint that the designation and redesignation violated
AHIF-Oregon's right to freedom of speech and association.  Since AHIF-Oregon's designation
and redesignation were not based on speech or mere membership in AHIF, as I have concluded
above, its First Amendment rights to freedom of speech and association have not been violated.

[16] Similarly, AHIF-Oregon argues only that it has standing to challenge the "designation
authority employed by defendants against it[.]"  Pls.' Mem. in Supp. of Mot. for Summ. J. at 41;
see also Pls.' Reply at 20; Supp. Comp. Count VI.  AHIF-Oregon was designated by OFAC, not
pursuant to the President's authority.  Accordingly, it does not challenge the vagueness or
overbreadth of the President's designation authority.

to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

MCASO has articulated a "concrete plan" that may subject it to designation by the Secretary of Treasury. It intends to engage in activities on behalf of AHIF-Oregon, an SDGT, that arguably could violate the executive order's prohibitions on assisting in or providing material support to an SDGT, or for being "otherwise associated" with an SDGT. "Material support," after all, is not a defined term and could include "promoting the interests" of AHIF-Oregon that has a "natural tendency" to affect the organization. Indeed, MCASO wishes to protest AHIF-Oregon's designation, and advocate on its behalf and for its benefit, by speaking about this case and AHIF-Oregon's designation in public, writing to the newspaper, contacting government representatives, and demonstrating. Additionally, as it has in the past, MCASO wishes to work on behalf of and with AHIF-Oregon in educating individuals about Islam, and it wishes to invite AHIF-Oregon to participate at its annual Multicultural Day Fair and at other educational forums. Furthermore, contrary to the government's argument, AHIF-Oregon is not yet a defunct corporation, and the head of the Oregon office is present locally.

With regard to the second and third factors, although there has been no specific threat of prosecution or designation by the Secretary of Treasury or OFAC, the fact that more than 10,000 names have been placed on the list of designated entities makes MCASO's fear "credible." Thomas, 220 F.3d at 1140. Accordingly, MCASO has standing to bring a challenge to the Secretary of Treasury's designation criteria.

In contrast, MCASO's fear that it could be designated by the President because "he has indicated a desire to designate based on association alone," is not sufficient to meet the requirements of Thomas to challenge the President's designation authority, and neither is the history of enforcement. Pls.' Reply at 22. Here, MCASO has failed to draw any parallels between the actions it wishes to take and the activities of any of the twenty-nine entities already designated by the President. The President determined the twenty-nine SDGTs "committed, supported, or threatened acts of terrorism that imperil[ed] the security of U.S. nationals or the national security, foreign policy, or economy of the United States." President Declares National Emergency, Sept. 24, 2001, available at http://www.whitehouse.gov/news/releases/2001/09/20010924.html. Furthermore, the President last designated an entity six years ago after declaring a national emergency that he concluded constituted an "unusual and extraordinary threat." E.O. 13,224. Among the entities and individuals he listed are Al Qaida, Osama bin Laden, and the Taliban. MCASO has shown no history of Presidential designations based on the kind of advocacy in which they seek to engage. Looking at all the factors, the likelihood that the President would designate MCASO is not reasonable or imminent.

In sum, MCASO lacks standing to challenge the President's designation authority under the IEEPA, but has demonstrated standing to challenge the Secretary of Treasury's designation authority under the executive order.

B       Whether the Secretary of Treasury's Designation Authority Pursuant to the Executive Order is Overbroad or Vague

Plaintiffs assert generally that the Secretary of Treasury's authority to designate based on an entity's support of and association with groups that have never engaged in terrorism is overbroad and vague. Plaintiffs also argue specifically that the terms "otherwise associated

with," "material support," and "services" permit the designation of individuals and entities "without regard to the character or intent of the association or support." Supp. Compl. ¶ 27.

The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights–both speech and conduct–if the impermissible applications of the law are substantial when "judged in relation to the statute's plainly legitimate sweep." City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (internal quotation omitted).

Even if the law does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because "it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." Id.[17] The question is whether the language is "sufficiently clear so as not to cause persons 'of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application.'" United States v. Wunsch, 84 F.3d 1110, 1119 (9th Cir. 1996) (quoting Connally v. General Constr. Co., 269 U.S. 385, 391 (1926)).

