Thomas H. Nelson, OSB No. 78315 (nelson@thnelson.com)
P.O. Box 1211, 24525 E. Welches Road
Welches, OR  97067
Telephone: 503.622.3123; Fax: 503.622.1438

J. Ashlee Albies, OSB No. 05184 (Ashlee@sstcr.com)
Steenson, Schumann, Tewksbury, Creighton & Rose, P.C.
815 SW Second Avenue, Suite 500
Portland, OR  97204
Telephone: 503.221.1791; Fax: 503.223.1516

David D. Cole, DC Bar No. 438355 (Cole@law.georgetown.edu)
c/o Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
Telephone: 202.662.9078

Lynne Bernabei, DC Bar No. 938936 (Bernabei@bernabeipllc.com)
Alan R. Kabat, DC Bar No. 464258 (Kabat@bernabeipllc.com)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
Telephone: 202.745.1942; Fax: 202.745.2627

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| Al Haramain Islamic Foundation, Inc., *et al.*, | Case No. 07-CV-1155-KI |
| Plaintiffs, | Plaintiffs' Supplemental Memorandum |
| v. | |
| United States Department of the Treasury, *et al.*, | |
| Defendants. | |

**Table of Contents**

INTRODUCTION . . . . . . . . . 1

ARGUMENT . . . . . . . . . 3

I.    OFAC's Violation of AHIF-Oregon's Due Process Rights Requires Vacation
of the Designation and Redesignation . . . . 3

    A.    OFAC's Failure to Provide Notice of the Factual and Legal Bases for
Its Actions Was a Structural Defect Not Susceptible to Harmless Error
Analysis . . . . . . . . 3

    B.    The Government Cannot Meet Its Burden of Showing that Its Due
Process Violation Was Harmless Beyond a Reasonable Doubt . 7

II.   OFAC's Seizure of AHIF-Oregon's Assets Violated the Fourth Amendment    10

    A.    Seizures of Property Have Historically Required Probable Cause and
a Warrant Absent an Established Exception to the Fourth Amendment    11

    B.    OFAC's Seizure of AHIF-Oregon's Assets Is Unreasonable in the
Absence of a Warrant or Probable Cause . . . . 14

        1.    The Government Has Not Shown that a Warrant and Probable
Cause Requirement Would be Impracticable . . 15

        2.    The Intrusion on Private Interests Effectuated Here Is Greater
Than the Supreme Court Has Ever Permitted Without Warrant
or Probable Cause . . . . . . 17

        3.    OFAC's Freeze Authority Contains No Adequate Substitute for
the Fourth Amendment's Warrant Requirement as a Check on
Executive Discretion . . . . . . 20

    C.    The Correct Standard For a Freeze is Probable Cause . . 21

    D.    The Appropriate Remedy Is to Vacate the Freeze and Designation . 24

III.  This Court Should Order OFAC to Release $108,834.32 in AHIF-Oregon's
Blocked Funds for the Payment of Attorneys' Fees . . . 25

IV.   Conclusion . . . . . . . . 29

**Table of Authorities**

*Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of the Treasury,*
    585 F. Supp. 2d 1233 (D. Or. 2008) (*"AHIF"*) . . . . *passim*

*Arizona v. Fulminante,*
    499 U.S. 279 (1991) . . . . . . . . 4

*Brigham City, Utah v. Stuart,*
    547 U.S. 398 (2006) . . . . . . . . 17

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) . . . . . . . . 11-12

*Camara v. Municipal Court of S.F.,*
    387 U.S. 523 (1967) . . . . . . . . 14

*Chandler v. Miller,*
    520 U.S. 305 (1997) . . . . . . . . 14, 16

*Chapman v. California,*
    386 U.S. 18 (1967) . . . . . . . . 4

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000) . . . . . . . . 15

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) . . . . . . . . 6

*Cole v. Arkansas,*
    333 U.S. 196 (1948) . . . . . . . . 5-6

*Colello v. U.S. Securities & Exchange Comm'n,*
    908 F. Supp. 738 (C.D. Cal. 1995) . . . . . . 22

*Colorado v. Bertine,*
    479 U.S. 367 (1987) . . . . . . . . 20

*Delaware v. Prouse,*
    440 U.S. 648 (1979) . . . . . . . . 17, 20

*DeMassa v. Nunez,*
    747 F.2d 1283 (9th Cir. 1984) . . . . . . . 25

*Donovan v. Dewey*,
    452 U.S. 594 (1981)    .    .    .    .    .    .    .    .    .    19

*Ferguson v. City of Charleston*,
    532 U.S. 67 (2001)    .    .    .    .    .    .    .    .    .    15

*Flores v. United States*,
    551 F.2d 1169 (9th Cir. 1977)    .    .    .    .    .    .    23

*Florida v. Royer*,
    460 U.S. 491 (1983)    .    .    .    .    .    .    .    .    24

*Florida v. Wells*,
    495 U.S. 1 (1990)    .    .    .    .    .    .    .    .    20

*G & G Jewelry, Inc. v. City of Oakland*,
    989 F.2d 1093 (9th Cir. 1993)    .    .    .    .    .    .    23

*G.M. Leasing Corp. v. United States*,
    429 U.S. 338 (1977)    .    .    .    .    .    .    .    .    23

*Gautt v. Lewis*,
    489 F.3d 993 (9th Cir. 2007)    .    .    .    .    .    .    6

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987)    .    .    .    .    .    .    .    .    16

*Herring v. United States*,
    555 U.S. __, 129 S. Ct. 695 (2009)    .    .    .    .    .    24

*Illinois v. Lidster*,
    540 U.S. 419 (2004)    .    .    .    .    .    .    .    .    16, 17

*Katz v. United States*,
    389 U.S. 347 (1967)    .    .    .    .    .    .    .    .    10, 14

*M.L. v. Federal Way Sch. Dist.*,
    394 F.3d 634 (9th Cir. 2005)    .    .    .    .    .    .    .    1, 4-5

*Meier v. Keller*,
    521 F.2d 548 (9th Cir. 1975)    .    .    .    .    .    .    .    25

*Mich. Dept. of State Police v. Sitz*,
    496 U.S. 444 (1990)    .    .    .    .    .    .    .    .    19

*Miranda v. City of Cornelius*,
　　429 F.3d 858 (9th Cir. 2005) .　　.　　.　　.　　.　　.　　.　　11

*Nat'l Treasury Employees Union v. Von Raab*,
　　489 U.S. 656 (1989) .　　.　　.　　.　　.　　.　　.　　.　　.　　19

*New Jersey v. T.L.O.*,
　　469 U.S. 325 (1985) .　　.　　.　　.　　.　　.　　.　　.　　.　　15, 16

*New York v. Burger*,
　　482 U.S. 691 (1987) .　　.　　.　　.　　.　　.　　.　　.　　.　　17, 19

*One 1958 Plymouth Sedan v. Pennsylvania*,
　　380 U.S. 693 (1965) .　　.　　.　　.　　.　　.　　.　　.　　.　　11

*One Lot of Emerald Cut Stones v. United States*,
　　409 U.S. 232 (1972) .　　.　　.　　.　　.　　.　　.　　.　　.　　13

*Payton v. New York*,
　　445 U.S. 573 (1980) .　　.　　.　　.　　.　　.　　.　　.　　.　　14

*Pennsylvania v. Mimms*,
　　434 U.S. 106 (1977) (*per curiam*) .　　.　　.　　.　　.　　.　　17

*Ramsden v. United States*,
　　2 F.3d 322 (9th Cir. 1993) .　　.　　.　　.　　.　　.　　.　　.　　25

*Redding v. Safford Unified Sch. Dist. # 1*,
　　531 F.3d 1071 (9th Cir. 2008) .　　.　　.　　.　　.　　.　　.　　18

