IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AL HARAMAIN ISLAMIC FOUNDATION,       )
INC., AND MULTICULTURAL ASSOCIATION   )
OF SOUTHERN OREGON,                   )
                                      )
                  Plaintiffs,         )       Civil Case No. 07-1155-KI
                                      )
         vs.                          )       OPINION AND ORDER
                                      )
UNITED STATES DEPARTMENT OF THE       )
TREASURY, TIMOTHY GEITHNER,           )
OFFICE OF FOREIGN ASSETS CONTROL,     )
ADAM J. SZUBIN, UNITED STATES         )
DEPARTMENT OF JUSTICE, AND ERIC H.    )
HOLDER,                               )
                                      )
                  Defendants.         )
_____  )

        Thomas H. Nelson
        P. O. Box 1211, 24525 E. Welches Road
        Welches, Oregon  97067

        J. Ashlee Albies
        815 SW Second Avenue, Suite 500
        Portland, Oregon  97204

Page 1 - OPINION AND ORDER

David D. Cole
c/o Georgtown University Law Center
600 New Jersey Avenue, N. W.
Washington, D. C.  20001

Lynne Bernabei
Alan R. Kabat
Bernabei & Wachtel, PLLC
1775 T Street, N. W.
Washington, D. C.  20009-7124

   Attorneys for Plaintiffs

Jeffrey S. Bucholtz
Jonathan Eli Zimmerman
Eric Joseph Beane
Sandra M. Schraibman
Anthony J. Coppolino
U. S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N. W.
Washington, D. C.  20001

   Attorneys for Defendants


KING, Judge:

  Plaintiffs Al Haramain Islamic Foundation, Inc., an Oregon corporation ("AHIF-

Oregon"[1]), and Multicultural Association of Southern Oregon ("MCASO") challenge the

determination that AHIF-Oregon is a Specially Designated Global Terrorist ("SDGT").  They

also challenge the blocking order freezing AHIF-Oregon's assets pending that determination, an

order which was finalized with the designation.  They have sued the United States Department of

---

  [1] I refer to plaintiff Al Haramain Islamic Foundation, Inc. as AHIF-Oregon throughout
this opinion to distinguish it from the world-wide organization of the Al Haramain Islamic
Foundation headquartered in Saudi Arabia, which I refer to as AHIF or AHIF-SA.

the Treasury, the Office of Foreign Assets Control ("OFAC'), the United States Department of

Justice, and individuals associated with those agencies,[2] alleging violations of the Due Process

Clause and the Fourth Amendment, and challenging AHIF-Oregon's designation under the

Administrative Procedures Act ("APA") and raising constitutional and statutory challenges to the

asset seizure statute itself.  I previously ruled on portions of the cross-motions for summary

judgment, but deferred ruling on several issues (## 36, 60) and requested additional briefing.  Al

Haramain Islamic Found., Inc. v. U.S. Dept. of the Treasury, 585 F. Supp. 2d 1233 (D. Or. 2008)

("AHIF").  I have now reviewed the supplemental briefing, in addition to cases decided

subsequent to AHIF.  I also have before me MCASO's Request for Clarification.

## BACKGROUND

As set out in more detail in AHIF, OFAC concluded, pursuant to the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, and its associated executive

order, Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ("E.O. 13,224"), that AHIF-

Oregon is "owned or controlled" by SDGTs and that it provided financial, material, or other

support to SDGTs as a branch office of the larger AHIF organization headquartered in Saudi

Arabia.  I first summarize the pertinent statutory and regulatory authority under which OFAC

acted, which I have set out more fully in AHIF.  Next, I highlight the relevant factual background

of AHIF, AHIF-Oregon, and the individuals believed by OFAC to "own" or "control" AHIF-

Oregon.  Finally, I discuss the remaining issues left for me to resolve.

---

[2] OFAC is a component of the United States Department of the Treasury.  The Court
substitutes Timothy Geithner, Secretary of the Treasury, and Eric H. Holder, Attorney General,
for former Treasury Secretary Henry M. Paulson and former Attorney General Alberto R.
Gonzales.

I.      Legal Framework

Pursuant to the IEEPA, President George H.W. Bush issued an executive order declaring a national emergency[3] on September 23, 2001 due to the events of September 11.  He authorized the Secretary of the Treasury to block contributions of funds, goods or services "to or for the benefit of" the 27 individuals and entities he listed in an annex to the executive order.  E.O. 13,224.

In that executive order, the President also delegated authority to the Secretary of Treasury to designate other foreign groups or individuals who have committed or who pose a risk of committing acts of terrorism, or who are "owned or controlled by, or . . . act for or on behalf of those" entities designated by the President or those subsequently designated by the Secretary of Treasury.  E.O. 13,224 at §§ 1(b) and (c).  Finally, the President delegated authority to the Secretary of Treasury to designate entities who "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism" or provide support for "those persons" designated by the President or by the Secretary of Treasury, or for being "otherwise associated" with a designated entity.  Id. at §§ 1(d)(i) and (ii).  According to the order, the Secretary of Treasury may utilize his designation authority only after consulting with the Secretary of State and the Attorney General.  The entities designated by the President or by the Secretary of Treasury are referred to as SDGTs.[4]

---

[3] Pursuant to the IEEPA, the President may declare a national emergency to "deal with any unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]"  50 U.S.C. § 1701(a).

[4] See 31 C.F.R. § 594.310 (SDGT defined to mean "any foreign person or persons listed in the Annex or designated pursuant to Executive Order 13224 of September 21, 2001").

Pursuant to the IEEPA, the President may

investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B).

The President authorized the Secretary of the Treasury to issue regulations to implement the executive order and to redelegate those functions if necessary. Pursuant to regulations issued by OFAC, a designated entity may seek a license to engage in any transaction involving blocked property. 31 C.F.R. §§ 501.801-.802. Such an entity may also seek "administrative reconsideration" of a designation. 31 C.F.R. § 501.807.

The IEEPA and regulations implementing the executive order specify criminal and civil penalties for violations of licenses, rulings, regulations, or orders. 50 U.S.C. § 1705; 31 C.F.R. § 594.701.

II.    <u>Factual Background</u>

OFAC froze AHIF-Oregon's assets and property on February 19, 2004, pending investigation. It was not until February 6, 2008, when OFAC "redesignated" AHIF-Oregon as an SDGT, thereby finalizing the blocking order, that AHIF-Oregon received a comprehensive explanation for the blocking order. OFAC redesignated AHIF-Oregon because it believed AHIF-Oregon is "owned or controlled" by Soliman H.S. Al-Buthe and Aqeel Al-Aqil, or acted on behalf of them. In addition, OFAC reported that, "As a branch of the Saudi charity Al-Haramain Islamic Foundation, [AHIF-Oregon] had acted for or on behalf of, or has assisted in, sponsored,

Page 5 - OPINION AND ORDER

or provided financial, material, or technological support for, or financial or other services to or in

support of Al Qaida and other SDGTs."  AR1899.