   1.  Overbreadth

Plaintiffs must show that the impermissible applications of the Secretary of Treasury's designation authority are substantial when "judged in relation to the statute's plainly legitimate sweep." City of Chicago, 527 U.S. at 52. The Supreme Court has stated, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Virginia v. Hicks, 539 U.S. 113, 124 (2003).

---

[17] The government suggests that a less strict vagueness inquiry applies where the affected party has the opportunity to address the issue in an administrative process. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982). This less stringent standard applies to the regulated community, not the general public.

Plaintiffs argue that E.O. 13,224 permits the Secretary of Treasury to designate any entity even if it has never engaged in or supported terrorist activities or groups. They suggest the International Red Cross could be designated. For example, the Red Cross could be designated for providing "services" to detainees in Guantanamo who are designated entities, by visiting them or by advocating for them. The Secretary could then designate anyone who had donated to the Red Cross. It could then designate any individual providing support to the donor, such as the donor's barber, then the barber's suppliers. Plaintiffs suggest the designation authority is overbroad because it prohibits providing support to groups that are many times removed from any terrorist activity. They also argue that the designation criteria are overbroad in that they prohibit protected conduct.

In response to plaintiffs' argument that the law could be applied to the Red Cross or a barber, the government points to the Supreme Court's conclusion that, "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" United States v. Williams, 128 S. Ct. 1830, 1844 (2008) (quoting Members of City Council of Los Angles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984)). Furthermore, the law is focused on terrorist financing, which the government has a substantial interest in eliminating, and which is not protected activity. HLP/AEDPA, 205 F.3d at 1133 ("[T]here is no constitutional right to facilitate terrorism . . . ."). The government also argues the provisions are content neutral and they require conduct beyond mere association.

I find that the law does not punish a substantial amount of protected free speech or associational rights. The terms are content neutral and the bulk of the hypothetical applications of the law do not "inhibit the exercise of First Amendment rights." City of Chicago, 527 U.S. at 52. Contrary to plaintiffs' fear that the Secretary of Treasury may designate individuals or

entities regardless of whether the individual or entity engaged in terrorist activity, I find the law

is largely directed at stopping financial assistance to terrorist organizations, which is a legitimate

state interest. The President designated twenty-nine entities specifically due to their terrorist

ties, and plaintiffs have not seriously suggested that any on the President's list have been

improperly designated. The Secretary may then designate any other "foreign person" who has

committed or poses a significant risk of committing a terrorist act. Terrorism is specifically

defined in the regulations.[18]

Additionally, an entity that is designated for being "owned or controlled" by an SDGT is

not being designated for "mere membership, association, or expressions of sympathy," but for a

close relationship that would allow for an SDGT to continue to conduct business through the

entity it owns or controls. See HLP/AEDPA, 380 F. Supp. 2d at 1143 (setting forth protected

associational rights).

The only basis for designation that may touch on First Amendment-protected conduct is

the criteria directed at "anyone who assists in, sponsors, or provides financial, material or

technological support for, or financial or other services to or in support of, acts of terrorism" or

to a designated entity. Again, however, an entity is not punished for mere association, but for

conduct that goes beyond membership. Holy Land Found., 219 F. Supp. 2d at 81 (E.O. 13,224

and blocking order do "not prohibit membership in Hamas or endorsement of its views, and

therefore do not implicate HLF's associational rights.").

It is true, as plaintiffs point out, that "services," which is defined to include "legal,

accounting, financial, brokering, freight forwarding, transportation, public relations, educational,

---

[18] Terrorism is defined to mean "an activity that: (a) Involves a violent act or an act dangerous to human life, property, or infrastructure; and (b) Appears to be intended: (1) To intimidate or coerce a civilian population; (2) To influence the policy of a government by intimidation or coercion; or (3) To affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking." 31 C.F.R. § 594.311.

or other services," may reach some protected activity. 31 C.F.R. § 594.406(b). These terms, however, are not directed at punishing expressive or associational conduct, but are intended to stem assistance to terrorist groups. See HLP/AEDPA, 509 F.3d at 1137 ("material support or resources" not "aimed at interfering with the expressive component of [Plaintiffs'] conduct but at stopping aid to terrorist groups"). Finally, the possibility of designation for being "otherwise associated with" a designated entity has been circumscribed by its regulatory definition.[19]