*Rise v. Oregon*,
　　59 F.3d 1556 (9th Cir 1995) .　　.　　.　　.　　.　　.　　.　　.　　21

*Samson v. California*,
　　547 U.S. 843 (2006) .　　.　　.　　.　　.　　.　　.　　.　　.　　17

*Sanders v. City of San Diego*,
　　93 F.3d 1423 (9th Cir. 1996) .　　.　　.　　.　　.　　.　　.　　23

*Sheppard v. Rees*,
　　909 F.2d 1234 (9th Cir. 1989) .　　.　　.　　.　　.　　.　　.　　6

*Skinner v. Ry. Labor Executives' Ass'n*,
　　489 U.S. 602 (1989) .　　.　　.　　.　　.　　.　　.　　.　　.　　16, 19, 20

*Soldal v. Cook County, Ill.*,
    506 U.S. 56 (1992)   .    .    .    .    .    .    .    .    .    11

*Stirone v. United States*,
    361 U.S. 212 (1960)   .    .    .    .    .    .    .    .    5-6

*Sullivan v. Louisiana*,
    520 US. 461 (1997)   .    .    .    .    .    .    .    .    4

*Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*,
    551 U.S. 291, 127 S. Ct. 2489 (2007).   .    .    .    .    .    3, 7

*Terry v. Ohio*,
    392 U.S. 1 (1968)   .    .    .    .    .    .    .    .    23-24

*United States v. $49,576 U.S. Currency*,
    16 F.3d 425 (9th Cir. 1997)   .    .    .    .    .    .    .    23

*United States v. 6380 Little Canyon Rd.*,
    59 F.3d 974 (9th Cir 1995)   .    .    .    .    .    .    .    24

*United States v. Annigoni*,
    96 F.3d 1132 (9th Cir. 1996)   .    .    .    .    .    .    .    4, 7-8

*United States v. Bulacan*,
    156 F.3d 963 (9th Cir. 1998)   .    .    .    .    .    .    .    17

*United States v. Calandra*,
    414 U.S. 338 (1974)   .    .    .    .    .    .    .    .    24

*United States v. Heckenkamp*,
    482 F.3d 1142 (9th Cir. 2007)   .    .    .    .    .    .    16

*United States v. Johnson*,
    572 F.2d 227 (9th Cir. 1978)   .    .    .    .    .    .    .    23

*United States v. Karo*,
    468 U.S. 705 (1984)   .    .    .    .    .    .    .    .    14

*United States v. Kimak*,
    624 F.2d 903 (9th Cir. 1980)   .    .    .    .    .    .    .    23

*United States v. Knights*,
    534 U.S. 112 (2001)   .    .    .    .    .    .    .    .    18

*United States v. One Assortment of 89 Firearms*,
    465 U.S. 354 (1984) .   .   .   .   .   .   .   .    13

*United States v. Place*,
    462 U.S. 696 (1983) .   .   .   .   .   .   .   .    24

*United States v. Real Prop. Located at Incline Village*,
    958 F. Supp. 482 (D. Nev. 1997) .   .   .   .   .    24

*United States v. Scott*,
    665 F.2d 874 (9th Cir. 1971) .   .   .   .   .   .    14

*United States v. United States Dist. Court for the Eastern Dist. of Mich.*,
    407 U.S. 297 (1972) .   .   .   .   .   .   .    14

*United States v. Usery*,
    518 U.S. 267 (1996) .   .   .   .   .   .   .    13

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995) .   .   .   .   .   .   .    18, 20

*Virginia v. Moore*,
    553 U.S. __, 128 S. Ct. 1598 (2008) .   .   .   .   .    11

**Statutes, Rules, and Executive Orders:**

18 U.S.C. § 981(a)(1)(G)   .   .   .   .   .   .   .   .    13, 16

18 U.S.C. § 981(b)(2)   .   .   .   .   .   .   .    23

18 U.S.C. § 983(f)   .   .   .   .   .   .   .    24

28 U.S.C. § 2465(a)(1)   .   .   .   .   .   .   .    24

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*    13-22

Rule 41(g), Federal Rules of Criminal Procedure   .   .   .   .    24-25

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001)   .   .   .    14-21

**Other Sources:**

T. Taylor, *Two Studies in Constitutional Interpretation* (1969)   .   .   .    11

## INTRODUCTION

This supplemental memorandum is submitted pursuant to this Court's order of November 6, 2008, requesting further briefing on three issues: (1) whether defendants' violation of the due process rights of plaintiff Al Haramain Islamic Foundation, Inc. ("AHIF-Oregon") by failing to provide notice of the factual and legal bases for its potential designation and redesignation is "harmless beyond a reasonable doubt;" (2) whether defendants' seizure of plaintiff's assets for more than four years without a warrant, probable cause, or individualized suspicion is an unreasonable seizure in violation of the Fourth Amendment; and (3) the amount of fees and expenses that this Court should order that AHIF-Oregon be allowed to pay its counsel out of its frozen funds, in light of defendants' arbitrary and capricious acts and restrictions. *Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of the Treasury*, 585 F. Supp. 2d 1233, 1272-73 (D. Or. 2008) (*"AHIF"*).

Defendant Office of Foreign Assets Control's ("OFAC") failure to notify AHIF-Oregon of the factual or legal bases for its potential designation and redesignation until four years after OFAC froze its assets, long after the administrative record was closed, fundamentally prejudiced the entire administrative process. It meant that AHIF-Oregon never had its constitutionally guaranteed opportunity to respond, and that the administrative record was fatally one-sided, not including AHIF-Oregon's defense because it never knew of what it was being accused. Because this error "permeated the entire conduct of the [OFAC process] from beginning to end" and "affected the framework within which the [administrative process] proceed[ed]," it warrants automatic reversal without even engaging in harmless error review. *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 646 (9th Cir. 2005). Even if this Court were to apply harmless error

analysis, reversal would also be required, because the government cannot possibly meet its burden of showing beyond any reasonable doubt that notifying AHIF-Oregon of what was at issue would not have affected the outcome. This Court should vacate the designation and redesignation, and if OFAC still wants to proceed with a designation, AHIF-Oregon should be allowed the opportunity to make the defense that it was never given the opportunity to do.

OFAC's actions also violated the Fourth Amendment. Seizures presumptively require both probable cause and a warrant, yet OFAC obtained neither in this case. Instead, it has frozen every penny of AHIF-Oregon's assets without so much as establishing probable cause of any crime, and without any warrant. The seizure is unreasonable because it fits none of the recognized exceptions to the warrant and probable cause requirement. There is simply no reason why the legal scheme governing OFAC's seizures could not incorporate a warrant requirement, thus assuring that the awesome power exercised by executive branch officials in this case is subject to the kind of check that the Fourth Amendment requires.

Finally, AHIF-Oregon should be permitted to pay its counsel for the full amount of the caps OFAC has imposed in general on such cases – $28,000 – because this Court found that OFAC's refusal to let AHIF-Oregon pay its counsel any fees at all out of its frozen funds, simply because they had obtained partial payment from other sources, was arbitrary and capricious. In addition, AHIF-Oregon should also be able to pay the difference between what its counsel have already been paid by outside funds and what they are owed, because this Court further found that OFAC's own actions here, by failing to provide notice to AHIF-Oregon, had impermissibly and substantially increased AHIF-Oregon's counsel's time.

**ARGUMENT**

**I.      OFAC's Violation of AHIF-Oregon's Due Process Rights Requires Vacation
of the Designation and Redesignation.**

This Court held that OFAC violated AHIF-Oregon's due process rights by failing to

provide it with notice of the legal and factual basis for its potential designation, thereby forcing

AHIF-Oregon to guess at what was at issue -- and to guess incorrectly, as it turned out.  This

Court further instructed the parties to address whether the constitutional error can be disregarded

as "harmless beyond a reasonable doubt."  *AHIF*, 585 F. Supp. 2d at 1257 (quoting *Tennessee*

*Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291, __, 127 S. Ct. 2489,

2497 (2007)).