Accordingly, AHIF-Oregon's relationship to the world-wide organization of the Al

Haramain Islamic Foundation that was headquartered in Saudi Arabia ("AHIF" or "AHIF-SA") is

central to the government's justification for designating AHIF-Oregon.  AHIF-SA was a Saudi

Arabian-based charity that at one point purportedly operated in fifty countries, with an annual

budget of between $30 and $80 million.  In addition to charitable activities, AHIF-SA was

involved in terrorist operations.  I specifically outlined many such activities in AHIF, including

that it was involved in terrorist activities as far back as the attacks against the Kenyan and

Tanzanian U.S. Embassies in 1998.  In fact, AHIF-SA was named in the 9-11 Commission's

Staff Report on Terrorist Financing, published in 2004, as an organization that supported al

Qaeda[5] and related terrorist groups.  AHIF-SA was not designated until June 19, 2008, near the

end of the deadline for the briefing on the parties' cross-motions for summary judgment, but

many of its branch offices were designated between 2002 and 2004.

Soliman H.S. Al-Buthe, a Saudi national, was an AHIF-SA official, primarily responsible

for AHIF-SA's internet and charitable works in the United States.  He helped found AHIF-

Oregon.  Aqeel Al-Aqil, also a Saudi national, was the Director of AHIF until he was purportedly

removed in January of 2004.  He was also one of the founders of AHIF-Oregon.

Just after freezing AHIF-Oregon's assets in February of 2004, OFAC issued a press

release explaining it had blocked AHIF-Oregon's assets "to ensure the preservation of its assets

---

[5]Al Qaeda appears to be the preferred spelling.  See
http://en.wikipedia.org/wiki/Al-Qaeda.

pending further OFAC investigation." AR0200. It described AHIF-Oregon's "parent" as being headquartered in Saudi Arabia, and described OFAC's other blocking actions against the AHIF branches in Bosnia, Somalia, Indonesia, Tanzania, Kenya, and Pakistan. Id.

OFAC provided unclassified documents to AHIF-Oregon in April 2004, asserting that it was considering designating AHIF-Oregon as an SDGT on the basis of that information as well as classified documents it did not disclose. OFAC provided no further explanation at that time for its belief that AHIF-Oregon might qualify as an SDGT.

AHIF-Oregon responded to the documents OFAC provided, believing that, on the basis of these records, OFAC was targeting it for distributing the Koran to prisoners and others, and for raising funds for Chechen refugees.

OFAC mailed a supplemental record on July 23, 2004, which included documents about AHIF-SA and its branches, newspaper articles about jihad in Chechnya and Saudi financial support for Chechen fighters, as well as newspaper articles about terrorism in Africa, Asia and Europe. AHIF-Oregon objected to inclusion of documents related to AHIF-SA because it asserted it had no control over it and had no relationship with its branches. AHIF-Oregon also submitted documentation to show that Russia supported its efforts in Chechnya.

OFAC provided additional documents on August 20, 2004.

On September 9, 2004, OFAC designated AHIF-Oregon and its director Al-Buthe as SDGTs under the criteria of 1(c)–the "owned or controlled" provision–and (d)–the "support" provision–without giving any further reasoning in the designation letter. AR2031. It issued a press release which reported "[t]he investigation shows direct links between the U.S. branch and Usama bin Laden," mentioned allegations of criminal violations of tax laws, and mentioned Al-

Aqil and the fact that he had been previously designated, but did not state that Al-Aqil owns or

controls AHIF-Oregon.  AR 1872.  The press release also noted suspected financing of Chechen

mujahideen and the designations of other branches of AHIF.

In November 2007, approximately three months after plaintiffs commenced this lawsuit,

OFAC notified AHIF-Oregon and Al-Buthe that it was considering redesignating them.  It

provided unclassified documents, including translations of Russian and Arabic newspapers from

2000 to 2004, that it had not provided earlier.

It was not until February 2008 that OFAC finally gave AHIF-Oregon a comprehensive

explanation for the designation and blocking order.  OFAC redesignated AHIF-Oregon because it

believed AHIF-Oregon is "owned or controlled" by Soliman H.S. Al-Buthe and Aqeel Al-Aqil,

or acted on behalf of them.  OFAC also concluded that because AHIF-Oregon was a branch of

the AHIF-SA, "it had acted for or on behalf of, or has assisted in, sponsored, or provided

financial, material, or technological support for, or financial or other services to or in support of

Al Qaida and other SDGTs."  AR1899.

I found in AHIF that OFAC had insufficient evidence showing Al-Aqil retained

ownership or control over AHIF-Oregon after he resigned from AHIF-Oregon's Board of

Directors in 2003.

In contrast, I found substantial evidence of Al-Buthe's ownership or control over AHIF-

Oregon at the time of the designation and redesignation.  Al-Buthe was one of the founders of

AHIF-Oregon, is listed as its Treasurer on AHIF-Oregon's tax return, and has not resigned from

its Board of Directors to this day, nor has AHIF-Oregon removed him.  Prior to AHIF-Oregon's

designation, Al-Buthe signed contracts for AHIF-Oregon and was one of only two individuals

with access to its bank account.  He raised funds from Saudi-Arabian sources for AHIF-Oregon

and disbursed those funds to AHIF-Oregon.  I found that, unlike Al-Aqil, AHIF-Oregon and Al-

Buthe never severed ties.  See Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C.

Cir. 2007) ("IARA") ("genesis and history" may be considered "at least where ties have not been

severed.").

OFAC designated Al-Buthe for serving as a senior AHIF-SA official.  I concluded there

was sufficient evidence in the administrative record to support OFAC's determination that AHIF-

SA supported SDGTs and terrorist activities and that Al-Buthe participated as a senior AHIF-SA

official.  This evidence refuted plaintiffs' assertion that AHIF-Oregon was designated for its

association with Al-Buthe, and that Al-Buthe had been designated for his association with AHIF-

Oregon.

Furthermore, I concluded that there is sufficient evidence in the classified and

unclassified record demonstrating that AHIF-Oregon supported SDGTs as a branch of AHIF.

AHIF-Oregon had not attempted to separate itself from the larger organization, and had not

sought delisting under OFAC's regulations.  It was founded with money from the larger

organization, identified itself with the same name as the larger organization, and its Board of

Directors significantly overlapped with the leadership of the larger organization.

Additionally, AHIF-Oregon and AHIF-SA had a close financial relationship.  On at least

one occasion, AHIF-Oregon supported AHIF-SA financially.  The combination of circumstances

surrounding Al-Buthe's personal delivery of over $150,000 to AHIF-SA from AHIF-Oregon's

bank account in March 2000 could reasonably be construed by OFAC as evidence of financial

support for terrorist activities.  The donor intended the money to be used for "our muslim

brothers in Chychnia," and Al-Buthe personally transported the money in travelers' checks and a

cashier's check rather than wiring the money and avoiding fees, at a time when AHIF-SA's

website carried articles supportive of Chechen mujahideen and a link through which funding

could be provided to the mujahideen.  AR 1059.  Indeed, photographs of mujahideen leaders

were found at AHIF-Oregon's office in 2004, well after the donation, along with passports

belonging to deceased Russian soldiers, a map noting the location of mujahideen military battles,

videos showing violence against Russian soldiers by mujahideen in Chechnya, and photographs

of deceased mujahideen and Russian soldiers.[6]

Based on my review of the classified and unclassified record, I concluded that the

government was entitled to summary judgment on AHIF-Oregon's Counts I, V and VII of the

Supplemental Complaint, finding that the designation and redesignation were supported by

substantial evidence.