In sum, plaintiffs' hypothetical application of the law is not substantial when compared with the legitimate sweep of the law. Plaintiffs' conjured-up hypothetical suggesting the Red Cross could be designated is an example of "the tendency of our overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals," especially where any provision of support or services to Guantanamo detainees would be highly unlikely to further any terrorist activity. Williams, 128 S. Ct. at 1843. Even assuming that the Secretary of Treasury could use his designation authority in a way to punish protected First Amendment speech or associational rights, this would not justify the invalidation of the entire executive order. To do so would undermine the government's ability to punish unprotected conduct. Instead, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973).

      2.    Vagueness

Plaintiffs argue that the terms "material support," "services," and "otherwise associated with" are so vague, it is not apparent how they apply.

_____

[19] "Otherwise associated" has been defined to mean "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to." 31 C.F.R. § 594.316.

With respect to AHIF-Oregon's challenge, it may only make an as applied challenge to the provision under which it was designated. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); United States v. Dang, 488 F.3d 1135, 1141 (9th Cir. 2007) ("[I]f the statute is constitutional as applied to the individual asserting the challenge, the statute is facially valid."). As I concluded above, AHIF-Oregon provided support to SDGTs as a branch of AHIF, and is owned or controlled by an SDGT, actions which are proscribed by the executive order. These provisions are not vague as applied to AHIF-Oregon and as a result its vagueness challenge fails.

As I concluded above, however, MCASO may bring a vagueness challenge to the Secretary of Treasury's designation authority.

a.    "Material Support"

"Material support" is not defined in the E.O. 13,224 or in the implementing regulations. According to the government, "material support" can be defined by referring to a dictionary: "material" means "having real importance or great consequences," and "support" means "to promote the interests or cause of." Defs.' Mem. in Supp. of Mot. to Dismiss at 48 (quoting Merriam-Webster's Collegiate Dictionary 715 (10th ed. 2002)). Alternatively, referring to other statutes, the word "material" in the term "material support" means support having a "natural tendency" to affect the activities of a terrorist organization. See Kungys v. United States, 485 U.S. 759, 772 (1988) (concealments are "material" if they have a "natural tendency" to influence the decisionmaker). In addition, the government argues that "material support" should be interpreted in the context of its larger clause, which is to "provide financial, material, or technological support for, or financial or other services . . . ." E.O. 13,224, § 1(d)(ii). The

government contends that "material support," then, means providing support in a way that is similar to providing financial or technological support or services. The government also argues that "material support" as used in other statutes has been held not vague. Singh-Kaur v. Ashcroft, 385 F.3d 293, 298-99 (3d Cir. 2004) (Immigration and Nationality Act); United States v. Assi, 414 F. Supp. 2d 707, 717-18 (E.D. Mich. 2006) (AEDPA, although some other terms determined to be vague).

MCASO seizes on the government's assertion that the term covers anything done "to promote the interests or cause of" a designated group that has "real importance or great consequences." Joining the lawsuit might be seen as "promot[ing] the interests" of AHIF-Oregon if the participation has "real importance or great consequences" such as if the plaintiffs win this lawsuit. MCASO queries whether writing letters on behalf of AHIF-Oregon would be considered material support.

The alternative definitions offered by the government for "material support" are confusing; in its opening brief, the government defines it as something that "promotes the interest or cause of" a designated group in a manner that has "real importance or great consequence," and in its reply defines the term as anything whose "'natural tendency' [is] to affect the activities of a foreign group." Contrary to the other statutes referenced by the government, neither the executive order nor OFAC's regulations give any guidance to MCASO, the public, or OFAC itself. The AEDPA, for example, defines "material support or resources" to mean "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and  transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b) (2006).

Page 55 - OPINION AND ORDER

Similarly, the Immigration and Nationality Act gives examples of "material support" that "broadly cover the areas of lodging, communications, transportation, financing, weapons and provision of other means to accomplish terrorist activiites." Singh-Kaur, 385 F.3d at 298 (citing 8 U.S.C. § 1182 (a)(3)(B)(iv)(VI) (2000 and 2002 supp.)).