The due process violation cannot be disregarded on this ground.  First, OFAC's violation

was a "structural defect" that permeated the entire proceeding, and, therefore, is not subject to

harmless error analysis at all.  Second, even if this Court were to apply harmless error review,

the government cannot possibly show that its failure to tell AHIF-Oregon was harmless beyond a

reasonable doubt, as AHIF-Oregon's investigation, conduct, and submission to OFAC would

have been totally different had it known the basis for OFAC's concern.

**A.      OFAC's Failure to Provide Notice of the Factual and Legal Bases for Its
Actions Was a Structural Defect Not Susceptible to Harmless Error Analysis.**

OFAC's failure to provide AHIF-Oregon with any notice of the factual or legal bases for

its potential designation and redesignation fundamentally infected the entire proceeding, because

it deprived AHIF-Oregon of the opportunity to respond to what was in fact at issue.  Such a

violation is so fundamental that it warrants automatic reversal, without application of the

harmless error test.

Where a constitutional error permeates the entire process of a trial or hearing, it is deemed structural, and requires reversal without regard to harmless error considerations. *M.L.*, 394 F.3d at 646 (applying structural error doctrine to defective administrative hearing); *United States v. Annigoni*, 96 F.3d 1132, 1143 (9th Cir. 1996) (applying structural error doctrine in criminal context). The Ninth Circuit has held that harmless error review is <u>not</u> appropriate for "an error 'that permeate[s] the entire conduct of the trial from beginning to end or affect[s] the framework within which the trial proceeds.'" *M.L.*, 394 F.3d at 646 (quoting *United States v. Recio*, 371 F.3d 1093, 1102 (9th Cir. 2004) (quoting *Rice v. Wood*, 77 F.3d 1138, 1141 (9th Cir. 1996))). "Unlike ordinary trial errors, 'structural defects in the constitution of the trial mechanism ... defy analysis by harmless-error standards.'" *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *see also Chapman v. California*, 386 U.S. 18, 23 & n.5 (1967) ("constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error").[1]

As the Ninth Circuit held in *M.L.,* even a nonconstitutional error can be treated as structural and require automatic reversal. The failure to include a teacher on an administrative tribunal reviewing a disabled student's claim to special education benefits was a structural error that required reversal regardless of harmless error analysis. *M.L.*, 394 F.3d at 646.

OFAC's failure to provide notice of the legal and factual bases of its potential designation is precisely the kind of error that "permeate[s] the entire conduct of the [process]." *Id.* Unlike, for example, the improper admission of a single piece of evidence, the failure to give

---

[1] The Supreme Court has treated all of the following as structural errors that require automatic reversal: deficient reasonable doubt instructions, *Sullivan v. Louisiana*, 520 US. 461, 468-69 (1997); race-based exclusion from a jury, *Fulminante*, 499 U.S. at 310; denial of right of self-representation in a criminal trial, *id.*; denial of a public trial, *id.*; denial of right to counsel, *Chapman*, 386 U.S. at 23 n.8; introduction of coerced confession, *id.*; and a partial judge. *Id.*

notice of what is at stake "affect[s] the framework within which the trial proceeds." *Id.* As this Court noted, without notice, AHIF-Oregon had to guess at what OFAC's concerns might be, in part based on OFAC's own misleading actions, particularly when OFAC requested that AHIF-Oregon provide it with a copy of a Koran that it had been distributing to prisons. And, as this Court recognized, AHIF-Oregon guessed incorrectly. It was never told that OFAC's concerns were that it was owned or controlled by Messrs. Al-Aqeel and Al-Buthi, or that OFAC considered it a component of a larger group that funded terrorism, despite the fact that these were the conclusions OFAC ultimately relied on in redesignating AHIF-Oregon. Accordingly, it never had an opportunity to address those concerns by submitting evidence for the administrative record. And in turn, OFAC never had an opportunity to reach a decision informed by a complete administrative record, and this Court never had an opportunity to review whatever decision OFAC might have then made with the benefit of a complete administrative record in front of it. Instead, both OFAC and this Court reached decisions based on manifestly incomplete records.

A hearing without notice of what is at issue is so fundamentally flawed that the defect is not susceptible to harmless error analysis. It is akin to holding a criminal trial without an indictment, or a civil trial without a complaint. The Supreme Court has twice reversed convictions in criminal cases for failure to provide adequate notice of what was at issue in the trial. In *Stirone v. United States*, 361 U.S. 212, 215-18 (1960), the Court held that such a defect violated the Fifth Amendment right to be tried on an indictment, and in *Cole v. Arkansas*, 333 U.S. 196, 201 (1948), the Court held that it violated the Sixth Amendment right to be informed of the nature and cause of the charges. In both cases, the Court reversed the convictions, finding the errors fundamentally compromised the fairness of the proceedings. In *Stirone,* the Court

reasoned that the failure "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury" and concluded that "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Stirone*, 361 U.S. at 217.  The Ninth Circuit has similarly treated the failure to provide a criminal defendant with notice as a structural error requiring automatic reversal. *Sheppard v. Rees*, 909 F.2d 1234, 1237 (9th Cir. 1989); *but cf. Gautt v. Lewis*, 489 F.3d 993, 1014-18 (9th Cir. 2007) (discussing these cases, but ultimately concluding that it need not decide whether denial of notice was structural error because government had not shown that error was harmless in any event).

The Supreme Court has long recognized that notice of the legal and factual basis of what is at stake is one of the core elements of due process, precisely because the affected party cannot possibly enjoy a meaningful opportunity to respond if it does not know what it is responding to. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)); *Cole*, 333 U.S. at 201 (requirement of notice is a "principle of procedural due process" that is unsurpassed in its "clearly established" nature).

Accordingly, OFAC's failure to provide AHIF-Oregon with notice of the legal and factual bases of its potential designation and redesignation is a structural error fatally infecting the entire administrative process, and therefore warrants an order vacating the designation and redesignation.

**B.    The Government Cannot Meet Its Burden of Showing that Its Due Process Violation Was Harmless Beyond a Reasonable Doubt.**

If this Court decides to subject OFAC's due process violation to harmless error analysis, the same result should obtain.  Under the harmless error doctrine, this Court must vacate the designation and redesignation unless OFAC can meet its burden of establishing that the failure to provide notice was "harmless beyond a reasonable doubt."  *Brentwood Academy*, 127 S. Ct. at 2497; *Annigoni*, 96 F.3d at 1143 (burden is on the government).  OFAC cannot possibly satisfy that demanding standard here, because had AHIF-Oregon known what was at stake, it would have radically altered its strategy in terms of its investigation, its submission to OFAC, and the conduct of its affairs.  Because the government cannot show beyond a reasonable doubt that nothing AHIF-Oregon could have done would have made a difference to the outcome, it cannot meet its burden.

This Court's determination that OFAC's redesignation of AHIF-Oregon was not arbitrary and capricious, *AHIF*, 585 F. Supp. 2d at 1249-53, does not alter the conclusion.  This Court reached that determination prematurely, on the basis of a necessarily one-sided and incomplete administrative record.  As this Court found, OFAC unconstitutionally deprived AHIF-Oregon of notice of the legal and factual bases for OFAC's action until February 2008, four years *after* OFAC froze its assets, and long *after* OFAC closed the administrative record.  As a result, both OFAC's decision to redesignate – and this Court's decision upholding the redesignation – were by definition premature, in that they were predicated on an incomplete administrative record.

The purpose of the harmless error doctrine is to "avoid 'setting aside convictions for small errors or defects that have *little, if any, likelihood of having changed the result of the trial,*' because reversal would entail substantial social costs."  *Annigoni*, 96 F.3d at 1143 (quoting

*Chapman*, 386 U.S. at 22) (emphasis in original).  The failure to tell AHIF-Oregon the basis of the charges against it can in no way be deemed a "small error or defect" with "little, if any likelihood of having changes the result."