I also dismissed Count IV (designation/redesignation based on interference with attorney-

client privileged communications), Count VI (designation criteria, as applied to AHIF-Oregon,

are vague and overbroad), and Count IX (violation of MCASO's First Amendment rights).  I held

that MCASO is entitled to judgment on Count X as to the vagueness of the term "material

support," but dismissed the remainder of that count with prejudice.

_____

[6] Then-Secretary of State Colin Powell designated three Chechen organizations as
terrorist groups in February of 2003 pursuant to Exec. Order 13,224.  The organizations were
"responsible for committing numerous acts of terrorism in Russia, including hostage-taking and
assassination, that have threatened the safety of U.S. citizens and U.S. national security or
foreign policy interests."  AR0713.

I deferred ruling on AHIF-Oregon's claim under the Due Process Clause (Count II), its claim under the Fourth Amendment (Count VIII), and its claim regarding attorneys' fees (Count III).

**DISCUSSION**

The issues remaining in the case are: (1) whether the due process violation AHIF-Oregon suffered is harmless; (2) whether OFAC's seizure of assets falls within an exception to the Fourth Amendment's warrant and probable cause requirements; (3) whether AHIF-Oregon is entitled to attorneys' fees; and (4) whether the regulatory prohibition on providing "services" "on behalf of or for the benefit of" a designated entity is vague in violation of the MCASO's Fifth Amendment rights, an issue raised in MCASO's Request for Clarification.

I.    The Violation of AHIF-Oregon's Due Process Rights was Harmless

Although I held in AHIF that AHIF-Oregon was properly redesignated as an SDGT for its relationship with Al-Buthe and AHIF, as I summarized above, I concluded that the government violated AHIF-Oregon's due process rights in delaying its notice to AHIF-Oregon about the reasons for contemplating a designation action. I held in AHIF that OFAC's September 9, 2004 designation represented the culmination of the investigation of AHIF-Oregon and finalization of the February 2004 blocking order. The notice to AHIF-Oregon contained in the September 2004 letter and press release came too late to constitute notice for purposes of the Due Process Clause. At that point, the administrative record had been closed and AHIF-Oregon had no further opportunity to persuade OFAC to come to a different decision, absent a request for

reconsideration.[7]  I concluded that AHIF-Oregon was entitled to post-deprivation notice, after the

February 2004 blocking order, without "unreasonable delay," and certainly before the September

9, 2004 designation finalizing the blocking order.    AHIF, 585 F. Supp. 2d at 1255 (citing Gete

v. I.N.S., 121 F.3d 1285, 1296 (9th Cir. 1997) (analyzing due process in a civil forfeiture

proceeding)).

    Additionally, even if the September 9, 2004 designation letter and press release could

serve as notice, for purposes of the redesignation process, it did not give AHIF-Oregon the

reasons for the designation in the kind of detail required by the Due Process Clause.  Indeed, the

designation letter and press release were somewhat deficient in alerting AHIF-Oregon as to how

it should defend the possible redesignation.  The designation letter stated only that AHIF-Oregon

"falls within the criteria for designation set forth in the [Executive] Order at § 1(c)-(d)," without

explaining why.  AR2031.  The press release neglected to mention § 1(c)–the "owned or

controlled" provision–as a basis for the designation at all.  Many of the reasons identified in the

press release were not repeated in the redesignation or were not proper concerns under the statute

or executive order.  For example, the press release stated, "The investigation shows direct links

between the U.S. branch and Usama bin Laden," a statement which is not supported by the

record and was not repeated in support of the redesignation.  AR 1872.  The press release

mentioned the allegations of criminal violations of tax laws, which is not a basis for designation.

The press release discussed Al-Aqil but did not expressly state that Al-Aqil owned or controlled

---

[7]OFAC is under no obligation to consider a request for reconsideration in a timely
manner.  It took OFAC three years to evaluate AHIF-Oregon's request.

AHIF-Oregon.  In fact, AHIF-Oregon only correctly suspected that its donation of funds to Chechnya was at issue and that OFAC may be disturbed by the activities of other AHIF branches.

OFAC again failed to give any explanation along with its notification to AHIF-Oregon that it was evaluating whether to redesignate the organization.  It was not until February 2008 when OFAC redesignated AHIF-Oregon that it finally gave a comprehensive explanation for AHIF-Oregon's SDGT status.  OFAC gave the notice four years after AHIF-Oregon's assets had been frozen, three years after its initial designation, six months after AHIF-Oregon filed this lawsuit, and after AHIF-Oregon's right to add to and complete the administrative record had ended.  OFAC did not explain why it could not have given this notice earlier.

In its February 2008 redesignation letter, OFAC informed AHIF-Oregon that the distribution of the Koran was not a basis for the September 2004 designation.  Instead, it redesignated AHIF-Oregon for being owned or controlled by Al-Aqil and Al-Buthe, and that as "an active arm" of AHIF, "including its direct provision of funding to AHIF in Saudi Arabia," AHIF-Oregon allowed AHIF to "continue supporting terrorist activities."  AR2198-99.

Despite the government's unconstitutional notice, I concluded that the question is whether I can say "any due process violation was harmless beyond a reasonable doubt." Tennessee Secondary School Athletic Ass'n v. Brentwood Academy, 551 U.S. 291, 303 (2007). I requested additional briefing from the parties on this question,  instructing the parties to consider my conclusion that OFAC's redesignation was rational and supported by substantial evidence.

A.    The Due Process Violation Was Not a Structural Error

AHIF-Oregon contends the due process violation was a structural error, along the lines of giving the jury an incorrect reasonable doubt instruction, excluding individuals from the jury on the basis of race, denying a public trial, denying the right to self-representation, denying assistance of counsel, admitting an improperly obtained confession, or having a biased judge preside over the trial. See Pls.' Supp. Mem. at 4 n.1 (collecting cases). AHIF-Oregon likens its experience to a criminal trial without an indictment or a civil trial without a complaint.

A structural error is defined as "an error that permeate[s] the entire conduct of the trial from beginning to end or affect[s] the framework within which the trial proceeds." M.L. v. Federal Way Sch. Dist., 394 F.3d 634, 646 (9th Cir. 2005) (quoting United States v. Recio, 371 F.3d 1093, 1102 (9th Cir. 2004)). To separate structural from harmless errors, courts consider whether the error is one in "the constitution of the trial mechanism" as opposed to one occurring "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented." Recio, 371 F.3d at 1101 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-309 (1991)).