I agree with plaintiffs; it is unclear whether and how MCASO's advocacy would be deemed of "real importance," "promot[ing] the interests or cause of," or as having a "natural tendency" to affect AHIF-Oregon or any other designated entity. The government suggests that "material support" should be read in context, but has identified no conduct that would constitute "material support" as opposed to financial or technological support or services. The term is not "sufficiently clear so as not to cause persons 'of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its applications." HLP/IEEPA, 463 F. Supp. 2d at 1057. Since the term "material support" lacks standards for OFAC and the public to employ, the term is impermissibly vague both as applied and facially.

> b.    "Services"

The government points to OFAC's definition of "services" as "legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services." 31 C.F.R. § 594.406.

Plaintiffs rely on HLP/AEDPA, 509 F.3d at 1135, which held that a similar ban on providing "services," "training," and "expert advice or assistance" to designated foreign terrorist organizations in 18 U.S.C. § 2339B was unconstitutionally vague. Plaintiffs argue the language at issue here is even broader than the language struck down as vague by the Ninth Circuit. Here, they argue, providing "services" to any group, regardless of whether it has supported terrorist activity, can be punished, with no showing of any knowledge whatsoever. In addition, a

conviction under § 2339B of the AEDPA requires a criminal trial, whereas here the group can be designated without a hearing, on secret evidence, and without a statement of reasons. Furthermore, in a pending appeal, the same defendants have argued "services" reaches "any act done for the benefit . . . of another" but does not include "independent advocacy on behalf of a designated person." Pls.' Mem. in Supp. of Mot. for Summ. J. at 52. Plaintiffs argue this further confuses things–individuals need to determine whether the advocacy is permitted "on behalf of" another or prohibited "for the benefit of" another, and whether the advocacy is "independent." As a result, there is no law to guide the individual about what is permitted or prohibited.

I agree with the well-reasoned opinion of the HLP/IEEPA court. 463 F. Supp. 2d at 1059, 1063. The term is a defined term, and does not give limitless discretion to OFAC as to what constitutes a "service." Contrary to plaintiffs' assertion, the focus of the prohibition is on the provision of "services *to or in support of*" an SDGT, which implies cooperation between the entities, as opposed to independent advocacy. As the HLP/IEEPA court noted, nothing in the definition of services "prohibits independent political activity . . . [or] independent advocacy in support of designated groups." 463 F. Supp. 2d at 1059-60. The HLP/IEEPA court had no trouble distinguishing between the language of the executive order and the AEDPA's provision that the court had previously held to be vague. "Service" was vague under the AEDPA because it contained within it two terms that the court also held were vague--"training" and "expert advice or assistance." Id. at 1060 (citing HLP/AEDPA, 380 F. Supp. 2d at 1150-52).

The government stated in oral argument that MCASO could speak out and express its views about this case and AHIF-Oregon's designation, could say whether it thinks the designation was right or wrong, and could promote multiculturalism. MCASO's proposed activities do not fall within the prohibition on providing "services to or on behalf of" AHIF-

Oregon, and "in the vast majority of its intended applications . . . any given individual would be able to distinguish when he or she was providing a 'service' to a designated terrorist group, as opposed to engaging in independent activity." HLP/IEEPA, 463 F. Supp. 2d at 1063.

The term "services" is not impermissibly vague.

c.    "Otherwise Associated With"

The term "otherwise associated with" has been defined by regulation to mean "(a) to own or control; or (b) to attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to" an SDGT. 31 C.F.R. § 594.316. The language requires the designated party to engage in unprotected conduct before the entity can come within its purview.

With the exception of incorporating "material support" in its definition, the regulation is not vague.

3.    Conclusion

Since the term "material support" is vague, MCASO is entitled to partial summary judgment on Count X of the Supplemental Complaint. The government is entitled to summary judgment on Counts VI and IX.

V.    Refusal to Pay Lawyers from Frozen Funds

AHIF-Oregon alleges that OFAC's attorney fee policy violates its due process rights and is arbitrary and capricious under the APA.