Had OFAC provided the notice AHIF-Oregon was constitutionally due, it would have been able to take measures directly responsive to OFAC's concerns that may well have led to a different result.  Unless this Court concludes "beyond a reasonable doubt" that *nothing* AHIF-Oregon could have done could have affected the result, the appropriate remedy is to vacate the designation, and require OFAC to provide due process before deciding whether to designate.

Had AHIF-Oregon known that it might be designated based on Soliman Al-Buthi's ownership and control, for example, it would have challenged his designation by responding to the charges against him (also not provided until February 2008), and more importantly, Mr. Al-Buthi would have resigned from the board, which, as this Court noted with respect to Mr. Al-Aqeel, would have eliminated that basis as a potential ground for designation.  *AHIF*, 585 F. Supp. 2d at 1251 (fact that Mr. Al-Aqeel resigned from board made designation of AHIF-Oregon based on his "ownership or control" unsupportable); *see also* Declaration of Thomas H. Nelson, at ¶ 5 (Feb. 13, 2009) (discussing potential resignation from the board); Declaration of Soliman H. Al-Buthi, at ¶ 11 (Feb. 15, 2009) (same) (attached and incorporated hereto as Exhibits 1-2).  Unless this Court can say beyond a reasonable doubt that this could not possibly have changed OFAC's decision, that error was not harmless.

Similarly, had AHIF-Oregon been notified -- at a time when it could have responded -- that OFAC might designate or redesignate it on the ground that "as a branch" of AHIF-Saudi Arabia ("AHIF-SA"), it had "acted for or on behalf of" or provided support for "Al Qaeda and

other SDGTs," *see* AR 1899, AHIF-Oregon could have produced evidence showing that it never

had any dealings with Al Qaeda nor any other SDGTs, either through AHIF-SA or otherwise.  It

could have shown that its activities were predominantly within the United States, and that there

is no evidence that it ever provided support to any SDGT, here, in Saudi Arabia, or elsewhere.  It

could have asked OFAC to identify the "other SDGTs" that it was alleged to have supported, and

responded to those charges specifically.  It could have shown that none of its donations went to

an SDGT.  It could also have shown that it played no role in AHIF-SA's independent activities.

*See* Nelson Decl. (Ex. 1), at ¶¶ 6-7; Al-Buthi Decl. (Ex. 2), at ¶¶ 3-7, 9-10.

Moreover, because OFAC did not tell AHIF-Oregon of this basis for its designation or

redesignation until February 2008, more than three years after Saudi Arabia had shut down

AHIF-SA as part of a coordinated effort by the United States and Saudi governments, *see* Szubin

Decl., at ¶ 51 (attached as Ex. 1 to Def. Mot. to Dismiss) (Doc. No. 37) (Feb. 7, 2008), AHIF-

Oregon was not put on notice that the above evidence might be critical to its defense.  Now that

AHIF-SA has been shut down, it is extremely difficult even to obtain evidence about AHIF-SA's

activities that would exonerate AHIF-Oregon.  *See* Nelson Decl. (Ex. 1), at ¶¶ 6-7; Al-Buthi

Decl. (Ex. 2), at ¶¶ 12-13.

It bears emphasizing that the *government* bears the burden of proving that its

constitutional error was "harmless beyond a reasonable doubt."  It is not AHIF-Oregon's burden.

Thus, unless OFAC can show that *nothing* AHIF-Oregon could have presented might have

changed the result – either at the OFAC administrative decision level, or at the level of this

Court's review – this Court must conclude that the error was not harmless beyond a reasonable

doubt, and warrants vacating AHIF-Oregon's designation and redesignation.

II.    **OFAC's Seizure of AHIF-Oregon's Assets Violated the Fourth Amendment.**

This Court's November 2008 decision held that OFAC's freezing of the entirety of AHIF-Oregon's assets – a freeze that has now lasted more than five years, and was effectuated without a warrant or probable cause – constituted a "seizure" and therefore must satisfy the Fourth Amendment. This Court ordered additional briefing on whether the seizure is reasonable, specifically requesting that the parties address: (1) any "historical law that might shed light on application of the Fourth Amendment in this context;" (2) the private and government interests at issue; (3) whether probable cause or a lesser standard should be required; and (4) what remedy is appropriate. *AHIF*, 585 F. Supp. 2d at 1264.

Fourth Amendment history and jurisprudence establish that a seizure of property, like the search of a home or the seizure of a person, presumptively requires a warrant and probable cause. That presumption can be overcome only where the government can point to a "specifically established and well-delineated exception." *Katz v. United States*, 389 U.S. 347, 357 (1967). No such exception exists here. The government may ask this Court to extend the "special needs" exception to this setting, but even if restricting support to terrorism is seen as a "special need," that exception is inapplicable for three reasons: (1) the government interest does not render a warrant and probable cause requirement impracticable; (2) the intrusion on private interests here is far more substantial than has been permitted in other "special needs" cases; and (3) the legal scheme provides no safeguards that substitute for the warrant and probable cause requirements as checks on executive discretion. The proper level of suspicion required for an indefinite freeze of the entirety of a person's assets is, at least, probable cause. And the appropriate remedy for an unconstitutional freeze is to lift the freeze.

A.    **Seizures of Property Have Historically Required Probable Cause and a Warrant Absent an Established Exception to the Fourth Amendment.**

As a historical matter, seizures of property, like seizures of persons, have been treated as presumptively requiring probable cause and a warrant, unless the seizure falls within an established exception to the warrant and probable cause requirements.  Fourth Amendment doctrine "unmistakably hold[s] that the Amendment protects property as well as privacy." *Soldal v. Cook County, Ill.*, 506 U.S. 56, 62 (1992).  Thus, the Ninth Circuit has instructed that "[t]he Fourth Amendment protects against unreasonable interferences in property interests regardless of whether there is an invasion of privacy[.]"  *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).  The Supreme Court has recently explained that:  "In determining whether a search or seizure is unreasonable, we begin with history.  We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to protect."  *Virginia v. Moore*, 553 U.S. __, 128 S. Ct. 1598, 1602 (2008).

There is relatively little case law or statutory law addressing the seizures of property at the time of the Framers.  T. Taylor, *Two Studies in Constitutional Interpretation* 27-29 (1969).  The closest analogy to the freeze authority at issue here is forfeiture, under which the Supreme Court has long recognized that forfeitures must comply with the Fourth Amendment.  *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 697-98 (1965) (suits for forfeiture "are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution") (citing *Boyd v. United States*, 116 U.S. 616, 633-34 (1886)).

In *Calero-Toledo*, the Supreme Court described in detail the history of forfeiture law, which originated as the concept of a "deodand" (an object forfeited to the Crown because it had caused a death), and which subsequently and alternatively developed as the forfeiture statutes:

At common law the value of an inanimate object directly or indirectly causing the accidental death of a King's subject was forfeited to the Crown as a deodand. . . . *See* O. Holmes, *The Common Law*, c. 1 (1881). The value of the instrument was forfeited to the King, in the belief that the King would provide the money for Masses to be said for the good of the dead man's soul, or insure that the deodand was put to charitable uses.  1 W. Blackstone, *Commentaries* *300. . . .

Forfeiture also resulted at common law from conviction for felonies and treason.  The convicted felon forfeited his chattels to the Crown and his lands escheated to his lord; the convicted traitor forfeited all of his property, real and personal, to the Crown.  *See* 3 W. Holdsworth, *History of English Law* 68-71 (3d ed. 1927); 1 F. Pollock & F. Maitland, *History of English Law* 351 (2d ed. 1909).  The basis for these forfeitures was that a breach of the criminal law was an offense to the King's peace, which was felt to justify denial of the right to own property.  *See* 1 W. Blackstone, *Commentaries* *299.