I do not view this due process violation as so serious that I could say it permeated and undermined the entire designation process. A structural error would perhaps exist in the situation where OFAC froze an organization's assets and failed to issue any press releases or provide any documents. Here, however, AHIF-Oregon was given some idea of the reasons for the government's blocking order, pending investigation, in February of 2004. OFAC provided unclassified documents to AHIF-Oregon in April 2004, asserting that it was considering designating AHIF-Oregon as an SDGT on the basis of that information, along with classified

Page 14 - OPINION AND ORDER

information it did not disclose.  The fact that AHIF-Oregon was aware that providing funds to

Chechnya might be of concern to the agency, and that AHIF-Oregon knew its relationship to the

larger organization, which funded terrorism, was of concern, gave it at least some insight into the

agency's rationale.  Additionally, it was told it may be in violation of the IEEPA.  In other words,

it had some of the factual reasons and the general legal authority for the blocking order and the

proposed designation.  As a result, the error falls more in line with one that "may . . . be

quantitatively assessed in the context of other evidence presented."  Id.  The court can consider

whether what AHIF-Oregon contends it would have submitted could outweigh the evidence in

the record supporting the designation.

Furthermore, AHIF-Oregon's suggestion that it was like a criminal defendant without an

indictment is unpersuasive.  Contrary to AHIF-Oregon's suggestion that I should be persuaded by

cases such as Stirone v. United States, 361 U.S. 212, 215-18 (1960) and Cole v. Arkansas, 333

U.S. 196, 201 (1948), involving the criminal defendant's constitutional right to be tried on

charges identified in an indictment, I note that this is not a criminal case nor does the Fifth

Amendment right to be tried only for crimes identified in an indictment apply in the civil,

administrative context.  In fact, even in criminal cases, "most constitutional errors can be

harmless."  See Arizona v. Fulminante, 499 U.S. at 306-07 (Rehnquist, J., concurrence joined by

majority) (collecting cases).  In short, the doctrine is reserved for the most serious constitutional

violations.  See M.L., 394 F.3d at 654 ("Structural errors are the 'exception and not the rule' and

noting no precedent for structural errors in civil cases in the Ninth Circuit (quoting Rose v. Clark,

478 U.S. 570, 578 (1986) (Gould, J., concurrence, joined by Clifton))).

Page 15 - OPINION AND ORDER

I conclude that the due process violation was not a structural error.

B.    The Due Process Violation Was Harmless

The government bears the burden of proving that the due process error is harmless

beyond a reasonable doubt.  The purpose of the "harmless error standard" is to "avoid 'setting

aside convictions for small errors or defects that have *little, if any, likelihood of having changed*

*the result of the trial*,' because reversal would entail substantial social costs."  United States v.

Annigoni, 96 F.3d 1132, 1143 (9th Cir. 1996) (quoting Chapman v. California, 386 U.S. 18, 22

(1967) (emphasis in Annigoni)).

AHIF-Oregon asserts that it would have changed its strategy with regard to its

investigation of the facts, the information it presented to OFAC, and how it and its board

members behaved.  AHIF-Oregon contends specifically that if it had known Al-Buthe's

ownership and control were at issue, it would have challenged his designation and he would have

resigned from the board.  It also argues it would have provided evidence demonstrating it had

never had any interactions with al Qaeda or other SDGTs, that its money never went to an

SDGT, and that it had no control or involvement over AHIF-SA's activities.  AHIF-Oregon

argues that, because it had no knowledge of what was at issue, my decision to uphold the

redesignation was based on an incomplete administrative record.

The government responds by suggesting that the redesignation corrected any due process

violation.  In AHIF, I described the redesignation notice as a "lengthy explanation" and

questioned why OFAC could not have issued such an explanation as a proposed decision just

after the blocking order.  585 F. Supp. 2d at 1257.  Such a comprehensive notice would have

provided AHIF-Oregon with the facts and law and would have given it the opportunity to

respond to OFAC's concerns in a knowing and intelligent way.  I disagree with the government, however, that the redesignation cured the earlier deficient notice.  The redesignation itself came too late to provide the requisite notice to AHIF-Oregon; the administrative record was closed upon issuance of the redesignation.  Furthermore, the redesignation *process*, culminating in the redesignation determination, might have been a cure for the earlier lack of notice had OFAC provided sufficient notice of what issues were of concern.  For example, had the initial designation itself provided AHIF-Oregon with all the reasons for the designation, the redesignation *process* would have been more meaningful.  As I explained in some detail in AHIF, however, the press release issued with the initial designation contained comments not supported by the administrative record, contained improper grounds for designation, and did not expressly connect Al-Aqil and AHIF-Oregon, or AHIF-Oregon and the other branches.  Thus, while the designation contained some of the rationale that in the end makes the due process violation harmless, as I explain below, the redesignation by no means cures the due process violation.

As for whether the due process violation was harmless, the government maintains its earlier position that the documents it provided AHIF-Oregon gave the organization the necessary notice.  It contends it highlighted the provisions of the executive order that it was most concerned about.  It also suggests that AHIF-Oregon's participation in the administrative and district court proceedings demonstrates that any error was harmless.

The question for me is whether AHIF-Oregon would have presented something different that would have changed OFAC's decision or would have made me find the redesignation to be arbitrary and capricious.  After careful review of the record and AHIF-Oregon's briefing, the

answer is no.  I find that any due process violation was harmless.  As a result of the records

OFAC provided to AHIF-Oregon, as well as the initial designation, the organization was aware

that its provision of funds to Chechnya was of concern to the agency.  It submitted a lengthy

explanation for that conduct.  Similarly, it knew that its relationship to the larger organization

was at issue and in its responses to the agency it attempted to minimize that relationship.  AR

424.

AHIF-Oregon contends that had it known Al-Buthe's membership on the board was

problematic, he would have resigned.  Al-Buthe's resignation would not have changed the

outcome, however.  I upheld the organization's designation on the "owned or controlled" prong

not just because Al-Buthe is on the board, but because other indicia of Al-Buthe's control is

present such that the government could have a rational concern about Al-Buthe acting through

AHIF-Oregon.  He was more heavily involved with AHIF-Oregon than was Al-Aqil.  Not only

was Al-Buthe one of the founders, but he was its treasurer and was one of only two people with

access to its bank account.  He raised funds from Saudi Arabian sources and disbursed those

funds to AHIF-Oregon and he was the individual who delivered the money to AHIF-SA for use

in Chechnya.  Additionally, he continues to be heavily involved with the organization.  In fact,

even now, he is the source, or the fundraiser, of much of the money the organization has used to

pay its attorneys.  Al-Aqil, in contrast, resigned from the board in March of 2003 and from

AHIF-SA's board in January of 2004.  The administrative record contains no evidence Al-Aqil

was involved with AHIF-Oregon after his resignation or at the time of AHIF-Oregon's

designation.

Furthermore, now that AHIF-Oregon knows Al-Buthe's involvement is one of the agency's concerns, as it has known since the September 2004 designation, it is not clear to me why he has not yet resigned.