OFAC recently amended its policy authorizing licenses to release some blocked funds to pay legal fees and costs in some circumstances. The blocked funds may now be used to pay fees and costs incurred "in seeking administrative reconsideration or judicial review of the designation or blocking pending investigation of a U.S. person . . ., where alternative funding

sources are not available." Pls.' Fed. R. Civ. P. Rule 56(f) Decl. of Counsel Ex. A; see also Pls.'

Notice of OFAC's Guidance on Legal Fees and Expenses Ex. 1.

Pursuant to the policy, AHIF-Oregon submitted a request for attorneys' fees through

March 2008. OFAC denied AHIF-Oregon's request pursuant to its new policy because AHIF-

Oregon's attorneys "have already been paid from alternative funding sources in excess of the fee

caps set forth in the policy." Notice of OFAC's Decision Attach. A. Accordingly, any argument

that plaintiffs' challenge is not ripe for review is moot.[20]

AHIF-Oregon argues generally that its funds are not tainted in any way, the funds will

not be used by the government for forfeiture, and paying AHIF-Oregon's attorneys will not

undermine the government's interest in ensuring the funds stay out of terrorist hands. It also

challenges the following components of the policy: (1) OFAC, as an adverse party, approves the

fees, which is an inherent conflict of interest; (2) AHIF-Oregon is arbitrarily limited to two

attorneys, even though the government has at least six; and (3) OFAC caps compensation at each

stage of the litigation.[21]

I agree with the government that the Fifth Amendment does not require access to blocked

fees to pay attorneys. In both civil and criminal cases, courts have concluded that prohibitions

on the use of funds for attorneys' fees do not pose a due process violation. For example,

"pretrial restraining orders which freeze assets, including funds which a defendant seeks to use

to pay an attorney, do 'not "arbitrarily" interfere with a defendant's "fair opportunity" to retain

---

[20] Plaintiffs' adequately plead this claim in Count III of their Supplemental Complaint.

[21] AHIF-Oregon initially challenged the policy believing it barred AHIF-Oregon from raising funds in the United States. The government clarified that AHIF-Oregon may seek a license to establish a legal defense fund. Furthermore, the government has clarified AHIF-Oregon need not identify specific sources of funding. Finally, AHIF-Oregon's single sentence asserting that OFAC's new policy was not issued pursuant to notice and comment procedures of the APA is not sufficient to properly assert a violation of that statute.

counsel' and violate neither the fifth nor the sixth amendments." <u>Federal Savings and Loan Ins.</u>
<u>Corp. v. Ferm</u>, 909 F.2d 372, 375 (9th Cir. 1990) (quoting <u>United States v. Monsanto</u>, 491 U.S.
600, 616 (1989)).  Similarly, a district court in New York held that OFAC's denial of plaintiff's
application for a license to pay attorney fees out of blocked funds did not deprive plaintiff of due
process rights.  <u>Beobanka D.D. Belgrade v. United States</u>, Nos. 95-5138, 95-5771, 1997 WL
23182 at * 1 (S.D.N.Y. Jan. 22, 1997).  AHIF-Oregon cites no contrary authority.  Furthermore,
OFAC has not precluded AHIF-Oregon from raising "fresh" funds outside the United States to
pay its counsel or from establishing a legal defense fund to raise money from funds within the
United States.

With respect to its claims under the APA, as I note above, review under the arbitrary and
capricious standard is narrow, and the court may not substitute its judgment for the judgment of
the agency.

Accordingly, contrary to AHIF-Oregon's argument, the government has legitimate
interests in blocking assets–such as depriving the designated entity of property, allowing the
President to use the property as a negotiating tool, and preserving the money for future legal
judgments–and its decision to limit the fees counsel can obtain is rationally related to achieving
those interests.  As the government explains, it now allows the use of some blocked funds after
balancing "the benefits of ensuring some compensation to counsel in designation challenges with
the importance of preserving blocked assets."  Defs.' Res. to Pls.' Notice of OFAC's Guidance
at 4.  I cannot say this is an irrational policy decision.