**In addition, English Law provided for statutory forfeitures of offending objects used in violation of the customs and revenue laws.** . . . Statutory forfeitures were most often enforced under the *in rem* procedure utilized in the Court of Exchequer to forfeit the property of felons.  *See* 3 W. Blackstone, *Commentaries* *261-262; *C. J. Hendry Co*. v. *Moore*, 318 U.S. 133, 137-38 (1943).

**Deodands did not become part of the common-law tradition of this country.**  *See Parker-Harris Co*. v. *Tate*, 135 Tenn. 509, 188 S.W. 54 (1916).  Nor has forfeiture of estates as a consequence of federal criminal conviction been permitted, *see* 18 U. S. C. § 3563; Rev. Stat. § 5326 (1874); 1 Stat. 117 (1790).  Forfeiture of estates resulting from a conviction for treason has been constitutionally proscribed by Art. III, § 3, though forfeitures of estates for the lifetime of a traitor have been sanctioned, *see Wallach* v. *Van Riswick*, 92 U.S. 202 (1876).  But "long before the adoption of the Constitution the common law courts in the Colonies -- and later in the states during the period of Confederation -- were exercising jurisdiction *in rem* in the enforcement of [English and local] forfeiture statutes," *C. J. Hendry Co. v. Moore, supra*, at 139, which provided for the forfeiture of commodities and vessels used in violations of customs and revenue laws. *See id*., at 145-148; *Boyd* v. *United States*, 116 U.S. 616, 623 (1886).  And almost immediately after adoption of the Constitution, ships and cargoes involved in customs offenses were made subject to forfeiture under federal law, as were vessels used to deliver slaves to foreign countries, and somewhat later those used to deliver slaves to this country.  **The enactment of forfeiture statutes has not abated; contemporary federal and state forfeiture statutes reach virtually any type of property that might be used in the conduct of a criminal enterprise.**

*Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680-83 (1974) (emphasis added).

Thus, as the Supreme Court explained in *Calero-Toledo*, and in subsequent decisions,

forfeiture has historically been linked to a criminal conviction or the violation of established law, and has required a finding of an actual violation, not merely probable cause. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 363 (1984) ("at common law, in many cases, the right of forfeiture did not attach until the offending person had been convicted and the record of conviction produced.")  Under contemporary federal forfeiture law, the government may temporarily seize property based on a warrant and probable cause, and must establish a violation of law in order to forfeit the property.[2] *United States v. Usery*, 518 U.S. 267, 284 (1996) (forfeitures "are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct"); *One Lot of Emerald Cut Stones v. United States*, 409 U.S. 232, 234-35 (1972).  Thus, the history of forfeiture law establishes that seizures of property must be justified at a minimum by probable cause of a legal violation.

OFAC's seizure in this case, by contrast, was carried out pursuant to a statute and Executive Order – International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701

---

[2] 18 U.S.C. § 981(a)(1)(G) provides that:

"The following property is subject to forfeiture to the United States: . . .
    (G) All assets, foreign or domestic--
        (i) of any individual, entity, or organization engaged in planning or perpetrating any any [*sic*] Federal crime of terrorism (as defined in section 2332b(g)(5) [18 U.S.C. § 2332b(g)(5)]) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization;
        (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in section 2332b(g)(5) [18 U.S.C. § 2332b(g)(5)]) against the United States, citizens or residents of the United States, or their property;
        (iii) derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in section 2332b(g)(5) [18 U.S.C. § 2332b(g)(5)]) against the United States, citizens or residents of the United States, or their property; or
        (iv) of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in section 2331 [18 U.S.C. § 2331]) against any international organization (as defined in section 209 of the State Department Basic Authorities Act of 1956 (22 U.S.C. § 4309(b)) or against any foreign Government. Where the property sought for forfeiture is located beyond the territorial boundaries of the United States, an act in furtherance of such planning or perpetration must have occurred within the jurisdiction of the United States.

Page 13 – Plaintiffs' Supplemental Memorandum

*et seq.* and Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ("E.O. 13,224" or

"Executive Order") – that do <u>not</u> require or involve any finding of a legal violation whatsoever,

much less a warrant or probable cause.  AHIF-Oregon has not been charged with violating any

law; instead, OFAC has simply made various allegations regarding AHIF-Oregon's associations

– associations that are not otherwise illegal.

> **B.      OFAC's Seizure of AHIF-Oregon's Assets Is Unreasonable in the Absence of a Warrant or Probable Cause.**

Searches and seizures conducted without a warrant based upon probable cause are "*per

se* unreasonable under the Fourth Amendment -- subject only to a few specifically established

and well-delineated exceptions."  *Katz*, 389 U.S. at 357; *see also Chandler v. Miller*, 520 U.S.

305, 308 (1997); *United States v. Karo*, 468 U.S. 705, 717 (1984); *Payton v. New York*, 445 U.S.

573, 586-87 (1980); *Camara v. Municipal Court of S.F.*, 387 U.S. 523, 528-29 (1967); *United

States v. Scott*, 665 F.2d 874, 876 (9th Cir. 1971).  Neither IEEPA nor the Executive Order

requires OFAC to have probable cause or a warrant before freezing an entity's assets.  Thus,

OFAC's seizure of AHIF-Oregon's assets is presumptively unreasonable, unless it falls within

one of the "few specifically established and well-defined exceptions."  *Katz,* 389 U.S. at 357.

The government's initial briefing, as this Court noted, cited no such exception, but

simply claimed broadly that the government's national security interests somehow render the

OFAC seizure authority reasonable.  In fact, there is no "national security" exception to the

Fourth Amendment.  *United States v. United States Dist. Court for the Eastern Dist. of Mich.*,

407 U.S. 297, 318-21 (1972) (holding that the Fourth Amendment's warrant and probable cause

requirements apply to domestic security investigations).

The government may alternatively argue that its seizure should be treated as reasonable

under the "special needs" exception, which authorizes warrantless searches and seizures to

further "special needs beyond the normal need for law enforcement." *New Jersey v. T.L.O.,* 469

U.S. 325, 351 (1985) (Blackmun, J., concurring).  This exception recognizes that where the

government is seeking to advance special needs distinct from criminal law enforcement that

make the warrant and probable cause requirements impracticable, its actions may be reasonable,

but only if they impose in only a limited way on private interests, and if the legal scheme

contains structural safeguards that substitute for the warrant and probable cause requirements as

checks on executive discretion.

However, this Court must find that the "special needs" exception does not save the

IEEPA freeze authority here for three reasons.  First, the government cannot show that the

warrant and probable cause standards would be impracticable; seeking advance court approval

and establishing probable cause would not interfere in any way with the government's

enforcement interests.  Second, the intrusion on private interests authorized by IEEPA and the

Executive Order, and imposed on AHIF-Oregon, can in no way be considered minimal.  The

Supreme Court has never upheld a "special needs" seizure that is so intrusive as a five-year-

running indefinite freezing of an entity's entire assets.  And third, neither IEEPA nor the

Executive Order contain a structural substitute for the warrant and probable cause requirement.

1.    **The Government Has Not Shown that a Warrant and Probable Cause
Requirement Would be Impracticable.**

The special needs exception is narrow, and the appellate courts have recognized such an

exception only where the government shows:  (1) that the primary purpose of its actions is above

and beyond criminal law enforcement, *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86

(2001); *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-47 (2000); and (2) that the special needs

"make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *T.L.O.*, 469 U.S. at 351); *accord United States v. Heckenkamp*, 482 F.3d 1142, 1147 (9th Cir. 2007). "Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, *make the warrant and probable-cause requirement impracticable*, is a court entitled to substitute its balancing of interests for that of the Framers." *T.L.O.*, 469 U.S. at 351 (1985) (Blackmun, J., concurring) (emphasis added). For example, the Supreme Court has upheld warrantless and suspicionless drug testing of railroad conductors because the "delay necessary to procure a warrant [to test a conductor after an accident] may result in destruction of valuable evidence," *see Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 623 (1989), but struck down mandatory drug testing of candidates for public office because that scheme was not "well designed to identify candidates who violate antidrug laws," nor serve any deterrent effect. *Chandler*, 520 U.S. at 319-20.