Given my acceptance of the government's argument that money is fungible, that even money used for charitable purposes frees up other money for violent activities, and that the law prohibits giving *any* financial support to or in support of terrorist acts, I am persuaded beyond a reasonable doubt that nothing AHIF-Oregon could have done would have changed the agency's decision, or would have changed my evaluation of the agency's decision. See AHIF, 585 F. Supp. 2d at 1253 (citing Humanitarian Law Project v. Reno, 205 F.3d 1130, 1136 (9th Cir. 2000), partly aff'd en banc, 393 F.3d 902 (9th Cir. 2004) (money is fungible and even contributions for peaceful purposes can be used for unlawful purposes); Farrakhan v. Reagan, 669 F. Supp. 506, 512 (D.D.C. 1987) ("no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security"); E.O. 13,224 at § (d)(i)).

Based on the above, I conclude that the due process violation was harmless. As a result, I dismiss Count II of plaintiffs' Supplemental Complaint.

II.    OFAC Did Not Violate the Fourth Amendment

The government's blocking order pending investigation was based on its "reason to believe" that AHIF-Oregon "may be engaged in activities that violate" the IEEPA. Decl. of Adam J. Szubin Attach. A ("Szubin Decl."). I found such an order constitutes a "'meaningful interference with an individual's possessory interests in that property'" such that it is a "seizure" for purposes of the Fourth Amendment. AHIF, 585 F. Supp. 2d at 1262-63 (quoting Soldal v.

Cook County, 506 U.S. 56, 61 (1992)).  I considered OFAC Director Adam Szubin's description

of the blocking process as "depriving the designated person of the benefit of the property,

including services, that might otherwise be used to further ends that conflict with U.S. interests."

Szubin Decl. ¶ 11.  I also considered OFAC's notice to the Jackson County Recorder of Deeds

notifying the clerk that AHIF-Oregon's real property is "blocked pending investigation by the

order of the United States Treasury Department" and prohibiting "[a]ny and all transactions"

including "the sale and conveyance of title or deed" unless "specifically licensed" by OFAC.

Szubin Decl. Attach. C.  Indeed, as Szubin explains more generally, "The blocking notice

provided to AHIF-Oregon on February 19, 2004, explained that, pursuant to E.O. 13224 and

IEEPA, any transfer, withdrawal, export, payment or other dealing in AHIF-Oregon's blocked

assets was prohibited without OFAC's prior authorization."  Szubin Decl. ¶ 73.

     Although the blocking is a seizure, such an action is constitutional if it is reasonable.  The

Fourth Amendment provides that the

> right of the people to be secure in their persons, houses, papers and effects, against
> *unreasonable* searches and seizures, shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by Oath or affirmation and particularly
> describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added).

     In analyzing whether the Fourth Amendment's warrant and probable cause requirements

apply, courts look first to whether the seizure would have been unreasonable at the time the

Fourth Amendment was framed.  If historical practices provide no insight, "we have analyzed a

search or seizure in light of traditional standards of reasonableness by assessing, on the one hand,

the degree to which it intrudes upon an individual's privacy and, on the other, the degree to

which it is needed for the promotion of legitimate governmental interests." <u>Virginia v. Moore</u>,

128 S. Ct. 1598, 1604 (2008) (citations and quotations omitted).

      A.     <u>The History of the Fourth Amendment is Not Revealing</u>

      Plaintiffs concede there is little legal guidance about seizures of property at the time of

the Framers. They contend that forfeiture is the closest analogy. In the forfeiture context, the

government must comply with the Fourth Amendment, and by federal statute, the government

may only temporarily seize property after complying with the warrant and probable cause

requirements. <u>United States v. Usery</u>, 518 U.S. 267, 284 (1996); 18 U.S.C. § 981(a)(1)(G)

(allows forfeiture of entity's assets engaged in planning or implementing terrorist act against

United States).

      The government disagrees that forfeiture is analogous since forfeiture involves a

permanent transfer of title. I, too, find the fit inapposite. Indeed, the purposes behind forfeiture

are different from those under the asset seizure program in that forfeitures "are designed

primarily to confiscate property used in violation of the law, and to require disgorgement of the

fruits of illegal conduct." <u>Usury</u>, 518 U.S. at 284. Here, as I examine more fully below, the

purpose of asset seizure is not as much punishment as it is prevention.

      The government reiterates its position that the Fourth Amendment does not apply because

no court has ever considered whether seizures undertaken pursuant to the Trading With the

Enemy Act ("TWEA") and IEEPA must comply with the Fourth Amendment. <u>See</u> <u>Regan v.</u>

<u>Wald</u>, 468 U.S. 222, 232-33 (1984); <u>Dames & Moore v. Regan</u>, 453 U.S. 654 (1981); <u>Orvis v.</u>

<u>Brownell</u>, 345 U.S. 183, 187-88 (1953); <u>Propper v. Clark</u>, 337 U.S. 472, 481-82 (1949). In

AHIF, I remarked that I was not persuaded by this argument because no litigant ever placed the issue before the Supreme Court.  585 F. Supp. 2d at 1262.

Nevertheless, while I maintain that these cases are not binding precedent on the question before me now, these cases inform my analysis of the reasonableness of the seizure.  See Mistretta v. United States, 488 U.S. 361, 401-02 (1989) (precedents may "reflect at least an early understanding" about a constitutional issue even when issues "not specifically addressed.").  As the government explains, in almost one hundred years of blocking actions, no court has considered whether such seizures need comply with the Fourth Amendment.  This precedent, combined with the fact that the President announced a national emergency pursuant to specific Congressional authorization, and the fact that the blocking action involves the interests of foreign nationals, are relevant considerations.  See, e.g. Nielsen v. Sec'y of the Treasury, 424 F.2d 833, 843, 839 (D.C. Cir. 1970) (blocked assets of Cuban national a "deprivation of property," but the court took a "broad view of the constitutional aspects" and held "no general constitutional inhibition that overrides a statute authorizing . . . a program that freezes the status within the United States of assets of a national of a foreign country 'designated' by the President"); Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1438 (9th Cir. 1996) ("level of deference" in foreign affairs "is so much greater" that an otherwise unconstitutional action restricting travel "may be valid in the foreign arena"); Regan v. Wald, 468 U.S. at 241-242  ("the Fifth Amendment right to travel, standing alone, [was] insufficient to overcome the foreign policy justifications supporting the restriction").

In short, as the government puts it,

> Requiring the Executive to obtain a warrant prior to imposing economic sanctions would be entirely inconsistent with the historical record and the long-established principle that the judiciary's role in foreign affairs is limited, as it would inject the judiciary into every executive decision to carry out financial sanctions involving assets in which foreign nationals have an interest.

Defs.' Supp. Mem. at 18.

Having found nothing in the historical practices suggesting the seizure would have been unreasonable at the time the Fourth Amendment was framed, and having concluded that the historical treatment of seizures under the TWEA and IEEPA informs the reasonableness of the government's actions, I now evaluate the exceptions posed by the government.