Similarly, OFAC's policy is not arbitrary and capricious in limiting the designated entity
to two attorneys, in generally capping the fees, and in approving the fees itself.  The policy does
not prohibit the designated entity to two counsel–it simply limits the number of attorneys who

Page 60 - OPINION AND ORDER

are paid out of blocked funds. Given the agency's interests identified above in preserving the blocked funds, I cannot say the agency's choice to limit a designated entity to reimbursement for only two attorneys and to limit the amount of fees to which they are entitled is arbitrary and capricious. Entities may obtain a license to raise "fresh" funds from outside the United States and may apply to OFAC for a license to set up a legal defense fund to raise money within the United States. Additionally, OFAC's review of attorneys' fees in-house, as opposed to a court's review, is not arbitrary and capricious to the extent that the agency is simply paying the fees up to the capped amount, rather than sifting through the invoices to determine whether expenditures are acceptable.

On the other hand, I find OFAC's application of its policy to AHIF-Oregon is arbitrary and capricious. The caps on legal fees are arbitrary and capricious because OFAC caused the run-up in legal expenses in the administrative and judicial proceedings by not giving AHIF-Oregon a statement of the charges it faced when OFAC was considering designating it, and by redesignating it in the midst of this litigation. AHIF-Oregon has sought $44,107.50 in attorneys' fees and $7,490.62 in legal expenses; the cap of $7,000 each for administrative and judicial proceedings, without considering the time caused by OFAC's litigation strategy, is arbitrary and capricious. Furthermore, OFAC's denial of fees on the basis that AHIF-Oregon has "already been paid from alternative funding sources in excess of the fee caps set forth in the policy" is arbitrary and capricious because it allows an entity to seek fees from OFAC first and then seek fees from other sources later. AHIF-Oregon should not be penalized for raising "fresh" funds first, and seeking blocked funds second.

AHIF-Oregon is entitled to partial summary judgment on Count III of its Supplemental Complaint. Since OFAC denied AHIF-Oregon's fee petition in the midst of this litigation,

neither party briefed the appropriate remedy for the violation. Accordingly, I request additional briefing from both parties to determine the relief to which AHIF-Oregon is entitled.

VI.    Summary

As set forth above, I conclude OFAC's redesignation of AHIF-Oregon was rational and supported by the administrative record, OFAC did not violate the APA or the Due Process clause in its composition of the administrative record and in keeping the classified record secret, and the IEEPA allows the government to sanction AHIF-Oregon.

I conclude, however, that the government violated AHIF-Oregon's due process right to adequate notice prior to designating it as an SDGT, although the violation may be harmless. I also conclude that the blocking order constitutes a seizure for purposes of the Fourth Amendment and, unless the government's actions were reasonable, the government violated AHIF-Oregon's Fourth Amendment rights. I have requested additional briefing on these issues.

I conclude that MCASO has standing to challenge the Secretary of Treasury's designation authority. E.O. 13,224 is not overbroad, but "material support" is a vague term both facially and as applied to MCASO.

Finally, I conclude that OFAC's attorney fees policy is arbitrary and capricious as applied to AHIF-Oregon, and I have requested additional briefing on AHIF-Oregon's remedy.

Accordingly, the following counts are dismissed with prejudice: Count I (arbitrary and capricious redesignation), Count IV (designation/redesignation based on interference with attorney-client privileged communications), Count V (redesignation violated AHIF-Oregon's First Amendment rights), Count VI (designation criteria, as applied to AHIF-Oregon, are vague or overbroad), Count VII (redesignation punished AHIF-Oregon for its associations), and Count IX (violation of MCASO's First Amendment rights). MCASO is entitled to judgment on Count

X as to the vagueness of the term "material support," but the remainder of that count is dismissed with prejudice. The following counts are deferred: Count II (redesignation violated Fifth Amendment rights), Count III (OFAC's attorney fee policy), and Count VIII (freezing of assets violated Fourth Amendment rights). The Court will schedule a telephone conference to discuss the timeframe for additional briefing on AHIF-Oregon's Fifth Amendment due process claim, Fourth Amendment claim and attorneys' fee petition.

## CONCLUSION

Defendants' Motion to Dismiss and for Summary Judgment (#36) is granted in part, denied in part, and deferred in part, and Plaintiffs' Motion for Summary Judgment (#60) is granted in part, denied in part, and deferred in part. Judgment will not be issued until after a decision is reached on the remaining Counts.

IT IS SO ORDERED.

Dated this _____ 6th _____ day of November, 2008.

_____
Garr M. King
United States District Judge