OFAC could have, but did not, seek a warrant before freezing AHIF-Oregon's assets pending its designation investigation. *See* 18 U.S.C. § 981(1)(a)(G) (civil forfeiture statute requires warrant and probable cause). An *ex parte* warrant application would in no way undermine the government's enforcement interests, and would interpose a judge between the executive and the person or entity whose assets are to be entirely frozen. And once a freeze pending investigation is in place, there is no conceivable reason why a warrant requirement could not be imposed.

Nor is the probable-cause requirement impracticable. The IEEPA scheme is a targeted scheme, and is not one where "the concept of individualized suspicion has little role to play." *Illinois v. Lidster*, 540 U.S. 419, 424-25 (2004). Accordingly, the government cannot satisfy the

threshold requirement of the "special needs" exception, because it cannot show that a warrant or probable cause requirement would be impracticable.

**2.      The Intrusion on Private Interests Effectuated Here Is Greater Than the Supreme Court Has Ever Permitted Without Warrant or Probable Cause.**

Even if the government succeeds in meeting the threshold requirements for invoking the special needs exceptions, it must also establish that its scheme is reasonable, *Lidster*, 540 U.S. at 426, which it cannot satisfy.  Reasonableness is the "ultimate touchstone" of any Fourth Amendment analysis, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), and the reasonableness requirement applies even where the warrant and probable-cause requirements do not.  *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (*per curiam*).

Whether a seizure is reasonable in a "special needs" setting depends on the totality of the circumstances, and requires this Court to consider both the degree of intrusion on the private interest, and the extent to which the legal regime provides a "constitutionally adequate substitute for a warrant."  *New York v. Burger*, 482 U.S. 691, 703 (1987); *see also Samson v. California*, 547 U.S. 843, 848-49 (2006); *Delaware v. Prouse*, 440 U.S. 648, 653-55 (1979); *United States v. Bulacan*, 156 F.3d 963, 974 (9th Cir. 1998) (regulation authorizing administrative searches unconstitutional because it did not "create an established procedure that limits discretion and sets the parameters of the search").

The freeze of AHIF-Oregon's assets is a more extreme intrusion on private interests than has ever been permitted in the "special needs" context.  It targets "all property and interests in property . . . that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons."  E.O. 13,224 § 1.  A freeze can last indefinitely, and the freeze authority makes it a crime for anyone to transact in

virtually any manner with the targeted entity.  *Id.* § 2; 50 U.S.C. § 1705.  AHIF-Oregon's assets,

including its real property, have been frozen for five years now.  The freezing order has forced

AHIF-Oregon to stop (1) using its funds to carry out its charitable operations; (2) engaging in

First Amendment advocacy on religious and related issues; and (3) assisting its followers and

members of the community with their religious devotions.  Further, AHIF-Oregon has been

substantially deprived of the right to defend itself from government and private accusations.  As

this Court recognized, "[AHIF-Oregon's] private interest is substantial. The effect of the

government's blocking and designation orders is effectively to close AHIF-Oregon's doors."

*AHIF*, 585 F. Supp. 2d at 1259.

The Supreme Court has upheld warrantless "special needs" searches only where the

intrusion is minimized, either because the affected party has consented to it or has a reduced

expectation of privacy, or because the duration and degree of the intrusion is minimal.  In

upholding drug testing of student athletes, the Court stressed that the intrusion was minimal

because:  students have a reduced expectation of privacy; in choosing to compete, student

athletes have consented to such searches; and the urine tests disclose only limited information,

*i.e.*, whether an individual has used specific drugs.  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S.

646, 654-57 (1995).  In contrast, the Ninth Circuit in *Redding v. Safford Unified Sch. Dist. # 1*,

531 F.3d 1071, 1087 (9th Cir. 2008), held that despite students' reduced expectations of privacy,

a strip search was too great a privacy intrusion for allegedly possessing ibuprofen, an analgesic.

Similarly, the Supreme Court has upheld searches of parolees and probationers on the

ground that they enjoy a reduced expectation of privacy, and have consented to the intrusions as

a condition on their freedom.  *United States v. Knights*, 534 U.S. 112, 120-21 (2001).  The Court

has also upheld warrantless administrative safety inspections of mines and drug testing of customs officials and railroad conductors, on the ground that those who work in these fields know that because of the heightened safety concerns implicated, they are subject to a higher degree of government regulation, and, therefore, have a reduced expectation of privacy.[3] Finally, the Court has upheld brief standardized stops at checkpoints to check for drunk drivers, because the stops were very brief, lasting at most a few minutes, and involved only a few simple questions. *Mich. Dept. of State Police v. Sitz*, 496 U.S. 444, 451-53 (1990).

This Court must find that the freeze authorized by IEEPA and imposed in this case on AHIF-Oregon cannot be compared to a two-minute auto stop, a limited drug test, or a routine safety inspection in a regulated industry. The IEEPA freeze authority is not limited to persons with reduced expectations of privacy, such as prisoners, students, or drug interdiction employees. It can be imposed on any citizen or entity in the United States, so long as the government can point to any foreign "interest," no matter its scope. The freeze immediately immobilizes *all* of the targeted entity's property and assets. And the freezes can last indefinitely. Never before has such an extraordinary intrusion on private interests been deemed "reasonable" without a warrant, no matter what the government interest at stake. And since the government's interest here – in stemming financing of terrorism – could just as easily be met with a warrant and probable cause requirement, the freeze authority cannot be deemed reasonable.

_____

[3] *Donovan v. Dewey*, 452 U.S. 594, 603-04 (1981) (upholding warrantless searches of mines, which are pervasively regulated such that "owner of such a facility cannot help but be aware that he 'will be subject to effective inspection'"); *Skinner*, 489 U.S. at 627-29 (upholding drug testing of train operators because of reduced expectation of privacy in heavily regulated industry); *Burger*, 482 U.S. at 707 (finding intrusion limited because of "reduced expectation of privacy" of automobile-junkyard operators); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989) (upholding drug testing of customs employees on ground that those "directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test").

    **3.**    **OFAC's Freeze Authority Contains No Adequate Substitute for the Fourth Amendment's Warrant Requirement as a Check on Executive Discretion.**

Finally, OFAC's freeze authority is unreasonable because it lacks an adequate substitute for the warrant requirement as a check on executive discretion. Where the government seeks an exception to the warrant and probable cause requirements under the "special needs" doctrine, the reasonableness inquiry focuses especially on the degree to which the scheme at issue imposes restraints that stand in for the warrant and probable cause requirements by cabining executive discretion. Thus, the Supreme Court has upheld standardized sobriety checkpoints, but not individualized automobile stops for the same purpose, since a standardization requirement reduces the risk of arbitrary enforcement. *See Prouse*, 440 U.S. at 654-55 ("In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'") (quoting *Camara*, 387 U.S. at 532)).

Similarly, the Supreme Court has upheld warrantless inventory searches conducted when an automobile is seized and brought into a police station, but only if the police department has a policy in place that establishes standardized procedures for the searches, to avoid the abuse of executive discretion. *Compare Colorado v. Bertine*, 479 U.S. 367, 375-76 (1987) (upholding inventory search where standardized procedures existed) *with Florida v. Wells*, 495 U.S. 1, 4-5 (1990) (inventory search violated Fourth Amendment because police lacked standardized procedures). And the Court has upheld drug testing where the testing scheme was systematically randomized, thereby eliminating the potential for an abuse of discretion. *Vernonia School District*, 515 U.S. at 654-57; *Skinner*, 489 U.S. at 622 (regulatory drug testing scheme valid due

to the "standardized nature of the tests and the minimal discretion vested in those charged with administering the program"); *see also Rise v. Oregon*, 59 F.3d 1556, 1562 (9th Cir 1995) (upholding taking of blood samples from inmates convicted of certain offenses under Fourth Amendment where "prison officials retain no discretion to choose which persons must submit blood samples").