B.    The Special Needs Exception Applies

The government first relies on the concept that "'reasonableness is still the ultimate standard.'" Soldal, 506 U.S. at 71 (quoting Camara v. Mun. Court of San Francisco, 387 U.S. 523, 539 (1967)). According to the government, no probable cause or warrant requirement is necessary because the seizure of AHIF-Oregon's assets is per se reasonable. The government concludes that because AHIF-Oregon is a donor to international terrorist groups, its diminished expectation of privacy is outweighed by the government's strong interest in stopping terrorist financing. The government also compares the outcome of its balancing test to border searches, suggesting that, as in border searches, the interest of the "sovereign" outweighs any privacy interests.

Searches and seizures, however, are usually only "reasonable" when supported by probable cause and a warrant, except for "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). "Over and over again this Court

Page 23 - OPINION AND ORDER

has emphasized that the mandate of the Fourth Amendment requires adherence to judicial

processes, and that searches conducted outside the judicial process, without approval by judge or

magistrate, are per se unreasonable under the Fourth Amendment[.]" Id. (internal citations and

quotations omitted).

Aside from its argument that the blocking action is per se reasonable, which I am

unwilling to accept, the government relies on the special needs exception. The special needs

exception to the Fourth Amendment requirement for probable cause and a warrant was first

articulated by Justice Blackmun in his concurring opinion in New Jersey v. T.L.O., 469 U.S. 325

(1985). He stated, "Only in those exceptional circumstances in which special needs, beyond the

normal need for law enforcement, make the warrant and probable-cause requirement

impracticable, is a court entitled to substitute its balancing of interests for that of the Framers."

Id. at 351. The special needs exception has been applied in a host of non-criminal searches such

as searches of prisoners, parolees, and probationers, border searches, immigration stops and

searches, airport security, administrative searches, and military searches. See 2 John Wesley

Hall, Jr., Search and Seizure § 38.2 (3rd ed. 2000).

Accordingly, the two factors that must be present for the special needs exception to apply

are: (1) the primary purpose of the seizure must be beyond criminal law enforcement, Ferguson

v. City of Charleston, 532 U.S. 67, 81-86 (2001), City of Indianapolis v. Edmond, 531 U.S. 32,

41-47 (2000), United States v. Heckenkamp, 482 F.3d 1142, 1147 (9th Cir. 2007); and (2) a

warrant and probable cause must be impracticable, Griffin v. Wisconsin, 483 U.S. 868, 873

(1987); T.L.O., 469 U.S. at 351 (Blackmun, J., concurring).

I find the first factor met.  When analyzing the government's actions under this factor, courts undertake a "close review" to find whether the "purpose actually served . . . is ultimately indistinguishable from the general interest in crime control."  <u>Ferguson</u>, 532 U.S. at 81-82 (internal citation and quotations omitted) (policy was directed at "arrest and prosecution of drug-abusing mothers").  Courts consider the "programmatic purpose" and "distinguish[] general crime control programs and those that have another particular purpose, such as protection of citizens against special hazards or protection of our borders. . . . The nature of the 'emergency,' which is simply another word for threat, takes the matter out of the realm of ordinary crime control."  <u>In re: Sealed Case</u>, 310 F.3d 717, 745-46 (FISA Ct. Rev. 2002); <u>see also</u> <u>Heckenkamp</u>, 482 F.3d at 1147 (consider whether the search or seizure is "motivated by a need to collect evidence for law enforcement purposes or at the request of law enforcement agents"); <u>Edmond</u>, 531 U.S. at 41 (evaluate whether the "primary purpose [is] to detect evidence of ordinary criminal wrongdoing," comparing approved purposes of "policing the border" or "ensuring roadway safety" versus "uncover[ing] evidence" of drug crimes).[8]

Applying these cases, then, the primary focus of the asset seizure scheme used to freeze AHIF-Oregon's assets is not for criminal law enforcement purposes.  Rather, the President declared a national emergency due to the terrorist attacks in New York, Pennsylvania and the Pentagon, and directed that assets and property in the hands of specified governments, entities

---

[8]Based on these cases, I respectfully disagree with <u>KindHearts for Charitable Humanitarian Development, Inc. v. Geithner</u>, No. 3:08CV2400, __ F. Supp. 2d ___, 2009 WL 2514057, * 18-19 (N.D. Ohio Aug. 18, 2009).  In that case, the court considered the "method" and "modus operandi" of the asset seizure program, rather than the purpose behind the program, and concluded the blocking actions had "more in common with ordinary law enforcement activity."  <u>Id.</u>  As is clear from the cases I cite above, the focus of the inquiry is on the programmatic purpose of the activity, not the method by which the activity is carried out.

and individuals be frozen to stop future attacks.  The purpose of the asset seizure scheme is not to obtain information about whether the asset owner has committed an act of terrorism, but rather is to withhold assets to ensure future terrorist acts are not committed.  As OFAC Director Szubin explained in his first declaration, the purpose of the freezing order is to "depriv[e] the designated person of the benefit of the property . . . that might otherwise be used to further ends that conflict with U.S. interests.  Blocking assets of designated terrorists and their supporters prevents their possible use in the orchestration, assistance or support of unlawful and dangerous global terrorist plots."  Szubin Decl. at ¶ 11.  Director Szubin also explains that blocking assets preserves them for future legal judgments and allows the President to use the assets in negotiations with foreign governments.

My finding is consistent with cases in the context of searches of mass transit operations, like ferries and airplanes, in which courts have concluded that "[p]reventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs and go well beyond them."  Cassidy v. Chertoff, 471 F.3d 67, 82 (2nd Cir. 2006) (searches on Lake Champlain ferries justified as special need) (citing MacWade v. Kelly, 460 F.3d 260, 272 (2d Cir. 2006) (searches of baggage on subways justified as special need)).

As for the second factor, the government has persuasively explained why it is impracticable to obtain a warrant.  First, the government must act quickly to prevent asset flight. I agree with plaintiffs that this reason alone would be insufficient to satisfy the impracticability requirement since the government could seize first and obtain a warrant later.  The government has also explained, however, how impossible it would be to meet the specificity requirements in

an application for a warrant, and how difficult it would be to track down assets belonging to the

designated individual and apply for a warrant in each jurisdiction in which the asset is located.

Pursuant to the Fourth Amendment, a warrant requires a description of the "place to be

searched and the persons or things to be seized."  Here, however, as Szubin explains in his

supplemental declaration, OFAC and the President have Congressional authority to seize a wide

variety of property interests, ranging from money to mortgages, options to insurance policies,

merchandise to accounts payable, located both in the United States and elsewhere, the existence

of which are not always known to the agency at the time of the blocking order.  Szubin explains

that OFAC and the President often rely on the holder of the property to freeze the asset and report

to OFAC about the existence of the asset.  As a result, it would be difficult to apply for a warrant

for every asset in each jurisdiction in which the asset might be located.  Such a requirement

would interfere with the President's and OFAC's ability to act fast in blocking assets that are

often very liquid and transferrable.