IEEPA and the Executive Order, by contrast, contain no such safeguards.  IEEPA places no constraints on who the President can designate, and the President has delegated that authority to OFAC pursuant to extraordinarily expansive criteria that allow designation on the basis of wholly lawful activity, such as being owned by another designated person.  In addition, the authority to freeze pending investigation, employed at the outset of this case, requires OFAC to make no finding whatsoever.  Nor does IEEPA or the Executive Order establish any independent oversight that might serve the purpose of a warrant requirement. Yet the government's interests could be furthered fully adequately if IEEPA included a warrant and probable cause requirement.

In short, OFAC's freeze authority fails to satisfy the "special needs" exception for three reasons:  it cannot show that its needs render a warrant requirement impracticable; the intrusion authorized is substantial; and neither IEEPA nor the Executive Order create checks on executive discretion that constitute an adequate substitute check on executive discretion.

### C.    <u>The Correct Standard For a Freeze is Probable Cause.</u>

This Court also asked the parties to brief what standard of suspicion the Fourth Amendment requires for a freeze.  As shown above, absent any "closely guarded" and "carefully delineated" exceptions, a seizure of property presumptively requires probable cause and a warrant.  Because no exceptions apply here, the warrantless seizure of AHIF-Oregon's assets for

five years is presumptively unreasonable. Even if this Court were to find that a warrant was not required, probable cause would remain the appropriate standard for a reasonable seizure, given the extraordinary sweep of the freeze, immediately affecting *all* of an individual's or entity's property, and the fact that a freeze can be indefinite. If the government is to have the power to put charities out of business, at a minimum it must have probable cause of some wrongdoing to do so. Yet IEEPA requires nothing of the kind.

Probable cause is the appropriate standard for seizure of assets generally, including the freezing of bank accounts. In *Colello*, plaintiffs' Swiss bank accounts were frozen pursuant to a treaty between the United States and Switzerland that provided for "mutual assistance" based on "reasonable suspicion." *Colello v. U.S. Securities & Exchange Comm'n*, 908 F. Supp. 738, 753 (C.D. Cal. 1995). Plaintiffs challenged the constitutionality of the asset freeze, arguing that the government's failure to obtain a warrant rendered the seizure unreasonable. The government essentially argued for the equivalent of a "special needs" exception, *i.e.*, (1) plaintiffs "'assumed the risk' of depositing their money in a foreign country;" (2) "'traditional domestic investigatory methods' are relatively ineffective abroad;" and (3) "the public interest in combatting international crime and maintaining the integrity of the U.S. securities market justifies the lesser standard" of reasonable suspicion. *Id.* The court rejected these arguments, and in holding that probable cause was the appropriate standard for the warrantless seizure, noted that the "serious, urgent, and complex challenges facing law enforcement agencies . . . do not permit circumvention of the constitutional limitation on governmental power by treaty where legislation could not accomplish the same objective." *Id.* (citation omitted). Here, too, the serious and urgent concerns facing the government in defeating terrorism do not justify dispensing with the

Fourth Amendment's probable cause standard.

Both the Supreme Court and the Ninth Circuit have repeatedly held that the Fourth Amendment requires probable cause for warrantless seizures in both exigent and non-exigent circumstances, including IRS tax seizures, *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 355-59 (1977); *Flores v. United States*, 551 F.2d 1169, 1174 (9th Cir. 1977); seizure of pawnbroker merchandise, *Sanders v. City of San Diego,* 93 F.3d 1423, 1247 (9th Cir. 1996); *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1099-1101 (9th Cir. 1993); and seizures of vehicles for potential forfeiture.  *United States v. Kimak,* 624 F.2d 903, 905 n.3 (9th Cir. 1980); *United States v. Johnson*, 572 F.2d 227, 234 (9th Cir. 1978).

Similarly, in the civil forfeiture context, probable cause is mandated even where warrantless seizures are permissible, because they otherwise satisfy an exception to the Fourth Amendment.  18 U.S.C. § 981(b)(2) ("a seizure may be made without a warrant if -- there is probable cause to believe that the property is subject to forfeiture [plus additional conditions].").  In fact, the Ninth Circuit has suggested that a higher burden than probable cause, such as "clear and convincing evidence," might be required because forfeiture proceedings are "quasi-criminal" and because "[t]he interests at stake are deemed to be more substantial than mere loss of money."  *See United States v. $49,576 U.S. Currency*, 16 F.3d 425, 428-29 (9th Cir. 1997).  Where, as here, the government is not merely seizing a piece of property, but the entirety of an individual's assets, anything less than probable cause would be wholly unreasonable.

The Supreme Court has permitted intrusions on privacy or property on the lower standard of reasonable suspicion <u>only</u> where the intrusion is limited to a brief and sharply curtailed intrusion.  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Court permitted brief stops and pat-down

frisks based on a showing of reasonable suspicion that crime is afoot and that the suspect may be armed. But a *Terry* stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (citations omitted). For example, when police held a traveler's luggage for 90 minutes, the Supreme Court held that the bounds of the *Terry* stop were exceeded, and the seizure was unreasonable absent probable cause. *United States v. Place*, 462 U.S. 696, 709-10 (1983). If a 90-minute seizure of a piece of luggage requires probable cause, then *a fortiori* an indefinite freeze of an entity's every asset, which has lasted already for *five years*, certainly requires no less.

    **D.**    <u>**The Appropriate Remedy Is to Vacate the Freeze and Designation.**</u>

The remedy for OFAC's violation of AHIF-Oregon's Fourth Amendment rights is an order lifting the freeze. A seizure in violation of the Fourth Amendment would ordinarily call not only for return of the object, but also the more radical remedy of suppression of that evidence from any criminal prosecution. *Herring v. United States*, 555 U.S. __, 129 S. Ct. 695, 700 (2009); *United States v. Calandra*, 414 U.S. 338, 348 (1974).

The principle that unconstitutionally seized property should be returned is reflected throughout federal law. In the forfeiture context, 28 U.S.C. § 2465(a)(1) and 18 U.S.C. § 983(f) both require return of property not subject to forfeiture to the owner. Property seized in violation of the Constitution is returned to the owner, and in the case of rental properties, the government has been required to compensate the owner for damages resulting from the illegal seizure. *See United States v. 6380 Little Canyon Rd.*, 59 F.3d 974, 981 (9th Cir 1995); *United States v. Real Prop. Located at Incline Village*, 958 F. Supp. 482, 493 (D. Nev. 1997).

Similarly, under Rule 41(g) of the Federal Rules of Criminal Procedure, "A person

aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return," and if the court "grants the motion, the court must return the property to the movant."  The Ninth Circuit has described Rule 41(g) (formerly Rule 41(e)) as the "functional equivalent of a motion to suppress because the rule provides that any property is returned."  *DeMassa v. Nunez*, 747 F.2d 1283, 1286 (9th Cir. 1984).  The Ninth Circuit has also recognized an inherent " power to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant."  *Ramsden v. United States,* 2 F.3d 322, 324 (9th Cir. 1993); *see also Meier v. Keller,* 521 F.2d 548, 554 (9th Cir. 1975).

Only ordering the unfreezing of AHIF-Oregon's property and assets would halt the constitutional violation.  It would not foreclose the government from acting in lawful ways, *i.e.*, proceeding under the civil forfeiture statute, or under an amended IEEPA authority that satisfied constitutional constraints.  Therefore, AHIF-Oregon's assets should be unfrozen.

### III.    This Court Should Order OFAC to Release $108,834.32 in AHIF-Oregon's Blocked Funds for the Payment of Attorneys' Fees.