Szubin further explains, "In many cases, the holders of blocked property have access to

substantially more information about the property than does OFAC and will be in the best

position to determine whether a blocked person has an interest in the property, particularly where

a third party is the nominal owner of the property and the blocked person's interest is indirect,

beneficial or contingent."  Supp. Decl. of Adam J. Szubin ¶ 8.  OFAC provides notice of

blocking actions through press releases and by updating its website, as well as by publishing a

notice in the Federal Register.  Once they have obtained notice, OFAC relies on holders of

blocked property "to comply with their obligations to identify and take appropriate steps to freeze

the property, including placing blocked funds into an interest-bearing blocked account in

Page 27 - OPINION AND ORDER

accordance with OFAC regulations. *See, e.g.*, 31 C.F.R. § 594.203." Id. at ¶ 9. Szubin also

explains that, technologically, banks and other financial institutions are in the best position to

track ownership of blocked assets and use interdiction software to identify assets that potentially

belong to a designated person.

In this way, the challenging circumstances OFAC faces are similar to the difficulties

faced by the probation officer in Griffin. Just as requiring a warrant prior to entering a

probationer's home would interfere with the probation system and make it difficult for a

probation officer to respond quickly to a potential violation of the conditions of probation, so too

would a warrant requirement here "make it more difficult to . . . respond quickly to evidence of

misconduct[.]" Griffin, 483 U.S. at 876.

Since I have determined that both the first and second factors apply in this special needs

analysis, I must now "assess the constitutionality of the search by balancing the need to search

against the intrusiveness of the search." Henderson v. Simi Valley, 305 F.3d 1052, 1059 (9th Cir.

2002); Ferguson, 532 U.S. at 78 ("we employ[] a balancing test that weigh[s] the intrusion on the

individual's interest in privacy against the 'special needs' that support[] the program").

As I noted in AHIF, the effect of the seizure of assets on AHIF-Oregon is "substantial.

The effect of the government's blocking and designation orders is effectively to close AHIF-

Oregon's doors." 585 F. Supp. 2d at 1259. AHIF-Oregon's assets have now been frozen for

more than five years. Nevertheless, a designated entity may seek a license from OFAC to engage

in any transaction involving blocked property. 31 C.F.R. §§ 501.801-.802.

On the other side of the scale, the government's interest in seizing the assets of

organizations with links to international terrorist organizations are substantial, as I have indicated

above.  I believe the government's interest in stopping the financing of terrorism outweighs

AHIF-Oregon's privacy interests.  See Propper, 337 U.S. at 481-82 (TWEA used to "deprive

enemies, actual or potential[,] of the opportunity to secure advantages to themselves or to

perpetrate wrongs against the United States" and does "necessitate[] some inconvenience to our

citizens and others").

  Finally, plaintiffs contend I must consider whether there are safeguards in place that act as

"constitutionally adequate substitute[s] for a warrant."  New York v. Burger, 482 U.S. 691, 703

(1987).  This factor is explicitly called for in the category of "closely regulated" businesses where

administrative searches take place to ensure compliance with a regulatory scheme.  See Griffin,

483 U.S. at 873 (citing cases for proposition that searches in such circumstances must meet

"reasonable legislative or administrative standards").  Where "some quantum of individualized

suspicion" is missing, the "safeguards are generally relied upon to assure that the individual's

reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'"

See Delaware v. Prouse, 440 U.S. 648, 653-55 (1979) (quoting Camara, 387 U.S. at 532).

  Here, however, OFAC froze AHIF-Oregon's assets due to its "reason to believe" that

AHIF "may be engaged in activities that violate" the IEEPA.  This reasonable suspicion standard

is equivalent to the standard applied in other special needs cases, such as T.L.O. and Griffin, and

is consistent with the standard of review courts use to evaluate designation decisions.  See AHIF,

585 F. Supp. 2d at 1252-53 ("rational," "supported by the administrative record," and

"reasonable belief that AHIF-Oregon provided support to SDGTs"); Holy Land Found. for Relief

and Dev. v. Ashcroft, 333 F.3d 156, 161-62 (D.C. Cir. 2003); IARA, 477 F.3d at 732.  Such a

standard is appropriate in cases of this kind, especially since "[t]he standard of probable cause is

Page 29 - OPINION AND ORDER

peculiarly related to criminal investigations, not routine, non-criminal procedures." Miranda v. City of Cornelius, 429 F.3d 858, 863 (9th Cir. 2005) (citing South Dakota v. Opperman, 428 U.S. 364, 371 n.5 (1976)); see also United States v. Knights, 534 U.S. 112, 121 (2001) ("Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."). Accordingly, because individualized suspicion is required before OFAC undertakes an asset seizure, no additional safeguards are necessary to act as a substitute for a warrant.

In sum, I find OFAC's seizure of AHIF-Oregon's assets was reasonable within the meaning of the Fourth Amendment because it was supported by the special needs of the government.

III.    Attorneys' Fees

OFAC authorizes licenses to release some blocked funds to pay legal fees and costs incurred "in seeking administrative reconsideration or judicial review of the designation or blocking pending investigation of a U.S. person . . . where alternative funding sources are not available." Pls.' Fed. R. Civ. P. Rule 56(f) Decl. of Counsel Ex. A; see also Pls.' Notice of OFAC Guidance on Legal Fees and Expenses Ex. 1.

AHIF-Oregon's attorneys submitted a request for fees through March 2008. OFAC denied AHIF-Oregon's request because AHIF-Oregon's attorneys "have already been paid from alternative funding sources in excess of the fee caps set forth in the policy." Defs.' Notice of OFAC's Decision.

Page 30 - OPINION AND ORDER

In AHIF, I agreed with the government that the Fifth Amendment does not require access to blocked fees to pay attorneys. I also agreed with the government that it has legitimate interests in blocking assets and that its decision to limit the fees counsel can obtain is rationally related to achieving those interests. I did not think that limiting the designated entity to two attorneys, caps on fees, or the fact that OFAC approves or denies the fee requests made the policy arbitrary and capricious.

Nevertheless, I concluded that OFAC's denial of fees on the basis that AHIF-Oregon has "already been paid from alternative funding sources in excess of the fee caps set forth in the policy" is arbitrary and capricious because it allows an entity to seek fees from OFAC first and then seek fees from other sources later. AHIF, 585 F. Supp. 2d at 1272. I concluded that AHIF-Oregon should not be penalized for raising "fresh" funds first and seeking blocked funds second.

Furthermore, I found OFAC's application of the caps on legal fees to be arbitrary and capricious in this case because OFAC caused the run-up in legal expenses in the administrative and judicial proceedings by not giving AHIF-Oregon a statement of the charges it faced when OFAC was considering designating it, and by redesignating it in the midst of this litigation. I concluded that applying the cap of $7,000 each for administrative and judicial proceedings, or $14,000 each for complex cases, without considering the events in this case, is arbitrary and capricious. I requested additional briefing on the appropriate remedy.