The proper remedy for OFAC's refusal to allow AHIF-Oregon to use any of its own frozen funds for attorneys' fees associated with challenging its designation and redesignation would be to order OFAC to release the following frozen funds for payment of AHIF-Oregon's attorneys' fees:  (1) the $28,000 that OFAC's fee policy generally permits, but which it arbitrarily denied in this case; and (2) 80% of the remaining unpaid fees incurred, or $80,834,52, because most of AHIF-Oregon's attorneys' fees that were incurred arose as a result of OFAC's unconstitutional failure to provide AHIF-Oregon with notice of the grounds of its potential designation and redesignation, and by effectively doing the process twice – once before AHIF-Oregon filed this suit, and again after its actions were subjected to a legal challenge.

This Court held that OFAC's refusal to allow AHIF-Oregon to pay its attorneys any money out of its own frozen funds was arbitrary and capricious for two reasons.  First, it held that OFAC's denial of fees on the grounds that AHIF-Oregon had already been paid from fresh, overseas funds, was arbitrary and capricious, in that OFAC was impermissibly engaging in bait-and-switch tactics by encouraging an entity to seek overseas funding and then using that funding to deny it the use of its own blocked funds, while allowing other entities "to seek fees from OFAC first and then seek fees from other sources later."  *AHIF*, 585 F. Supp. 2d at 1272. Second, it held that enforcing OFAC's general limits – $7,000 each for two attorneys for each of the two stages of the litigation, for a total of $28,000 – was arbitrary and capricious in this case "because OFAC caused the run-up in legal expenses in the administrative and judicial proceedings by not giving AHIF-Oregon a statement of the charges it faced when OFAC was considering designating it [in 2004], and by redesignating it in the midst of this litigation."  *Id.*

The remedy should also be two-fold.  First, this Court should order OFAC to allow AHIF-Oregon to access the $28,000 that OFAC's fee policy would generally allow, because this Court found that OFAC's denial of that amount on the grounds that AHIF-Oregon had already been paid from fresh, overseas funds was arbitrary and capricious.

Second, this Court should allow AHIF-Oregon to access its frozen funds to pay 80% of the remaining outstanding fees and expenses as of the time this Court issues its decision.  This figure reflects the fact that the vast majority of the work AHIF-Oregon's attorneys had to do was caused by OFAC's conduct in failing to notify it of the grounds for its designation actions, and in essentially re-doing the designation in response to this lawsuit challenging the legality of the initial designation.  *See* Declaration of Alan Kabat, at ¶ 6 (Feb. 16, 2009) (attached and

incorporated hereto as Exhibit 3).  While it is not possible to calculate precisely the amount of time AHIF-Oregon's attorneys were forced to spend because of OFAC's unconstitutional and duplicative tactics, it is fair to say that most of the work was necessitated by OFAC's actions, so that 80% is a reasonable, good-faith estimate.  *Id.*  Had OFAC told AHIF-Oregon what was at issue, instead of hiding the ball, AHIF-Oregon's attorneys could have focused their efforts on responding to those charges in particular, and it is possible that this litigation would not have been required at all.  *Id.*  Instead, they were forced to devote substantial time and resources to responding to issues that OFAC only told them were *not* at issue *after* the lawsuit was filed.  And once the lawsuit was filed, OFAC radically changed course, effectively starting over again and redesignating AHIF-Oregon, changing the factual basis, and, quite possibly, its legal rationale for its designation in doing so, and *still* not notifying of AHIF-Oregon what was at stake until *after* it had been redesignated.  Finally, OFAC also altered its attorneys' fee policy at the last minute, only after AHIF-Oregon challenged it in this lawsuit.  *Id.*

Given the breadth of OFAC's actions, which caused the vast majority of the time counsel has had to spend challenging OFAC's decisions, AHIF-Oregon should be permitted to access its frozen funds to pay 80% of its outstanding attorneys' fee bill as of the time this Court issues its decision.  *See* Kabat Decl. (Ex. 3), at ¶¶ 4-5; Declaration of J. Ashlee Albies, at ¶¶ 1-3 (Feb. 13, 2009) (attached and incorporated hereto as Exhibit 4); Declaration of David Cole, at ¶¶ 1-3 (Feb. 13, 2009) (attached and incorporated hereto as Exhibit 5).  Moreover, the time and fees that AHIF-Oregon's counsel have spent on this litigation are eminently reasonable, as shown by comparison to the time incurred for other designation challenges, in which comparable or larger amounts of attorney time were required.  *See* Kabat Decl. (Ex. 3), at ¶¶ 7-8 & Att. B-C.

The hours and unreimbursed fees and expenses thus far, through January 2009, are as follows:

| Attorney | Hours | Unreimbursed Fees and Expenses |
|---|---|---|
| Ashlee Albies | 92.05 | $18,410.00 |
| Bernabei & Wachtel | 734.55 | $79,627.50 |
| David Cole | 138.70 | $31,005.65 |
| **Total** | **965.30** | **$129,043.15** |
| minus $28,000 OFAC fee policy amount | | **$101,043.15** |
| **80% amount to be reimbursed** | | **$80,834.52** |

The hours set forth above represent an update to AHIF's fee petition, *see* Pls. Notice (Doc. 83) (Aug. 6, 2008), which only provided the time for Bernabei & Wachtel through March 31, 2008.[4]  Counsel will update these numbers after the briefing on this issue is completed.

Thus, this Court should require OFAC to release AHIF-Oregon's blocked funds, so that AHIF-Oregon may use those funds to pay its attorneys the sums of $28,000.00 and $80,834.52, for a total of $108,834.52 in unreimbursed attorneys' fees and expenses, as updated through the completion of briefing.

---

[4] As explained in earlier filings, Bernabei & Wachtel agreed with their client, AHIF-Oregon, to charge a substantially reduced rate of $100 an hour in view of OFAC's ban on the use of frozen funds, but also agreed that if that ban were successfully challenged, they would be entitled to a still reduced rate of $250 an hour.  *See* Kabat Decl. (Ex. 3), at ¶¶ 4-5.  Hence, Bernabei & Wachtel is only seeking the $150/hour difference between what they have been paid (at $100/hour) and their reduced rate ($250/hour). *Id.*

IV.    **CONCLUSION.**

This Court should find that defendants' violation of AHIF-Oregon's due process rights by failing to provide notice of the factual and legal bases for its designation and redesignation is a structural defect that is not a mere harmless error, so that the appropriate remedy for this constitutional violation is vacation of the designation and redesignation.

This Court should further find that OFAC's seizure of AHIF-Oregon's assets for five years violated the Fourth Amendment, since it was unreasonable in the absence of probable cause and a warrant, and because OFAC's freeze authority lacks any adequate substitution for the Fourth Amendment's warrant requirement, so that the appropriate remedy is to vacate OFAC's freeze and designation.

Finally, this Court should find that the appropriate remedy for OFAC's arbitrary and capricious acts in failing to provide notice and in misleading AHIF-Oregon into seeking overseas funding, is to order that AHIF-Oregon be entitled to payment of its attorneys' fees from its blocked assets, both the $28,000 amount under OFAC's fee policy and $80,834.52, representing 80% of AHIF-Oregon's remaining unreimbursed attorneys' fees, for a total of $108,834.52.

Respectfully submitted this <u>16th</u> day of February 2009.

/s/ David Cole

_____

David Cole, DC Bar No. 438355
  (202) 662-9078
Thomas H. Nelson, OSB No. 78315
  (503) 622-3123
J. Ashlee Albies, OSB No. 05184
  (503) 221-1791
Lynne Bernabei, DC Bar No. 938936
Alan R. Kabat, DC Bar No. 464258
  (202) 745-1942
*Attorneys for Plaintiffs*

**<u>Certificate of Service</u>**

Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 100.1(b), 100.2(c), and 100.7(a), I certify that a copy of the foregoing Plaintiffs' Supplemental Memorandum was served on counsel for defendants by this Court's Electronic Case Filing system, this <u>16th</u> day of February 2009.

/s/ Alan R. Kabat
_____
Alan R. Kabat, DC Bar No. 464258
Attorney for Plaintiffs