The government has clarified in its supplemental briefing that the policy does not unfairly allow a party to seek fees from other sources after it obtains a release of blocked funds from OFAC. Instead, OFAC's guidance states:

> Should additional fresh funds or legal defense funds be received after blocked
> funds are licensed and used for payment of legal fees and/or costs, then such
> additional funds must first be deposited into a blocked account until the amount
> previously unblocked is restored.  Any remaining funds may then be applied to
> legal fees and/or costs.

OFAC Guidance at 3.  In other words, if a blocked party receives funds from a new source, after

OFAC already provided funds for attorneys' fees from blocked assets, the blocked party is

required to return an amount equal to the blocked funds it received.  As a result, the timing I was

concerned about is rectified by this portion of the policy and, accordingly, I rescind my ruling

that the policy was arbitrary and capricious on this ground.

Plaintiffs' attorneys seek $108,834.52 in unreimbursed attorneys' fees and expenses

through January 2009.  Plaintiffs' attorneys have been paid from other sources in the amount of

$128,972.83.  They explain that they are seeking the difference in hourly fees between what they

have been paid from other sources (at $100/hour) and their reduced rate to their client

($250/hour).

As I noted in AHIF, I am bothered by OFAC's actions in causing AHIF-Oregon to

expend unnecessary resources in guessing at the charges it faced.  Nevertheless, I agree with the

government that since I previously concluded AHIF-Oregon does not have a constitutional right

to access the blocked assets, that OFAC has a rational basis to maintain the asset freeze, and that

OFAC's decision to limit fees is rationally related to the agency's interests, I must deny AHIF-

Oregon's request for attorneys' fees.  OFAC has a rational basis for its attorneys' fees policy,

since it allows an entity to hire an attorney when the entity has no other access to funds, and I do

not second guess the agency's rationale under the narrow review permitted by the Administrative

Procedures Act.  See 5 U.S.C. § 706(2)(A) (agency action must be "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law"); <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 378 (1989) (courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.").

Accordingly, I rescind my rulings to the contrary in <u>AHIF</u> and dismiss Count III of plaintiff's Supplemental Complaint.

IV.    <u>MCASO's Request for Clarification</u>

In <u>AHIF</u>, I held that the term "services" in the executive order is not vague because the term is a defined term, and does not give limitless discretion to OFAC as to what constitutes a "service." I held that, contrary to plaintiffs' assertion, the focus of the prohibition is on the provision of "services *to or in support of*" an SDGT, which implies cooperation between the entities, as opposed to independent advocacy. <u>AHIF</u>, 585 F. Supp. 2d at 1270. The government reported that under this language MCASO could speak out and express its views about the case and AHIF-Oregon's designation, could say whether it thinks the designation was right or wrong, and could promote multiculturalism. I concluded that MCASO's proposed activities "do not fall within the prohibition on providing 'services to or on behalf of' AHIF-Oregon." <u>Id.</u>

MCASO requests clarification of my ruling. Although the provision in the executive order prohibits services "to or in support of" a designated entity, the regulation prohibits providing services "on behalf of or for the benefit of" a designated entity. <u>Cf.</u> E.O. 13,224, §1(d)(i) <u>with</u> 31 C.F.R. § 594.406(a)(1). MCASO is concerned that while it may offer independent advocacy "in support of" AHIF-Oregon under the executive order, it will run afoul of the regulations' prohibition on independent advocacy which is "for the benefit of" AHIF-Oregon. MCASO wishes to protest AHIF-Oregon's designation, and advocate on its behalf and

for its benefit, by speaking about this case and AHIF-Oregon's designation in public, writing to

the newspaper, contacting government representatives, and demonstrating, but it is afraid its

activities will fall within the prohibition on providing "services" "on behalf of or for the benefit

of" a designated entity.  MCASO believes I failed to address the constitutionality of the

regulation.

> The applicable regulation reads as follows:
>
> § 594.406   Provision of services.
>
> (a) Except as provided in §594.207, the prohibitions on transactions or dealings involving blocked property contained in §§ 594.201 and 594.204 apply to services performed in the United States or by U.S. persons, wherever located, including by an overseas branch of an entity located in the United States:
>
> (1) *On behalf of or for the benefit of a person* whose property or interests in property are blocked pursuant to § 594.201(a); or
>
> (2) With respect to property interests subject to §§ 594.201 and 594.204.
>
> (b) Example: U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked pursuant to § 594.201(a).

31 C.F.R. § 594.406 (emphasis added).

The government reiterates its position from its earlier briefing, that nothing in the

regulations prohibit "independent advocacy in support of designated groups."  Defs.' Response to

Pl. MCASO's Request for Clarification at 1 (quoting Humanitarian Law Project v. U. S.

Treasury Dept., 463 F. Supp. 2d 1049, 1059-60 (C.D. Cal. 2007)).

The Ninth Circuit recently affirmed the district court's conclusion in Humanitarian Law

Project.  The Ninth Circuit held that the "'services' ban in the regulations implementing the

Page 34 - OPINION AND ORDER

Executive Order . . . indicate that one should not perform a useful professional or business task for a terrorist organization." Humanitarian Law Project v. U. S. Treasury Dept., 578 F.3d 1133, 1146 (9th Cir. 2009). The court could "see no basis for supposing" that the term "services" "could ensnare independent advocacy undertaken for the benefit of" terrorist organizations. Id. at 1147.

The court relied in part on the Secretary of Treasury's assertion that the "designation criteria [under the Executive Order] will be applied in a manner consistent with pertinent Federal law, including, where applicable the First Amendment to the United States Constitution." Id. (quoting 72 Fed. Reg. 4,206 (January 30, 2007)). The Ninth Circuit then commented, "This reflects the Treasury Department's intent to interpret its own regulations, including the ban on 'services,' to exclude independent advocacy because independent advocacy is always protected under the First Amendment." Id. Additionally, the court noted that the plaintiff could identify "no instance where any person engaged in independent advocacy has been subject to civil or criminal penalties under IEEPA for engaging in such conduct." Id. In the event of any concerns about compliance with the regulations, the court pointed out that the Department of Treasury offers multiple options to obtain advice about whether proposed activities would be permitted. These options include a telephone hotline, an e-mail hotline, and consultation with the Chief Counsel's office. Id. at 1147 n.13.

In short, to the extent AHIF needed to be clarified, I find that neither the executive order nor the regulation is vague. So long as MCASO acts independently, it may engage in the kinds of activities it describes.

**CONCLUSION**

For the foregoing reasons, I dismiss Counts II, VIII, and III of plaintiffs' Supplemental

Complaint.  Judgment will be entered dismissing plaintiffs' complaint with the exception of

MCASO's Count X as to the vagueness of the term "material support," in conformance with my

decision in AHIF.

IT IS SO ORDERED.

Dated this _____5_____ day of November, 2009.


                                    __/s/ Garr King_____
                                    Garr M. King
                                    United States District Judge